UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------X

In Re METLIFE
DEMUTUALIZATION
LITIGATION

CV 00-2258
(TCP)(AKT)

**AMENDED MEMORANDUM** and **ORDER**

-----------------------------------------------X

PLATT, District Judge.

Plaintiffs ("Movants" or "Federal Plaintiffs") in the Metlife Demutualization Litigation move this Court to enjoin a putative class action filed in New York State Supreme Court ("*Fiala*" or the "State action"), which was also brought against Defendants MetLife Co. and MetLife, Inc. and alleges similar claims. For the following reasons, Federal Plaintiffs' Motion to Enjoin is hereby **DENIED**.

## BACKGROUND

A thorough recitation of the facts may be found by reading this Court's previous decisions in this matter: *In re Metlife Demutualization Litig.*, 156 F. Supp. 2d 254 (E.D.N.Y. 2001) *In re Metlife Demutualization Litig.*, 322 F. Supp. 2d 267 (E.D.N.Y. 2004), and *In re Metlife Demutualization Litig.*, 229 F.R.D. 369 (E.D.N.Y. 2005). Nevertheless, as this inquiry is particularly fact intensive, the background of this case bears repeating.

**A.     The Demutualization**

On September 28, 1999, MetLife Co.'s Board of Directors approved a Plan of Reorganization (the "Plan") that would convert MetLife Co. from a mutual life insurance company to a stock life insurance company. *In re MetLife Demutualization Litigation*, 156 F. Supp. 2d at 258; (Fed. Pls.' Mem. Supp. Mot. Enjoin State Action ("Fed. Pls.' Mem.") at 2). The process of demutualization occurred in a number of stages. First, MetLife Co. policyholders' interests were extinguished. Second, all Eligible Policyholders received in return for their policies, consideration in the form of shares of MetLife Co. common stock - with 100% of MetLife Co. common stock (about 700 millions shares) allocated to the Eligible Policyholders (*See* Stamell Aff., Ex. 3 ("Plan of Reorganization") at Article II (defining "allocable common shares"); *see also* Plan of Reorganization ¶ 7.1(a).) Third, the former policyholders exchanged their shares of MetLife Co. common stock for cash, policy credits, or beneficial interests in the MetLife Policyholder Trust (the "Trust"). (Plan of Reorganization ¶¶ 7.1-7.3.) The Trust held shares of stock in the newly formed holding company, MetLife, Inc.[1] *In re MetLife Demutualization Litigation*, 156 F. Supp. 2d at 259.

On or about November 24, 1999, MetLife Co. issued each policyholder a Policyholder Information Booklet ("PIB"), wherein the Company recommended approval of the Plan. (*In re MetLife Demutualization* Appx. to

---

[1] MetLife's motivation for creating such a convoluted demutualization process is not known to this Court. Nonetheless, this process controls whether or not the State action will be enjoined.

Second Amended Compl., Ex. A ("Policy Information Booklet").) The PIB also stated that the demutualization would allocate 100% of MetLife Co. shares, and that these shares would be paid in the form of MetLife, Inc. stock, cash or policy credits. (Policy Information Booklet at 18.) Both parties' Complaints allege that the PIB contained untrue statements and omitted material facts that misled policyholders into approving the Plan. (Fed. Pls.' Mem. at 4.)

At some point prior to January 30, 2000 (the record is unclear exactly when) MetLife Co. allocated its 700 million shares of common stock to its policyholders. (*See* Fed. Pls.' Appx. of Cited Materials in Second Amended Complaint, Ex. C ("Read Me First pamphlet") at 3 (stating that "[o]n or after January 30, 2000, [policyholders] can inquire about the total number of shares allocated to you by calling MetLife[.]") According to MetLife documents, of the 700 million shares MetLife Co. distributed, 70% were exchanged for shares in the MetLife, Inc. Trust, 26% were exchanged for cash, and 4% were applied as policy credits. (Stamell Aff., Ex. 4 at MLSEC 11785.)

On February 18, 2000, individuals holding an interest in MetLife Co. voted on the demutualization plan. MetLife Co. reported that ninety-three (93%) of the nearly 2.8 million votes were cast in favor of demutualization. On April 4, 2000, the N.Y. Superintendent of Insurance approved the Plan. On the same day, MetLife, Inc. announced its IPO of MetLife, Inc. common stock at $14.25 per share. *In re MetLife Demutualization*, 156 F. Supp. 2d at 258-59. Though not clear from the parties' papers, it appears that on this day, the 70% of

MetLife Co. shareholders who elected MetLife, Inc. shares received their MetLife, Inc. shares. On April 7, 2000, MetLife Co. became a wholly owned subsidiary of MetLife, Inc. *Id.* at 259.

Both Federal and State Plaintiffs allege that MetLife, Inc. issued an excess supply of IPO shares, which depressed the stock price. Specifically, Plaintiffs allege that policyholders received only 54 cents on the dollar for their policies, and that dividends were reduced. (Fed. Pls.' Mem. at 4; State Pls.' Second Amended Complaint ("SAC") ¶ 18(e).) The excess shares were issued as part of MetLife Co.'s undisclosed (in the PIB) billion dollar share buyback plan. (State Pls.' SAC ¶ 18(a).) Only minutes after the stock started publicly trading did MetLife, Inc. announce the share buyback plan.[2] (State Pls.' Mem. Opp. Mot. Enjoin ("St. Pls.' Mem. Opp.") at 6.)

Between April 2000 and 2001, the market price of MetLife, Inc. stock almost tripled, and MetLife paid between $20.00 and $35.00 to buy back shares it had sold in the IPO for $14.25. (*Id.* at 6-7).

**B.    The State Action**

State Plaintiffs filed their original actions between January and March 2000 in New York Supreme Court, a few months prior to Federal Plaintiffs' filing, and also prior to MetLife Co.'s demutualization in April 2000. (State Pls.'

---

[2] State Plaintiffs allege that the excess issuance and subsequent buyback of shares served the interests of executives at MetLife Co. and MetLife, Inc. because the excess shares increased the companies' return on equity. Increases in return on equity directly increased bonus compensation for MetLife executives. (State Pls.' Mem. Opp. Mot. Enjoin ("State Pls.' Mem. Opp. at 7 n.4.)

4

Mem. Opp. at 5.) Unlike the federal action, which alleges violations of federal securities laws, the State action alleges common law fraud and violations of New York State Insurance Law § 7312. (State Pls.' SAC ¶¶ 76-81.) The Complaint was lodged against MetLife Co., MetLife Inc., and fifteen individual defendants. (State Pls.' Mem. Opp. at 5.) As noted above, the *Fiala* Plaintiffs allege there would have been greater consideration for their shares had Defendants not engaged in the share buyback plan.

The *Fiala* Plaintiffs also allege that their proposed class is substantially larger than Movant's class. The putative *Fiala* class consists of all MetLife Co. policyholders, while Movant's class contains only participating policyholders. *In re MetLife Dumutualization Litig.*, 229 F.R.D. 369, 372 (E.D.N.Y. 2005); (State Pls.' Mem. Opp. at 8.) Participating policyholders were those who had both a statutory interest in MetLife Co.'s surplus and a right to vote on matters submitted to policyholder votes such as director elections. *In re MetLife Dumutualization Litig*, 322 F. Supp. 2d at 259. According to MetLife documents, there are approximately 2.5 million nonparticipating policyholders who are included in the *Fiala* class but are not included in the class certified by this Court. (Stamell Reply Aff., Ex. D; Tr. at 18.) Other groups included in the State but not the Federal case are those policyholders who could not take shares and were forced to take cash or policy credits. (State Pls.' Mem. Opp. at 8; Tr. at 18.)

### C. The Federal Class Action

Like State Plaintiffs, Federal Plaintiffs allege that material information was omitted from the PIB, including *inter alia* the value of voting rights, and rights as beneficiaries in the Trust etc. *In re Metlife Demutualization Litig.*, 156 F. Supp. 2d at 260. The Federal action was brought only against the Companies, and not against any individuals.

**D.     Procedural History**

This Court has previously made three substantive rulings in this case. In July 2001, we denied Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). In 2004, we denied Defendants' Motion to Dismiss Plaintiffs' second claim for relief in the Second Amended Complaint brought under Section 10(b) of the Securities Exchange Act of 1934. In 2005, this Court granted Plaintiffs' Motion to Certify the Class.

On December 29, 2005, this Court signed an Order to Show Cause as to why an Injunction should not issue barring the *Fiala* litigation in State court. The parties submitted their papers in late January 2006 and Oral Argument on the Motion to Enjoin was held on February 3, 2006.

This Motion to Enjoin would have been rendered moot had Defendants chosen to remove the *Fiala* action to federal court. However, they chose not to, arguing that the entire action belonged in State court. (Tr. at 30.) Defendants took no position on the instant Motion.[3]

---

3   During oral argument, this Court inquired of the parties whether it had the power to *sua sponte* remove the State action to Federal court. However, as we find that the Court does not have original jurisdiction over the State action (because SLUSA does not apply to *Fiala*) the case may

6

On May 9, 2006, Defendants MetLife Co and MetLife, Inc. made a Motion for a Determination of the Certified Class and Federal Plaintiffs filed a brief in opposition. Some of the arguments Federal Plaintiffs make in that brief contradict positions they took in this Motion. Such contradictions will be discussed herein.

## DISCUSSION

**A. Securities Litigation Uniform Standards Act Background**

The questions presented here are whether the Securities Litigation Uniform Standards Act ("SLUSA") applies to the *Fiala* action, and if so, whether an exception to SLUSA allows *Fiala* to be brought in State court. To resolve these issues, a brief history of SLUSA is necessary.

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") to curtail abusive shareholder derivative suits which were brought not for the benefit of wronged shareholders, but for windfall plaintiffs attorneys' fees. *See Merrill Lynch, Pierce, Fenner & Smith v. Dabit*, ___ U.S. ___, 126 S.Ct. 1503, 1510 (2006). The PSLRA imposed heightened pleading requirements in actions brought under the federal securities law. *Id*. at 1511 (quoting 15 U.S.C. §§ 78u-4(b)(1),(2)). However, the PSLRA did not adequately curb these abusive lawsuits because members of the Plaintiffs' bar began filing shareholder class

---

not be removed. *See Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 33 (2002) (holding that Section 1441 "requires that a federal court have original jurisdiction over an action in order for it to be removed from a state court.")

actions in State court under State law to get around the statute. *Id*. To close this loophole, Congress passed SLUSA in 1998, which made "federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001).

The core provision of SLUSA preempts certain class actions which are based on state law. It reads as follows:

> (1) CLASS ACTION LIMITATIONS. No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--
>
>> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
>
> (2) Removal of covered class actions
>
> Any covered class action in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f)(2).

Section 78bb(f)(3), known as the Delaware Carve Out, excludes certain types of covered class actions from preemption. The Section reads as follows:

> (3) Preservation of certain actions --

8

> (A) Actions under State law of State of Incorporation
> (i) Actions Preserved
>
> Notwithstanding paragraph (1) or (2), [above], a covered class action described in clause (ii) of this subparagraph that is based upon the statutory or common law of the State in which the issuer is incorporated (in the case of a corporation) or organized (in the case of any other entity) may be maintained in State or Federal court by a private party.
>
> (ii) Permissible actions. A covered class action is described in this clause if it involves --
>
>> (I) the purchase or sale of securities by the issuer or an affiliate of the issuer exclusively from or to holders of equity securities of the issuer; or
>>
>> (II) any recommendation, position, or other communication with respect to the sale of securities of an issuer that--
>>
>>> (aa) is made by or on behalf of the issuer or an affiliate of the issuer to holders of equity securities of the issuer; and
>>>
>>> (bb) concerns decisions of such equity holders with respect to voting their securities, acting in response to a tender or exchange offer, or exercising dissenters' or appraisal rights.

15 U.S.C. § 78bb(f)(3).

As noted above, State Plaintiffs argue that the *Fiala* action fits into the Delaware Carve Out. To resolve this question, we must first consider whether *Fiala* is a covered class action. SLUSA defines "covered class action" in pertinent part as "any single lawsuit -- in which damages are sought on behalf of more than 50 persons or prospective class members and questions of law or fact common to those persons . . . predominate over any questions affecting only individual persons or members[.]") 15 U.S.C. § 78bb(f)(5)(B). Here, the *Fiala*

9

Plaintiffs assert claims on behalf of approximately 10 million Eligible Policyholders and allege common questions of law or fact, concerning fraud in the demutualization of MetLife. Indeed, both parties essentially agree that *Fiala* is a covered class action. (Fed Pls.' Mem. at 1; State Pls.' Mem. Opp. at 10-11.) Accordingly, the *Fiala* action may fit into the Delaware Carve Out.

**B. The Delaware Carve Out**

There are three issues we must consider in determining whether *Fiala* may be exempted from SLUSA pursuant to the Delaware Carve Out (1) whether MetLife Co, or MetLife, Inc. was the "issuer" under Section 78bb(f)(3)(A)(i), (2) whether plaintiffs may be considered holders of equity securities under Section 78bb(f)(3)(A)(I), and (3) whether Defendants made any recommendations to these holders of equity securities which concerned voting pursuant to Section 78bb(f)(3)(A)(II). We shall take each issue in turn.

1. <u>The Issuer</u>

Federal Plaintiffs contend that *Fiala* is not based upon the statutory or common law of the State in which the issuer is incorporated because the action is based on New York law and the issuer is MetLife, Inc., a Delaware Corporation. *Fiala* Plaintiffs respond that the issuer is actually MetLife Co, a company incorporated in New York. (State Pls.' Mem. Opp. at 10.)

Federal Plaintiffs argue that State Plaintiffs mischaracterize their

Complaint in order to claim that MetLife Co. is the issuer. According to Federal Plaintiffs, the *Fiala* Complaint alleges fraud in the IPO conducted by MetLife, Inc., and does not focus on MetLife Co. (Pl.'s Reply Mem. at 1.) However, this argument minimizes the extent to which the *Fiala* Complaint alleges wrongdoing by MetLife Co. prior to the April 4, 2000 IPO. Firstly, the Complaint (which lists both MetLife Co. and MetLife, Inc. as Defendants) proposes a class which includes all MetLife Co. policyholders, not just those who elected interests in MetLife, Inc. shares. (State Pls.' SAC ¶ 15.) Secondly, the Complaint alleges that Defendants made material omissions in the PIB, a document which was issued by the Board of MetLife Co. prior to the IPO. *See supra* pp. 2-3; (State Pls.' SAC ¶ 36) Thirdly, the Plan of Reorganization - the framework in which the fraud occurred - was formulated by the Officers and Directors of MetLife Co. in 1998-1999. (State Pls.' SAC ¶¶ 4-10; State Pls.' SAC ¶ 27 ("[I]n 1998-1999, the Individual Defendants considered and eventually proposed a demutualization.") Lastly, the Complaint alleges that it was MetLife Co.'s directors and officers who developed the plan to sell excess IPO shares prior to the distribution of the PIB. (State Pls.' SAC ¶ 41 (Defendants formed the buyback plan "prior to the mailing of the PIB to policyholders.").) Thus, contrary to Movants' arguments, the *Fiala* Complaint focuses on the actions of MetLife Co., and thus it is reasonable for the *Fiala* Plaintiffs to now contend that MetLife Co. is the relevant issuer.

Moreover, Movants basically concede in their opposition to Defendants' Motion for a Determination Regarding the Membership of the

Certified Class that MetLife Co. is the issuer. In that brief, Movants argue that the class consists of all individuals who were allocated MetLife Co. shares, not just those who elected interests in MetLife, Inc. shares.[4] (Pls.' Mem. Opp. Def.'s Mot. Certified Class at 1-6.) At the very least, it is questionable for Movants to argue that MetLife, Inc. is the issuer, while attempting to include policyholders in their class who never received stock in MetLife, Inc.[5]

Lastly, the Delaware Carve Out does not indicate that there must be only one set of relevant shares. A permissible action is any covered class action which "involves the purchase or sale of securities by the issuer[.]" § 78bb(f)(3)(A)(ii). The definition of "involve" is quite broad, indicating that a number of securities may be purchased or sold. *See* Webster's II New Riverside Dictionary (Rev. Ed. 1996) at 367 (defining "involve" as "to contain as a part.") Thus, the Delaware Carve Out could apply to both MetLife Co. and MetLife, Inc.

---

[4] Federal Plaintiffs make the following argument in their Memorandum in Opposition to Defendants' Motion:

> "The Class is defined by the terms MetLife used in the demutualization plan (the 'Plan'). All policyholders received an 'allocation . . . of Allocable [MetLife Co.] Common Shares . . . .'[] The shares were then 'paid in the form of [MetLife Inc.] stock, cash or policy credits.'[] The complaint and the class motion define the Class to include all policyholders who received cash and credits[.]"

(Pls.' Mem. Opp. Defs.' Mot for a Determination of Certified Class at 1 (quoting the Plan § 7.1).)

[5] It could also be argued (although Movants' fail to make such argument) that an "issuer" is an entity which issues a "covered security." A covered security is essentially a security which is listed on the New York Stock Exchange ("NYSE"). 15 U.S.C. § 78bb(5)(E). MetLife, Inc. shares are listed on the NYSE, while MetLife Co. shares apparently are not. (Fed. Pls.' Mem. at 10-11.) However, Section 78bb(f)(3)(A)(ii), unlike Section 78bb(f)(1) uses the term "securities" as opposed to "covered securities" indicating that an issuer does not necessarily have to issue a covered security for the Delaware Carve Out to apply. *See United States v. Capobianco*, 836 F.2d 808, 811 (3d Cir. 1988) (holding that omissions in statutes are generally intentional).

shares.

For all these reasons, this Court finds that MetLife Co., a New York Company, was an issuer for purposes of the Delaware Carve Out, and accordingly that the *Fiala* action is based upon the law of the State in which the issuer is incorporated.

2. Holders of Equity Securities, 15 U.S.C. § 78bb(f)(3)(A)(ii)(I)

To satisfy Section 78bb(f)(3)(ii)(A)(I) of the Delaware Carve Out, State Plaintiffs argue that the demutualization involved a purchase of securities by MetLife, Inc., an affiliate of the issuer MetLife Co., exclusively from holders of equity securities of the issuer, MetLife Co. (State Pls.' Mem. Opp. at 10.) This assertion is correct. First, MetLife, Inc. is an affiliate of MetLife Co. SLUSA defines "affiliate" as "a person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with, the issuer." 15 U.S.C. § 78bb(5)(A). There is no question that MetLife Co. - a wholly owned subsidiary of MetLife, Inc. - is an affiliate of MetLife, Inc. *See In re MetLife Demutualization*, 229 F.R.D. at 259. Indeed, Movants do not dispute this point. Second, the Plan indicates that MetLife, Inc. shareholders purchased their interests from MetLife Co. *See supra* p. 2; (Plan of Reorganization § 7.3(a).)

Movants argue in response that the IPO shares of MetLife, Inc. were not issued *exclusively* to current equity holders (holders of MetLife Co. shares) because some IPO shares were issued to the public. (Fed. Pls.' Reply

Mem. at 7 n.12.) However, the proper analysis would be whether the IPO shares that were sold to the public were allocated by MetLife Co. As Movants do not undertake this analysis, their argument must fail.[6]

3. Recommendations to Holders of Equity Securities § 78bb(f)(3)(ii)(II)

Even assuming that the *Fiala* action did not satisfy Section 78bb(f)(3)(A)(ii)(I), it would still fit into the Delaware Carve Out because the action involves a recommendation with respect to voting on the sale of securities for purposes of Section 78bb(f)(3)(A)(ii)(II).

The PIB recommended numerous times that the demutualization be approved. (*See* Policy Information Booklet at 7 (containing a two paragraph section under the heading "How will the demutualization benefit MetLife and its policyholders?"); *see also* Policy Information Booklet at 49 (stating the Board's finding that the Plan was fair and equitable to policyholders, and its recommendation that policyholders vote "YES" in favor of approving the plan).) These recommendations were made on behalf of MetLife Co., the issuer, to the holders of equity securities of the issuer - the MetLife Co. policyholders, who were allocated shares of the company. These recommendations concerned MetLife Co. shareholders' decisions with respect to voting in favor or against the demutualization plan.

Federal Plaintiffs essentially argue that the policyholders were not

---

[6] It should be noted that Movants also failed to provide this Court with the percentage and number of MetLife, Inc. shares that were provided to the public.

equity security holders during the relevant time period, and thus, State Plaintiffs do not meet the Section 78bb(f)(3)(A)(ii)(II) test. (*See* Fed. Pls.' Reply Mem. at 7.) Their assertion is belied by the time-line of events. While the PIB was distributed on November 24, 1999, perhaps prior to the allocation of MetLife Co. shares (which ended January 30, 2000), the recommendations in the document were not acted on until February 18, 2000, when the MetLife Co. shareholders voted for the demutualization.[7] The fact that the demutualization was not voted on for a few months after the recommendations were made indicates that such recommendations were on-going in nature and carried over to when the policyholders received their MetLife Co. common stock. (Plan § 3.1(c).) (St. Pls.' Mem. Opp. at 13.) Accordingly, the recommendations were made to the holders of equity securities of the issuer.

Movants argue that the *Fiala* class includes non-participating policyholders who received the PIB and that these individuals may not be considered equity security holders because they received no equity in MetLife Co. (Federal Pls.' Reply Mem. at 7.) Movants' are technically correct; however, their

---

[7] In the Plan, MetLife included under the heading "Form of Reorganization", the following language:

> (c) the Policyholders Membership Interests will be extinguished and the Eligible Policyholders will receive in return consideration in the form of shares of [MetLife Co.] Common Stock (which shall *then* be exchanged for an equal number of shares of [MetLife, Inc.] Common Stock to be held through the Trust), cash or Policy Credits, in each case in proportion to the Eligible Policyholders' allocations of Allocable Common Shares.

(Plan § 3.1(c) (emphasis added).)

Thus, the policyholders received MetLife Co. shares prior to receiving MetLife, Inc. shares during the IPO.

15

argument does not imply that *Fiala* fails to satisfy Section 78bb(f)(3)(A)(ii)(II). Again, the broad language of the Section controls. The class action need only "involve" a recommendation with respect to the sale of securities. The statute does not state, nor even imply, that all class members must be able to act on such recommendation. Accordingly, Federal Plaintiffs' arguments fail and Section 78bb(f)(3)(A)(ii)(II) excludes the *Fiala* action from SLUSA.

## CONCLUSION

For the foregoing reasons, Federal Plaintiffs' Motion to Enjoin a State Action is hereby **DENIED**.

**SO ORDERED.**

/S/_____
Thomas C. Platt, U.S.D.J.

Dated: August 28, 2006
       Central Islip, New York