**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

IN RE                                              **MEMORANDUM**
METLIFE DEMUTUALIZATION                        **AND ORDER**
LITIGATION,

----------------------------------------------------------X        CV 00-2258 (TCP) (AKT)

This document relates to all actions
----------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

Plaintiffs have filed three separate motions to compel the production of documents by

MetLife Co. and MetLife Inc. (collectively, "MetLife" or "Defendant") as well as MetLife's

outside counsel Debevoise & Plimpton LLP ("Debevoise").   Specifically, Plaintiffs seek the

production of approximately 1,400 documents for which MetLife has asserted a claim of

privilege as well as the production of documents in the possession of Debevoise relating to tax

advice provided to MetLife in connection with MetLife's demutualization.

**I.       Background**

A thorough recitation of the facts may be found by reading Judge Platt's previous

decisions in this matter:  *In re MetLife Demutualization Litig.,* 229 F.R.D. 369 (E.D.N.Y. 2005);

*In re MetLife Demutualization Litig.,* 322 F. Supp. 2d 267 (E.D.N.Y. 2004)**;**  *In re MetLife*

*Demutualization Litig.*, 156 F. Supp. 2d 254 (E.D.N.Y. 2001).  Familiarity with these facts is

therefore presumed and I will only briefly summarize those facts which are applicable to these

motions.

_____In April 2000, MetLife changed from a mutual life insurance company to a stock life

insurance company, a process known as "demutualization."  This action was originally filed in

April 2000 as a class action alleging a non-fraud securities violation concerning the allocation of

ten shares of MetLife stock to each policyholder and the cost of a policyholder trust.  Pl. June 1,

2006 Mem. at 2.  An Amended Complaint was filed in 2004, asserting claims pursuant to Section

12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2) and Section 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b).  This matter has been certified as a class action by

Judge Platt.  *See In re MetLife Demutualization Litig.,* 229 F.R.D. 369 (E.D.N.Y. 2005).  The

Plaintiff Class includes "all persons who were participating [MetLife] Policyholders on or about

September 28, 1999, for whom MetLife Co. calculated a positive actuarial equity share

("participating policyholders") and whose rights as participating policyholders were exchanged

for shares of stock in MetLife Co., pursuant to Defendant's plan of demutualization."  *In re*

*MetLife Demutualization Litig.,* 229 F.R.D. at 372.

      According to Plaintiffs, the principal vehicle for carrying out the alleged securities fraud

was the prospectus that MetLife delivered to policyholders to solicit their vote on the

demutualization (the "Prospectus").  *Id.*  The Prospectus included the Policyholder Information

Booklet Parts One and Two ("PIB"), a letter from MetLife's Chairman, a brochure entitled

"Important! Read Me First!," a ballot and a notice of a January 24, 2000 public hearing to be held

by the Superintendent of Insurance of the State of New York to determine whether the Plan was

fair and equitable and should be approved.  Def. June 9, 2006 Mem. at 1.

      Plaintiffs allege that as a result of the demutualization, and in exchange for their rights as

participating policyholders, they "received only 54 cents on the dollar for their policies, that

dividends were reduced, and that MetLife engage[d] in fraud by not stating this in the

[Prospectus]."  *In re Metlife Demutualization Litig.,* 322 F.Supp.2d at 269.  Specifically, Plaintiffs

allege that MetLife made four misrepresentations in the Prospectus: (i) omitting to state that the

actuarial method used to calculate policyholders' contributions to MetLife's surplus arrived at a value of $15,300,000,000, far higher than the $8,400,000,000 in stock that these policyholders received as compensation; (ii) omitting to state that MetLife's method of reorganization, i.e., an exchange of policies for stock with the right to elect cash, as opposed to an exchange of policies for cash with the right to elect stock, was chosen for the benefit of MetLife and not the policyholders, because Plaintiffs would allegedly have received double the compensation under the latter method; (iii) omitting to state that policyholders would surrender their right to annual dividends from their contributions to MetLife's surplus; and (iv) misstating that reasonable dividends would "continue to be paid as declared," when, in Plaintiffs' view, the assets allocated to pay dividends had been limited. *Id.*

## II.  Procedural History

The first motion to compel which is the subject of this Memorandum and Order was filed by Plaintiffs on June 1, 2006, and seeks an order compelling Defendant to produce certain documents which Defendant claims are privileged, pursuant to the attorney-client privilege and the work product doctrine, and which are therefore immune to production.  The documents, according to Plaintiffs, were prepared for the public hearing on MetLife's demutualization and include a Briefing Book used at the hearing as well as related drafts, memoranda and e-mails. Plaintiffs sought the production of 63 documents protected by the work product doctrine, 84 protected by the attorney client privilege, and 191 additional documents protected by both.  Def. June 9, 2006 Mem. at 3-4.  Plaintiffs argued that any privilege had been waived as to a Briefing Book containing testimony to be given by witnesses at the Public Hearing to consider the Plan, as well as to a draft response written by lawyers answering questions raised at the public hearing,

because those documents had been inadvertently produced by a third party. Plaintiffs also challenged Defendant's assertion of privilege with respect to the remaining documents prepared for the public hearing on the following grounds: (a) the documents were intended for public distribution and therefore no privilege applies; (b) the documents were not prepared in anticipation of litigation; (c) the privilege was waived because the documents were provided to a third party; (d) Defendant waived any privilege by affirmatively claiming that it did not have guilty knowledge of the fraud at issue; (e) the documents should be disclosed under the crime-fraud exception to the attorney-client privilege; and (f) under the *Garner* doctrine, MetLife cannot assert a claim of privilege against its shareholders. *See* Pl. June 1, 2006 Mem. at 1-2.

Plaintiffs filed a second motion to compel on July 10, 2006. In connection with this second motion, Plaintiffs seek an order from the Court requiring MetLife to "produce drafts of the Plan of Reorganization, the PIB, the remainder of the Prospectus, the S-1, and requests for legal advice and responses from outside counsel, and witnesses to testify about the documents." Pl. July 10, 2006 Letter Mot. at 2. According to Plaintiffs "[t]his is the only way plaintiffs can obtain direct evidence that MetLife intentionally omitted facts to deceive policyholders." *Id.* Plaintiffs contend that the arguments set forth in their original motion to compel concerning the crime-fraud exception, the *Garner* doctrine, and waiver by affirmative defense apply equally to the documents sought by their second motion to compel. Defendant repeats its position with respect to each of these legal arguments and also contradicts Plaintiffs' assertion that Plaintiffs have a need for privileged communication to obtain otherwise unavailable information about the alleged fraud. According to Defendant, the information allegedly omitted was either (1) never

omitted at all, but rather was moved to a separate section of the Prospectus or (2) omitted at the request of the Securities and Exchange Commission. *See* Def. July 13, 2006 Letter at 3.

Following oral argument on the first two motions to compel, the parties were ordered to meet and confer regarding, *inter alia,* "the documents as to which a claim of privilege (attorney-client and work product) has been asserted and which Plaintiffs argue should be produced." July 20, 2006 Order. The parties were directed to provide the Court with a detailed list of the documents covered by the first two motions to compel and as to which the parties were unable to reach agreement. *Id.* In addition, Defendant's counsel was advised that the Court did not have sufficient information and support from any individual with first-hand knowledge of the facts which would shed light on the preparation of these documents in order for the Court to render a decision on the motions to compel. *Id.* Accordingly, Defendant was afforded an opportunity to provide additional support for its claims of privilege by filing an affidavit from an individual with first-hand knowledge of facts supporting Defendant's assertions of privilege. *Id.*

Shortly after the hearing on Plaintiffs' first two motions to compel, Plaintiffs moved the Court for a third time seeking an order to compel, this time "requiring MetLife's outside counsel . . . to produce all subpoenaed documents relating to its tax opinion published in the Policyholder Information Booklet and its related work as independent tax counsel in MetLife's demutualization." Pl. Aug. 2, 2006 Letter Mot. Defendant objects to the production of the requested tax related documents on the grounds that (1) such documents are not relevant to the claims asserted in the Second Amended Complaint, and (2) to the extent the Court finds such documents are relevant, the majority of the documents requested are privileged communications. *See* Def. Aug. 11, 2006 Letter. The documents that are responsive to this request which

5

Defendant claims are privileged are not included on any of the privilege logs provided to the Court to date. Nevertheless, Plaintiffs take the position that the arguments with respect to attorney-client privilege which it has set forth in the two prior motions (waiver by denial of guilty knowledge, *Garner* doctrine and crime-fraud exception) relate to these documents as well.

Defendant has "withdrawn the assertion that (1) the public hearing on the Plan constitutes litigation, and (2) certain documents prepared for the public hearing were also prepared in anticipation of court litigation." Def. Supp. Br. at 2. Accordingly, Defendant has agreed to produce those documents prepared for use at the public hearing that were withheld from production solely on work product privilege grounds. However, Defendant maintains its claim of privilege as to drafts of documents used at the public hearing which purportedly contain attorney client communications.

On August 15, 2006, the parties provided the Court with a list containing 1,577 entries representing the documents for which the parties could not reach an agreement regarding privilege. That list was revised and shortly thereafter, the Court was provided with another list containing 1,583 entries, describing the document, author, recipients and basis for the claim of privilege. On September 8, 2006, the Court received a log listing the basis for Plaintiffs' objections to Defendant's claim of privilege. I note for the record that the following three objections are asserted by Plaintiffs for over 1,400 of the 1,600 documents on the privilege log: (1) Defendant waived any privilege by affirmatively claiming that it did not have guilty knowledge of fraud; (2) the *Garner* doctrine precludes MetLife from asserting a claim of attorney client privilege against Plaintiffs; and (3) the documents listed on the privilege log must be disclosed under the crime-fraud exception to the attorney-client privilege. Defendant argues that

Plaintiffs have not articulated any grounds for disputing privilege as to 1,327 documents on Defendant's log which do not relate to the topics that Plaintiffs have identified as the subject of their motion to compel (i.e., drafts prepared before the public hearing, drafts of the Plan of Reorganization, the PIB, the remainder of the Prospectus, the S-1, and tax related documents). Def. Supp. Br. at 2. Thus, according to Defendant, this Court should summarily deny Plaintiffs' motion as to those 1,327 documents. Plaintiffs take the position that each one of those documents falls within one of the legal arguments advanced above with respect to privilege.

There are five issues, then, that must be decided in connection with the three pending motions to compel:

(1) are the tax documents relevant and, if so, are they privileged or has privilege been waived?

(2) to what extent are draft documents privileged generally (which will impact any finding with respect to the tax documents as well)?

(3) has Defendant waived any privilege by affirmatively claiming that it did not have guilty knowledge of the fraud?

(4) does the *Garner* doctrine preclude MetLife from asserting a claim of attorney client privilege, and if so, have Plaintiffs established "good cause" to require the production of the privileged documents? and

(5) to what extent, if any, should the 1,400 documents listed on the privilege log and challenged by Plaintiffs be disclosed under the crime-fraud exception to the attorney-client privilege?

III.    **Discussion**

A.    **Relevancy of the Tax Documents**

Plaintiffs seek the production of all "documents relating to [Debevoise's] tax opinion published in the PIB and its related work as independent tax counsel." Pl. Aug. 2, 2006 Letter Mot. According to Plaintiffs, "this tax discovery relates to omissions regarding the closed block and to obtaining evidence that contradicts MetLife's Rule 30(b)(6) testimony." *Id.* More specifically, Plaintiffs contend that MetLife's tax disclosures "omit any information about the loss in $3 billion in tax benefits caused by the closed block." *Id.* at 2. At oral argument, counsel for Plaintiffs again stated that Plaintiffs were interested in the tax analysis issue with respect to the closed block. Defendant contends that "[t]he tax implications to MetLife of a hypothetical overfunding of the closed block have nothing to do with the tax disclosures that are referenced in the Tax Opinion." Def. Aug. 11, 2006 Letter. Debevoise takes the position that its tax opinion discussed the tax consequences to eligible policyholders of the exchange of their shares rather than tax implications for MetLife flowing from the demutualization generally. *Id.*

Plaintiffs also argue that they are entitled to discovery from Debevoise relating to its tax opinion and its associated work as independent tax counsel in connection with the demutualization to undermine MetLife's asserted positions in this case, such as those set out by its Rule 30(b)(6) witnesses. Pl. Aug. 2, 2006 Letter Mot. at 2. As Defendant points out, "Plaintiffs do not . . . cite any deposition testimony that they claim contradicts the private letter ruling request, nor do they explain even generally the nature of the supposed contradictions, or

how the alleged inconsistencies would be material to any issue in this case." Def. Aug. 11, 2006 Letter at 2.

Rule 26 sets forth the general standards for discovery and provides:

> that [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . . The information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to discovery of admissible evidence.

*Baxter v. A.R. Barron & Co., Inc.*, No. 94 CIV 3913, 1996 WL 709624, at *1 (S.D.N.Y. Dec. 10, 1996).

In his June 2004 Order denying Defendant's motion to dismiss, Judge Platt ordered discovery to go forward concerning "the circumstances under which the decision on how to value contributions to the surplus was arrived at, and how this decision was explained to policyholders, and also as to the funding of the 'Closed Block' and the issuance of dividends." *In re MetLife Demutualization,* 322 F. Supp. at 273. The discovery requested by Plaintiffs from Debevoise, however, relates to issues beyond those included in Judge Platt's Order, i.e., the accuracy of outside counsel's tax opinion and any tax advice rendered in connection with the demutualization. To the extent the tax documents in possession of Debevoise relate to the surplus, the funding of the closed block, or the tax consequences flowing from the issuance of dividends, those documents are relevant. Any other tax documents are not. To the extent Plaintiffs contend that certain tax related documents are necessary for cross-examination purposes, Plaintiffs have not sufficiently identified the subject matter of those documents and production will therefore not be compelled. Thus, Plaintiffs' motion to compel the production of tax documents is hereby GRANTED to the limited extent described above. This ruling does not

affect any assertion of attorney-client privilege Debevoise may make with respect to the relevant documents.

**B.    <u>Standards For Attorney-Client Privilege and Waiver</u>**

Plaintiffs have asserted only federal claims and therefore federal law determines the substance of the attorney-client privilege. *See* Fed. R. Civ. P. 501; *In re Omnicom Group Inc. Sec. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006). To invoke the attorney-client privilege under federal law, a party must demonstrate that there was:

> (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice

*United States v. Construction Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir. 1996). The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *United States v. Zolin,* 491 U.S. 554, 562 (1988). The attorney-client relationship exists because "'sound legal advice or advocacy serves public ends and . . . such advice or advocacy depends upon the lawyer's being fully informed by the client.'" *United States v. Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 182 (2d Cir. 2000) (quoting *In re von Bulow*, 828 F.2d 94, 102 (2d Cir.1987)). The party asserting the privilege bears the burden of proof that the privilege is applicable. *See In re Grand Jury Subpoena Dated Dec. 19, 1978*, 599 F.2d 504 (2d Cir. 1979).

The attorney-client privilege is not absolute and, in certain circumstance, it can be waived.[1] *See, e.g., In re Napster, Inc. Copyright Litig.,* Nos. 06-15886, 06-72515, 2007 WL

---

[1]    Plaintiffs have not challenged Defendant's assertions of work product privilege other than with respect to the materials prepared in anticipation of the public hearing in January 2000. Defendant has withdrawn its claim of work product with respect to those materials. Because it

754748 (9th Cir. Mar. 14, 2007). As recognized in *Chase Manhattan Bank v. Drysdale Sec. Corp.,* 587 F. Supp. 57, 58 (S.D.N.Y. 1984),

> [a]ll of the established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party.

*Id.* The court also noted that "the burden is particularly high on one seeking to pierce the attorney-client privilege." *Id.*

Plaintiffs argue that the attorney-client privilege has been waived by Defendant for a number of reasons: <u>first</u>, the privilege has been waived with respect to all drafts of documents that ultimately became public; <u>second</u>, Defendant's publication of a tax opinion drafted by Debevoise waives any privilege with respect to the subject matter of that opinion letter; and <u>third</u>, MetLife waived any claim of privilege that may have attached to over 1,400 of the documents on the privilege log by claiming in its answer that "it did not act with the intent to deceive and did not know of any untruth or omission," thereby claiming that it did not have guilty knowledge of the alleged fraud.

1. *Waiver Of The Privilege As To Drafts*

Plaintiffs seek the production of certain categories of documents withheld from production on the basis of privilege, arguing that these materials were drafts of documents that were ultimately made available to the public, and, therefore, any privilege has been waived. Pl. June 1, 2006 Mem. at 7 (citing *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958)).

---

has not been raised by the parties, the Court has not addressed whether any claim of work product has been waived.

Plaintiffs rely upon this argument to support their motion to compel the production of all drafts of the Briefing Book, the Plan of Reorganization, the PIB, the remainder of the Prospectus, the S-1, and requests for legal advice and responses from outside counsel relating to any of the foregoing drafts. *See* Pl. June 1, 2006 Mem. at 7; Pl. July 10, 2007 Letter Motion at 2. Relying upon *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459, 474 (S.D.N.Y. 1996), Defendant argues that the attorney-client privilege for draft documents not disclosed to the public (even where the final version is distributed to the public) is not waived. In further support of its position, MetLife has submitted affidavits from Ira Friedman, Senior Vice President and Chief Privacy Officer of Metropolitan Life Insurance Company and Joseph A. Reali, Vice President and Tax Director of Metropolitan Life Insurance Company. Both individuals were involved in different capacities with the demutualization and have submitted affidavits asserting that the drafts were prepared and revised by counsel as legal advice to the Company, were intended to be confidential and were in fact kept confidential to the best of their knowledge. *See* Friedman Aff. at ¶¶ 11 - 17; Reali Aff. at ¶¶ 8, 18, 19 - 24.

The Second Circuit has expressly held that drafts of documents which may ultimately become public may be privileged if the drafts reflect a party's confidential request for legal advice. *See, e.g., In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983 (Marc Rich & Co. A.G. v. United States),* 731 F.2d 1032, 1037 (2d Cir. 1984) ("although some of the documents appear to be drafts of communications the final version of which might eventually be sent to other persons, and as distributed would not be privileged, we see no basis for inferring that [defendant] did not intend the drafts - which reflect its confidential requests for legal advice and were not distributed - to be confidential."); *see also Asset Value Fund Limited v. The Care*

12

*Group,* No. 97 Civ. 1487, 1997 WL 706320, at *6 (S.D.N.Y. Nov. 12, 1997) ('in New York, the

general rule is that 'a draft document prepared by an attorney is privileged if it contains

information provided in confidence by the client and subsequently maintained in confidence'")

(quoting *Bowne of New York City v. AmBase Corp.*, 150 F.R.D 465, 490 (S.D.N.Y. 1993)); *see*

*also Ziemack v. Centel Corp.,* No. 92-3551, 1995 WL 314526, at *4 (N.D. Ill. May 19, 1995)

("drafts of the joint-proxy statement, for which attorney-client privilege is claimed, are

protected").   Where, as here, "the transaction was not a routine business matter and required

considerable involvement with a state regulatory agency," the Court should take "a broad view of

legal advice in applying the privilege, in recognition of the unique role that an in-house attorney

brings to bear in imparting [legal] advice that may incidentally also involve business advice."

*United States Postal Serv. v. Phelps Dodge Refining Co.,* 852 F. Supp. 156, 160 (E.D.N.Y.

1994).

       *In re Kidder Peabody Securities Litigation*, 168 F.R.D. 459 is instructive here.   In *Kidder*,

plaintiffs argued fairness dictated that the drafts of a report ultimately made public by Kidder

should be disclosed because  "variations between the draft and final versions of the report may

reflect distortions in the final version to the benefit of [defendant]." *Id.*   The court in *Kidder*

utilized a two-step analysis.   First, the court determined that the public release of the final report

"does not waive the privilege as to drafts if they were otherwise protected by privilege." *Id.*

Next, the court noted that "[t]he same may be said for all drafts of documents published in final

form, but that is not a sufficient justification, by itself to override the privilege." *Id.* at 474.   The

court held that "[w]hatever they say, they are not crucial to a determination of the accuracy or

reliability of the final report." *Id.*   Accordingly, the court concluded that privilege was not

waived with respect to the drafts. *Id.* Similarly, I find here that Plaintiffs' motion to compel the production of drafts of the Briefing Book, the Plan of Reorganization, the PIB, the remainder of the Prospectus, and the S-1, to the extent those documents reflect the advice of counsel, must be DENIED. [2]

2.       *Subject Matter Waiver With Respect To Extrajudicial Disclosure*

Plaintiffs contend that "[p]ublication of the tax opinion waived privilege on discovery relating to the same subject matter" and therefore Plaintiffs are entitled to discovery of all tax advice relating to the demutualization provided by Debevoise to MetLife. Pl. Aug. 2, 2006 Letter Mot. at 1. Plaintiffs rely upon *United States v. Tellier*, 255 F.2d at 447 and *In re Grand Jury Proceedings*, 33 F.3d 342, 354 (4th Cir. 1994) in support of their position. Defendant argues that, as a matter of law, disclosure of the Tax Opinion of Debevoise as part of the PIB does not give rise to a subject matter waiver with respect to all tax issues. Def. Aug. 11, 2006 Letter at 3.

Courts have distinguished the effect of an extrajudicial disclosure of an otherwise privileged communication from the selective disclosure of such communication in a litigation. *See, e.g., Securities & Exch. Comm'n v. Beacon Hill Asset Mgmt.*, 231 F.R.D. 134, 142 (S.D.N.Y. 2004); *Oxyn Telecommunications, Inc. v. Onse Telecom,* No. 01 Civ. 1012, 2003 WL 660848, at *5 (S.D.N.Y. Feb 27, 2003); *Asset Value Fund Limited Partnership v. The Care*

---

[2]       Plaintiffs also contend that attorney notes and comments on the drafts can be redacted and the draft document itself produced. Pl. Sept. 8, 2006 Supp. Br. at 8. Defendant claims to have already done that to the extent possible. Def. Sept. 18, 2006 Supp. Reply at 4. I have no reason to question Defendant's representation to the Court in this regard; however, I am willing to review a limited number of documents, *in camera*, to test the accuracy of the representation. Plaintiffs shall designate no more than 25 documents for my review within ten (10) days from the entry of this Memorandum and Order. Those documents shall then be supplied by Defendant within ten (10) days from such designation.

*Group,* No. 97 Civ 1487, 1997 WL 706320 at *5 (S.D.N.Y. Nov. 12, 1997).  A party waives the

attorney-client privilege with respect to a certain subject matter when that party places otherwise

privileged communications "at issue" in the litigation; however, that rule "does not come into

play when . . . the privilege-holder . . . has made extrajudicial disclosures." *See In re von Bulow*,

828 F.2d 94, 102 (2d Cir.1987).    The court in *von Bulow* reasoned that

> Matters actually disclosed in public lose their privileged status
> because they obviously are no longer confidential. The cat is let out
> of the bag, so to speak. But related matters not so disclosed remain
> confidential. . . . The reason is that disclosures made in public
> rather than in court – even if selective – create no risk of *legal*
> prejudice until put at issue in the litigation by the privilege-holder.

*See von Bulow*, 828 F.2d at 103.

Defendant's disclosure of the tax opinion of Debevoise as part of the Prospectus was an

*extrajudicial* disclosure of this communication.  As such, the rules established in the Second

Circuit limit the ramifications of the waiver because "extrajudicial disclosures...do not implicate

the *legal* prejudice the fairness doctrine is intended to prevent."  *Oxyn Telecommunications, Inc.,*

2003 WL 660848 at *5 (emphasis in original).

Plaintiffs reliance upon *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958) and *In*

*re Grand Jury Proceedings*, 33 F.3d 342 (4th Cir. 1994) is misplaced.  The Second Circuit in *In*

*re von Bulow*, 828 F.2d 94, 102 (2d Cir.1987) distinguished *United States v. Tellier*, 255 F.2d

441, 447 (2d Cir. 1958), holding "that the privilege was waived as to an attorney-client

communication where that very communication was intended to be disclosed to third parties."  In

*Tellier*, the Second Circuit found that the communication was not privileged because it was never

intended to be confidential.  *Id.*  Here, to the contrary, according to the affidavits submitted by

Defendant, the privileged communications *were* intended to be kept confidential and Plaintiffs have not demonstrated that such was not the case. *See* Friedman Aff. at ¶ 9; Reali Aff. at ¶ 10. To the extent Plaintiffs rely upon decisions from the Fourth Circuit, those decisions are not controlling here.[3] This principle is particularly apt since the decision of the Fourth Circuit is at odds with the rule in the Second Circuit. In *United States v. Jones,* the Fourth Circuit opined that "voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all communications relating to the same subject matter. *Id.* at 1073. The Second Circuit, however, has taken a more limited view of subject matter waiver, particularly in the context of *extrajudicial* disclosure. In *von Bulow,* the Second Circuit opined that "the extrajudicial disclosure of an attorney-client communication – one not subsequently used by the client in a judicial proceeding to his adversary's prejudice – does not waive the privilege as to the undisclosed portions of the communications." *Id.* at 102. *See also Strategem Development v. Heron Int'l N.V.,* 153 F.R.D. 535, 544 (S.D.N.Y. 1994) ("most of the cases that have found implied waivers involved assertions by a client that made his confidential communications a material issue in a judicial proceeding") (citing *United States v. Aronoff,* 466 F. Supp. 855, 862 (S.D.N.Y. 1979)).

Thus, Plaintiffs' motion to compel the production of all tax advice relating to the demutualization provided by Debevoise to MetLife on the grounds that the attorney-client privilege asserted with respect to those documents has been waived by the publication of a tax opinion letter as part of the Prospectus is DENIED.

---

[3]     *See Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F. Supp. 213 (S.D.N.Y.1992) (federal courts only bound by precedent set by the Supreme Court and the Court of Appeals for that Circuit).

3. *Waiver By Assertion Of Lack Of Intent Defense*

Plaintiffs also claim that MetLife waived any claim of privilege which may have attached to over 1,400 documents listed on the privilege log by stating in its Answer that "it did not act with the intent to deceive and did not know of any untruth or omission."  Here, Plaintiffs claim MetLife  is attempting to use the privilege both as a sword and a shield.  Pl. June 1, 2006 Mem. at 12.  They argue that since "MetLife used lawyers to draft documents and advice on what disclosures should be made . . . MetLife cannot now assert" attorney-client privilege to prevent discovery into what MetLife told the lawyers and what the lawyers advised about information omitted from the prospectus and other public statements.  Pl. June 1, 2006 Mem. at 12.  Additionally, Plaintiffs claim that assertion of the following two defenses is sufficient to overcome any claim of privilege.  As its twelfth defense, Defendant asserted that "[w]ith respect to the claim under § 12(a)(2) of the Securities Act of 1933, defendants did not know, and in the exercise of reasonable care could not have known, of any untruth or misleading omission in the alleged prospectus."  As its thirteenth defense, Defendant asserted that "[w]ith respect to the claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, defendants did not act with intent to deceive, did not know of any untruth or misleading omission in the alleged prospectus, and /or did not act with reckless disregard of the truth with regard thereto."

Defendant contends that "[u]nder Plaintiffs' theory, any defendant facing a fraud complaint would have to choose in its answer either to deny the allegations and thereby waive all

privileges, or else admit to allegations of fraudulent intent no matter how baseless." Def. June 9, 2006 Mem. at 23.

The general rule is that "selective disclosure *in a litigation* of privileged information that is favorable to a party's litigation position, while withholding unfavorable communications, results in a waiver of the privilege with respect to related privileged material." *Oxyn Telecommunications, Inc.,* 2003 WL 660848, at *5 (emphasis in original). This waiver principle is applicable where a party asserts his reliance upon the advice of counsel or otherwise puts his understanding of the law "at issue." Communications are "at issue" when the party makes an assertion "that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir. 1991) (criminal defendant waived privilege when he asserted that he had a good faith belief that his actions were legal), *cert. denied,* 502 U.S. 813 (1991); *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 470 (S.D.N.Y.1996) (party "may waive the privilege if [it] makes factual assertions the truth of which can only be assessed by examination of the privileged communication").

The cases cited by the parties support the proposition that "[i]mplied waiver of the privilege occurs only through an affirmative act on the part of the one who holds it." *Chase Manhattan Bank No. v. Drysdale Securities Corp.*, 587 F. Supp. 57, 58 (S.D.N.Y. 1984). In *Bowne of NYC v. AmBase Corp.*, 150 F.R.D. 465 (S.D.N.Y. 1993), the court cited three criteria used to determine if the party has effectuated an implied waiver. The court considered whether:

> (1) assertion of the privilege was a result of some affirmative act such as filing suit, by the asserting party;

(2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case;

(3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Id. at 488-89.* In *AmBase,* the court pointed out that the "at issue" waiver concept, in the context of disclosures made in the course of the litigation, "sweeps more broadly." The court continued, "[a]s summarized by the New York courts, a waiver may be found 'where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information.'" *AmBase,* 150 F.R.D. at 488 (citations omitted). In a similar context, the Second Circuit in *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), found that the attorney client privilege was waived where defendant asserted the defense of good faith to allegations of securities fraud. The court concluded that "the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *Id.* at 1292.

However, "[t]o waive the privilege the party must do more than deny allegations, he must raise new factual or legal issues that involve privileged communications." *Burress v. Union Pacific Railroad Co.,* No. 1:01CV00072, 2007 WL 60935 (E.D. Ark. Jan. 8, 2007). The court in *Bilzerian* distinguished the circumstances brought before it from the type of situation presented here, noting that "denial of an essential element of the crime charged – here criminal intent – is a constitutional right to be carefully safeguarded." *Bilzerian*, 926 F.2d at 1293.

In analogous circumstances, the court in *Oxyn Telecommunications, Inc.* pointed out that a denial of allegations of bad faith and fraud is not the equivalent of an affirmative claim either

of good faith or reliance on advice of counsel as a defense. *See Oxyn Telecommunications, Inc.,* 2003 WL 660848, at *6. As a policy matter, it is difficult to imagine a way generally for defendants to deny allegations of fraud without putting themselves at risk of waiving privilege. MetLife here persuasively argues that it "merely . . . asserted, as defenses, a denial of each of the elements of plaintiffs Rule 10b-5 fraud claim, such as intent to defraud, which plaintiffs must prove." Def. July 13, 2006 Letter at 2. Accordingly, Plaintiffs' motion to compel on this basis is DENIED.

C. **Applicability of the *Garner* Doctrine**

Plaintiffs next argue that they are entitled to all privileged documents pursuant to the *Garner* doctrine. It is Plaintiffs' position that "MetLife cannot assert attorney-client privilege against its policyholders or shareholders, so long as there is good cause for the production of documents." Pl. June 1, 2006 Mem. at 13. Defendant counters with the argument that no fiduciary relationship exists and that good cause has not been established. Def. June 9, 2006 Mem. at 18-22.

In *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir. 1970), the Fifth Circuit held that the fiduciary nature of the relationship between a public corporation and its stockholders necessitates that, upon a showing of good cause, plaintiffs in a shareholder derivative action can obtain privileged communications between corporate counsel and management. [4] *Id.* at 1095-96. The Second Circuit has never expressly adopted the *Garner* doctrine. However, district courts within this Circuit have applied the *Garner* doctrine regularly. *See American Steamship Owners Mutual*

---

[4] The *Garner* doctrine does not apply to attorney work product. *See In re Pfizer Inc. Sec. Litig.*, No. 90 -1260, 1993 WL 561125 at *14 (S.D.N.Y. Dec. 23, 1993) (citing cases).

*Protection and Indemnity Association v. Alco Steamship Co., Inc.,* 232 F.R.D. 191, 201

(S.D.N.Y. 2005) (citing cases). The *Garner* doctrine arose in the context of a shareholder

derivative litigation, but its principles have also been applied where there is a fiduciary

relationship owed by the party asserting the privilege to the party seeking to abrogate it. *Id.* A

number of courts in this Circuit have applied the *Garner* doctrine in the context of shareholder

class action lawsuits. *See, e.g., In re Omnicom Group Inc. Securities Litig*, 233 F.R.D. 400, 411

(S.D.N.Y. 2006) (citing cases extending *Garner* doctrine to shareholder class action lawsuits);

*RMED Intern., Inc. v. Sloan's Supermarkets, Inc., No.* 94 Civ. 5587, 2003 WL 41996 at *4

(S.D.N.Y. Jan. 6, 2003) (applying *Garner* to a securities fraud class action); *In re Bairnco Corp.*

*Sec. Litig.,* 148 F.R.D. 91, 98-99 (S.D.N.Y. 1993) (applying *Garner* in securities fraud class

action).

Some courts have concluded that the *Garner* doctrine applies only where there is proof

that the fiduciary relationship existed at the time of the alleged communications. *See, e.g.,*

*Omnicom,* 233 F.R.D. at 412 (*Garner* "good cause" analysis inapplicable because plaintiffs were

not shareholders at time of attorney-client communications); *In re Kidder Peabody Sec. Litig.,*

168 F.R.D. 459, 475 (S.D.N.Y. 1996) ("the logic of the *Garner* approach may limit its

application to parties that were shareholders at the time of the assertedly privileged

communication"); *In re Atlantic Financial Mgmt. Securities Lit.,* 121 F.R.D. 141, 146 (D.Mass.

1988) ("Plaintiffs in this case have not made a sufficient showing that a fiduciary relationship

existed between plaintiffs and defendants . . . at the time the discussions with counsel took

place); *Quintel Corp. v. Citibank, N.A.*, 567 F. Supp. 1357, 1364 (S.D.N.Y. 1983) (*Garner*

inapplicable to communications made prior to formation of fiduciary relationship); *Moskowitz v.*

*Lopp*, 128 F.R.D. 624, 637 (E.D. Pa. 1989) ("there must be some fiduciary relationship and a mutuality of interest at the time the privileged communications were made for the *Garner* rationale to apply").

As a mutual insurance company, MetLife did not owe a fiduciary duty to its policyholders before the demutualization. The relationship between mutual insurer and policyholder is a contractual one. *See, e.g., Fiala v. Metropolitan Life Ins. Co.,* 776 N.Y.S.2d 29, 32 (N.Y. App. Div. 1st Dept. 2004) (dismissing breach of fiduciary duty claims because "an insurance company does not owe its policyholder a common-law fiduciary duty except when it is called upon to defend its insured"); *Chatlos v. MONY Life Ins. Co., 749 N.Y.S.2d 230* (N.Y. App. Div. 1st Dept. 2002) (holding that N.Y. Ins. Law § 7312, which governs demutualizations, does not create fiduciary relationship between insurer and policyholders); *Rabouin v. Metropolitan Life Ins. Co.,* 669 N.Y.S.2d 655 (N.Y. Sup. Ct. 1999), *aff'd,* 723 N.Y.S.2d 651 (N.Y. App. Div. 1st Dep't 2001) (no fiduciary relationship between mutual insurance company and policyholders); *Uhlman v. New York Life Ins. Co.,* 109 N.Y. 421 (N.Y. 1888) (same). All of the alleged misstatements and asserted attorney-client communications at issue in this action were made prior to MetLife's demutualization. Thus, as in *Omnicom,* "the transactions that are at the heart of the complaint and that formed the trigger for the targeted attorney-client communications were undertaken in the absence of a fiduciary relationship . . . ." *Id*. at 412. Thus, following this analysis, the *Garner* doctrine cannot be invoked by Plaintiffs to overcome the attorney-client privilege.

Other courts have adopted a more expansive reading of the *Garner* doctrine and have extended it to include shareholders who became shareholders as a result of the allegedly misleading statements. *See, e.g., In re Pfizer Inc. Sec. Litig.,* No. 90-CV-1260, 1993 WL 561125,

at *12, (S.D.N.Y. Dec. 23, 1993) (extending *Garner* doctrine to plaintiff class that included investors who were not fiduciaries at the time of the alleged misleading statement, but later purchased the stock in reliance on that statement); *In re IBM Sec. Litig.,* No. 92-CV-9076*,* 1993 WL 760214, at *3 (S.D.N.Y. Nov. 30, 1993) (applying *Garner* doctrine in shareholder class action where some shareholders were not shareholders at the time of the allegedly misleading communications); *In re Bairnco Corp. Sec. Litig.*, 148 F.R.D. 91, 98 (S.D.N.Y. 1993) (members of the plaintiff class were "purchasers" and not "shareholders" at the time of the alleged misleading statements); *Cohen v. Uniroyal, Inc.,* 80 F.R.D. 480, 484 (E.D. Pa. 1978) (extending the same protection of the *Garner* doctrine to class members who had not yet purchased stock at the time of the alleged misleading communications).

The instant case does not fall within this extension of the *Garner* doctrine.  In *Cohen v. Uniroyal, Inc*. 80 F.R.D. 480, the court found that extending the *Garner* doctrine to shareholders who were purchasers pursuant to the allegedly misleading statement, rather than to those who were "shareholders" during the period of the communications at issue, was consistent with the "basic rationale" underlying the *Garner* doctrine because

> [t]he class as certified in this case does not include any putative purchasers, but encompasses only those purchasers that actually bought . . . stock . . .  That the special relationship of management-to-stockholder existed as to all class members for some period, however brief, thrusts those class members ineluctably within the scope of the protection afforded by the Garner doctrine.

*Id.* at 484.  Here, the class includes individuals who exchanged their policies for MetLife shares as well as those "who exchanged their insurance policies for cash or policy credits."  *See* Judge Platt's August 29, 2006 Decision at 6.  Judge Platt held that despite ambiguity in the Plan itself, extrinsic evidence supported the conclusion that "MetLife Co. shares were allocated to all

Policyholders (including those who elected cash or policy credits) in consideration (or in exchange ) for their policy interests in Metropolitan." *Id.* at 11. Therefore, even if an election to receive cash was made simultaneously with the effective date of the Plan, those individuals held MetLife Co. stock for some brief period of time. Even though, technically, shares may have been issued to policyholders who elected to receive cash or policy credits pursuant to the Plan, those policyholders nevertheless expressed their preference <u>not</u> to receive an ownership interest in MetLife, Inc. In light of this expressed preference, I find that MetLife did not owe a fiduciary obligation to those policyholders. Given the make-up of the class in the instant action, I decline to extend the fiduciary exception to the attorney-client privilege to the Plaintiff Class as certified in this matter.

Even if I were to find the *Garner* doctrine applicable in this context, I would next have to consider whether Plaintiff has established good cause to overcome the privilege. *Garner* delineates nine factors necessary to establish good cause as follows: "the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose

confidentiality the corporation has an interest for independent reasons." *Garner*, 430 F.2d at 1104.

Because Plaintiffs bring this action as a class of individuals adverse to MetLife, rather than as a derivative suit on behalf of MetLife, they must make an "elevated showing" of good cause under *Garner*. *See Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, No. 02 C 5893, 2006 U.S. Dist. LEXIS 88826 at *26 (N.D. Ill. Dec. 6, 2006) ("[t]his court . . . views the non-derivative nature of the claim as a strong factor to consider in determining whether to prevent invocation of the attorney-client privilege"); *Omnicom*, 233 F.R.D. at 412 ("In a securities-fraud case, the interests of the plaintiffs are still less congruent with those of the corporation (and its other shareholders) than is the case in a derivative suit."); *Ward v. Succession of Freeman*, 854 F.2d 780, 786 (5th Cir. 1988) ("[a] non-derivative suit by shareholders against management actions that necessarily arise from some adverse interests (e.g. disclosures related to a tender offer) presents more problems for finding good cause"). As in *In re Omnicom Group Inc. Sec. Litig*, 233 F.R.D. 400, Plaintiffs here are challenging actions taken by MetLife which allegedly injured the shareholders individually. They are not complaining about conduct that injured the Company as a whole – indeed, quite the contrary – plaintiffs allege that the Company benefitted to the detriment of former policyholders by shifting "$ 6 billion of accumulated premium payments of these policyholders into the future profits of the new stock corporation established in the demutualization." Pl. June 1, 2006 Mem.at 5; *see also* Pl. Supp. Mem. at 13 ("MetLife's Board Committee and senior executives knew the Closed Block would provide billions of dollars in profit to the corporation, and inflict a multi-billion dollar loss on policyholders").

Reviewing Plaintiffs' assertions of good cause under an elevated standard, I find that even if Plaintiffs were treated as fiduciaries within the meaning of *Garner,* Plaintiffs have not established good cause for overcoming the attorney-client privilege with respect to the 1,400 documents Plaintiffs have challenged on this basis. According to Plaintiffs, each of the nine factors favors production of the documents. I find otherwise. First, Plaintiffs assert that "Policyholders number approximately 8.4 million, representing 78% of the members of the mutual company and 96% of the stock allocated to those members in the demutualization." Stamell Aff. Exh. L This assertion misses the point. The Court must look to what percentage of the Company is represented by the class. In this instance, an initial public offering of MetLife, Inc. common stock occurred simultaneously with receipt of the Plaintiff Class of their shares of MetLife, Inc. and I would need to consider the percentage of the shares which were held by the class members. *See, e.g., RMED* at *5 ("not knowing the percentage of stock that they own diminishes the weight the Court can give this factor"). Plaintiff has not demonstrated that the class represents a significant stake in the Company. Therefore, I view this factor as neutral.

As to the remaining factors, several weigh in Plaintiffs' favor. As set forth in the Stamell Affidavit, "there is no risk that any trade secrets or other confidential information would be revealed because the demutualization was completed six years ago" and there is a Protective Order in place. *See* Pl. June 1, 2006 Mem. at 15; Order of Confidentiality dated May 6, 2002; *see also Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*, 2006 U.S. Dist. LEXIS 88826. In addition, "the communications did not concern the pending litigation." *See* Pl. June 1, 2006 Mem. at 14. As to the third factor, Plaintiffs assert that "the denial of MetLife's two motions to dismiss established that the claims are colorable." At least one court in this Circuit, however,

has taken the position that Plaintiff must show "a 'clearly colorable' case (that is, one that is more than simply colorable, as reflected in the denial of a Rule 12 (b)(6) dismissal)." *Omnicom,* 233 F.R.D. at  413.  However, even assuming Plaintiffs have asserted a colorable claim, the weight of these factors alone is insufficient to establish good cause.

Plaintiffs assert that requiring wholesale production of all documents claimed to be privileged is necessary because Plaintiffs "need direct evidence of why information provided MetLife's Board Committee was omitted from the Prospectus, the Briefing Book and other documents."  This assertion comes closest to establishing good cause.  However, viewing all the factors together, it is simply not enough to carry the day.  According to Defendant, the discovery Plaintiffs seek is potentially available from other sources.   Plaintiffs have already conducted 23 days of depositions in this case, in many instances of MetLife employees, and they have reviewed over two hundred and fifty thousand of pages of documents.  *See* Def. June 9, 2006 Mem. at 21. Despite all this discovery, and unlike many of the cases relied upon by Plaintiffs, Plaintiffs have not specifically identified any particularized information that they need, that is likely to be in the documents, and that is not available from other sources.  *Id.*  Plaintiffs state only generally that they "need discovery about how and why MetLife decided to omit information it provided to a Board committee and senior management" from various documents.  Pl. June 1, 2006 Mem. at 4.  This boils down to a claim that the documents are needed to show scienter.  Scienter, however, is an element of every securities fraud case.  The relevance of a document to a claim of scienter is not sufficient to satisfy *Garner*.  *See Ward,* 854 F.2d at 786; *see generally Kidder,* 168 F.R.D at 475 (refusing to order the production of drafts of a report made public pursuant to the *Garner*

doctrine noting that Plaintiffs cannot establish good cause requiring the production of drafts because "drafts of the . . . report are likely to be of only marginal significance").[5]

Most importantly, however, a review of Plaintiffs' objections to the privilege log reveals that nearly every document for which Defendant claims privilege is purportedly within the *Garner* exception to the attorney client privilege (approximately 1,400 documents). This is precisely the "fishing expedition" discovery *Garner* cautions against. *Garner,* 430 F.2d at 1104 ("the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing"). Courts have recognized that "the complete removal of the attorney-client privilege from the grasp of the corporation client . . .would expose corporations to harassment suits by minority stockholders and a possible deterioration of candid attorney-client communication and effective corporate management." *Cohen,* 80 F.R.D. at 483; *see also In re Bairnco,* 148 F.R.D. at 98-99 (recognizing "submitting to the 'invasion' of an expansive document sweep" or "requiring 'wholesale production' of all applicable documents" outside the scope of *Garner* doctrine). *Garner* does not support wholesale abrogation of the attorney-client privilege "merely because those demanding information enjoy the status of stockholders." *Garner,* 430 F.2d at 1103. "[T]hese countervailing interests of the corporation and its stockholders are both valid but must be weighed against each other in order to determine whether there is good cause for the corporation's interest in confidentiality to yield to the stockholders'

---

[5]     Several other factors weigh in favor of Defendant. Plaintiffs have not demonstrated that (1) the conduct was criminal or (2) the communications related to past actions. In addition, Plaintiffs' "bona fides" are suspect since this action is being prosecuted as a class action rather than derivatively. *See, e.g., In re IBM Corp. Sec. Litig.,* No. 92 Civ. 9076, 1993 WL 760214, at *5 (S.D.N.Y. Nov. 30, 1993) ("plaintiffs' bona fides are questionable since their suit is non-derivative")*.*

interest in full disclosure." *Cohen*, 80 F.R.D. at 483.  Weighing the dangers of the wholesale abrogation of MetLife's privilege sought by Plaintiffs against Plaintiffs' limited demonstration of good cause, I find Plaintiffs have not demonstrated sufficient good cause as required by *Garner* to pierce the privilege.

Plaintiffs' motion to compel the production of over 1,400 documents claimed to be privileged by Defendant in reliance upon the *Garner* doctrine is hereby DENIED.

### D.      Crime-Fraud Exception

Finally, Plaintiffs contend that all documents Defendant has withheld on the basis of privilege should be produced pursuant to the crime-fraud exception to the attorney-client privilege.  Pl. Supp. Mem. at 5.  According to Plaintiffs, "[t]o establish the crime-fraud exception, plaintiffs must offer a factual basis to show probable cause that defendant committed a fraud.  Once the Court is satisfied that probable cause exists, the Court conducts an *in camera* review of the material to determine whether the crime fraud exception applies."  Pl. June 1, 2006 Mem. at 13.  In their subsequent two motions, Plaintiffs have argued that the crime-fraud exception to the attorney-client privilege requires the production of the documents sought by those motion as well, i.e., all drafts of the Plan of Reorganization, the PIB, the remainder of the Prospectus, the S-1, requests for legal advice and responses from outside counsel, and all tax documents in the possession of Debevoise that may be withheld from production on the basis of privilege. Pl. July 10, 2006 Letter Mot; Pl. Aug. 2, 2006 Letter Mot.

It is Defendant's position that Plaintiffs have made no showing that the particular communications at issue were made in furtherance of a crime or fraud, as opposed to being made for the purpose of obtaining legal advice.  Defendant contends that "if plaintiffs' argument had

any merit, the crime fraud exception would swallow the attorney client privilege and work product doctrine in every securities fraud case." Def. June 9, 2006 Mem. at 23. According to Defendant, "MetLife sought legal advice from its attorneys on countless matters in connection with the demutualization, most of which have absolutely nothing to do with what was or was not disclosed in the PIB." Def. Supp. Reply at 3.

The Second Circuit has also held that the crime-fraud exception to the attorney-client privilege is a limited exception that applies where two distinct requirements are met. There must be a "showing of probable cause to believe that [1] fraud or crime has been committed . . . and [2] that the communications [in question] were in furtherance of the fraud or crime."[6] *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997); *see In re Napster, Inc. Copyright Litig,* Nos. 06-15886, 06-72515, 2007 WL 754748 (9th Cir. Mar. 14, 2007); *In re Grand Jury Investigation,* 842 F.2d 1223, 1226 (11th Cir. 1987) ( "[M]ere allegations of criminality are insufficient to warrant application of the exception"); *see also Clark v. United States*, 289 U.S. 1, 15 (1933) ("It is obvious that it would be absurd to say that the privilege could be got rid of merely by making a charge of fraud.")(quotation marks and citation omitted.). The Second Circuit has cautioned that

> the crime-fraud exception has a narrow and precise application: It applies only when the communications between the client and his lawyer further a crime, fraud or other misconduct. It does not suffice that the communications may be related to a crime. To subject the attorney-client communications to disclosure, they must actually *have been made with an intent to further an unlawful act.*

*United States v. Jacobs*, 117 F.3d 82, 88 (2d Cir. 1997).

---

[6]     The crime-fraud exception applies to the work product privilege as well as the attorney-client privilege. *See, e.g., In re Grand Jury Subpoenas,* 454 F.3d 511, 520 (6th Cir. 2006).

The Second Circuit has held that the perpetration of a crime or fraud must "have been the objective of the client's communication." *In re Grand Jury Subpoena Duces Tecum (Marc Rich & Co.),* 731 F.2d 1032, 1039 (2d Cir. 1984); *see also In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). In *Roe*, the Second Circuit reversed the District Court's findings that the documents in question provided relevant evidence of activity in furtherance of a crime. *Id.* at 40. The court determined that "the relevant evidence test" departs from the correct "in furtherance" test. *Id.* Ultimately, the court held that "the crime-fraud exception applies only where there is probable cause to believe that the <u>particular communication</u> . . .was intended in some way to facilitate or conceal the criminal activity." *Id*. (emphasis added); *see also NXIVM Corp. v. O'Hara,* No. 1:05-CV-1546, 2007 WL 632708, at *22 (N.D.N.Y. Feb. 9, 2007) ("the particular communication or document in issue 'itself' must be 'in furtherance of a contemplated or ongoing criminal or fraudulent conduct'"). "Because a simple finding of relevance does not demonstrate a criminal or fraudulent purpose, it does not trigger the exception." *Roe,* 68 F.3d at 41.

Plaintiffs have not demonstrated that the advice of counsel was sought in furtherance of a crime or fraud with respect to each of the documents in question. I therefore find that the crime-fraud exception does not apply to the over 1,400 documents which Plaintiffs seek to obtain. *See, e.g., Roe*, 68 F.3d 41 (the scope of the crime-fraud exception only extends to "which, if any documents or communications were in furtherance of a crime or fraud"); *see also In re Grand Jury Subpoena,* 419 F.3d 329, 344 (5th Cir. 2005) ("We conclude that the proper reach of the crime-fraud exception when applicable does not extend to all communications made in the course of the attorney-client relationship, but rather is limited to those communications and documents in furtherance of the contemplated or ongoing criminal or fraudulent conduct"). Application of the

crime-fraud exception to the attorney-client privilege in the wholesale, broad brush manner suggested by Plaintiffs is contrary to the Second Circuit's admonition that the "crime-fraud exception has a narrow and precise application." *Jacobs*, 117 F.3d at 88.

Moreover, granting Plaintiffs' motion to compel on the basis of the crime-fraud exception at this time would unnecessarily "tilt the playing field of this lawsuit at a relatively early stage in this litigation." *Omnicom,* 233 F.R.D. at 406. To prevail on this motion, Plaintiffs must establish "probable cause that a fraud or crime has been committed." *Jacobs,* 117 F.3d at 87. The standard Plaintiffs must meet to satisfy this test is a high one because, as explained by Magistrate Judge Dolinger in *Omnicom,*

> [t]o accept a looser standard would mean, in effect, that in any case in which a fraud claim is asserted and the plaintiff proffers enough evidence to survive a hypothetical summary judgment motion on the issue of fraud--no matter how early in the proceedings--the defendant would likely lose any protection for communications made with an attorney during the period of the alleged fraud. This result seems implausible in view of the functional importance of the privilege, which the federal courts have repeatedly recognized.

233 F.R.D. at 408. Thus, Plaintiffs' unsupported position that "[p]robable cause exists because MetLife's Board Committee and senior executives knew the Closed Block would provide billions of dollars in profits to the corporation, and inflict a multi-billion dollar loss on policyholders" is insufficient to establish probable cause, even where, as here, Plaintiff's Amended Complaint has withstood a motion to dismiss and motion for summary judgment. *See* Pl. June 1, 2006 Mem. at 13.

This Court has not been presented with sufficient evidence to allow it to make a finding of probable cause at this time. This is not the last opportunity for Plaintiffs to raise this exception, however. Indeed, some courts have suggested that a motion on the basis of the crime-fraud

exception is more appropriately made at the time of trial. *See, e.g., Duplan Corp. v. Deering Milliken*, 540 F.2d 1215, 1222 (4th Cir. 1976); *Omnicom,* 233 F.R.D. at 407. If during the pretrial phase and through the course of discovery Plaintiffs obtain additional information with which to pursue this motion, leave is hereby GRANTED, to do so.

Plaintiffs have not at this time demonstrated an adequate basis for setting aside the attorney-client privilege or work product privilege on the basis of the crime-fraud exception, and, therefore, this portion of their motion is DENIED, without prejudice.

## IV. <u>Conclusion</u>

In light of the foregoing, Plaintiffs' motion to compel the production of tax documents is GRANTED to the limited extent described above; Plaintiffs' motion to compel the production of drafts of the Briefing Book, the Plan of Reorganization, the PIB, the remainder of the Prospectus, and the S-1, to the extent those documents reflect the advice of counsel, is DENIED; Plaintiffs' motion to compel the production of all tax advice relating to the demutualization provided by Debevoise to MetLife on the grounds that the attorney-client privilege asserted with respect to those documents has been waived by the publication of a tax opinion letter as part of the Prospectus is DENIED; Plaintiffs' motion to compel the production of over 1,400 documents listed on Defendant's privilege log on the basis of waiver of any privilege by Defendant claiming that it did not have guilty knowledge of the fraud is DENIED; Plaintiffs' motion to compel the production of over 1,400 documents claimed to be privileged by Defendant in reliance upon the *Garner* doctrine is DENIED. Plaintiffs have not demonstrated at this time an adequate basis for setting aside the attorney-client privilege or work product privilege on the basis of the crime-fraud exception, and, therefore, this portion of their motion is DENIED, without prejudice.

**SO ORDERED.**


Dated: Central Islip, New York
       March 30, 2007

                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge