FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 2 4 2009 ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

---

In re: METLIFE DEMUTUALIZATION
LITIGATION

---

**Memorandum and Order
on Admissibility of New York
Insurance Superintendent's Opinion**

**00 CV 2258**

APPEARANCES:

| | |
|---|---|
| For Plaintiffs: | Stamell & Schager, LLP<br>One Liberty Plaza, 35th Floor<br>New York, NY 10006<br>By:   Jared B. Stamell, Esq.<br>        Eric B. Newman, Esq. |
| | Mandel & Mandel LLP<br>169 E Flagler Street<br>Suite 1200<br>Miami, FL 33131<br>By:   David S. Mandel, Esq. |
| | Berman DeValerio<br>425 California Street<br>Suite 2100<br>San Francisco, CA 94104<br>By:   David E. Barenbaum, Esq.<br>        Joseph J. Tabacco, Jr., Esq. |
| For Defendants: | Debevoise & Plimpton, LLP<br>919 Third Avenue<br>New York, NY  10022<br>By:   Bruce E. Yannett, Esq.<br>        Mark P. Goodman, Esq.<br>        Helen V. Cantwell, Esq.<br>        Carl Micarelli, Esq.<br>        Michael Schaper, Esq. |
| | Metropolitan Life Insurance Company<br>1095 Avenue of the Americas<br>New York, NY 10036<br>By:   Teresa Wynn Roseborough, Esq.<br>        Kevin S. Flannigan, Esq.<br>        Duncan S. Logan, Esq. |

State of New York:  Attorney General of the State of New York
                    120 Broadway
                    New York, NY 10271
                    By:    Elizabeth Foreman, Esq.

Special Master:     Richard J. Davis, Esq.

**JACK B. WEINSTEIN, Senior United States District Judge:**

<u>**Table of Contents**</u>

I.   Introduction ..........................................................................................................3
II.  Facts......................................................................................................................4
   A.   MetLife's Plan of Reorganization ..............................................................5
      1.   New York Insurance Law § 7312 ........................................................5
      2.   Features of the Plan ............................................................................8
      3.   Exercise of Board's Business Judgment in Selecting Plan................9
      4.   Reliance on Superintendent ..............................................................10
   B.   Solicitation of Policyholder Votes ...........................................................11
      1.   Mailings.............................................................................................11
      2.   Telephone ..........................................................................................15
   C.   Superintendent's Investigation and Approval ..........................................16
      1.   Appointment and Reliance on Advisors.............................................16
      2.   Public Hearing ..................................................................................16
      3.   Written Submissions .........................................................................19
      4.   Opinion and Decision .......................................................................20
   D.   Contentions as to Admission of Superintendent's Opinion......................22
III. Federal Securities Law ......................................................................................23
   A.   Rule 10b-5 and Section 12(a)(2) Generally..............................................23
   B.   Materiality.................................................................................................26
   C.   Scienter .....................................................................................................27
   D.   Non-Negligence.........................................................................................29
IV.  Admissibility of Superintendent's Opinion .......................................................30
   A.   Relevance—Rules 401 and 402.................................................................31
      1.   Hearsay ..............................................................................................31
      2.   Non-Hearsay.......................................................................................33
   B.   Official Report—Rule 803(8)(C) .............................................................34
      1.   Presumption of Reliability.................................................................35
      2.   Indicia of Reliability .........................................................................39
   C.   Potential for Unfair Prejudice—Rule 403 ...............................................41
   D.   Completeness—Rule 106 ..........................................................................42
   E.   Experts for Superintendent—Rules 701 and 702 .....................................42
   F.   Deliberative Process Privilege..................................................................42
V.   Conclusion..........................................................................................................43

2

## I.     Introduction

A class action by policyholders was brought against Metropolitan Life Insurance Company and MetLife, Inc. (collectively "MetLife"), arising from MetLife's 2000 conversion from a mutual to a stock life insurance company. The process, called demutualization, is governed by a comprehensive New York insurance law, supervised by the Superintendent of Insurance of the state of New York ("Superintendent"). *See* N.Y. Ins. L. § 7312 ("Section 7312").

Plaintiffs were insureds, eligible to vote on, and receive compensation in connection with, the demutualization. They learned about the transaction through informational materials MetLife sent to them prior to the vote (collectively the "Booklet"). Their claim is that the Booklet—on which policyholders relied in voting (92% favorable) for the conversion—was false and misleading in violation of federal securities laws. *See* 15 U.S.C. § 77*l*(a)(2); 15 U.S.C. § 78j(b).

The Superintendent issued an Opinion and Decision on April 4, 2000 ("Opinion") finding MetLife's demutualization in compliance with New York insurance law. Opinion & Decision, *In re Plan of Reorganization of Metropolitan Life Ins. Co. from Mutual Life Ins. Co. Into a Stock Life Ins. Co.* (Apr. 4, 2000) [hereinafter "Opinion"], *available at* http://www.ins.state.ny.us/life /demut/ metlife.pdf (last accessed Nov. 23, 2009). The Opinion followed a public hearing. It included the Superintendent's finding that the transaction was "fair and equitable," *id.* ¶¶ 50, 54, 67, 71, 79, 80, 86, 88, 112, 131, 137, 158, 201, 204, 205, 207, 233, 237, 238, and that the Booklet contained "sufficient information" to enable policyholders to "make an informed decision" about the transaction, *id* ¶ 216. His written approval was necessary for MetLife's demutualization to become effective. *See* N.Y. Ins. L. § 7312(b).

3

Plaintiffs move to exclude the entire Opinion from evidence. In Opposition, MetLife contends that the Opinion is not only admissible, but that it is conclusive as a matter of law on the fairness of the transaction—effectively foreclosing a finding that there was a violation of any federal securities law.

For the reasons set forth below, the full Opinion is admissible, but not conclusive, under the hearsay exception for official reports (Fed. R. Evid. 803(8)(C)) and as non-hearsay evidence of MetLife's scienter—the critical federal issue. The information MetLife was supplied by the Superintendent and his advisors, and transmitted to potential voters, was central to the defendants' state of mind.

This evidentiary ruling favoring defendants makes it almost impossible for plaintiffs to prove their case. Were jurors to be prevented from hearing of the State's approval of the conversion and notice to shareholders, the jury conceivably could have brought in a verdict for billions of dollars in damages.

## II.   Facts

Detailed prior aspects of this complex litigation need not now be rehearsed. *See e.g.*, *In re MetLife Demutualization Litig.*, 156 F. Supp. 2d. 254 (E.D.N.Y. 2001) (denying MetLife's motion to dismiss); *In re MetLife Demutualization Litig.*, 322 F. Supp. 2d. 267 (E.D.N.Y. 2004) (denying MetLife's second motion to dismiss); *In re MetLife Demutualization Litig.*, 229 F.R.D. 369 (E.D.N.Y. 2005) (certifying plaintiff class), *pet. for interlocutory appeal denied* No. 05-8020 (2d Cir. Mar. 29, 2009); *In re MetLife Demutualization Litig.*, 624 F. Supp. 2d 232 (E.D.N.Y. 2009) (denying cross-motions for partial summary judgment); Order Appointing Special Settlement Master, *In Re MetLife Demutualization Litig.*, No. 00-cv-2258 (E.D.N.Y. Oct. 16, 2009) (Docket Entry ("D.E.") No. 501); Order Regarding Motions In Limine, *In Re MeLife*

4

*Demutualization Litig.*, No. 00-cv-2258 (E.D.N.Y. Oct. 30, 2009) (D.E. No. 537); Mem. & Order

Regarding Notice & Hearing on Approval of Proposed Settlement (E.D.N.Y. Nov. 4, 2009)

(D.E. No. 536); Order Approving Form of Class Notice, *In Re MetLife Demutualization Litig.*,

No. 00-cv-2258 (E.D.N.Y. Nov. 11, 2006) (D.E. No. 540).  *Cf. Shah v. Metropolitan Life Ins.*

*Co.*, Nos. 108887/2000 & 601181/200, 2003 WL 728869 (N.Y. Sup. Ct. Feb. 21, 2003) (granting

Metlife's motion to dismiss); *Fiala v. Metropolitan Life Ins. Co.*, 6 A.D.3d 320 (N.Y. App. Div.

2004) (reversing in part decision on MetLife's motion to dismiss); *Fiala v. Metropolitan Life Ins.*

*Co.*, 235 N.Y.L.J. 106, No. 601181/2000, 2006 N.Y. Misc. LEXIS 4092 (N.Y. Sup. Ct. June 2,

2006) (certifying plaintiff class); *Fiala v. Metropolitan Life Ins. Co.*, 17 Misc.3d 1102(A), No.

601181/2000, 2007 WL 2777230 (N.Y. Sup. Ct. Aug. 28, 2007) (unreported disposition)

(approving procedure for class notification); *Fiala v. Metropolitan Life Ins. Co.*, 52 A.D.3d 251

(N.Y. App. Div. 2008) (affirming class certification as modified); *Fiala v. Metropolitan Life Ins.*

*Co.*, Order  Regarding Notice & Hearing on Approval of Proposed Settlement, No. 601181/2000

(N.Y. Sup. Ct. Nov. 5, 2009).

### A.    MetLife's Plan of Reorganization

#### 1.    New York Insurance Law § 7312

Demutualization is authorized by Section 7312 of the New York Insurance Law, adopted

to ensure the industry's viability.  The state legislature found that:

> "[I]t is in the interest of the state to maintain a financially sound and
> competitive life insurance industry in this state and to provide statutory
> authority for domestic mutual life insurance companies to find it in the best
> interest of the company and its policyholders to convert to stock form to do so
> pursuant to this legislation. . . . [F]lexibility of corporate form can be an
> important factor in an environment of rapidly changing economic conditions.

Section 1 of L. 1988, ch. 683; amended L. 1988, ch. 684, § 1 (Sept. 1, 1988), *reprinted in* N.Y.

Ins. L § 7312 note (McKinney Supp. 1999-2000) (legislative findings).

To demutualize, a mutual life insurance company like MetLife—as it then was—must

adopt, by action of three-fourths of its entire board of directors, a detailed plan of reorganization

that is consistent with the statue and "fair and equitable" to policyholders.  N.Y. Ins. L §

7312(e)(1).

The plan must: "(1) demonstrate a purpose and specify reasons for the proposed

reorganization; (2) be in the best interest of the mutual life insurer and its policyholders; (3) be

fair and equitable to policyholders; (4) provide for the enhancement of the operations of the

reorganized insurer; and (5) not substantially lessen competition in any line of insurance

business."  *Id.* § 7312(c).  It must set forth, among other things: (1) "the manner and basis by

which the reorganization shall take place;" (2) "the consideration to be given to policyholders;"

(3) "the method of allocating consideration among policyholders;" and (4) "a plan of operation

for the reorganized insurer," including actuarial projections.  *Id.* § 7312(e).

Four different methods of demutualization are specified.  The fourth encompasses "[a]ny

method approved by the superintendent under which the policyholders' membership interest is

converted into or exchanged for consideration to be determined by the superintendent to be fair

and equitable to policyholders and meeting the requirements of this section."  *Id.* § 7312(d)(4).

In order to become effective, the plan must be approved by vote of two-thirds of

policyholders entitled to vote.  *Id.* § 7312(k)(2).  The Superintendent controls the voting

procedure, including the notice that must be sent to policyholders before the vote.  *Id.* §

7312(k)(3).  Notice must be "preceded or accompanied by a true and complete copy of the plan,

6

or by a summary thereof approved by the superintendent, and such other explanatory information as the superintendent shall approve or require." *Id.* § 7312(k)(1).

A final hurdle is obtaining the Superintendent's written approval. The statute states that:

> The superintendent shall . . . approve the plan of reorganization if he finds that the proposed reorganization, in whole and in part, does not violate this chapter, is fair and equitable to the policyholders and is not detrimental to the public and that, after giving effect to the reorganization, the reorganized insurer will have an amount of capital and surplus . . . reasonably necessary for its future solvency.

*Id.* 7312(j). *See also id.* § 7312(e)(1) (requiring Superintendent's approval be in writing).

Broad authority to review a proposed demutualization is provided to the Superintendent. Before issuing written approval, the Superintendent must hold a public hearing on the fairness, reasons and purposes of the plan, and whether it is in the best interests of the insurer and its policyholders. *Id.* § 7312(i). In addition, he may "appoint one or more qualified disinterested persons or institutions as consultants to advise him on any matter related to the reorganization." *Id.* § 7312(h)(1). The advisors may request access to a mutual company's books and records and any other information in its possession. *Id.* § 7312(h)(4). The Superintendent himself may "request any additional documents or information and may examine the mutual life insurer or any of its affiliates, to the extent he may determine necessary to enable him to make the findings required . . . for the approval by him of the plan of reorganization." *Id.* § 7312(g).

These provisions are consistent with the plenary authority the state legislature has delegated to the Superintendent to "make an examination into the affairs of any insurance corporation or other insurer doing or authorized to do any insurance business in this state . . . as often as he deems it expedient for the protection of the interests of the people of this state, in addition to examinations authorized by other provisions of [the Insurance Law]." *Id.* § 309(a).

7

*See also id.* § 401(b) (granting Superintendent "broad authority . . . to investigate activities which may be fraudulent and to develop evidence thereon"); *id.* § 201 ("The Superintendent shall possess rights, powers, and duties . . . expressed or reasonably implied by any applicable law of this state").

> 2.   Features of the Plan

The plan of reorganization ("Plan") adopted by MetLife's board of directors ("Board"), as amended on November 16, 1999, provided for the fourth method of demutualization.  Plan, Joint Ex. 1 at 6 ("3.2 Basis for Choice of Method") (D.E. No. 530-10).  The major features of the Plan included:

1) a requirement that consideration be given to policyholders in the form of shares of common stock, cash, or policy credits, allocated among policyholders based on an actuarial calculation, as detailed in a separate Actuarial Contribution Memorandum, *id.* at 18 ("7.1 Allocation of Allocable Common Shares");

2) the creation of a MetLife Policyholder Trust (the "Trust") to hold the common stock that would be issued to eligible policyholders in consideration for their extinguished membership interests, *id.* at 6 ("3.3 Establishment and Operation of the Trust.");

3) the establishment of an accounting mechanism known as a "closed block," the stated purpose of which was "to ensure reasonable dividend expectations of policyholders," *id.* at 2 (defining "closed block"); *id.* at 22 ("Article VIII Method of Operation for Participating Business");

4) a condition that the demutualization would not be effective unless it met the requirements and satisfaction of the Superintendent, *id.* at 10 ("5.2 Effectiveness of Plan");

5) an Initial Public Offering ("IPO") to take place simultaneously with the effective date of the demutualization, *id.* at 10-11 ("5.2 Effectiveness of Plan"); and

6) a caveat that the Board had authority to withdraw the Plan at any time prior to its effective date, *id.* at 27 ("10.4 Amendment or Withdrawal of the Plan").

8

This sixth feature was particularly significant for purposes of the instant case. As noted below, the public hearing, circularization of voters with the Booklet, availability of telephone hotline to answer questions of voters, and the Opinion of the Superintendent approving the Plan and notice to policyholders all occurred before the Board's power to withdraw the Plan expired. *See infra* Sections II.B. and II.C.

3. Exercise of Board's Business Judgment in Selecting Plan

After considering the limitations of alternate statutory methods one and two, the Board determined that the flexibility of the fourth was "best suited to provide [MetLife's] policyholders with a fair and equitable result." Plan at 6 ("3.2 Basis for Choice of Method"). The Board concluded that it was "fair and equitable to policyholders" and "in the best interests of MetLife and its policyholders." *Id.* at 6 ("3.2 Basis for Choice of Method"). *See also* Stipulation of Agreed Facts ("Stipulation"), Oct. 30, 2009, at ¶ 15 (D.E. No. 530-9) (noting that MetLife was ineligible for the third method).

Under the business judgment rule, the Board had broad discretion in adopting policy, strategy, and tactics. *See, e.g., Clifford v. Metropolitan Life Ins. Co.*, 264 N.Y.S.2d 693, 696 (N.Y. App. Div. 1942) ("Directors are presumed to act honestly and in accordance with their best judgment, and . . . [in matters] of internal management . . . courts seldom interfere with the discretion so exercised by directors."). *See also* James A. Smallenberger, "Restructuring Mutual Life Insurance Companies: A Guide Through the Process," 49 Drake L. Rev. 513, 540 (2001) (noting that demutualization approval process is structured to ensure that boards are protected by the business judgment rule). The Board appropriately exercised its discretion in choosing method four and in selecting the means of execution.

9

4.    Reliance on Superintendent

In late 1998, MetLife notified the Superintendent of its intention to demutualize soon after the Board authorized management to develop a plan of reorganization. *See* Opinion ¶ 15, Stipulation ¶ 10. Particularly because the Board opted for the fourth method that lacked statutory detail, it had to make sure the details of the Plan satisfied the Superintendent.

MetLife personnel and advisors worked closely with the Superintendent and his staff and advisors for over a year in developing details of the Plan. There were, for example, weekly meetings regarding the detailed and abstruse calculation of compensation policyholders would receive in connection with the transaction. *See, e.g.*, Transcript of Joseph Reali Deposition (D.E. No. 363-35) at 152:5-9 (stating that MetLife representatives met and corresponded with the Department's representatives regarding methods used to calculate actuarial contributions and assets and liabilities of its closed block); *id* at 37:23-25 (stating that MetLife "discussed issues time and again with the New York Insurance department"); *id.* at 83:8-20 (stating that MetLife personnel kept its own advisors apprised of "where [it] was on discussions with the Insurance Department"); Transcript of Michael Harwood Deposition (D.E. No. 431-2) at 22:6-21 (stating that MetLife representatives met weekly with Department regarding formation of closed block and actuarial calculation of equity share).

MetLife's Board and management relied on the Superintendent's review and expertise in assuring themselves that the demutualization was being conducted properly—particularly with respect to critical actuarial calculations and formation of the closed block that would assure future dividends to policyholders. *See, e.g.*, Transcript of Robert Schwartz Deposition (D.E. No. 508-4) at 78:22-79:11 ("I relied . . . on the insurance department who in turn hired, as I recall, outside professionals, actuaries. You know, we were extremely well-regulated and constantly

10

under their supervision and review, so I felt very comfortable that it was being done well and properly"); Transcript of Stewart Nagler Deposition (D.E. No. 508-5) at 202:20-203:14 (stating that the Board adopted the Plan that he Superintendent had indicated that the Plan was "approvable. . . [and MetLife] could go ahead and just plan that it would be approved"); Transcript of Robert Benmosche Deposition (D.E. No. 508-6) at 61:9-14 (stating that, in connection with technical and actuarial matters, "you have to rely on the advisers and the Insurance Department. The insurance Department has a large number of people that go through the details of how you calculate it and review the calculations").

The Plan adopted by the Board—and then approved by voting policyholders—reflected MetLife's responses to the Department's "comments on all elements of the plan, suggestions, [and] questions".  Transcript of Joseph Reali Deposition (D.E. No. 363-37) at 9:17-23.

The Board was aware that MetLife's demutualization could not be effective without the Superintendent's approval. By its own terms, the Plan could be amended, withdrawn, or altered in response to any concerns the Superintendent might raise before the IPO of MetLife's stock. Plan at 27; Oct. 13, 2009 Hr'g Tr. at 56:16-57:8. Any amendments would require the Superintendent's approval in order to become effective. Plan at 27.

### B.      Solicitation of Policyholder Votes

#### 1.      Mailings

On November 24, 1999, MetLife began mailing the Booklets to policyholders describing the Plan in advance of the policyholder vote. Stipulation ¶ 20. The mailing was completed on December 21, 1999, having by then reached substantially all of the 11 million policyholders entitled to vote on and receive compensation under the Plan. *Id.* at ¶¶ 17, 20.

Each Booklet contained:

- a cover letter from MetLife's Chairman of the Board;

- a brochure titled "Important! Read Me First";

- a two-part Policyholder Information Booklet;

- a ballot for voting on MetLife's demutualization plan;

- a card listing the policies for which a policyholder was eligible to receive compensation and the form of compensation to be received;

- a card that allowed policyholders eligible to receive compensation in the form of stock to elect instead to receive compensation in the form of cash;

- an Internal Revenue Service Form W-9, along with a return envelope for returning the ballot, the Form W-9, and/or the card electing cash compensation.

*See* Booklet, Joint Ex. 3 to Final Pretrial Order, Oct. 30, 2009 (D.E. Nos. 530-12 and 530-13).

*See also* Stipulation ¶ 19 (listing contents of Booklet).

Featured in the Booklet was the notice of the purpose, date, time, and location of the policyholder vote:

> In order for the Plan to be approved, at least two-thirds of the votes validly cast by eligible policyholders must be in favor of the Plan. You may cast your vote in person at MetLife or return your ballot by mail using the postage-paid envelop enclosed.  You may vote in person at the offices of MetLife:
>
> Place: MetLife
>         One Madison Avenue, 1st Floor
>         New York, New York
> Date: February 7, 2000
> Time: 10:00 a.m. to 4.00 p.m. (EST)
>
>            ****
> You must either vote in person or mail the ballot card (card #2) so that we receive it by 4:00 p.m. (EST) February 7, 2000 in order for your vote to count.

Booklet at 5. *See also id.* at 9-10 (letter of Department stating, time, date, and place of vote).

Included was notice of the public hearing to be conducted by the Superintendent in advance of

the policyholder vote. It stated that policyholders could make oral statements or written

submissions in connection with the hearing:

> The Superintendent of Insurance of the state of New York has
> scheduled a public hearing to consider the Plan of Reorganization
> adopted by the Board of Directors of Metropolitan Life Insurance
> Company (MetLife) on September 28, 1999 and by amended
> adopted on November 16, 19999.
>
> THE PUBLIC HEARING WILL BE HELD AT THE GRAND
> HYATT NEW YORK, PARK AVENUE AT GRAND CENTRAL
> (AT 42ND STREET), IN THE EMPIRE STATE BALLROOM,
> NEW YORK, NEW YORK, BEGINNING AT 10:00 A.M. (EST)
> ON JANUARY 24, 2000.
>
> ****
>
> If you would like to submit a written statement concerning the Plan
> to the New York State Superintendent, you may do so . . . . If you
> would like to make an oral statement at the public hearing, you
> should register [to do so] by January 20, 2000.

*Id.* at 8 (emphasis in original).

The bulk of the Booklet consisted of the Policyholder Information Booklet (PIB), which

was over 350 pages. Part One summarized the Plan, including a complete copy of the Plan of

Reorganization (with some exhibits and schedules in summary form). Part Two contained

information about MetLife's business and finances. The stated purpose of the PIB was to "give

[policyholders] information to help [them] decide how to vote." *Id.* at 6.

It is apparent that one purpose of the Booklet was to convince policyholders to vote for

the Plan—in part by assuring them that the plan, though adopted by the Board, was subject to

final approval of the Superintendent. The Chairman's Letter supported a favorable vote,

explaining:

13

> In electing to demutualize, the Board was guided by one overriding concern: the best interests of our policyholders.
>
> <div align="center">****</div>
>
> The Board of Directors has determined that the reorganization is in the best interests of MetLife and its policyholders, and has found the demutualization to be fair and equitable to policyholders. Therefore, the Board urges you to vote YES in favor of approving the demutualization plan.

*Id.* at 1.

The pivotal role of the Superintendent was highlighted throughout the Booklet. A letter from the Department – embossed with the state agency's seal – was enclosed with the Read-Me-First brochure at the front of the Booklet. Signed by the Deputy Superintendent, the letter described the Department's involvement in the process and made clear that, even if policyholders were to vote in favor of the transaction, MetLife's demutualization would not become effective without final approval of the Superintendent. *Id.* at 9. Similar statements were contained throughout. *See, e.g., id.* at 2, 4, 9, 12, 26, 44.

The Superintendent reviewed, commented upon, and approved the Booklet before it was mailed to policyholders. Opinion ¶ 216 ("[t]he policyholder notices and accompanying documents, including the Policyholder Information Booklets, Parts One and Two . . . were approved by the Superintendent . . ."); Transcript of Joseph Reali Deposition (D.E. No. 363-35) at 61:23-62:13 ("Everything that was sent out [to policyholders] was discussed with the Insurance Department").

<div align="center">14</div>

2.          Telephone

Included in the Booklet were toll-free telephone numbers for policyholders to call if they

had questions, needed assistance, or wanted additional information. *See, e.g.*, Booklet at 1, 2, 57.

Prospective voters took advantage of this telephone hotline:

> MetLife received **over 2.5 million phone calls** from policyholders
> with questions about the demutualization, from time of the mailing
> until after the initial public offering.   To handle those calls,
> MetLife had a voice response unit that will allow policyholders to
> get answers to the frequently asked questions at any time.   In
> addition, MetLife had 500 customer service representatives
> available to answer further questions.
>
> ****
>
> As of April 11, 2000, the call centers had received 2,513,183 calls
> (including 66,183 calls in Canada).   41.9% of these inquiries
> [1,053,023 calls] were satisfied through the voice response unit.

Ex. 2 to Jared Stamell Decl., Apr. 4, 2008, at 28-29 (D.E. No. 360-13) (emphasis in original).

MetLife prepared scripts to be used at call centers, with answers to expected queries.

Defs.' Letter of Oct. 14, 2009 (attaching scripts) (D.E. No. 499).   Almost 50 of the prepared

responses directed callers to the New York insurance law; they made it clear that the

demutualization would not become effective without approval of the Superintendent. *See id.*

(and attachments).   The Superintendent and his advisors had reviewed and commented on drafts

of the telephone scripts before they were used. *See id.*; Transcript of Ira Friedman Deposition

(D.E. No. 363-24) at 27:18 (stating that development of call center scripts was iterative process

involving Department review and comments).

## C.     Superintendent's Investigation and Approval

### 1.     Appointment and Reliance on Advisors

Four outside advisors to assist in the review of MetLife's proposed demutualization were appointed by the Superintendent. They were legal consultant Fried, Frank, Harris, Shriver and Jacobson; financial consultant The Blackstone Group; and actuarial consultant Milliman & Robertson. *See* Opinion ¶ 16; N.Y. Ins. L. § 7312(h) (authorizing appointments).

With the help of his advisors, the Superintendent posed searching questions to, and requested detailed information from, MetLife about the substantive details of the transaction and requested actuarial and other documentation to perform their analysis. *See, e.g.*, Letter from N.Y. Ins. Dep't to MetLife, July 6, 1999 (D.E. No. 431-5) (requesting actuarial information on behalf of consultant and stating that "[t]he department will not be in a position formally or informally to approve any aspect of the proposed transaction which is dependent upon matters which the department and its advisors have not had an adequate time to review, including any necessary revisions"); Letter from MetLife to N.Y. Ins. Dep't and its Consultants, Jan. 12, 1999 (D.E. No. 531-4) (containing responses to information request from the Department). The Department and its appointed advisors reviewed and relied upon information MetLife provided on its own volition as well as at the Department's specific request. *See* Opinion ¶¶ 17, 127, 131.

### 2.     Public Hearing

On January 24, 2000, the Superintendent held a public hearing, at which policyholders and members of the public were invited to speak on the proposed demutualization. He put critical questions to MetLife management and directed them to answer inquiries from policyholders and the public. *See generally* Jan. 24, 2000 Public Hr'g Tr. (D.E. No. 499-4)

16

[hereinafter "Public Hr'g Tr."], *available at* http://www.ins.state.ny.us/life/demut/met_trans.pdf (last accessed Nov. 23, 2009).

Approximately 150 people attended the hearing. Opinion ¶ 25. It lasted for some three hours. *Id.* ¶ 26. Accompanied by five officials from the Department, the Superintendent was present. *See* Public Hr'g Tr. at 2:4-13.

A video of the hearing was posted on the Department's website. *See id.* at 114:16; Press Release, N.Y. Dep't Ins., "Department Makes Video of Public Hearing Available On Web Site For First Time: Consumers Can Access Video and Audio of MetLife's Demutualization Hearing" (Jan. 27, 2000), *available at* http://www.ins.state.ny.us/press/2000/p0001272.htm (last accessed Nov. 23, 2009).

Anyone who intended to pose a question was given ten minutes to make an oral statement. Public Hr'g Tr. at 5:5-10. Twenty members of the public registered with the Department as proposed speakers, but only nine presented statements. Opinion ¶ 26. *See also* Public Hr'g Tr. at 52:18-113:22 (statements of Richard Norton, Ralph Kabrinik, V.J. Shash, Lance Gad, Paul Benton Weeks III, Tom Tierney, Anita Kartalopoulos, Phillip Bieluch, and Thomas Welling).

One policyholder spoke positively about the Plan. *Id.* at 62:14-65:4 (statement of V.J. Shah). Each of the others criticized the Plan and its various components, including the methods used to calculate policyholder compensation and adequacy of the Booklet. *E.g.*, *id.* at 52:18-58:11 (statement of Richard Norton) (policyholder criticizing, among other things, valuation of "right to vote"); *id.* at 65:7-70:19 (statement of Lance Gad) (self-described expert, criticizing methods of allocation as unfair and inequitable); *id.* at 70:20-80:12 (statement of Paul Benton Weeks III) (attorney criticizing adequacy of disclosures); *id.* at 80:13-92:25 (statement of Tom

17

Tierney) (actuary criticizing adequacy of closed block and compensation to each policyholder); *id.* at 99:19- 109:16 (statement of Phillip Bieluch) (actuary criticizing efficacy of closed block and adequacy of disclosures); *id.* at 109:21-113:22 (statement of Thomas Welling) (chartered underwriter and financial consultant criticizing 10-share fixed minimum allocation of compensation).

Robert Benmosche, MetLife's then Chief Executive Officer and Chairman of the Board, reiterated the contents of his letter that had been included in the Booklet:

> Based on our extensive analysis and consultation with independent financial, actuarial, legal and other advisors . . . . [and] based on careful consideration of various elements of the plan over the preceding months, our board of directors unanimously adopted our demutualization plan.   Our directors concluded, among other things, that the plan is in the best interests of MetLife and our policyholders, and that it is fair and equitable to our policyholders.

*Id.* at 10:21-11:1.

MetLife's Chief Financial Officer, Stuart Nagler, discussed the method of calculating and allocating policyholder compensation, Trust, and the closed block. *See id.* at 14:2-23:4.  General Counsel, Gary Beller, "reviewed how MetLife's demutualization plan and related actions taken by MetLife will have satisfied each and every requirement of New York Insurance Law." *Id.* at 23:14-23:18.  He emphasized that the Superintendent had reviewed and approved the packet of materials mailed to policyholders, *id.* at 26:22-27:1, and that the Plan would not be effective without ultimate approval from the Superintendent, *id.* at 30:2-30:14.

A representative of MetLife's financial advisors, Goldman Sachs & Company ("Goldman") and Credit Suisse First Bank Boston, reiterated the essence of their fairness opinions, that "the exchange of the aggregate policyholders' membership interests in MetLife for

18

shares of holding company stock, cash or policy credits in accordance with the plan is fair from a financial point of view to [eligible] policyholders." *Id.* at 39:16-40:4. The financial advisors declared that they expected to coordinate the IPO with the Superintendent, who would be given an opportunity to monitor that component of the transaction. *Id.* at 38:18-28.

MetLife's actuarial advisor, Kenneth Beck, a principal of PricewaterhouseCoopers ("PWC"), reiterated the content of PWC's fairness opinion, that "the plan for allocating compensation to eligible policyholders is fair and equitable," and that "the plan makes appropriate provisions with regard to the objective funding and operations for the closed block, as well as providing a vehicle to make appropriate adjustments to further policy dividends if the underlying experience changes. *Id.* at 45:19-46:1.

The Superintendent directed MetLife to answer five questions, regarding, among other things, the Plan's absence of subscription rights, the anticipated timing of the IPO, and the efforts MetLife was making to find policyholders for whom MetLife had no address. *Id.* at 46:10-5:24. Written versions of statements made at the public hearing were submitted to the Department and became part of the written record of the proceedings.

        3.     Written Submissions

The record of the public hearing remained open until February 14, 2000 so that the Superintendent could obtain additional written comments, questions, or statements about MetLife's demutualization plan from policyholders and others. *Id.* at 115:25-116:2. A total of 165 letters were received by the Department. Opinion ¶ 28. Many of the letters criticized policyholder compensation and adequacy of materials mailed in solicitation of their votes. *See* Defs.' Letter, Oct. 13, 2009 (D.E. No. 512) (attaching correspondence).

The written submissions and their responses became part of the public record of the Department's hearing. *See* Opinion ¶ 28. They were reviewed by the Superintendent and his advisors during their investigation of MetLife's proposed demutualization. *See id.*

    4.    Opinion and Decision

On April 4, 2000, the Superintendent issued his Opinion approving MetLife's demutualization. The Opinion contains conclusions with respect to the fairness and equity of the demutualization and the adequacy of the disclosure materials sent to policyholders. *See generally* Opinion ¶¶ 198-238 (section titled "Conclusions and Decision"), including the following:

1) "The reorganization of MetLife from a mutual insurer to stock company form, as set forth in the Plan, is in the best interests of MetLife and its policyholders, in compliance with Section 7312(c)(2)." *Id.* ¶ 200.

2) "The provisions of the Plan are fair and equitable to the policyholders of MetLife, in compliance with Section 7312(c)(3)." *Id.* ¶ 201.

3) "The Policyholders' Membership Interests will be exchanged for an aggregate amount of consideration that is fair and equitable to the policyholders of MetLife and meets the requirements of Section 7312, in compliance with Section 7312(d)(4)(A)." *Id.* ¶ 204.

4) "The consideration to be given to the policyholders of MetLife will be allocated among such policyholders in a manner which is fair and equitable in compliance with Section 7312(d)(4)(B)." *Id.* ¶ 205.

5) "The provisions of the Plan are fair and equitable to the policyholders of MetLife, taking into account the legitimate economic interests of participating policyholders as delineated in Section 7312, in compliance with Section 7312(d)(4)(D)." *Id.* ¶ 207.

6) "The policyholder notices and accompanying documents, including the Policyholder Information Booklets, Parts One and Two, contained sufficient information about the proposed reorganization to enable Eligible Policyholders to make an informed decision regarding the Plan, and, for that reason, were approved by the Superintendent pursuant to Section 7312(i), (k)(1)." *Id.* ¶ 216.

The sixth point above, on the adequacy of information supplied to prospective voters, was critical. It cut the legs off any contention that notice was insufficient, unfair, or fraudulent. Other sections of the Opinion provide the facts and the law supporting the Superintendent's conclusions. The first two sections summarize applicable provisions of New York insurance law and overview the process of MetLife's demutualization. *Id.* at ¶¶ 1-14 ("I. Legislative Background and Statutory Requirements"), ¶¶ 15-30 ("II. Procedural History"), ¶¶ 31-42 ("III. Plan of Reorganization"). Detailed findings and analysis of the Superintendent with respect to specific components of MetLife's plan of demutualization are included. *See id.* at ¶¶ 43-71 ("IV. The Trust"), ¶¶ 72-79 ("V. Purchase and Sale Program"), ¶¶ 80-112 ("VI. IPO, Private Placements, and Other Capital Raising Transaction"), ¶¶ 113-141("VII. Eligibility and Policyholder Consideration"), ¶¶ 142-161 ("VIII. The Closed Block"), ¶¶ 162-176 ("IX. Restrictions on Acquisition of Securities by MetLife Personnel."), ¶¶ 177-181 ("X. Future Operations and Solvency"), ¶¶ 182-188 ("XI. Corporate Governance"), ¶¶ 189-191 ("XII. Tax Matters"), ¶ 192 ("XIII. Department of Labor Exemption"), ¶¶ 193-194 ("XIV Securities Law Matters"), ¶ 195 ("XV. Expenses"), ¶¶ 196-197 ("XVI. Notice of Pendency").

Throughout, the Opinion describes the steps the Superintendent took to investigate and to decide whether to approve the Plan, including a description of the public hearing and the fact that he appointed advisors to aid in the investigation. *See id.* ¶¶ 15-17, 21. Described were the issues and materials the Superintendent relied on in rendering his Opinion, including:

- The oral and written comments and objections on the demutualization submitted to the Department by policyholders and members of the public. *See, e.g., id.* ¶¶ 34, 37, 50, 54, 66, 84, 86, 106, 125, 128, 145, 153, 188, 237.

- The opinions of actuaries and other consultants. *See, e.g. id.* ¶¶ 15-17, 42, 83, 126, 127, 129, 131, 144, 160, 161, 194.

- The compensation given to policyholders and the allocation of that compensation among those policyholders, *see, e.g., id.* ¶¶ 119-131, 205, including the fixed share component and actuarial formula used to calculate the formula, *id.* ¶¶ 122-124, 126-128.

- The structure and funding of the closed bock. *See id.* ¶¶ 142-161.

- The information on the demutualization that was disclosed to policyholders. *See e.g., id.* ¶¶ 66, 216, 238.

**D.    Contentions as to Admission of Superintendent's Opinion**

Defendants seek to have the entire Opinion, consisting of 238 paragraphs, admitted into evidence. *See* Ex. 8 to Proposed Final Pretrial Order, Oct. 30, 2009 (D.E. No. 530-8) (listing Opinion as Defendants' Trial Exhibit K).  Plaintiffs oppose any reference to the Opinion.

It is plaintiffs' contention that the disclosures to policyholders in the Booklet contained a number of misrepresentations—through omissions and misstatements—and that MetLife made those misrepresentations with requisite scienter.

Alleged misrepresentations in the Booklet, and particularly the PIB, include:

1) the PIB omitted to state that the actuarial method used to calculate policyholders' contributions to MetLife's surplus arrived at a value of $15.3 million, far higher than the $8.4 million in stock that these policyholders received as compensation;

2) the PIB omitted to state that MetLife's Method 4 demutualization (which involved an exchange of policies for stock with the right to elect cash), as opposed to Method 2 demutualization (which involved the exchange of policies for cash with the right to elect stock), was chosen for the benefit of MetLife and not the policyholders, because Plaintiffs allegedly would have received double the compensation under the latter method;

3)  the PIB omitted to state that policyholders would surrender their right to annual dividends from their contributions to MetLife's surplus; and that

22

4) the PIB misstated that "reasonable dividends would be paid as declared," when in plaintiffs' view the assets allocated to pay dividends had been limited.

*See, e.g.*, Pls.' 2d Consol. Am & Supp. Class Compl. [hereinafter "Compl."], at ¶¶ 55-56, 103-106 (D.E. No. 414-1).

Plaintiffs contend that because of MetLife's misrepresentations in the PIB, "it was not possible for participating policyholders to make an informed decision to approve or disapprove the demutualization plan." *Id.* at ¶ 55. Central to the claim are allegations that the PIB did not explain that—according to plaintiffs—policyholders received only 54¢ on the dollar for their policies, that dividends were reduced, and that MetLife engaged in fraud by not stating this in the PIB. *Id.* ¶ 61.

**III.    Federal Securities Law**

Plaintiffs' claims arise under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (collectively "Rule 10b-5"), and Section 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.* ("Section 12(a)(2)"). Before assessing the admissibility of the Opinion, an explication of these federal laws is in order.


**A.    Rule 10b-5 and Section 12(a)(2) Generally**

The Securities Act and the Exchange Act share a joint purpose of protecting purchasers and holders of securities. Enacted in the aftermath of the stock market crash of 1929, the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, regulates initial offerings. The Exchange Act, 15 U.S.C. § 78a, enacted a year later, regulates the sale and distribution of securities in the secondary market. Though targeted to different aspects of securities transactions, the statutes

23

cover overlapping conduct. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 ("It is hardly

a novel proposition that the Securities Exchange Act and the Securities Act prohibit some of the

same conduct.") (internal quotation marks omitted).

Section 10(b) of the Exchange Act makes it unlawful to "to use or employ, in connection

with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may proscribe." 15 U.S.C. §

78j(b). Rule 10b-5, the Securities and Exchange Commission rule implementing the statute,

prohibits "mak[ing] any untrue statement of material fact or omit[ting] to state a material fact

necessary in order to make statements made, in the light of the circumstances under which they

were made, not misleading." 17 C.F.R. § 240.10b-5(b) (2008). *See Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 318 (2009) (recognizing implied private right of action).

To succeed on a civil claim under Rule 10b-5, a plaintiff has the burden of proving that,

in connection with the purchase or sale of securities, the defendant made a materially false

statement or omitted a material fact, with scienter, and that plaintiff relied on defendant's

actions, and was injured as a result. *ECA Local IBEW Joint Pension Trust of Chicago v. JP*

*Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2007). The Supreme Court has described these

elements as "(1) material misrepresentation; (2) scienter; (3) a connection with the sale of a

security; (4) reliance; (5) economic loss; and (6) loss causation." *Dura Pharmaceuticals, Inc. v.*

*Broudo*, 544 U.S. 336, 341 (2005) (internal citations and quotations omitted). *See also, e.g.*,

*Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir. 1986) (stating that plaintiff must show

that the defendant had no knowledge of the alleged misrepresented or omitted a material fact).

24

Section 12(a)(2) makes it unlawful to "offer or sell a security . . . by means of a prospectus . . . which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 77*l* (a)(2).

The elements for establishing liability under Section 12(a)(2) are similar, though not identical, to those for establishing liability under Rule 10b-5. Although Section 12(a)(2) does not require that plaintiffs show reliance, causation, or scienter, *see Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)), *Wilson v. Saintine Exploration & Drilling* Corp, 872 F.2d 1124, 1126 (2d Cir. 1989), *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1034 (2d Cir. 1979), plaintiffs still have the burden of showing that the alleged misstatements or omissions were material facts and that the defendant had no knowledge of those facts, 15 U.S.C. § 77*l* (a)(2), *Healey v. Chelsea Resources Ltd.*, 947 F.2d 611, 617-18 (2d Cir. 1991), *Mayer*, 803 F.2d at 755. To establish liability under Section 12(a)(2), plaintiffs must prove that they suffered an economic loss. *Goodridge v. Harvey Group, Inc.*, 778 F. Supp. 115, 129 (S.D.N.Y. 1991); Oct. 22 Hr'g Tr. at 36:5-23. *See also Commercial Union Assur. Co. v. Milken*, 17 F.3d 608, 615-16 (2d Cir. 1994).

While Section 12(a)(2) does not require a plaintiff to show that the defendant acted with scienter, the statute provides an affirmative defense: defendants "did not know, and in the exercise of reasonable care could not have known, of such untruth or omission" alleged by plaintiffs. 15 U.S.C. §77*l*(a)(2). *See Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1019 (2d Cir. 1989). Where, as here, defendants rely on the affirmative defense of reasonable care, defendants' state of mind is central to any liability under Rule 10b-5 or Section 12(a)(2). *See* Ex. 2 to Final Pretrial Order, Oct. 30, 2009, at 3 (D.E. No. 530-2).

25

**B.    Materiality**

"In order to prevail on a Rule 10b-5 [or a Section 12(a)(2)] claim, a plaintiff must show

that the statements were misleading as to a material fact." *Basic Inc. v. Levinson*, 485 U.S. 224,

238 (1988). *See Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1184 (S.D.N.Y. 1996)

(noting that element of materiality for Section 12(a)(2) and Rule 10b-5 is the same).

A fact is material if "there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to act." *ECA, Local 134 BEW Joint Pension Trust of Chi.*

553 F.3d at 197 (citation omitted).  An omission is material if there is a "substantial likelihood

that the disclosure of the omitted fact would have been viewed by the reasonable [policyholder]

as having significantly altered the 'total mix' of information made available." *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S.

438, 449 (1976). *Accord Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002);

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F. 3d 2 (2d Cir. 1996).

These "reasonable investor" tests require a context-specific inquiry.  *See generally In re*

*Britannia Bulk Holdings Inc. Securities Litig.*, 2009 WL 3353045, at *6 (S.D.N.Y. Oct. 19,

2009).  As the Supreme Court has observed, "the ultimate determination of materiality . . .

requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a

given set of facts and the significance of those inferences to him. . . ." *TSC Indus., Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 450 (1976).  "[W]hether an alleged misrepresentation or omission

is material necessarily depends on all relevant circumstances of the particular case." *Ganino v.*

*Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

### C.    Scienter

The scienter requirement for Rule 10b-5 claims is well established.  The Supreme Court

held in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) that no "private cause of action

for damages will lie under [Section] 10b and Rule 10b-5 in the absence of any allegations of

scienter. . . ."  The requirement was recognized in the Second Circuit even earlier.  *See Novak v.*

*Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *Shemtob v. Shearson, Hammill & Co.*, 448 F.2d 442,

445 (2d Cir. 1971); *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1301 (2d Cir. 1973) (en banc).

Scienter connotes "with knowledge."  It refers to a defendant's mental state.  It means

here "intent to deceive manipulate, or defraud." *Tellabs*, 551 U.S. at 318; *Kalnit v. Eichler*, 264

F.3d 131, 138 (2d Cir. 2001).  "[P]roof of scienter required in fraud cases is often a matter of

inference from circumstantial evidence." *Herman & MacLean v. Huddleston*, 459 U.S. 375,

390-91 n.30 (1983); *S.E.C. v. U.S. Environmental, Inc.*, 2003 WL 21697891, at \*22 (S.D.N.Y.

2003).

When the defendant is a company, scienter refers to the state of mind of one or more of

the company's agents. *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital,*

*Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Here that would include the Board and MetLife's

management.

Recklessness is a sufficiently culpable mental state to establish scienter in securities fraud

cases. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 45 (2d Cir. 1978)); *Teamsters Local*

*445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008); *ATSI*

*Commc'ns, Inc v. Shaar Fund Ltd.*, 493 F.3d 87, 99 n.3 (2d Cir. 2007).  Relevant circumstantial

27

proof includes evidence that a defendant had an opportunity and motive to act fraudulently. *See Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).

Reckless conduct requires "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142. *Accord Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996); *Rolf*, 570 F.2d at 47. Included in recklessness is making misstatements, through omissions or misrepresentations, with "reckless disregard for the truth". *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).

A defendant who believes his statements to be false acts with requisite scienter. *Rolf*, 570 F.2d at 45. Scienter also exists if a defendant knows of omitted facts which make its statement materially misleading. *See S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996) (defining "scienter" to include "at least knowing misconduct."). *Cf.* Restatement (Second) of Torts § 529 (defining misrepresentation as fraudulent if it "stat[es] that truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter").

Often, because of practical problems of proof, plaintiffs will seek to establish scienter by showing recklessness. *See Rolf*, 570 F.2d at 47. *See generally* Commentary, "On Scienter, Knowledge, and Recklessness under the Federal Securities Laws," 34 Hous. L. Rev. 121, 187-96 (1997). The ultimate question for the jury is whether, "under the circumstances, the defendants knew or . . . should have known that that they were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

### D.      Non-Negligence

While recklessness is not required to establish liability under Section 12(a)(2), a defendants' knowledge and state of mind is nonetheless important where, as here, the defendant puts forward the defense of "reasonable care" under 15 U.S.C. §77*l*(a)(2).

To defeat Section 12(a)(2) liability on this affirmative defense, a defendant must prove that he acted with "reasonable care" in preparing a prospectus that contains the allegedly fraudulent misrepresentations. *See, e.g., Royal Am. Managers, Inc.*, 885 F.2d 1011, 1018 (2d Cir. 1989) ("No liability lies under Section 12(2) where the defendant did not know, and in the exercise of reasonable care could not have known, of [the alleged] untruth or omission.") (internal citation and quotation omitted); *In re Worldcom Inc. Secs. Lit.*, 346 F. Supp. 2d 628, 663 (S.D.N.Y. 2004) ("Section 12(a)(2) . . . only requires the defendant to show that it used reasonable care [in order to defeat liability]."). For purposes of the instant case, the Booklet can be considered a prospectus.

Because neither the Securities Act nor other securities laws define "reasonable care," courts have applied common law. *Demarco v. Edens*, 390 F.2d 836, 842 (2d Cir. 1968). "Reasonable care is the degree of care which a reasonably prudent [person] would use under like circumstances." *Densberger v. United Technology Corp*, 297 F.3d 66, 69 (2d Cir. 2002). *See also* Restatement (Third) of Torts § 3, cmt. A ("Conduct that displays reasonable care is conduct . . . that shows 'reasonable prudence.'"). *Accord In re Fuwei Films Securities Litig.*, 634 F. Supp. 2d 419, 436, n.10 (S.D.N.Y. 2009) ("[S]ection 12(a)(2) imposes negligence liability on all sellers"); *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 689 (3rd Cir. 1991) ("Section 12(2) . . . makes actionable negligent misrepresentation"). "[T]he level of care required . . .

29

depend[s] on a variety of factors, including the manner of sale, the nature of the relevant

security, [and] the nature of the seller." Therese H. Maynard, "The Affirmative Defense of

Reasonable Care Under Section 12(2) of the Securities Act of 1933," 69 Notre Dame L. Rev. 57,

86 (1993).

"[T]he crucial issue is the scope of the seller's reasonable diligence burden, including any

obligation on the seller's part to make a 'reasonable investigation.'" *Id.* at 87.  Courts have

likened Section 12(a)(2)'s "reasonable care" standard to the requirement that sellers make a

"reasonable investigation" in order to avoid liability under Section 11 for making fraudulent

misrepresentations in a registration statement. *See, e.g.*, *In re Worldcom. Inc. Secs. Litig.*, 346 F.

Supp. 2d. 628, 663 (S.D.N.Y. 2004) (discussing the standards); *Sanders v. John Nuveen & Co.,*

*Inc.*, 619 F.2d 1222, 1228 (7th Cir. 1980) (equating the standards); *John Nuveen & Co., Inc. v.*

*Sanders*, 450 U.S. 1005 (1981) (Powell, J. dissenting from denial of certiorari) (stating that

Section 12(a)(2)'s "reasonable care" standard is lower than the "reasonable investigation"

standard under Section 11).  A defendant may show "reasonable care" by introducing evidence

that the allegedly fraudulent prospectus was the result of reasonable investigation.


## IV.    Admissibility of Superintendent's Opinion

Plaintiffs contend that the Opinion is: (1) inadmissible under Rule 803(8)(C) because it

consists of hearsay and conclusions of law, not factual findings, and is not the result of an

investigation; (2) inadmissible under Rule 402 because its conclusions are conclusions of New

York State law that are irrelevant to this action; and (3) inadmissible under Rule 403 because it is

likely to receive undue consideration by the jury.  Pls.' Mot In Limine Exclude Superintendent's

Opinion 1 (D.E. No. 421-2).

## A.     Relevance—Rules 401 and 402

Relevant evidence is evidence having "any tendency to make the existence of any fact that is of consequence in the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed. R. Evid. 402. The federal rules favor the liberal admission of evidence.

The significance of the Opinion is that it tends to make several factual elements of plaintiffs' claims less likely—including materiality, scienter, negligence, and recklessness.

### 1.     Hearsay

Assuming the truth of its assertions, the Opinion is relevant, at a minimum, to materiality and scienter. It is probative on the issue of materiality because much of it makes it less likely that "a reasonable [policyholder] would consider [the allegedly misrepresented facts] important in deciding how to act." *ECA, Local 134 BEW Joint Pension Trust of Chi.*, 553 F.3d at 197 (2d Cir. 2009) (internal citation and quotation marks omitted).

Contained in the Opinion is the Superintendent's critical conclusion that the Booklet embodied "sufficient information for Eligible Policyholders to make an informed decision." Opinion ¶ 216. This finding undercuts plaintiffs' claim that the alleged nondisclosures were material because they made it impossible "for participating policyholders to make an informed decision to approve or disapprove the demutualization plan". Compl. at ¶ 55.

31

The Superintendent's findings that the transaction was "fair and equitable" bear directly on plaintiffs' claims that the alleged nondisclosures were material because there was something improper or unfair about the transaction.  Examples include the following:

1) Plaintiffs allege that "[t]he consideration allocated on both a fixed and variable basis was not fair, and the statements in the Prospectus that they were fair are false." *Id.* at ¶ 71. But the Superintendent concludes that "the consideration to be given to the policyholders of MetLife will be allocated among such policyholders in a manner which is fair and equitable." Opinion ¶ 205.

2) Plaintiffs allege that the Booklet failed to state that MetLife's Method 4 demutualization was chosen for the benefit of MetLife rather than policyholders, because policyholders would have fared better under Method 2.  Compl. at ¶ 56(g). But the Superintendent concluded that Method 4 "is in the best interests of MetLife's policyholders," Opinion ¶ 200, and involved an exchange of policies for "an aggregate amount of consideration that is fair and equitable," *id.* at ¶ 204.

3) Plaintiffs allege that the Booklet misstated that "reasonable dividends" would be paid as declared, when in their view, the assets allocated to pay dividends had been limited.  Compl. at ¶ 72. But the Superintendent and his advisors examined the calculations and determined the funding of the closed block was efficacious, and that MetLife would have sufficient capital and surplus to remain solvent. *See, e.g.*, Opinion ¶¶ 154, 181.

4) Plaintiffs question MetLife's method of calculating policyholders' contributions to equity. *E.g.* Compl. at ¶ 57-71.  But the Superintendent and his actuarial advisors concluded that MetLife's demutualization complied with "standard actuarial practices" and New York insurance law. *See* Opinion ¶¶ 126-128.

If taken as true, the Superintendent's conclusions deny the materiality of specific omissions and misstatements alleged by plaintiffs, as well as the materiality of steps MetLife did not take.

For similar reasons, the Opinion is probative of scienter under both Rule 10b-5 and non-negligence under Section 12(a)(2).  Just as the Opinion supports MetLife's contentions that the alleged nondisclosures were immaterial, it reduces dramatically the probability that MetLife "knew . . . or should have known that [the Booklets] misrepresent[ed] material facts about the corporation". *Novak*, 216 F.3d at 308.  If, in fact, the Booklet contained no material

misrepresentations, it cannot be said that MetLife acted with reckless disregard for the truth in preparing it.

The steps the Superintendent took in scrutinizing the process of MetLife's transaction and Booklets, as detailed in the Opinion, also are significant. The Opinion states that the Superintendent reviewed and approved the Booklets before they were mailed to policyholders. Opinion ¶ 216. Because it establishes that the Booklet was controlled in part by the Superintendent, the statement counters plaintiffs' allegation that "[MetLife] controlled disclosures made to policyholders relating to the Demutualization Plan, and therefore, was in a position to mislead them." Compl. ¶ 107. That the Superintendent reviewed the Booklets and substantive details of MetLife's demutualization and its impact on policyholders proves that MetLife had less "opportunity to commit fraud" than otherwise would appear. *Novak*, 216 F.3d at 307-08.

Significant in determining whether any reasonable voter could be misled was the detailed Booklet, the public hearing, the hotline, the letters to the Superintendent and *then* the Superintendent's Opinion. As explained previously, the Board could have withdrawn the Plan after all of this occurred. *See* Plan at 27; Oct. 13, 2009 Hr'g Tr. at 56:16-57:8; *supra* Section II.A.2. It can only be concluded that MetLife relied upon all information available, and particularly the Opinion, in deciding to go forward with demutualization.

2.    Non-Hearsay

Evidence that would otherwise satisfy the definition of hearsay, if not offered for the truth of the matters asserted, but instead to show defendants' state of mind, is not hearsay. *See* Fed. R. Evid. Rule 801(c); *Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005) ("[T]he mere

33

utterance of a statement, without regard to its truth, may indicate circumstantially the state of

mind . . . of the declarant and is *not hearsay*.") (emphasis in original).

The Opinion is highly probative non-hearsay evidence of scienter and non-negligence.

To the extent that MetLife's Board and management relied on the Superintendent, an expert

agency, in designing and implementing the demutualization plan, the Opinion makes highly

improbable a finding that MetLife's description of the transaction in the Booklet was

"unreasonable" or "represent[ed] an extreme departure from the standards of ordinary care."

*Kalnit*, 264 F.3d at 142.

Plaintiffs' contention that the Opinion is irrelevant to show MetLife's state of mind

because it was issued after the Booklets were mailed to policyholders is not persuasive. As

explained previously, MetLife's management relied on the Superintendent's approval process—

the capstone of which was his Opinion. *See supra* Sections II.A.3 and II.A.4. And it is

undisputed that MetLife was free to withdraw, amend, or postpone the transaction in response to

the Superintendent's Opinion. *See* Oct. 13, 2009 Hr'g Tr. at 56:16-57:8.

## B.    Official Report—Rule 803(8)(C)

To the extent MetLife proposes to introduce the Opinion for the truth of its assertions, it

is hearsay. Fed. R. Evid. 801. Federal Rule of Evidence 803(8) excepts "public records and

reports" from exclusion as evidence under the hearsay rule. The rule permits admission of:

> Records, reports, statements, or data compilations, in any form of
> public offices or agencies, setting forth . . . (C) in civil actions and
> proceedings . . . factual findings resulting from an investigation
> made pursuant to authority granted by law, unless the source of
> information or other circumstances indicate lack of
> trustworthiness.

34

Rule 803(8) is grounded on the presumption—based on experience of the drafters, the Supreme

Court, Congress, and the President—that "public officials perform their duties properly without

motive or interest other than to submit fair and accurate reports." *Bradford Trust Co. v. Merrill*

*Lynch*, 805 F.2d 49, 54 (2d Cir. 1986). *See also Gentile v. County of Suffolk*, 129 F.R.D. 435,

447-48 (E.D.N.Y. 1990), *affirmed*, 926 F.2d 142 (2d Cir. 1991).

### 1.      Presumption of Reliability

To be presumptively admissible under Rule 803(8)(C), a public report must "be based

upon an investigation made pursuant to legal authority" and contain "factual findings".

*Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000).

#### a)      *Legally Authorized Investigation*

The first threshold issue is whether the Superintendent's Opinion was based on a legally

authorized investigation within the purpose of Rule 803(8)(c).   It clearly was.

As pointed out above, the Superintendent, under an authorizing statute, appointed and

relied on advisors, conducted a public hearing, considered written and oral objections of

policyholders, reviewed and edited the disclosures mailed to policyholders in the Booklet, and

posed questions to MetLife concerning the substantive details of the transaction. *See supra*

Section II.C.  These activities constitute a searching inquiry sufficient to meet the requirements

of Rule 803(8)(3). *See, e.g., Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) (reading

Rule 803(8)(C) broadly to encompass findings of administrative agencies); *accord Henry v.*

*Daytop Village, Inc.* 42 F.3d 89, 96 (2d Cir. 1994); *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700

F.2d 785, 818 (2d Cir. 1983). *See also Wyckoff v. Metropolitan Life Ins. Co.*, 2006 WL 3060048,

at *1-2 (W.D. Pa. Oct. 24, 2006) (concluding that statements of state insurance regulator based

on interviews of MetLife policyholders and employees were factual findings under Rule 803(8)(C)); *Solarchick v. Metropolitan Life Ins. Co.*, 2006 WL 1308073, at *1-2 (W.D. Pa. May 10, 2006) (same).

Nor is there any doubt that the investigation was made "pursuant to authority granted by law". Fed. R. Evid. Rule 803(8)(C).  In investigating MetLife's demutualization, the Superintendent acted under the express authority of Section 7312 to: (1) request any documents and information from MetLife it deemed necessary to evaluate the proposed demutualization; (2) appoint and rely on the advisors, (3) review the substance of disclosures mailed to policyholders, and (4) hold a public hearing.  *See* N.Y. Ins. L. § 7312.  He had, in addition, plenary independent authority to investigate all insurers.  *See e.g.*, *id.* § 309(a); *id.* § 401(b).

Plaintiffs' contention that Section 7312 does not "require" an investigation is meritless. Because the Superintendent had a duty to ensure that MetLife's demutualization met the requirements of state law, *see* N.Y. Ins. L. § 7312(j), the corollary duty thoroughly to investigate the proposal must be inferred.  *See id.* § 201 (giving Superintendent "rights, powers, and duties . . . expressed or reasonably implied by any applicable law of this state").  Concluding otherwise would contravene the assumption underlying Rule 803(8)(C) that "public officials perform their duties properly".  *Bradford Trust Co.*, 805 F.2d at 54.  *See also* Mueller & Kirkpatrick, § 8.50 ("Express authority is not required, and the exception [of Rule 803(8)(C)] can apply if the agency investigates and reports on matters within its general area of responsibility.").

### b)      *Factual Findings*

The second threshold issue is whether the Superintendent's Opinion contains factual findings within the meaning of Rule 803(8)(C).  It does.

Plaintiff contends that the Superintendent's conclusions are not admissible under the Rule because they are "conclusions of law," rather than findings of fact. The distinction between "conclusions of law" and "factual findings" is without significance in the present setting. Opinions and conclusions in official reports are admissible if, as here, they are "based on factual investigation." *Beech Aircraft Corp v. Rainey*, 488 U.S. 153, 169 (1988). *Accord Bridgeway*, 201 F.3d at 143 ("The rule renders presumptively admissible 'not merely . . . factual determinations in the narrow sense, but also . . . conclusions or opinions based upon factual investigation.") (quoting *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991)).

In any event, the critical conclusions in the Opinion—that the transaction was "fair and equitable" and that the notices were adequate—are admissible mixed questions of law and fact. Section 7312 permits the Superintendent to review notices, but the determination of what constitutes "sufficient information" is left entirely to his observation and judgment. Although Section 7312 requires the Superintendent to determine whether a plan of demutualization is "fair and equitable," the content of that analysis is for him alone. *See, e.g.*, N.Y. Ins. L. §§ 7312(d)(4)(A); 7312(j). The statements in the Opinion are findings of "ultimate facts" underlying the Superintendent's conclusion that the Plan satisfied requirements of New York insurance law. *See Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299, 303 (11th Cir. 1989) (citing Isaacs, *Law and the Facts*, 22 Colum. L. Rev. 1 (1922)).

Where courts have excluded legal conclusions under Rule 803(C)(3) they have done so out of concern that "the jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires." *Id.* at 303. That concern

37

is not present here, where the Superintendent is expert in New York insurance law and statutorily charged with defining the "standards" the law requires.

Another category of statements in the report are pure statements of law, which merely state pertinent provisions of New York insurance law, without application or conclusion. *E.g.* Opinion ¶¶ 1-14. The court need not consider whether such "factual depictions" of the law may also be considered "factual findings" for purposes of Rule 803(8)(C). *See* Bryan A. Gardner, *Dictionary of Modern Legal Usage* (noting that "'factual' has two meanings: (1) 'of or involving facts' <factual issue>; (2) 'true' <a factual depiction>"). Both parties proposed, without objection, to introduce the text of Section 7312 into evidence at trial and to argue from it. And the introduction of these statements provides a necessary foundation for any adequate understanding of the report. *Cf.* Fed. R. Evid. 106 (permitting introduction of complete documents to avoid statements being taken out of context).

The remainder of the Opinion consists of the factual statements that form the basis of the Superintendent's conclusions and decision, which fall within the broad definition of "factual findings" for purposes of the Rule. *See Bridgeway Corp.*, 201 F.3d. at 143 ("'Factual finding' includes not only what happened, but how it happened, and who caused it to happen.") (quoting *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991)).

Plaintiffs argue that the Opinion is inadmissible as containing "factual findings" because it is based on hearsay. As previously explained, the Superintendent properly and necessarily relied on statements and analyses of MetLife's and its own legal, financial, and actuarial advisors, as well as self-described experts representing policyholders. *See supra* Sections I.A.1 and II.C. In light of the Superintendent's expertise, *see infra* Section IV.B.2(b), and the fact that these are the types of documents that one would expect an expert administrator to rely upon, the

38

court finds that the agency—and the Superintendent—is effectively qualified as an expert under Federal Rules of Evidence 702 and 703. "[W]hatever hearsay [the Opinion] relied upon was . . . adequately evaluated and filtered within its capacity as expert." *Gentile*, 129 F.R.D. at 453.

### 2. Indicia of Reliability

Having determined that the Opinion is presumptively admissible, the court must determine whether there are "sufficient independent indicia of reliability to justify its admission." *Bradford Trust Co.*, 805 F.2d at 54 (2d Cir. 1981) (quoting *City of New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2d Cir. 1981)). The Court of Appeals for the Second Circuit has indicated four factors to guide this analysis: "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." *Bridgeway*, 201 F.3d at 143.

#### a) Timeliness

It is undisputed that the Opinion was timely. The underlying investigation took place contemporaneously with the approval and effectuation of MetLife's Plan. A significant portion of the information upon which the Opinion relied was contained in the written record associated with the near concurrent public hearing. Even if the Superintendent relied on documents collected years earlier, the passage of time would not appreciably detract from their reliability. *See Gentile*, 129 F.R.D. at 451.

#### b) Skill and Expertise

For reasons already explicated, the task of assessing demutualizations is squarely within the Superintendent's purview, mandate, and expertise. *See supra* Sections II.A.1 and II.C. The

Department's longstanding experience and skill in regulating and examining insurance company transactions and their effect on policyholders and the public are indisputable. *See, e.g.*, *State Farm Mut. Auto Ins. Co. v. Mallela*, 827 N.E.2d 758, 760 (N.Y. 2005) (noting Superintendent's "special competence and expertise with respect to state insurance industry") (internal citation omitted).

<div align="center">

c) *Due Process*

</div>

Unavailing is plaintiffs' contention that the Opinion is untrustworthy because "[i]t is the result of a non-adversarial procedure based on material self-selected by MetLife presenting a one-sided view of the transaction where no witnesses were sworn and no one was cross-examined." Pls.' 2d Mot. In Limine Exclude Superintendent's Opinion 2 (D.E. No. 506).

Because MetLife necessarily possessed much of the critical actuarial information underlying the Plan and Booklet at the heart of this case, it was essential that the Opinion be based on records and other information supplied primarily by MetLife and its advisors.

Any lack of an adversarial hearing with cross-examination is not sufficient to rebut the presumption of trustworthiness. The Superintendent heard from policyholders and their representatives, made specific information requests to MetLife, and, in reliance on his own experts, analyzed some of MetLife's assumptions—even duplicating actuarial work and making substantive line edits to the Booklets. *See supra* Sections II.A.3 and II.C.1. The vigor with which a relatively minute number of persons challenged the Plan at the hearing and by written communication indicates that the "other side" was forcefully presented to the Superintendent—the operational equivalent of cross-examination. *See* Public Hr'g Tr. at 52:18-113:22. *See also supra* Sections II.C.2. and II.C.3.

<div align="center">

40

</div>

#### d)     Motivation

Nor is there any showing that the Superintendent or Department was tainted by any improper motivation or bias. Plaintiffs' contention that the then Superintendent had a conflict of interest arising from connections with MetLife's financial advisor, Goldman, is meritless. Mr. Levin had a retirement account managed by Goldman and was employed by the company before becoming Superintendent. But the performance of his accounts were not affected by Goldman's profitability. *See* Aff. of Neil D. Levin, Feb. 16, 2001, at ¶¶ 1, 2 (D.E. 508-2). Moreover, Mr. Levin already had received an opinion from the New York State Ethics Commission concluding that his participation in review and approval of demutualizations of companies advised by Goldman did not give rise to a conflict of interest. *See id.* at ¶¶ 5-9 (attachment A).

### C.     Potential for Unfair Prejudice—Rule 403

Evidence that is otherwise admissible may still be excluded under Federal Rule of Evidence Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. A trial court has "broad discretion" in determining whether to exclude evidence under Rule 403. *United States v. Awadallah*, 436 F.3d 125, 133 (2d. Cir. 2006). *Accord United States v. Al-Moayad*, 545 F.3d 139, 159-60 (2d Cir. 2008) ("[S]o long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational") (quotation marks omitted).

Although the admission of the Opinion would make it almost impossible for plaintiffs to prove a violation of federal securities law, no *prejudice* is shown as that term is used in Rule 403. *See United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (holding that relevant evidence

41

"is prejudicial only when it tends to have some adverse effect upon a defendant *beyond* tending

to prove the fact or issue that justified its admission into evidence") (emphasis added).

Nor is it appropriate to exclude the Opinion simply because the parties have stipulated

that MetLife's demutualization was approved by the Superintendent.  For reasons explained

previously, it is the content of the Opinion, not just the fact of the Superintendent's approval, that

is relevant. *See supra* Section IV.A. The stipulation does not provide a "less risky alternative [to

detailed] proof going to the same point." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

### D.      Completeness—Rule 106

Under the completeness rule all parts of the Opinion are admissible and necessary to

understand any part of it. *See* Fed. R. Evid. 106; *Phoenix Assoc. III v. Stone*, 60 F.3d 95, 101 (2d

Cir. 1995) (noting that Court of Appeals for the Second Circuit has "interpreted Rule 106 to

require that a document be admitted [in whole] when it is essential . . . to place the admitted

document in context, or to avoid misleading the trier of fact") (quotation marks omitted).

### E.      Experts for Superintendent—Rules 701 and 702

The appointed experts who assisted the Superintendent may testify as to their research

and conclusions. *See* Fed. R. Evid. 701 & 702.  They are both fact witnesses as to the extent that

they provided research supporting the Opinion, and experts as both to the fairness of the Plan and

to its publication.

### F.      Deliberative Process Privilege

Advice given to the Superintendent by his advisors is not subject to inquiry in this

litigation.  The State's deliberative process applies. *See* Oct. 29, 2009 Hr'g Tr. at 6:4-6. *See

also, e.g., Dep't of the Interior v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 8-9 (2001)

(recognizing deliberative process privilege); *Tigue v. United States Dep't of Justice*, 312 F.3d 70, 76-77 (2d Cir. 2002) (recognizing that deliberative process privilege protects from disclosure advice of "outside consultants"); *In re Franklin Nat. Bank Sec. Litig.*, 478 F.Supp. 577, 581 (E.D.N.Y. 1971) (recognizing that deliberative process privilege protects from disclosure facts not severable from the admitted opinion); *Burke v. New York City Police Dep't*, 115 F.R.D. 220 (S.D.N.Y. 1987) (same).

The fact that the Superintendent consulted specified advisors is known. This revelation does not constitute a waiver of the details of the advice given. No federal policy respecting federal securities laws requires preemption of the State's privilege in a federal action, which is essentially based on state substantive law. *See* Henry S. Noyes, "Federal Rule of Evidence 502: Stirring the State Law of Privilege and Professional Responsibility with a Federal Stick," 66 Wash & Lee L. Rev. 673, 760 (2009).

## V.    Conclusion

Plaintiffs' motions to exclude the Superintendent's Opinion and related materials are denied.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   November 24, 2009
        Brooklyn, New York

43