U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN RE METLIFE DEMUTUALIZATION
LITIGATION

Civil Case No.
00 CV 2258 (JBW)

---

NEW YORK STATE SUPREME COURT
NEW YORK COUNTY

---

EUGENIA J. FIALA, ET AL., v.
METROPOLITAN LIFE INSURANCE
COMPANY, ET AL.

Civil Case No.
601181/2000 (Kornreich)

---

## MEMORANDUM IN SUPPORT OF
## FINAL APPROVAL OF THE SETTLEMENT, AWARDING ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND GRANTING COMPENSATORY AWARDS TO THE REPRESENTATIVE PLAINTIFFS

**LOVELL STEWART HALEBIAN LLP**
Christopher Lovell, Esq. (CL 2595)
Ian T. Stoll, Esq. (IS 3424)
61 Broadway, Suite 501
New York, New York 10006
Telephone: (212) 608-1900

**MILBERG LLP**
Barry A. Weprin, Esq
William B. Scoville, Jr., Esq.
One Pennsylvania Plaza
New York, New York 10119-0165
Telephone: (212) 694-5300

**STULL STULL & BRODY**
Jules Brody, Esq.
James Henry Glavin IV, Esq.
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230

**WEISS & LURIE**
Richard A. Acocelli, Esq.
551 Fifth Avenue
New York, New York 10176
Telephone: (212) 682-3025

*Counsel for Certified Class Representatives*

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ............................................................... 1

II.  STATEMENT OF FACTS ................................................................... 5

A.  The Parties, Mutual Insurance Companies, And
Mutual Insurance Policyholders ............................................................ 5

B.  Defendants' Proposal To Convert MetLife From A Mutual To A
Stock Insurance Company And Pay For Policyholders' Interests
At The Rate Set By The IPO Price ........................................................ 6

C.  Plaintiffs Allege That Defendants Presented Their Conversion Proposal
To Policyholders Through Standardized Proxy Disclosure Documents That
Omitted To Disclose Defendants' Share Buy Back Plan ........................................ 7

    1.  Defendants Allegedly Failed To Follow Their Advisers' Written Advice
To Disclose Their Plan To Sell Excess Shares In MetLife's IPO
And Then Repurchase Those Shares ......................................................... 8

    2.  The Omission To Disclose The Buy Back Plan Allegedly
Rendered The Standardized Disclosure Document
False And Misleading ...................................................................... 10

D.  The Allegedly Mandated Behavior Of All Class Members:  If The Policyholder
Vote Was Favorable and The Conversion Was Approved, Then All Policyholders
Mandatorily Had To Engage In The Same Two Uniform, Standardized Changes
In Their Position ........................................................................ 11

    1.  Compulsory Sale Behavior:  Regardless Of Their Personal Preferences,
Each Policyholder Had To Sell Their Interests In The MetLife Mutual
Insurer To MetLife Co. ................................................................... 11

    2.  Compulsory Acceptance of Specified Consideration Behavior:
Regardless Of Their Personal Preferences, Each Policyholder Had to
Accept As Consideration For Such Sale of Their Mutual Insurer
Interests A Mandatory Rate of Compensation:  MetLife's IPO Price
Multiplied by The Amount of Each Class Member's Interests ................. 11

    3.  Defendants' Failure To Disclose The Alleged Share Buy Back Plan
Caused Policyholders To Change Their Position To Their Detriment.....11

E.  Within This Mandatory Behavior, Some Policyholders Had To
Accept Cash As The Form of Consideration For Their Mutual

i

Insurer Policyholder Interests But Most Could Choose To Receive Either Cash or Shares of The Newly-Issued Stock of MetLife, Inc. .....12

F.  Whereas The Excess Share Issuance Allegedly Depressed The IPO Price And, Therefore, The Consideration Provided By Electing Cash, The Share Buyback Plan Allegedly Increased The Price of the Shares of Stock After The IPO . . . . .13

G.  The IPO Price of MetLife, Inc. Stock Was Allegedly A Depressed $14.25 Per Share But MetLife Then Became The Only Company In Hundreds of IPOs Studied, To Announce On The First Day of Trading In Its Stock That It Was Buying Its Shares ......13

H.  Thereafter, As MetLife, Inc. Bought Back In Excess of $4,000,000,000 Worth of Its Stock, The Price of MetLife, Inc. Stock Was Pushed Back Up From Its Depressed Initial Level To More Reasonable Levels of $30.00-40.00 Per Share And More ........14

I.  The Alleged See-Saw or Teeter-Totter In Which The Greater The Depression of The IPO Price, The Greater The Subsequent Increase In Executive Compensation .......15

J.  The Procedural History Appendix ................................................................. 16

    1.  Defendants' Successful Motion to Dismiss The Entire Complaint And Defendants' Unsuccessful Motion To Compel Plaintiffs To Pay Defendants' Attorneys' Fees.................................................................. 17

    2.  The First Department Reverses the Dismissal of the Share Buy-Back and New York Insurance Law § 7312 "Fairness" Causes of Action, And Upholds The Denial of MetLife's Motion For Attorneys' Fees And A Bond ......................................................................... 17

    3.  Plaintiffs Successfully Defeat The Renewed Motion To Dismiss............ 18

    4.  Plaintiffs Successfully Move To Certify This Action As A Class Action ...................................................................... 19

    5.  Plaintiffs Successfully Uphold This Decision On Appeal To The First Department ............................................................... 19

    6.  The Millions of Pages of Fact and Expert Document Disclosure, Dozens of EBTs, And Hundreds of Interrogatories And Notices to Admit ........................................................................ 20

    7.  The Fully-Briefed Motion For Summary Judgment................................ 20

K.     The Joint State-Federal Settlement Under Mediator Richard Davis, Esq. ........... 21

**III.    ARGUMENT** ...................................................................................................... 21

POINT A.    THE SETTLEMENT SHOULD BE APPROVED AS FAIR REASONABLE AND ADEQUATE ........................................................ 21

1.    The Standards For Judicial Approval of Class Action Settlements ...................... 21

2.    More Generally, Compromises of Disputed Claims Are Favored ....................... 22

3.    Defendants Vigorously Deny All Liability And Experienced Class Counsel Recommend The Settlement As Fair and Reasonable ......................................... 23

4.    The Presumption of Fairness Arising From, Or The Great Weight Accorded To, The Recommendation of Experienced, Well Informed Counsel Who Has Engaged In Arms-Length Bargaining ................................................................................. 23

5.    Good Process Preceded Class Counsel's Decision to Enter The Settlement And Their Recommendation That The Settlement Is Fair and Reasonable ................. 24

    a.    Class Counsel Are Highly Experienced .................................................... 24

    b.    Nine-Plus Years of Litigation Have Made The Experienced Class Counsel Exceedingly Well Informed About The Merits and Risks of The Claims Here    . . . .24

    c.    There Was Highly Adversarial, Good Faith And Wholly Arms'-Length Bargaining At All Times ............................................................ 25

    d.    Only The Persuasion of Mediator Richard Davis, Esq. Caused There To Be A Settlement Here ........................................................................ 25

6.    Even Without The Presumption of Reasonableness From the Proper Process, The Settlement Is Within the Range of Reasonableness That Merits Approval By The Court ........................................................................................ 26

    a.    The Risks Arising From The Lack of Favorable Precedent Concerning The New York Insurance Law § 7312 Cause of Action, And The Superintendent's Findings of The Fairness of The Transaction And The Disclosures .............................................................................. 26

    b.    The Risks Arising From Collateral Estoppel, *Res Judicata* And Summary Judgment    ......27

      c.     The Additional Risks And Complexities of Proving Liability And Causation At Trial...................................................................... 28

      d.     The Risks of Proving Damages At Trial................................................. 30

7.    The Risks of Judgment Notwithstanding The Verdict and Of Appeals Concerning This New Cause Of Action ............................................ 31

8.    The Support Of The Parties For The Settlement ................................... 32

9.    Delays In Payment In The Absence Of Settlement .............................. 32

10.   The Method of Payment:  $47,500,000 Into The Closed Block And $2,500,000 Into A *Cy Pres*, Is Fair And Reasonable     . . . .33

B.    THIS COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES ................................................................................ 34

    1.    The Standards Governing The Award Of Attorneys' Fees ...................... 34

    2.    Ordinarily, The Substantial Risks Here Would Justify Awarding A Reasonable Fee That Is Greater Than The Lodestar Value of the Professional Services Performed ............................................................. 35

      a.     The Risk of Litigation Was High Because There Was No Prior Government Action To Pave The Way........................................... 36

      b.     On The Contrary, The Superintendent of Insurance Approved The Conversion Transaction ................................................................ 37

      c.     The Defendants' Request To Compel Plaintiffs To Pay Defendants' Attorneys' Fees, Added To The Risks .................... 37

      d.     The Lack of Precedent For A New York Insurance Law § 7312 Fairness Cause of Action, Created Many Risks........................... 38

      e.     The Total Lodestar Value of the Attorneys' Time Is In Excess of $45,000,000.................................................................................. 38

    3.    The Proposed Fees Represents A Percentage of the Settlement Fund that Is Substantially Less Than The Percentages awarded In Comparable Class Actions ............................................................................... 39

C.    Class Counsel Should Be Awarded Reimbursement of Expenses Advanced During The Course of the Litigation................................................... 40

D.      The Request For An Award of Compensation to The Named Plaintiffs
        Under The PSLRA .............................................................................. 41

CONCLUSION          .............................................................................. 44

# TABLE OF AUTHORITIES

## Cases

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045 (2d Cir. 1973) .......... 36

*Blum v. Stenson*, 465 U.S. 886 (1984) ........................................................................... 39

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ............................................................ 35

*Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) ................................. 34

*Carbon Dioxide Industry Antitrust Litigation*, 229 F.3d 1321 (l1th Cir. 2000) ............... 29

*Carlson v. Xerox Corp.*, 3:00-cv-1621 (D.Conn., Jan. 14, 2009) .................................... 42

*Chatelain v. Prudential-Bache Sec. Inc.*, 805 F. Supp. 209 (S.D.N.Y. 1992) ................. 23

*Cherner v. Transitron*, 221 F.Supp. 55 (D. Mass. 1963) (Wyzanski, J.) ........................ 35

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 459 (2d Cir. 1974) ........................ *passim*

*Colt Industries Shareholder Litig. v. Colt Industries, Inc.*,
   77 N.Y.2d 185 (N.Y. 1991) ....................................................................................... 40

*Corrugated Container Antitrust Litigation*,
   1983-2 Trade Cas. (CCH) (S.D. Tex. Sept. 1, 1983) ................................................. 29

*Dornberger v. Metropolitan Life Insurance Co.*,
   203 F.R.D. 118 (S.D.N.Y. 2001) (Sand, J.) ............................................................... 41

*Dubin v. E.F. Hutton Group, Inc.*, 878 F. Supp. 616 (S.D.N.Y. 1995) ........................... 39

*Dusek v. Mattel, Inc.*, No. CV-99-10864 (C.D.Cal., Oct. 1, 2003) ................................. 42

*Fiala v. Metropolitan Life Ins. Co.*, 6 A.D.3d 320, 323 (1st Dep't 2004) ................. *passim*

*Fiala, et al. v. Metropolitan Life Insurance Co., et al.*, 52 A.D.3d 251,
   859 N.Y.S.2d 426, 2008 NY Slip Op. 05010 (N.Y. App. Div. 2008) ........................... 3

*Fiala, et al. v. Metropolitan Life Insurance Co., et al.*, Index No. 601181/00, Memorandum
   Decision, issued May 2, 2006 (Sup. Ct., New York County) ....................................... 38

*Fielding v. Allen*, 99 F. Supp. 137 (S.D.N.Y. 1951) ....................................................... 23

*Flemming v. Barnwell Nursing Home and Health Facilities, Inc.*, 56 A.D.3d 162, 165, 865 N.Y.S.2d 706, 708, 2008 Slip. Op. 07838 (3rd Dep't Oct. 16, 2008) .................... 34, 35

*Florin v. NationsBank of Georgia, NA.*, 34 F.3d 560 (7th Cir. 1994) ............................. 34

*Friar v. Vanguard Holding Corp.*, 78 A.D.2d 83 (2d Dep't 1980) ................................. 22

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ........................... 36

*In re Baldwin-United Corp.*, 607 F. Supp. 1312 (S.D.N.Y. 1985) ................................. 23

*In re Bausch & Lomb Sec. Litig.*, 183 F.R.D. 78 (W.D.N.Y. 1998) ................................ 40

*In re Cablevision Systems Corp. Shareholders Litig.*, 868 N.Y.S.2d 456, 2008 Slip. Op. 28323 (Sup. Ct. Nassau County 2008) .................................................................. 35

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ................................................ 31

*In re Chicken Antitrust Litig.*, 1980-1 Trade Cas. (CCH) ¶ 63 (N.D.Ga. 1980) .............. 23

*In re Colt Indus., Inc. Shareholder Litig.*, 155 A.D.2d 154 (1st Dep't 1990) .................. 22

*In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322 (5th Cir. 1981) ................... 32

*In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320 (E.D.N.Y. 1993) .................................. 39

*In re General Motors Corp. Pick-Up Truck Fuel-Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ..................................................................................... 31

*In re Initial Public Offering Securities Litig.*, __ F.Supp.2d __, 2009 WL 3397238 (S.D.N.Y. Oct. 5, 2009) ............................................................................................. 24

*In re Janney Montgomery Scott LLC Fin. Consultants Litig.*, No. 06-3202 (S), 2009 U.S. Dist LEXIS 609790, 2009 WL 2137224 (E.D. Pa. July 16, 2009) ...................................... 41

*In re Medical X-Ray Film Antitrust Litig.*, No.CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug 7, 1998) .................................................................. 39

*In re MetLife Demutualization Litig.*, 624 F.Supp.2d 232 (E.D.N.Y. May 27, 2009) (Platt, J.) .......................................................................... 4, 28

*In re Metris Co. Inc. Sec. Litig.* 02-CV-3677 (D.Minn., Apr. 24, 2008) ......................... 42

*In re Novell, Inc. Sec. Litig.*, No. 2:99-CV-995 TC (D.Utah, May 26, 2005) ................. 42

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997) ....................... 31

*In re Painewebber Sec. Litig.*, No. 86 Civ. 6776 (VLB),
   1994 WL 416020 (S.D.N.Y. Aug. 5, 1994)................................................. 39

*In re Prudential Securities Inc. Ltd. P'Ships Litig.*,
   1995 WL 798907 (S.D.N.Y. 1995)........................................................... 31

*In re Rhythms Securities Litig.*, CV-02-K35 (D.Co. April 13, 2009) .............................. 42

*In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y. 1999)(Pollack, J.) ........ 36, 38

*In re Tenet Healthcare Corp*, CV 02-8456 (C.D.Cal., Nov. 25, 2008) ........................... 42

*In re Thirteen Appeals Arising Out of the San Juan Dupon Plaza Hotel Fire Litig.*,
   56 F.3d 295 (1st Cir. 1995)..................................................................... 34

*In re Time Warner Communications*, 618 F.Supp. 735 (S.D.N.Y. 1985)....................... 36

*In re Top Tankers, Inc. Securities Litig.*, 2008 WL 2944620 (S.D.N.Y. 2008)............... 31

*In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000
   (D.Minn. 2005) ..................................................................................... 42

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir.)................................................................ 35

*Klurfeld v. Equity Enterprises, Inc.*, 79 A.D.2d 124, 133,
   436 N.Y.S.2d 303 (2d Dept. 1981) ........................................................ 22

*Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Standard Sanitary Corp.*,
   487 F.2d 161 (3rd Cir. 1973) ................................................................. 35

*MCI Communications Corp. v. American Telephone & Telegraph Co.*,
   708 F.2d 1081 (7th Cir. 1983) ............................................................... 29

*Michaels v. Ambassador Group, Inc.*,110 F.RD. 84 (E.D.NY. 1986) ............................. 39

*Michels, et al., v. Phoenix Home Life Mutual Ins. Co.*,
   No. 95/5318, 1997 WL 1161145 (NY. Sup. Jan 7, 1997) ........................... 21

*Rawlings v. Prudential-Bache Properties, Int.*, 9 F.3d 513 (6th Cit. 1993) .................... 34

*Rexrode v. Allstate Indem. Co.*, Case No. 06-cv-00887,
   2007 U.S. Dist. LEXIS 58216 (D. Colo. Aug. 9, 2007) .............................. 42

*Shah v. Metropolitan Life Ins. Co., et al.*,
   2003 WL 728869 (Sup. Ct., New York County) ............................... 2, 8, 17, 37

*Slomovics v. All for a Dollar, Inc.,* 906 F. Supp. 146 (E.DN.Y. 1995) ............................ 32

*Smith v. Vista Org., Ltd.,* No. 89 Civ. 0048, 1991 WL 152612 (S.D.N.Y. 1991) ........... 23

*State of West Virginia v. Chas. Pfizer & Co.,*
     314 F. Supp. 710 (S.D.N.Y. 1970) ............................................................. 29

*Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261 (D.C. Cir. 1993) ........................................ 34

*Trustees v. Greenough,* 105 U.S. 527 (1881) .................................................... 35

*U.S. Football League v. National Football League,*
     644 F. Supp. 1040 (S.D.N.Y. 1986)........................................................ 29, 31

*U.S. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153 (2d Cir. 1996) ............................... 40

*Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir. 1982) ........................................ 22, 25, 27

*Williams v. First Nat'l Bank,* 216 U.S. 582 (1910) ............................................ 22

## Statutes
15 U.S.C. ........................................................................................................ *passim*

New York Business Corporation Law ............................................................... *passim*

New York Ins. Law § 7312 ............................................................................... *passim*

## Rules
Fed. R. Civ. P. 23 ............................................................................................ *passim*

## Other Authorities
New York Civil Practice Law and Rules ........................................................... *passim*

*Report of the Third Circuit Task Force, Court Awarded Attorneys Fees,*
     108 F.R.D. 237, 243 (1985) ............................................................. 35

## I.  PRELIMINARY STATEMENT

After more than nine years of hard-fought litigation, the production of literally millions of pages of documents, and two successful appeals to the First Department to reinstate their claims and uphold their successful motion for class certification, Plaintiffs reached on November 5, 2009, a settlement with the Defendants in this class action.

The proposed settlement calls for MetLife to make payments of $50,000,000 in return for a release of liability for the claims made in the Federal and State Actions.  *See,* the Stipulation of Settlement, ¶ 16, attached as Exhibit 1 to the accompanying Notice of Motion.

This is the first class action settlement and the first successful prosecution in the history of New York Insurance Law § 7312 of a "fairness" cause of action under that section.  *See,* Stipulation of Settlement.  Almost all actions challenging insurance company demutualization have ended in failure.  *See infra.*  Moreover, Plaintiffs here were challenging as unfair a transaction that the Superintendent of Insurance had expressly found to be fair.

Recognizing that Plaintiffs were sailing into uncharted and turbulent waters, MetLife, represented by one of the largest and best law firms in the nation, tried to sink Plaintiffs' high risk claims through motions to dismiss, requests for attorneys' fees and posting a bond, oppositions to class certification, repeated appeals, various discovery objections and maneuvers, a summary judgment motion, and multiple other stratagems too numerous to mention in this summary.  *See infra.*

In order to obtain this Settlement, Plaintiffs had to prevail over Defendants and their excellent counsel on every significant roadblock Defendants threw up in this

1

litigation.  This includes every significant contested motion and all the following other important issues:

- Plaintiffs settled their anticipated motion for a temporary restraining order by obtaining early disclosure of voluminous documents, including documents revealing Defendants' alleged plan to sell excess shares on the IPO and buy back shares later.

- Plaintiffs successfully used these documents to prepare an amended complaint pleading Defendants' undisclosed share buy back plan.

- Plaintiffs eventually defeated Defendants' motion to dismiss the complaint only by means of a successful appeal to the First Department.  Based upon some of the aforesaid documents obtained through pre-consolidated complaint disclosure, the First Department reinstated Plaintiffs' share buy back claim and implied cause of action under New York Insurance Law § 7312.  *Shah v. Metropolitan Life Ins. Co., et al.*, 2003 WL 728869 *18 (Sup. Ct., New York County), *rev'd in part*, *Fiala, et al. v. Metropolitan Life Ins. Co., et al.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (1st Dep't 2004).

- Plaintiffs successfully defeated Defendants' motion to require Plaintiffs to pay attorneys' fees and post a bond.  *Id.*

- Plaintiffs successfully upheld that decision on appeal. *Id.*

- Plaintiffs successfully defeated Defendants' renewed motion to dismiss the share buy back claim in the amended complaint filed after the First Department reinstated the claims and remanded.  *Fiala, et al. v. Metropolitan Life Ins. Co., et al.*, Index No. 601181/00, Memorandum Decision (Oct. 11, 2005) at 10 (Sup. Ct., New York County).

- Plaintiffs successfully prevailed on their motion to certify this action as a class action pursuant to Article 9 of the CPLR. *Fiala, et al. v. Metropolitan Life Insurance Co., et al.*, Index No. 601181/00, Memorandum Decision (May 2, 2006) (Sup. Ct. New York County), *aff'd, Fiala, et al. v. Metropolitan Life Insurance Co., et al.*, 52 A.D.3d 251, 859 N.Y.S.2d 426, 2008 NY Slip Op. 05010 (N.Y. App. Div.).

- Plaintiffs successfully upheld such Class certification on appeal to the First Department. *Id.*

- Plaintiffs substantially prevailed in a series of disclosure disputes and otherwise succeeded in obtaining millions of pages of documents, dozens of examinations before trial, responses to hundreds of interrogatories and notices for admissions, and full expert disclosure.

- Plaintiffs extracted from Defendants' main economic expert the concession, during his examination before trial, that if MetLife issued extra shares, then, all other things equal, this caused MetLife's initial public offering price (and, hence, the consideration to policyholders) to be lower.[1]

****

The complex settlement between Plaintiffs and Defendants jointly settles the claims of the Plaintiff Class made in this action as well as in the federal action that also arose out of Defendants' disclosures in connection with the conversion of Metropolitan

---

[1] *See,* Plaintiffs Memorandum in Opposition to Defendants Motion for Summary Judgment, dated September 22, 2008, p. 2, *citing* Defendants' expert, Michael Keable (". . . '[a]s would be true in any IPO and every IPO, any situation I can think of as I sit here today, the more shares that are issued, the lower the IPO price would be, but the question is should there have been more shared issued. . .' Keable Tr., Def. Ex. 25 pp. 210-11.").

Life Insurance Company from a mutual to a stock insurance company. *In re MetLife Demutualization Litig.*, 00-CV-2258 (E.D.N.Y.)(JBW).

Plaintiffs' motion here is part of a joint motion with the federal court plaintiffs in *In re MetLife Demutualization Litig.,* 00-CV-2258 (E.D.N.Y.), for final approval of the settlement, including the method of payment of the $50,000,000. This method is that $47,500,000 is to be paid into the Closed Block[2] and $2,500,000 into a *cy pres* for health and longevity purposes. *See*, Stipulation of Settlement, ¶¶ 14(g), 16(a).

Such joint motion for final approval of the joint settlement is to be presented to this Court and the federal court, the Honorable Jack B. Weinstein, at the joint final approval hearing on December 30, 2009, in the United States District Court for the Eastern District of New York.

Further, working with Mediator Richard Davis, Esq., the Plaintiffs' Class Counsel have reached agreement with the federal plaintiffs' Class Counsel on a joint application for attorneys' fees. Specifically, Class Counsel in this action and the federal action jointly request (and have an agreement to divide) attorneys' fees equal to $15,000,000 minus the sum of expenses of counsel awarded in "2" below and any Plaintiff reimbursement awarded in "3" below. This represents approximately only 21% of the $50,000,000 settlement. *See* Argument Point B *infra*.

No fees are requested from the $2,500,000 *cy pres*.

For the reasons set forth herein, in the accompanying Affidavit of Ian T. Stoll, Esq., and the other affidavits included within the Stoll Affidavit as well as in the papers

---

[2] The "Closed Block" is the accounting mechanism established pursuant to MetLife's Plan of Reorganization and the assets allocated thereto. Stipulation of Settlement, ¶ 14(d).

submitted by the federal court plaintiffs (annexed as Exhibits A-1 to A-3 to Stoll Aff.),

and in any subsequent submissions (including during the hearing on December 30, 2009):

(1)     the proposed $50,000,000 joint settlement of the State and federal claims

reflected in the Stipulation of Settlement annexed as Exhibit 1 to the Notice of

Motion is fair, reasonable, and adequate to Class members, and fully satisfies

the requirements for approval of a settlement of a class action pursuant to

Article 9 of the New York Civil Practice Law and Rules ("CPLR") (*see*

Argument Point A *infra*);

(2)     the joint State and federal request for reimbursement of Class Counsel's

expenses in the amount of $4,500,000 is fair and reasonable (*see* Argument

Point C *infra*);

(3)     the proposed reimbursement to the named Plaintiffs under the Private

Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737

(codified as amended in scattered sections of 15 U.S.C.) ("PSLRA"), of their

lost wages devoting time to this case is fair and reasonable (*see* Argument

Point D *infra*); and

(4)     the joint request by Class Counsel in the State and federal cases for an award

of attorneys' fees in an amount equal to $15,000,000 minus the sum of

expenses of counsel awarded in "2" above and any Plaintiff reimbursement

awarded in "3" above, is fair and reasonable under Article 9 of the CPLR.  *See*

Argument Point B *infra*.

## II. STATEMENT OF FACTS

### A.     The Parties, Mutual Insurance Companies, And Mutual Insurance Company Policyholders

Plaintiffs and the members of the certified class were the policyholders of Metropolitan Life Insurance Company ("MetLife") entitled to vote to approve or disapprove the Defendants' proposed conversion of MetLife from a mutual to a stock insurance company ("demutualization").

Defendant MetLife was a mutual insurance company organized under the laws of New York and headquartered in New York County.

The Defendants herein are MetLife, the newly created affiliated companies of MetLife, and the directors and top officers of MetLife who proposed MetLife's conversion from a mutual to a stock insurance company.

In a mutual insurance company, policyholders own the rights to surplus on liquidation or in dividends.  They also have the right to vote, elect directors, and approve any changes of the form of the organization.

The directors of a mutual insurer owe their duties to the policyholders. By suing the individual Defendants, Plaintiffs not only triggered the insurance policy for the directors and officers but also brought into the case as defendants the top officers of MetLife who allegedly benefited the most from the alleged non-disclosures described hereinafter. *See infra.*

### B. Defendants' Proposal To Convert MetLife From A Mutual To A Stock Insurance Company And Pay For The Mutual Policyholders' Interests At The Rate Set By The IPO Price

Defendants, working with their Advisors, created during 1998-1999 a plan to convert MetLife from a mutual insurer to a stock insurance company through an initial public offering ("IPO") of MetLife stock to the public.

An important part of this conversion plan was the creation of a Closed Block of assets dedicated to satisfy policyholder claims.

As a stock insurance company, MetLife's executives allegedly could and did receive hundreds of millions of dollars more in compensation than as a mutual insurance company.  Increases in executive compensation would allegedly be much easier and greater if Defendants sold excess shares of the MetLife stock company at a relatively low price and then bought those shares back later.  *See infra*.

However, Defendants could not, on their own, reach their greatly increased compensation by automatically executing their planned conversion. Rather, Defendants were required, pursuant to New York Insurance Law § 7312, to convince two-thirds of the policyholders voting on the conversion plan to vote in favor of the Defendants' proposed conversion plans.

> **C.      Plaintiffs Allege That Defendants Presented Their Conversion Proposal To Policyholders Through Standardized Proxy Disclosure Documents That Omitted To Disclose Defendants' Share Buy Back Plan**

In order to solicit the policyholder vote required to approve their proposed conversion, the Defendants were also required, under New York Insurance Law § 7312, to send a standardized disclosure document to MetLife policyholders, *i.e.*, the Class here. This standardized disclosure document had to provide a complete and truthful description of Defendants' plans for their conversion.  *E.g.*, New York Ins. Law § 7312 (i).

Defendants prepared and sent to Class members this standardized disclosure document that purported to describe Defendants' plans for the conversion.  This two volume disclosure document was entitled the "Policyholder Information Booklet" and is sometimes referred to as the "PIB".

The PIB was presented to the Superintendent of Insurance of New York ("Superintendent") who approved its contents.

In the PIB, Defendants urged policyholders to read and rely on the PIB. *Id.*, p. 96. Further, Defendants represented to policyholders that Defendants were policyholders' fiduciaries. *Id.*, p. 36. Also in the PIB, Defendants urged policyholders to vote in favor of the plan.

Plaintiffs alleged that Defendants uniformly omitted to disclose in the legally required disclosure document various material facts. All of these alleged facts were held not to be actionable in *Shah v. Metropolitan Life Ins. Co., et al.*, 2003 WL 728869 *18 (Sup. Ct., New York County), but the First Department reversed the dismissal of the New York Insurance Law § 7312 fairness causes of action and MetLife's alleged plan to issue excess shares of MetLife, Inc. in order to quickly buy back shares of MetLife, Inc.[3]

## 1. Defendants Allegedly Failed To Follow Their Advisers' Written Advice To Disclose Their Plan To Sell Excess Shares In MetLife's IPO And Then Repurchase Those Shares

Defendants' Advisers allegedly urged them to disclose and Defendants were allegedly required to disclose that Defendants intended to sell excess shares to the public in MetLife's IPO in order to buy back shares after the IPO. *Compare, Fiala v. Metropolitan Life Ins. Co.*, 6 A.D.3d 320, 323 (1st Dep't 2004) (holding that Plaintiffs have properly alleged that Defendants possessed an undisclosed stock buy-back plan which Defendants' demutualization adviser recommended that Defendants disclose).

---

[3] Plaintiffs still have the right to appeal to the Court of Appeals the dismissal of these causes of action and they are part of what the Settlement Agreement is resolving.

These dismissed omissions include allegations that Defendants allegedly failed to disclose the true value of MetLife's real estate, the adverse aspects of using an IPO to fix the compensation to policyholders, and related material facts. *Id.* at 7.

Defendants were allegedly warned **in writing** by their investment Advisers that they should disclose their excess share sale and buy-back plan. *See, Fiala*, 6 A.D.3d at 323.

Plaintiffs contended and alleged that as early as July 1998, Defendants' Adviser, Goldman Sachs, discussed with Defendants in writing a share repurchase program in connection with an IPO and recommended "the benefit of the significant planned share repurchase also would be seen as a catalyst for improving returns."

On December 7, 1998, Defendants' other Adviser, Credit Suisse, allegedly suggested to Defendants in writing as follows: **although there was an absence of any identified need for capital by MetLife** (*i.e.*, MetLife had no identified use for the proceeds from the IPO), the funds raised on the IPO should be used to provide additional capital "to allow a consistent repurchase program by MetLife." Credit Suisse allegedly noted that, unlike other insurers (Equitable and AllAmerica) that sold shares to raise capital "to bolster weak financial positions ... MetLife currently is well capitalized ... and any substantial new equity capital raised with no defined use could suppress return on equity."

Credit Suisse's proposed solution was allegedly for MetLife to issue excess shares on the IPO with the "defined use" of buying them back. Such planned buy-backs of shares would reduce some of the "substantial new equity capital" raised by the IPO.

Third, prior to and after September 1999, Defendants allegedly continued to exchange numerous documents with their Advisors in which the return on equity and other ratios that Defendants were projecting for MetLife were all premised on MetLife's buying back substantial amounts of its stock after the IPO.

Fourth, in September 1999, Goldman Sachs allegedly advised MetLife in writing that "MetLife should indicate in the prospectus that it will implement a stock repurchase program immediately post IPO."

Fifth, and finally, in September 1999, Goldman Sachs allegedly advised Defendants in writing:  "Announce company stock buy-back program to commence immediately post IPO."

### 2.   The Omission To Disclose The Buy Back Plan Allegedly Rendered The Standardized Disclosure Document False And Misleading

Defendants' alleged non-disclosure allegedly rendered false and materially misleading various statements in the PIB.  These allegedly included representations with respect to MetLife's intended use of the offering proceeds, the description of the anticipated IPO price, MetLife's needs for capital, and MetLife's statements of what it intended to do after the IPO.  For convenience, the reasons for this falsity are discussed as part of the effects of the alleged share buy back plan set forth *infra*.

Based on such standardized and allegedly misleading PIB, a two-thirds approval of voting policyholders, as a group, was obtained.  Compl. ¶¶48(b),59.  This policyholder vote occurred, was counted and was consummated in New York subject to New York law. Compl.¶¶ 36-41.

Defendants' standardized disclosure document and the Class' vote based thereon **were not just an essential link** but were legally required links in the approval process for the Defendants' conversion transaction.  Compl.¶¶40,59-61,68.  The alleged excess share issuance and buy back plan were allegedly "crucial" facts that should have been disclosed.

10

This alleged omission allegedly caused the favorable vote.

**D.    The Allegedly Mandated Behavior Of All Class Members:  If The Policyholder Vote Was Favorable and The Conversion Was Approved, Then All Policyholders Mandatorily Had To Engage In The Same Two Uniform, Standardized Changes In Their Position**

Because Defendants obtained approval of their conversion plan, then each policyholder allegedly had to engage in the same standardized behavior and changes in their position. This "mandatory reliance" was allegedly true regardless of each policyholder's personal preferences, subjective analyses, or individual opposition to or support of Defendants' conversion plans.

**1.    Compulsory Sale Behavior:  Regardless Of Their Personal Preferences, Each Policyholder Had To Sell Their Interests In The MetLife Mutual Insurer To MetLife Co.**

First, each policyholder allegedly **had to sell** his, her or its ownership interest in the MetLife mutual insurance company to MetLife Co.

**2.    Compulsory Acceptance of Specified Consideration Behavior:  Regardless Of Their Personal Preferences, Each Policyholder Had to Accept As Consideration For Such Sale of Their Mutual Insurer Interests A Mandatory Rate of  Compensation:  MetLife's IPO Price Multiplied by The Amount of Each Class Member's Interests**

Second, each policyholder allegedly had to make this compulsory sale in consideration for a standardized, uniform rate of compensation.  This was the amount of MetLife's IPO price multiplied by the amount of interest in the MetLife mutual insurance company that each policyholder held.

**3.    Defendants' Failure To Disclose The Alleged Share Buy Back Plan Caused Policyholders To Change Their Position To Their Detriment**

Issuing excess shares allegedly reduced the IPO price and, therefore, the standardized rate of consideration that policyholders received for their mutual insurer interests. That is, first, because price is inversely related to the supply. As Defendants' expert economist allegedly conceded, if Plaintiffs establish that MetLife sold additional shares on its IPO, then, all other things being equal, this reduced the IPO price.

Second, an open market share buyback plan is allegedly favorable information for shareholders because it increases a stock price. By not disclosing the alleged share buyback plan, MetLife allegedly further caused the IPO price to be lower than it would have been.

Plaintiffs, thus, contended that Defendants' intentional failure to disclose their excess share issuance and buy-back plan caused MetLife's IPO price and the consideration that each policyholder received to be lower. Compl.¶¶47,51-53,58-61.

If Plaintiffs' common, class wide evidence would have been accepted by the trier of fact, then Defendants' failure to disclose the alleged buy back plan, allegedly caused a detrimental, standardized change in the behavior of each policyholder. Specifically, each policyholder had to engage in the standardized behavior of accepting less consideration for their mutual insurer interests than they would have if full disclosure had been made.

Thus, Defendants' alleged non-disclosures allegedly caused each policyholder to change his, her or its own position to their detriment.

> **E.     Within This Mandatory Behavior, Some Policyholders Had To Accept Cash As The Form of Consideration For Their Mutual Insurer Policyholder Interests But Most Could Choose To Receive Either Cash or Shares of The Newly-Issued Stock of MetLife, Inc.**

Under the terms of Defendants' conversion plan, some policyholders **had** to receive the consideration for their MetLife mutual insurer interests in the form of cash.

But most policyholders could elect to receive the consideration for their interests either cash or newly-issued shares in MetLife, Inc.

### F.     Whereas The Excess Share Issuance Allegedly Depressed The IPO Price And, Therefore, The Consideration Provided By Electing Cash, The Share Buyback Plan Allegedly Increased The Price of the Shares of Stock After The IPO

As explained above, the alleged effect of the undisclosed excess share issuance aspect of Defendants' alleged share buy-back plan was allegedly to reduce the IPO price of MetLife stock.

But the alleged effect of MetLife, Inc.'s buy back of its shares was allegedly to subsidize and increase the trading price of MetLife stock after the IPO.

Therefore, the existence of the buyback plan was critical information to persons considering whether to elect cash as the form in which to take their consideration for their mutual insurer interests.

This was allegedly because the undisclosed alleged buy back plan made the amount of consideration in electing a cash payment lower and made the amount of consideration in electing MetLife Inc.'s shares and selling them later, higher.

Under Defendants' proposed plan, approximately 25% of policyholders were forced to receive or mistakenly elected to receive their compensation for their mutual insurer interests in the form of cash.  The remainder of policyholders received the consideration in shares.

### G.     The IPO Price of MetLife, Inc. Stock Was Allegedly A Depressed $14.25 Per Share But MetLife Then Became The Only Company

13

**In Hundreds of IPOs Studied, To Announce On The First Day of Trading In Its Stock That It Was Buying Its Shares**

The excessive share issuance allegedly caused the IPO price to be $14.25 per share when the IPO occurred on April 14, 2000.

But on the very day after the IPO had occurred, the first day of public trading in MetLife, Inc. stock occurred, and MetLife's Chairman then allegedly told a press service, Bridge News, that MetLife had an open market share buy back plan.

According to Plaintiffs' expert testimony, MetLife's buy back announcement on the first day of trading of its stock was the only share buy back announcement made on the first day of trading of all of the literally hundreds of different IPOs studied by Plaintiffs' expert.

This uniquely early announcement allegedly further reflected the existence of Defendants' plan to issue excess shares in order to buy them back.

**H.      Thereafter, As MetLife, Inc. Bought Back In Excess of $4,000,000,000 Worth of Its Stock, The Price of MetLife, Inc. Stock Was Pushed Back Up From Its Depressed Initial Level To More Reasonable Levels of $30.00-40.00 Per Share And More**

But MetLife allegedly paid over $4,000,000,000 to buy back its shares. This allegedly was one cause of substantial increases in the price of MetLife stock from the depressed level of the IPO to more reasonable levels. The price of MetLife stock allegedly increased to $19.50-$35.00 per share and (later) much higher levels after MetLife's initial buy-back announcement and its follow-on billions of dollars of purchases. Compl. ¶¶51-54. *E.g.*:

> 54. In engaging in the IPO, MetLife was selling shares out of the company and taking cash or capital into the company at a rate of $14.25 per share. In the buy-back, MetLife was taking shares back into the company and paying cash out of the company at a rate of

$19.50 - 35.00 per share.  In other words, MetLife lost at least $5.00 per share and at times $20.00 per share by issuing the excess shares and raising the excess capital on the IPO, and then buying the shares back at higher prices in order to expend that capital.

Why would Defendants allegedly sell MetLife, Inc. shares at $14.25 per share and then quickly buy MetLife, Inc. shares at $19.00 – 45.00 per share?

### I.     The Alleged See-Saw or Teeter-Totter In Which The Greater The Depression of The IPO Price, The Greater The Subsequent Increase In Executive Compensation

The alleged reason for Defendants' undisclosed alleged buy-back plan was to allegedly increase the Officer Director Defendants' bonus and incentive compensation. Such compensation was allegedly based upon IMPROVEMENTS in return on equity and earnings per share.[4]  *See infra*.

MetLife's official and final 2000-2002 Business Plan dated December 1999, allegedly stated that MetLife's plan, following the IPO, was to engage in repurchases of shares of at least $750 million:

> The Plan results for earnings per share and ROE reflect the expected capital raising activities at the time of our IPO, as well as share repurchases contemplated over the Plan period.  Specifically, we expect to raise approximately $1.7 billion of primary equity capital at the time of our IPO, which will consist of common and possibly preferred stock. Over time, we also expect to gradually increase our debt and leverage ratios, while maintaining such ratios that will enable us to maintain strong ratings. In the Plan, increases in leverage are achieved through share repurchases ($750 million over the Plan period), which have an accretive [*i.e.*, increasing] impact on EPS and ROE.

---

[4]  MetLife's required public filings in the years after the conversion plan, allegedly provided evidence that increases in ROE and EPS would increase the Officer Defendants' bonuses and incentive compensation.  Compl.¶58.

"EPS", as used above, means earnings per share which are calculated by dividing the shares outstanding into the earnings. "ROE", as used above, means return on equity which is calculated by dividing equity into earnings.

The alleged excess public issuance of shares aspect of the buy back plan, allegedly caused the IPO price to be lower than it otherwise would have been and thereby **harmed** the policyholders by reducing their standardized rate of compensation. *Fiala, et al. v. Metropolitan Life Ins. Co., et al.*, 6 A.D.3d 320, 322-23, 776 N.Y.S.2d 29, 32 (1st Dep't 2004) (even those policyholders who held on to their shares, suffered an initial dilution that could never be regained).

But such excess share issuance and subsequent buyback allegedly helped MetLife's executives' bonus compensation by allegedly establishing a low initial benchmark ROE and EPS.

By allegedly causing MetLife to buy back those same shares after the IPO, Defendants allegedly caused MetLife to automatically reduce its number of shares outstanding and its amount of equity. Because the earnings remained approximately the same, this decrease in shares and equity allegedly **increased** both EPS and the percentage return on equity or ROE calculations. Compl.¶¶47-48.

Accordingly, notwithstanding losses of $5-$30 per share, MetLife allegedly sold excess IPO shares at $14.25 per share and bought them back in the days, weeks, months and years thereafter at prices of $19.00-$45.00 per share.

**J.**      **The Procedural History Appendix**

The nine-year procedural history of this action is so lengthy that it has been set forth in a separate appendix annexed to the Stoll Aff.  The procedural history is briefly summarized below.

### 1. Defendants' Successful Motion to Dismiss The Entire Complaint And Defendants' Unsuccessful Motion To Compel Plaintiffs To Pay Defendants' Attorneys' Fees

By obtaining early disclosure at the outset of the case and through subpoenas on MetLife's Advisors, Plaintiffs learned of documents and facts allegedly indicating MetLife's discussions and plans for a share buy back.  Plaintiffs prepared and filed the consolidated amended complaint on the basis of these documents and facts.

Defendants successfully moved to dismiss all causes of action under CPLR 3211. *Shah v. Metropolitan Life Ins. Co., et al.*, 2003 WL 728869 *18 (Sup. Ct., New York County).

Defendants' excellent counsel simultaneously moved to compel Plaintiffs to pay Defendants' attorneys' fees and to post a bond under CPLR 7312(t)(2).  *See, Shah v. Metropolitan Life Ins. Co., et al.*, 2003 WL 728869 *18 (Sup. Ct., New York County). This motion was denied.  *Id.*

### 2. The First Department Reverses the Dismissal of the Share Buy-Back and New York Insurance Law § 7312 "Fairness" Causes of Action, And Upholds The Denial of MetLife's Motion For Attorneys' Fees And A Bond

However, on appeal, the Appellate Division of the Supreme Court, First Department, reinstated Plaintiffs' fraud and New York Insurance Law § 7312 causes of action. *See, Fiala, et al. v. Metropolitan Life Ins. Co., et al.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (1st Dep't 2004).

Specifically, the First Department held that

> the Fiala plaintiffs' claim that the plan of the MetLife and individual defendants to buy back MetLife stock after the IPO had taken place should have been disclosed in the Policyholder Information Booklet (PIB) was improperly dismissed at this stage on the ground that disclosure was not required because the buy-back plan was insufficiently uncertain at the time of the PIB.  It is apparent, as the court found, that the defendants were considering a share repurchase and apparent, particularly in light of defendant Goldman Sachs' statement that 'MetLife should indicate in the prospectus that it will implement a stock repurchase program immediately post IPO,' that at the time of the PIB the event was at least reasonably likely to occur.

*Id.*, 6 A.D.3d 320, 322-23, 776 N.Y.S.2d at 32.  The Goldman Sachs' document was one of tens of thousands of pages of documents that Plaintiffs obtained from subpoenas as a result of Plaintiffs' settlement of their TRO motion and agreement to obtain early disclosure before preparing and filing their consolidated amended complaint.

In essence, the grounds for the First Department's reversal of the dismissal of the complaint were that Plaintiffs had documents allegedly demonstrating they had a cause of action against MetLife for omitting material facts (the share buy back plan) which depressed the IPO price and diluted Plaintiffs' equity in the mutual company resulting from the conversion.

The First Department also upheld the denial of Defendants' motion to compel Plaintiffs to pay Defendants' attorneys' fees and post a bond.  *Id.*

### 3. Plaintiffs Successfully Defeat The Renewed Motion To Dismiss

On June 16, 2004, Plaintiffs filed their Second Amended Consolidated Complaint.

Defendants moved to dismiss Plaintiffs' first and second causes of action and dismiss and/or strike various paragraphs of the Second Amended Complaint.

After oral argument, the Court, on October 11, 2005, denied Defendants' motion to dismiss except to the extent of dismissing the portion of Plaintiffs' conversion law

claim based on Defendants' failure to disclose the proposed buy-back plan and certain

preferential treatment; dismissing the portion of Plaintiffs' fraud claim based on MetLife

Defendants' failure to disclose certain preferential treatment; and striking certain

paragraphs and headings of the Second Amended Consolidated Complaint. *Fiala, et al.*

*v. Metropolitan Life Ins. Co., et al.*, Index No. 601181/00, Memorandum Decision (Oct.

11, 2005) at 10 (Sup. Ct., New York County).

### 4. Plaintiffs Successfully Move To Certify This Action As A Class Action

Plaintiffs then moved to certify the Class, and Defendants opposed the motion.

Following briefing and oral argument, the Court granted class certification with

respect to Plaintiffs' New York Insurance Law § 7312 cause of action and denied class

certification regarding the common law fraud cause of action. *Fiala, et al. v.*

*Metropolitan Life Insurance Co., et al.*, Index No. 601181/00, Memorandum Decision

(May 2, 2006) (Sup. Ct. New York County).  The grounds for the denial of the fraud

class were that the element of reliance presented individual issues that could not be

resolved under a class basis. *Id.*

The Court certified the following Class: "All Eligible Policyholders of MetLife,

who owned or had in force, as of September 28, 1999, life insurance policies, annuity

contracts, or accident and health insurance policies issued by MetLife, or other

certificates or interests identified in the Plan, excluding defendants, their officers,

directors, subsidiaries [and] affiliates." *Id.*

### 5. Plaintiffs Successfully Uphold This Decision On Appeal To The First Department

Thereafter, Defendants appealed the Supreme Court's decision certifying the Class and Plaintiffs cross-appealed the Court's denial of class certification.  Following oral argument, the First Department upheld the order of class certification by the Supreme Court.  *Fiala, et al. v. Metropolitan Life Insurance Co., et al.*, 52 A.D.3d 251, 859 N.Y.S.2d 426, 2008 NY Slip Op. 05010 (N.Y. App. Div. 2008).  The First Department's findings (including that the individual issue of reliance rendered the common law fraud cause of action inappropriate for class treatment) could not then be appealed to the Court of Appeals.  *Id.*

### 6. The Millions of Pages of Fact and Expert Document Disclosure, Dozens of EBTs, And Hundreds of Interrogatories And Notices to Admit

The parties conducted extensive fact and expert disclosure.  For example, MetLife, its Advisors and non-parties produced millions of pages of documents to Plaintiffs.  Plaintiffs reviewed these documents, issued EBTs, deposed some twenty four witnesses, and propounded and successfully compelled responses to hundreds of interrogatories and notices to admit.

Defendants deposed the named Plaintiffs.  The parties submitted disclosures by their experts.  The parties then conducted EBTs of one another's six testifying experts. *See, e.g.,* Plaintiffs Memorandum in Opposition to Defendants Motion for Summary Judgment, dated September 22, 2008, p. 2, *citing* Defendants' expert, Michael Keable (". . . '[a]s would be true in any IPO and every IPO, any situation I can think of as I sit here today, the more shares that are issued, the lower the IPO price would be, but the question is should there have been more shared issued. . .' Keable Tr., Def. Ex. 25 pp. 210-11.").

### 7. The Fully-Briefed Motion For Summary Judgment

Defendants moved for summary judgment under CPLR 3125(b) on the grounds, among others, that there was no buy back plan; that if there was, the Superintendent of Insurance or his advisers knew about it; and that, in any event, there was no unfairness to the price of the conversion transaction.

Using the materials referenced above, Plaintiffs submitted volumes of evidence in opposition to summary judgment.

Following the full briefing by the parties on Defendant's motion, oral argument was held.

The motion was *sub judice* at the time of the settlement herein.

### K.     The Joint State-Federal Settlement Under Mediator Richard Davis, Esq.

The start of trial in the federal case was set for the early November 2009.  After the jury was sworn in, a settlement of the claims by both the State and federal plaintiffs was reached between the parties.

This settlement was reached solely thanks to the intervention of this Court and the District Court through their appointment of Richard Davis, Esq. of Weil, Gotshal & Manges as mediator.

Mr. Davis persuaded the parties, including Class Counsel for the Plaintiffs here, of the reasonableness of the settlement course of action.

### III.     ARGUMENT

### POINT A.     THE SETTLEMENT SHOULD BE APPROVED AS FAIR REASONABLE AND ADEQUATE

### 1.     The Standards For Judicial Approval of Class Action Settlements

In approving a proposed settlement under CPLR 908, "[t]he focus of the Court's inquiry is whether the settlement is fair, reasonable and adequate when its benefits are viewed against the risks and possible benefits of litigation." *Michels, et al., v. Phoenix Home Life Mutual Ins. Co.,* No. 95/5318, 1997 WL 1161145 at *26 (N.Y. Sup. Jan 7, 1997) (internal citations and punctuation omitted).

When evaluating the settlement, the Court should consider the following factors: (i) the likelihood that plaintiffs will succeed on the merits; (ii) the extent of support from the parties; (iii) the judgment of counsel; (iv) the presence of good faith bargaining; and (v) the complexity and nature of the issues of law and fact. *See, In re Colt Indus., Inc. Shareholder Litig.,* 155 A.D.2d 154, 160 (1st Dep't 1990); *Klurfeld v. Equity Enterprises, Inc.,* 79 A.D.2d 124, 133, 436 N.Y.S.2d 303, 308 (2d Dept. 1981).

Applying these criteria, it is clear that the settlement is fair, reasonable and adequate.

Article 9 of the CPLR was modeled after the class action provisions of Rule 23 of the Federal Rules of Civil Procedure and adopts the prerequisites of a Rule 23 action for all class actions. *E.g., Friar v. Vanguard Holding Corp.,* 78 A.D.2d 83, 93 (2d Dep't 1980). Accordingly, New York courts have looked to federal decisions for guidance on judicial approval of class action settlements.

### 2. More Generally, Compromises of Disputed Claims Are Favored

It is well established that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank,* 216 U.S. 582, 595 (1910); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 459 (2d Cir. 1974). There is a "general policy favoring the settlement of litigation." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982).

3.    **Defendants Vigorously Deny All Liability And Experienced Class Counsel Recommend The Settlement As Fair and Reasonable**

Defendants continue to deny that Plaintiffs and the other Class members are entitled to any relief whatsoever and Defendants have pending a fully-briefed motion for summary judgment.

Class Counsel have considered and weighed the issues involved in establishing the validity of their claims and have concluded that, in light of the uncertainty of the outcome as well as the substantial risks and inevitable delay in proceeding to trial, the Settlement provides the best method for resolving the parties' claims and a reasonable and fair result for the members of the Class.

4.    **The Presumption of Fairness Arising From, Or The Great Weight Accorded To, The Recommendation of Experienced, Well Informed Counsel Who Has Engaged In Arms-Length Bargaining**

Plaintiffs respectfully submit that this Court should conduct a two step analysis. First, because "good process produces good results," this Court should determine whether the process that produced the Settlement was one of arm's-length bargaining by experienced and well informed counsel.

If the Court finds that this is so, then somewhat different consequences have been articulated by various courts. Some say that there is a strong presumption that the class action settlement is fair and reasonable where the settlement is reached by experienced counsel after arm's-length negotiations. *In re Baldwin-United Corp.,* 607 F.Supp. 1312, 1320 (S.D.N.Y. 1985); *Chatelain v. Prudential-Bache Sec. Inc.,* 805 F.Supp. 209, 212 (S.D.N.Y. 1992).

Others courts say that the opinion of experienced counsel supporting the settlement is "entitled to considerable weight." *Smith v. Vista Org., Ltd.,* No. 89 Civ.

0048, 1991 WL 152612 at *5 (S.D.N.Y. 1991), *citing Fielding v. Allen,* 99 F. Supp. 137, 144 (S.D.N.Y. 1951); *In re Chicken Antitrust Litig.,* 1980-1 Trade Cas. (CCH) ¶ 63,237 at 78,148 (N.D.Ga. 1980) ("Notwithstanding the court's substantial involvement in the suit over the past five years, the parties' counsel are best able to weigh the relative strengths and weaknesses of their arguments. The court is not inclined to substitute its educated estimate of the complexity, expense and likely duration of this litigation without a sound basis for concluding that the settlements are inadequate.").

Whatever standard is employed, the second step should be to determine whether the consideration provided by the joint Settlement here is within the range that that is fair and reasonable.

5. **Good Process Preceded Class Counsel's Decision to Enter The Settlement And Their Recommendation That The Settlement Is Fair and Reasonable**

a. **Class Counsel Are Highly Experienced**

Class Co-Lead Counsel are the firms of Lovell Stewart Halebian LLP (Chairman); Milberg LLP; Weiss & Lurie LLP; and Stull, Stull & Brody.

These firms have extensive experience in the successful prosecution and resolution of class action law suits. *See,* resumes of Class Co-Lead Counsel included within Stoll Aff. (Ex. D-3 and Exs. E-1 to E-8); *In re Initial Public Offering Securities Litig.,* __ F.Supp.2d __, 2009 WL 3397238 *17 (S.D.N.Y. Oct. 5, 2009) (finding that "[e]ach of the firms that comprise the Committee [which included Lovell Stewart and Milberg as well as Stull, Stull & Brody] has tremendous experience in complex securities litigation.").

b. **Nine-Plus Years of Litigation Have Made The Experienced Class Counsel Exceedingly Well**

**Informed About The Merits and Risks of The Claims Here**

As detailed in the Statement of Facts, this action involves complex legal issues and has been thoroughly litigated by the parties over nine years.  MetLife has repeatedly moved to dismiss, all fact and expert disclosure was completed, and a fully brief motion for summary judgment was awaiting decision at the time of the settlement.

As a result of the millions of pages of document disclosure and EBTs, and the advanced stage of the proceedings, Class Counsel was fully informed when it determined to settle.

### c.  There Was Highly Adversarial, Good Faith And Wholly Arms'-Length Bargaining At All Times

Again, in evaluating class action settlements, courts seek to ensure that the settlement is the result of arm's length negotiations between experienced counsel with the ability to effectively represent the class' interests.  *See, Weinberger,* 698 F.2d at 74.

The Settlement negotiations here were hard-fought, highly-adversarial and took place at arm's-length between experienced and skilled attorneys.  *See,* Christopher Lovell Affidavit (annexed as Exhibit B to Stoll Aff.), at ¶¶ 2-3.

### d.  Only The Persuasion of Mediator Richard Davis, Esq. Caused There To Be A Settlement Here

Indeed, so arm's-length was the bargaining here that the parties would not have come together to settle without the intervention of the Court and the mediator Richard Davis, Esq., of Weil Gotshal & Manges.  *Id.*¶ 4

Only the persuasion of Mr. Davis brought the parties to an agreement.  *Id.*

Therefore, this Court should find that the settlement is the product of arm's-length negotiation and good faith bargaining by experienced and well-informed class counsel. *E.g., Paine Webber,* 171 F.R.D. at 125.

Class Counsel's recommendation that the Court grant final approval of the settlement should, at least, be given great weight.  *Smith v. Vista Org. Ltd., supra,* 1991 WL 151612 at *5.

   6.   **Even Without The Presumption of Reasonableness Arising From the Proper Process, The Settlement Is Within the Range of Reasonableness That Merits Approval By This Court**

      a.   **The Risks Arising From The Lack of Favorable Precedent Concerning The New York Insurance Law § 7312 Cause of Action, And The Superintendent's Findings of The Fairness of The Transaction And The Disclosures**

Plaintiffs' Class Counsel acknowledge that this is the first "fairness" cause of action to be sustained under New York Insurance Law § 7312 and to be settled.

Because it is the first, there was no precedent and, therefore, many uncertainties concerning what, precisely, would or would not have been held or found to constitute fairness or unfairness of Defendants' conduct.

In this absence of any such precedent, the Defendants argued that the Superintendent found the conversion transaction to be fair and the disclosure materials adequate.  Class Counsel believes that Plaintiffs demonstrated overwhelmingly that the Superintendent was not aware of the share buy back plan.

But Class Counsel acknowledge that some materials that Plaintiffs rely on to show the buy back plan were provided to the Superintendent's adviser.

26

If the finder of fact agreed with Defendants or if Plaintiffs otherwise failed to prove a lack of fairness resulting from the allegedly undisclosed share buyback plan, Class members would have received nothing here.

The risks that this failure of proof would occur place the settlement within a range that responsible, experienced attorneys could accept, considering all relevant risks and factors of litigation. *Weinberger,* 698 F.2d at 74; *Grinnell,* 495 F.2d at 455.

### b. The Risks Arising From Collateral Estoppel, *Res Judicata* And Summary Judgment

At the time of the settlement, Defendants' motion for summary judgment was pending.  Therein, Defendants argued, among other things, that there was no buy-back plan; if there was a buy-back plan, the Superintendent was aware of same and the Superintendent effectively approved the undisclosed buy-back plan as fair and reasonable.

Again, Plaintiffs submitted voluminous evidence in opposition to Defendants' motion for summary judgment.  Class Counsel are confident that Plaintiffs' causes of action would have survived Defendants' summary judgment motion.  Class Counsel are particularly confident that their allegations of an undisclosed share buy-back plan would have survived summary judgment.

Although Class Counsel believe that they showed that the documents provided to the Superintendent's Advisers clearly did not include almost all of the documents on which Plaintiffs based their buy-back claim, Plaintiffs acknowledge that some documents were provided to the Superintendent's Advisers.

Thus, Class Counsel recognize that there could be no assurance that even the summary judgment motion would be denied.  If the motion had been granted and upheld

on appeal, then there would have been no recovery whatsoever on the causes of action here.  The settlement avoids these risks of no recovery.

Moreover, another non-trial risk of dismissal here arises from potential collateral estoppel and *res judicata* under the single judgment rule or otherwise.

Specifically, Defendants have repeatedly stated that, if they prevailed in the federal action, then that result would be binding on the Class here. Although the Plaintiffs in the federal action survived summary judgment, there were parts of the opinion denying summary judgment that indicated that Defendants had strong defenses to the federal claims.  *In re MetLife Demutualization Litig.*, 624 F.Supp.2d 232 (E.D.N.Y. May 27, 2009) (Platt, J.).

If the federal claims were dismissed during or at the end or after trial and such dismissal was upheld on appeal, then there was a substantial risk that the Class' causes of action here would have been subject, in whole or in part, to dismissal on *res judicata* or collateral estoppel grounds.  This risk could have eliminated all recovery on the causes of action here.

### c.  The Additional Risks And Complexities of Proving Liability And Causation At Trial

Plaintiffs believe they could put forth, through three expert witnesses and a concise selection of documentary evidence and live testimony, their trial presentation that Defendants' undisclosed share buy back plan materially and unfairly decreased the consideration to policyholders in order to increase MetLife's executive compensation.

However, as a general matter, class actions "have a well deserved reputation as being most complex." *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1997).  Trials are particularly complex and risky.  Therefore, as has been repeatedly observed, "[i]t is

known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *State of West Virginia v. Chas. Pfizer & Co.,* 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970).[5]

Even outside of an unprecedented cause of action such as this one, the history of litigation is replete with cases where plaintiffs succeeded at trial on liability, but they recovered no damages, or only disappointing damages. *See, e.g., U.S. Football League v. National Football League,* 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages"), *aff'd,* 842 F.2d 1335, 1377 (2d Cir. 1988) (affirming Judge Leisure's approval of the nominal damage verdict); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1166-69 (7th Cir. 1983) (judgment remanded for a partial new trial and damages).

Further, Plaintiffs must acknowledge the factual sympathy "defense" that MetLife could have developed at trial. This "defense" is that the price of MetLife's stock increased after the IPO from $14.25 per share to more than $50.00 per share. Yes, the executives of MetLife made monies from this. But so, except for the initial dilution resulting from the low IPO price, did most of the policyholders who are Class members.

Class Counsel believes the success of this favorable movement in the stock price presents a two-edged sword. One edge Defendants could and would have used to argue that the conversion transaction was favorable to policyholders. The other edge Plaintiffs

---

[5] Often, when some of the largest members of classes have opted-out of the class to try to do better than the class, they have failed to establish liability and have lost their cases at trial. This occurred, for example, in *Corrugated Container Antitrust Litig.,* 1983-2 Trade Cas. (CCH) 4jf 65,628 at 69,157 (S.D. Tex. Sept. 1, 1983), and more recently in the *Carbon Dioxide Industry Antitrust Litig.,* 229 F.3d 1321, 1323 (11th Cir. 2000).

would have used to argue as follows. If the post-IPO prices of MetLife stock increased by such a large amount, while stock market averages fell, then the inescapable inference is that the IPO price was too low. And something had to cause the IPO price to be too low. Weighing down the IPO issuance with excess shares, is such explanation. Buying back large volumes of shares after the IPO, also helps explain the post-IPO increases in MetLife share prices.

But Plaintiffs also acknowledge that these causation arguments would have devolved into a "battle of the experts." As the Court observed in *In re Warner Communications Securities Litigation*:

> In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors ....

618 F.Supp 735, 744-45 (D.C.N.Y. 1985). Plaintiffs acknowledge there were risks that Plaintiffs would fail to prove at trial that MetLife's conversion transaction was unfair.

### d.  The Risks of Proving Damages At Trial

If the finder of fact determined that the conversion transaction was unfair to Class members, then the issue of the amount of damages remained. Plaintiffs' expert put forth various estimates of damages up to and including $5,000,000,000.

However, the most realistic estimates of the Class' damages were between $350,000,000 and $1,600,000,000.

"[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *City of Detroit v. Grinnell,* 495 F.2d at 455 n.2. Here, the settlement amount represents far more than 1% of $350,000,000-$1,600,000,000.

Plaintiffs acknowledge that damages depended on the intangible of what would a

fair consideration have been and a battle of the experts about "fairness." *See, In re Top*

*Tankers, Inc. Securities Litig.*, 2008 WL 2944620 (S.D.N.Y. 2008) (the crucial element

of damages would likely be reduced at trial to a battle of the experts), *citing In re*

*PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d

(2d Cir. 1997) (noting unpredictability of outcome of battle of damages experts) and *In re*

*Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001)(establishing damages at trial

would lead to battle of experts with no guarantee whom the jury would believe) (internal

marks omitted).

If Defendants' experts' testimony were accepted over Plaintiffs', then the Class

would receive no damages or, certainly, far less than the foregoing reasonable estimates.

*See, e.g., U.S. States Football League v. National Football League*, 644 F.Supp. 1040,

1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages,

concluding the USFL had suffered only $1.00 in damages"), *aff'd*, 842 F.2d 1335, 1377

(2d Cir. 1988).

Accordingly, the risks of establishing damages strongly favor approval of the

proposed settlement. *In re Prudential Securities Inc. Ltd. P'Ships Litig.,* 1995 WL

798907 at *14 (S.D.N.Y. 1995).

### 7.    The Risks of Judgment Notwithstanding The Verdict and Of Appeals Concerning This New Cause Of Action

Finally, even if the trial obtained a successful result in excess of the proposed

settlement, there remained post-verdict motions and the appeal process. *In Re Tyco*

*Intern., Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249, 260 (D.N.H. 2007) (approving

settlement and finding that "[t]his was not just a complex case, however.  It was also a

risky case for both sides, in large part because of an uncertain legal environment.

Plaintiffs' theory of the case put them at the cutting edge of a rapidly changing area of the

law. . . .  Moreover, the law remains in flux and it is by no means certain that plaintiffs

would have prevailed if they had taken the case to trial and attempted to defend any

favorable verdict on appeal.").  In an unprecedented claim like this one, experienced

counsel are well aware of and must acknowledge the appeal risks.

Even with all the foregoing substantial risks, Plaintiffs wanted to obtain a higher

settlement or present their claims at trial.  However, on the one hand, as Mediator

Richard Davis, Esq. repeatedly informed Plaintiffs, the essence of a settlement is

compromise.  On the other hand, "a just result is often no more than an arbitrary point

between competing notions of reasonableness." *In re Corrugated Container Antitrust

Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981).

In these circumstances, Class Counsel accepted the Mediator's recommendation

to settle and the settlement is fair and reasonable to Class members.

### 8.       The Support Of The Parties For The Settlement

Both Plaintiffs and Defendants believe the Settlement represents a fair, reasonable

and adequate resolution of the claims asserted in the Complaint.

### 9.       Delays In Payment In The Absence Of Settlement

Also, absent the Settlement, this action would have continued for many years with

both Plaintiffs and Defendants incurring substantially larger expenses than those to date

should the action continue to trial.  Accordingly, the parties have concluded that the

complexity of this action and the legal issues involved militate in favor of settlement.

*See, Slomovics v. All for a Dollar, Inc.,* 906 F. Supp. 146, 149 (E.DN.Y. 1995) ("The

potential for this litigation to result in great expense and to continue for a long time

suggest that settlement is in the best interests of the Class.").

> ### 10. The Method of Payment:  $47,500,000 Into The Closed Block And $2,500,00 Into A *Cy Pres*, Is Fair And Reasonable

Again, the Settlement Agreement calls for $47,500,000 to be paid into the Closed

Block and $2,500,000 into *cy pres* in the form of health and longevity benefits.

Stipulation of Settlement, ¶¶ 14(g), 16(a).  The charges for attorneys' fees,

reimbursement of costs, etc. will be deducted from this $47,500,000 payment.

By causing the overwhelming majority of the settlement monies to be paid into

the Closed Block, the parties are doing several things.  First, they are saving the

administrative costs of distributing checks to individual Class members.  This savings is

substantial.  Indeed, such administrative costs could consume most or all of the

$50,000,000.

Second, the parties are effectively shifting the administrative distribution costs

(which, again, could be $50,000,000) on to MetLife's normal operations.

Third, the parties are enhancing the primary protection --- the Closed Block ---for

most policyholders provided by the conversion transaction.  *See* fn. 2 *supra.*

Fourth, the parties are providing a tax-free method of growth for such monies in

the Closed Block.

However, not all policyholders now benefit from the Closed Block.  The amount

of the administrative costs to send individual checks to these policyholders would also

overwhelm the settlement fund.  In these circumstances, it is fair and reasonable to pay

$2,500,000 into a *cy pres* fund.  The *cy pres* recipients selected here (charities that

promote health and longevity) are appropriate, reasonable and fair to benefit the

policyholders.  *See*, Federal Plaintiffs' Memorandum in Support of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds, dated December 22, 2009, (attached as Ex. A-1 to Stoll Aff.).  None of the $2,500,000 will be paid for attorneys' fees, reimbursement of costs, etc.

Therefore, this part of the settlement further renders it fair and reasonable.

**B.     THIS COURT SHOULD AWARD THE REQUESTED FEES AND EXPENSES**

Again, Class Counsel herein and in the federal case jointly request a fee equal to $15,000,000 minus the sum of the reimbursements expenses and the award to named Plaintiffs of lost wages requested in "C" and "D" below.

**1.     The Standards Governing The Award Of Attorneys' Fees**

The Class has been certified and, therefore, treatment under CLPR 909 is appropriate.

> Where a favorable settlement has been obtained on behalf of a class, 'the court in its discretion may award [counsel] fees to the representatives of the class based on the reasonable value of legal services rendered (CPLR 909).'   The party seeking the fee bears the burden of showing the reasonableness of the fee by providing definite information regarding the way in which time was spent and the experience of the attorneys performing each task . . . .

> While the 'determination as to the proper amount of an award of [counsel] fees lies largely within the discretion of the court, the discretion is not unlimited.' . . .  When reviewing a fee application in a class action, the court acts as a fiduciary and must protect the rights of absent class members . . . .

*Flemming v. Barnwell Nursing Home and Health Facilities, Inc.*, 56 A.D.3d 162, 165, 865 N.Y.S.2d 706, 708, 2008 Slip. Op. 07838 (3rd Dep't Oct. 16, 2008) (brackets in original; internal citations omitted) ("*Flemming*").[6]

Where a class plaintiff successfully recovers a benefit for the entire class, the costs of litigation should be spread among the class members.  Under the "common fund" or "common benefit" doctrine established by *Trustees v. Greenough,* 105 U.S. 527 (1881), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work.  *In re Cablevision Systems Corp. Shareholders Litig.*, 868 N.Y.S.2d 456, 2008 Slip. Op. 28323 (Sup. Ct. Nassau County 2008) ("The 'common fund' doctrine allows for an award of counsel fees out of a common fund actually created by a successful shareholder litigation."); *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).

### 2. Ordinarily, The Substantial Risks Here Would Justify Awarding A Reasonable Fee That Is Greater Than The Lodestar Value of the Professional Services Performed

[T]wo acceptable options [for determining fees] are the percentage approach and the lodestar method, the latter having originated in class action litigation. . . .  Under the lodestar method, the court determines the reasonable hourly rate and multiplies it by the reasonable number of hours expended, then adjusts the fee based upon certain subjective criteria. . . .

*Flemming*, 56 A.D.3d at 165, 865 N.Y.S.2d at 708.  In *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974) ("*Grinnell I*"), the Second Circuit held that: "No one

---

[6] *See also, e.g., In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re General Motors Corp. Pick-Up Truck Fuel-Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995), *affd.*, 134 F.3d 133 (3d Cir. 1998); *Rawlings v. Prudential-Bache Properties, Int.*, 9 F.3d 513, 515-17 (6th Cit. 1993); *Florin v. NationsBank of Georgia, NA*, 34 F.3d 560, 564-65 (7th Cir. 1994); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993).

expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success." 495 F.2d at 470, *quoting Cherner v. Transitron*, 221 F.Supp. 55, 61 (D. Mass. 1963) (Wyzanski, J.).[7]

Therefore, courts ordinarily should apply a multiplier to the "lodestar" in order to take account of such factors as: (i) the contingent nature of the fee and the consequent risk on non-payment; (ii) the risks of the case, *e.g.*, the likelihood of success, viewed as of the time of filing suit; (iii) the quality of representation; and (iv) the result achieved. *See, Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *Grinnell*, 495 F.2d at 470-73.

In adjusting the lodestar, the Second Circuit and other courts also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation. *See, Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973); *In re Time Warner Communications*, 618 F.Supp. 735, 750-51 (S.D.N.Y. 1985).

### a. The Risk of Litigation Was High Because There Was No Prior Government Action To Pave The Way

---

[7] *Accord, e.g., Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Standard Sanitary Corp.*, 487 F.2d 161, 168 (3rd Cir. 1973); *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir.), *cert. dism'd*, 453 U.S. 950 (1981) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result."). *See, Report of the Third Circuit Task Force, Court Awarded Attorneys Fees*, 108 F.R.D. 237, 243 (1985) ("An increase or decrease of the lodestar amount is referred to as a 'multiplier.' In determining whether to increase the lodestar to reflect the contingent nature of the case, the Third Circuit said 'the district court should consider any information that may help establish the probability of success." (internal citations omitted)).

Here, the risks of litigation faced by Class counsel were especially high. *See*, Argument Point A *supra* (listing risks). Moreover, an important factor in assessing risks is whether the private action followed a similar government action. The notion is that, where class counsel merely follows or copies a government, class counsel do not face the usual risks of litigation. *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393, 398 (S.D.N.Y. 1999)(Pollack, J.) ("[T]he CFTC proceedings actually undercut Plaintiffs' claims by greatly shortening the time of the alleged manipulation. Because they did not provide any new facts or 'roadmap' and began . . . after this action, the very limited government proceedings did not help Petitioners in any way to overcome the complexities and risks of this action.").

Here, there was no prior government action.

### b. On The Contrary, The Superintendent of Insurance Approved The Conversion Transaction

Far from having a government action to pave the way, Plaintiffs were confronted by the fact that the Superintendent had affirmatively approved of the transaction and specifically found it to be fair to policyholders and the disclosures to be adequate.

Plaintiffs faced extraordinary risks that the case would be dismissed in its entirety until the First Department's decision reinstating Plaintiffs' undisclosed share buy back claim.

### c. The Defendants' Request To Compel Plaintiffs To Pay Defendants' Attorneys' Fees, Added To The Risks

Compounding such extraordinary risks, Defendants were seeking attorneys' fees and a bond under New York Insurance Law § 7312(t)(2) and New York Business Corporation Law § 627. *See, e.g., Shah, supra,* Reply Memorandum of Law In Further

Support of Metropolitan Life Insurance Company for Security for Reasonable Expenses, dated November 2, 2000, at pp. 3-4, 7.

Thus, Plaintiffs and Class Counsel simultaneously faced not just dismissal risks (and an initially dismissed action) but also the risk that they would have to pay Defendants' attorneys' fees. *See, e.g., Shah, supra,* Memorandum of Law In Support of Metropolitan Life Insurance Company for Security for Reasonable Expenses, dated September 11, 2000, *passim.*

### d. The Lack of Precedent For A New York Insurance Law § 7312 Fairness Cause of Action, Created Many Risks

Another exceptional risk here is the fairness cause of action under New York Insurance Law § 7312. This cause of action did not have any favorable precedent until this case. The legal risks of review of this cause of action by the Court of Appeals were substantial.

### e. The Total Lodestar Value of the Attorneys' Time Is In Excess of $45,000,000

In all the foregoing circumstances, a large risk multiplier for Class Counsel's lodestar could be justified here. This risk multiplier could have been 2.0 or 3.0. *See, Sumitomo Copper Litig.,* 74 F.Supp.2d 393 at 399 (2.5 risk multiplier).

During the more than the nine-year course of this litigation, Class counsel have rendered legal services in the amount of $17,628,346.25 in lodestar value of attorneys' fees. *See,* Stoll Aff., Section II, Exs. C-1 and D-1, and the accompanying affidavits of Class Counsel attached thereto (Stoll Aff. Exs. E-1 to E-8). They detail the credentials of the attorneys and the time that each expended on the litigation. They also aver that based

on contemporaneously maintained time records the tasks undertaken by each firm in the litigation.

Class Counsel in the federal cases have rendered services with a total lodestar value of $25,214,472.00. *See,* the federal plaintiffs' Lead Counsel's Joint Application for An Award of Attorneys' Fees and Reimbursement of Expenses and the Declaration of Jared B. Stamell In Support of Attorneys' Fees and Reimbursement of Expenses, dated December 22, 2009, at ¶ 15 (attached as Ex. A-2 to Stoll Aff.).

Therefore, the lodestar in both cases is $42,842,818.25.[8] *See, id.;* Stoll Aff. ¶ 33 and Ex. C-1 thereto.

In contrast, the requested fee is only approximately $10,500,000. This requested fee constitutes an overwhelmingly **negative** multiplier discount of more than a 75% reduction.

 3. **The Proposed Fees Represents A Percentage of the Settlement Fund that Is Substantially Less Than The Percentages Awarded In Comparable Class Actions**

The proposed fee is also very reasonable when expressed as a percentage of the Settlement Fund.

The United States Supreme Court has expressly approved the use of the percentage of recovery method in a common fund case. *Blum v. Stenson,* 465 U.S. 886, 900 n. 16 (1984) ("... under the 'common fund doctrine' ... a reasonable fee is based on a percentage of the fund bestowed on the class.").

The utility of the percentage of recovery method has been recognized by courts in New York and throughout the United States. *See, e.g., Dubin v. E.F. Hutton Group, Inc.,*

---

[8] Counsel for the State and federal Plaintiffs have agreed to a division of any attorneys' fees.

878 F. Supp. 616, 621 (S.D.N.Y. 1995) ("the percentage method offers the advantage of helping to ensure both that the fee award will stimulate the market and that attorneys will have an incentive to settle the case rather than to litigate it fully in order to increase the lodestar.").

Here, the proposed fee likely represents 21% of the Settlement fund.[9]  This percentage is far less than fee awards made in other class actions in New York.  *See, e.g., In re Medical X-Ray Film Antitrust Litig.,* No.CV-93-5904, 1998 WL 661515 (E.D.N.Y. Aug 7, 1998) (awarding one third of settlement fund); *Michaels v. Ambassador Group, Inc.,*110 F.RD. 84 (E.D.NY. 1986) (35%); *In re Painewebber Sec. Litig.,* No. 86 Civ. 6776 (VLB), 1994 WL 416020 (S.D.N.Y. 1994) (33 1/3 %); *In re Crazy Eddie Sec. Litig.,* 824 F. Supp. 320 (E.D.N.Y. 1993) (33.81 %).

### C.    Class Counsel Should Be Awarded Reimbursement of Expenses Advanced During The Course of the Litigation

A party whose efforts confer a benefit on a class is entitled to reimbursement of expenses that are reasonably incurred and equitable.  *In re Bausch & Lomb Sec. Litig.,* 183 F.R.D. 78, 89 (W.D.N.Y. 1998), *citing U.S. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153,173 (2d Cir. 1996); *Colt Industries Shareholder Litig. v. Colt Industries, Inc.,* 77 N.Y.2d 185 (N.Y. 1991)("The foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation.").

Class Counsel respectfully request that the Court grant their application for reimbursement of $1,344,887.04 in litigation expenses incurred in connection with the

---

[9] The requested fee would be as much as 30% only in the unlikely event that all reimbursement of Class Counsel's costs and Plaintiffs' lost wages were denied *in toto.* *See,* pp. 2-3 *supra.*

prosecution of this action.  These expenses are all supported by affidavit evidence of Class Counsel.

New York State Class Counsels' Expenses.  The specified amounts and nature of these expenses are detailed in the Stoll Affidavit ¶¶ 46-57 and the accompanying affidavits.  Stoll Aff. Exs. D-2 and E1 to E8.

For example, $380,806.50 was expended for experts and non-testifying consultants. Stoll Aff. ¶ 51.

$454,161.83 was expanded for notice to the Classes.  Stoll Aff. ¶ 52; *see, Fiala, et al. v. Metropolitan Life Insurance Co., et al.*, Index No. 601181/00, Memorandum Decision, issued May 2, 2006 (Sup. Ct., New York County) (decision certifying class).

$156,537.90 was expended in legal research.  Stoll Aff. ¶ 53.

$102,652.10 was expended for photocopying and other charges in connection with the millions of pages of physical and electronic documents produced in this action by Defendants and non-parties.  Stoll Aff.¶ 54.

$67,267.65 was expended for examinations before trial including transcribing reporter costs and other items.  Stoll Aff. ¶ 55.

All of the expenses detailed were directly connected to the State and federal claims and were necessarily incurred by Class Counsel for the benefit of the members of the Class.  Stoll Aff. ¶ 56.

### D.    The Request For An Award of Compensation to The Named Plaintiffs Under The PSLRA

Class representatives in non-securities class actions in federal court have often been given lump sum "incentive" awards to compensate them for their efforts on behalf of the class.  *See, e.g. Dornberger v. Metropolitan Life Insurance Co.*, 203 F.R.D. 118,

124-25 (S.D.N.Y. 2001) (Sand, J.), (noting case law supporting payments of between $2,500 and $85,000 to representative plaintiffs in class actions); *In re Janney Montgomery Scott LLC Fin. Consultants Litig.*, No. 06-3202 (S), 2009 U.S. Dist LEXIS 609790, 2009 WL 2137224, at *12 (E.D. Pa. July 16, 2009) (awarding $20,000 for each named plaintiff).

Payments to the named plaintiffs under New York State law have frequently been denied.

However, at Defendants' insistence and because this case involved the settlement of a federal securities case, the agreement provides that all class representatives could seek compensation under the standards set forth in the PSLRA. *See*, Stipulation of Settlement, ¶ 28 (e).

The PSLRA allows compensation for "reasonable expenses including lost wages." 15 U.S.C. §700-4(a)(4).

The term "lost wages" is commonly understood to be quite broad. *Rexrode v. Allstate Indem. Co.*, Case No. 06-cv-00887, 2007 U.S. Dist. LEXIS 58216 at *7 (D. Colo. Aug. 9, 2007). It has been interpreted by many courts to allow reimbursement for the time class representatives spend conferring with counsel and participation in discovery based on the number of hours spent and their normal compensation level. However, lost wages may encompass a wide variety of other forms of compensation that an employee may receive for services rendered, and are not limited to mere salary or hourly pay. *Id.*

Accordingly, courts have availed themselves of the discretion given to them to grant remuneration to lead plaintiffs and class representatives. *See, e.g., In re Rhythms Securities Litig.*, CV-02-K35 (D.Co. April 13, 2009); *In re Xcel Energy, Inc. Sec.,*

*Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1000 (D.Minn. 2005) (court awarded

$100,000 to be distributed among the eight lead plaintiffs in a manner to be determined

by plaintiffs' counsel); *Carlson v. Xerox Corp.*, 3:00-cv-1621 (D.Conn., Jan. 14, 2009)

(three lead plaintiffs awarded $43,000, $20,870 and $20,000 each); *In re Tenet

Healthcare Corp,* CV 02-8456 (C.D.Cal., Nov. 25, 2008) (sole lead plaintiff awarded

$52,000); *In re Metris Co. Inc. Sec. Litig.* 02-CV-3677 (D.Minn., Apr. 24, 2008) (sole

class representative awarded $20,000); *In re Novell, Inc. Sec. Litig.*, No. 2:99-CV-995 TC

(D.Utah, May 26, 2005) (two lead plaintiffs awarded $25,000 in the aggregate); *Dusek v.

Mattel, Inc.*, No. CV-99-10864 (C.D.Cal., Oct. 1, 2003) (awarded three lead plaintiffs

approximately $50,000 each).

Most of the awards sought here are relatively modest by the standards of other

cases, especially given that this litigation lasted ten years:

> Eugenia J. Fiala ($2,000);
>
> Paulette Belunias ($1,760);
>
> Theresa Hazen ($1,800);
>
> Mark Smilow ($17,250);
>
> John Brophy ($10,000);
>
> Vijay Shah ($20,000);
>
> Ira Gelb, M.D. ($2,500); and
>
> June Gelb ($1,000).

Each of the above Plaintiffs responded to interrogatories, subjected themselves to

examination before trial and assisted Class Counsel in the preparation of the case.  The

amounts sought by such Plaintiffs are supported in the individual declarations of each

Plaintiff. *See*, Exs. F-1 to F-8 to Stoll Aff.  Such amounts compensate each Plaintiff for lost wages.

## CONCLUSION

Finally, Plaintiffs respectfully refer this Court to the federal plaintiffs' (a) Memorandum in Support of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds, and the Declaration of Jared B. Stamell in Support of Lead Counsel's Motion for Final Approval of Settlement and Plan of Allocation of Settlement Proceeds (and Appendix thereto); (b) Lead Counsel's Joint Application for An Award of Attorneys' Fees and Reimbursement of Expenses, and the Declaration of Jared B. Stamell In Support of Attorneys' Fees and Reimbursement of Expenses; and (c) the Application of Lead Plaintiffs in the Federal Action for Awards Under the PSLRA, and the Declaration of Jared B. Stamell In Support of Application of Lead Plaintiffs in the Federal Action for Awards under the PSLRA, all dated December 22, 2009.  Stoll Aff. Exs. A-1 to A-3.

For the reasons set forth above, and in the federal plaintiffs' submissions, this Court should grant the joint motion for final approval of the Settlement, the joint motion for an award of Class Counsel's fees and expenses, and award of the named Plaintiffs' requested fees.

Proposed orders will be submitted in advance of the final approval hearing.[10]

---

[10] As of this writing, there are two objections.  The objections will be addressed *seriatim* after the deadline for the receipt of objections has passed.

Dated: December 22, 2009

LOVELL STEWART HALEBIAN LLP

By _____
Christopher Lovell, Esq. (CL 2595)
Ian T. Stoll, Esq. (IS 3424)
61 Broadway, Suite 501
New York, New York 10006
Telephone:  (212) 608-1900


MILBERG LLP
Barry A. Weprin, Esq.
William B. Scoville, Jr., Esq.
One Pennsylvania Plaza
New York, New York  10119-0165
Telephone:  (212) 594-5300


STULL STULL & BRODY
Jules Brody, Esq.
James Henry Glavin IV, Esq.
6 East 45th Street
New York, New York  10017
Telephone:  (212) 687-7230


WEISS & LURIE
Richard A. Acocelli, Esq.
551 Fifth Avenue
New York, New York  10176
Telephone:  (212) 682-3025


*Counsel for Certified Class Representatives*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2009, the foregoing *Notice of Motion, Memorandum of Law in Support of Final Approval of Settlement Awarding Attorneys' Fees and Reimbursement of Expenses and Granting Compensatory Awards to the Representative Plaintiffs, and Affidavit of Ian T. Stoll, Esq. in Support of Joint Petitions by the State and Federal Plaintiffs* were filed and served by electronic mail and hand delivery on:

Carl Micarelli, Esq.
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022
cmicarelli@debevoise.com

*Attorney for Defendants*

Jared Stamell
Stamell & Schager LLP
1 Liberty Plaza, 35th Floor
New York, NY 10006
stamell@ssnyc.com

*Lead Counsel for Federal Plaintiffs*

and via the Eastern District's ECF system.

Dated:  December 22, 2009

Respectfully,

*/s/ Ian T. Stoll*
Ian T. Stoll
**Lovell Stewart Halebian LLP**
61 Broadway, Suite 501
New York, New York 10006
T: (212) 608-1900
F: (212) 719-4775

*Attorney for Plaintiffs*