# Exhibit A-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re | : | 00 CV 2258 (JBW) (AKT) |
| METLIFE DEMUTUALIZATION LITIGATION | : | ECF Filing |
| | : | |
| This Document Relates To All Actions | : | |

**MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS**

Jared B. Stamell (JS 5225)
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, New York  10006-1404
(212) 566-4047

*Lead Counsel for Federal Plaintiffs and Federal Class*

(Additional counsel on signature page)

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ............................................................................................1

    I.    The Court Should Grant Final Approval ........................................2

        A.    Application of the Grinnell Factors ......................................4

            1.    The Complexity, Expense and Likely Duration of the Litigation Supports Approval of the Settlement ....................4

            2.    The Classes' Reaction To The Settlement Supports Approval of the Settlement ...........................................................6

            3.    The Stage of the Proceedings and the Amount of Discovery Completed Supports Approval of the Settlement............................................................................6

            4.    The Risks of Establishing Liability Supports Approval of the Settlement .........................................................................7

            5.    The Risks of Establishing Damages Supports Approval of the Settlement .........................................................................9

            6.    The Risks of Maintaining the Class Action Through Trial.........11

            7.    The Ability of the Defendants to Withstand Greater Judgment .................................................................12

            8.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery And All the Attendant Risks of Litigation Supports Approval of the Settlement. .....................................................12

    II.    The Plan of Allocation is Fair and Reasonable and Should be Approved...................................................................................13

    III.    The Notice to the Class Satisfies Due Process...................................15

CONCLUSION................................................................................................16

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Beecher v. Able*, 575 F.2d 1010 (2d Cir. 1978) .......................................................................13

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).........................................3, 4, 12

*Consol. Edison, Inc. v. Northeast Utils.*, 332 F.Supp.2d 639 (S.D.N.Y. 2004)..........................15

*County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp 1422 (E.D.N.Y. 1989) .................16

*Fears v. Wilhelmina Model Agency*, 315 Fed.Appx. 333 (2d Cir. 2009) ...................................14

*Franks v. Bowman Transportation Co., Inc.* 424 U.S. 747 (1976)............................................12

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000)..................................................4

*In re Am. Bank Note Holographics*, 127 F.Supp.2d 418 (S.D.N.Y. 2001)...................................6

*In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007)....................3

*In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 310 (E.D.N.Y. 2006) ...........................3, 6

*In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997) ................6, 12, 13, 14

*In re Pharmaceutical Industry Average Wholesale Price Litigation*,
    2009 WL 3933088 (1st Cir. Nov. 19, 2009)................................................................14, 15

*In re Sterling Foster & Co., Inc. Sec. Litig.*, 238 F.Supp.2d 480 (E.D.N.Y. 2002)...................13

*In re Sumitomo Copper Litig.*, 189 F.R.D. 274 (S.D.N.Y. 1999)..................................................3

*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007) ................................14

*McAnaney v. Astoria Fin. Corp.*, 2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007)......................12

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972)..........................................................................12

*Sirota v. Solitron Devices, Inc.*, 673 F.2d 556 (2d Cir. 1982) ............................................11, 12

*Strougo v. Bassini*, 258 F.Supp.2d 254 (S.D.N.Y. 2003) ............................................................6

*Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688 (M.D. Fla. 2005)..................................3

*Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ..........................................................13

*Wellman v. Dickinson*, 497 F.Supp. 824 (S.D.N.Y. 1980),
    *aff'd*, 647 F.2d 163 (2d Cir. 1981) ............................................................................13

**<u>Other Authorities</u>**

*Actuarial Standard of Practice 37*, "Allocation of Consideration in
    Mutual Life Insurance Demutualizations." .....................................................9

Federal Rule of Civil Procedure 23 .....................................................................1, 15

*Newberg on Class Action § 11:20* (4th ed.2002) .................................................15

## INTRODUCTION

This memorandum is submitted in support of Lead Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the settlement of the class action litigations (respectively the "Federal Action" and the "State Action") against defendants Metropolitan Life Insurance Company ("MetLife Co.") and MetLife, Inc. (collectively, "defendants") and for final approval of the plan of allocation of the settlement proceeds. [1]  The terms of the settlement are set forth in the Stipulation of Settlement (the "Stipulation"), which was previously submitted to the Court and is attached as Exhibit A.  Lead Counsel also submits the declaration of Jared B. Stamell, which fully describes the litigation in the Federal Action, and is attached as Exhibit B.  Attached at Exhibit C is the memorandum in support of the settlement prepared by Lead Counsel in the State Action, which includes the declaration of Ian Stoll describing the history of the litigation in state court.  The two declarations and exhibits are an integral part of this submission and the Court is respectfully referred to them for a detailed description of, *inter alia*, the history of the litigation from the beginning through settlement; the nature of the claims; the investigations undertaken in the actions; the negotiations leading to the settlement; the value of the settlement, as compared to the risks and uncertainties of continued litigation; the plan of allocation for the settlement; and a description of the services plaintiffs and their counsel provided.  Contemporaneously, Lead Counsel is together filing a Memorandum in Support of Lead Counsel's Joint Application for an Award of Attorneys' Fees and Reimbursement of Expenses, as well as separate applications for compensation awards for Lead Plaintiffs in the Federal Action and State Action, respectively.

---

[1] Lead Plaintiffs in the federal action are Mary Adele DeVito, Michael A. Giannattasio, Kevin L. Hyms and Harry S. Purnell, III.

I.      **The Court Should Grant Final Approval**

The settlement is fair, reasonable and adequate.  It provides for defendants to pay $50 million in return for a release of any further liability for the claims made in the Federal and State Actions.  The allocation that plaintiffs propose for the settlement is $32.5 million to the Closed Block, $2.5 million as a *cy pres* award to a health-related non-profit organization, and $15 million to attorneys' fees, reimbursement of litigation expenses and compensation as provided in the PSLRA to the representative plaintiffs.

The settlement is the product of nine years of hard fought litigation.  In the Federal Action, the parties briefed and argued two motions to dismiss, four motions for summary judgment, three motions relating to class certification, a score of discovery motions, two petitions for mandamus, two motions for interlocutory appeal, an appeal, a dozen motions *in limine*, plus other pre-trial and trial motions.  The docket shows dozens of hearings and conferences before two district court judges, three magistrate judges and a Second Circuit panel before this case was resolved.  In the course of discovery hundreds of thousands of pages were produced by defendants and studied by plaintiffs.  Dozens of witnesses were deposed.  There were two separate jury selections.  Stamell Decl. ¶ 1.  Finally, after a jury was empanelled and the parties were ready with their opening statements, the parties reached a settlement.  *Id.* ¶¶ 169, 170.  The mediation, conducted by court-appointed Special Master, Richard J. Davis, Esq., followed years of unsuccessful efforts at settlement by the parties themselves.  *Id.* ¶ 170.  Because the case did not settle until trial, plaintiffs were well-informed about the strengths and weaknesses of the class claims.  Lead Plaintiffs and their counsel believe that they have reached a fair resolution of these claims.  It is Lead Counsel's and Lead Plaintiffs' opinions that, given the uncertainty of prosecuting the trial and possible appeals, the proposed settlement is fair, reasonable, and adequate.

Courts acknowledge the "overriding public interest in favor of settlement" of class actions because it is "common knowledge that class action suits have a well deserved reputation as being the most complex." *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 688, 698 (M.D. Fla. 2005) (citation and internal quotations omitted). "[I]n evaluating the settlement of a securities class action ... 'federal courts have long recognized that such litigation is notably difficult and notoriously uncertain." *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (citations omitted; emphasis omitted). Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute," *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007), and thus "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of litigation. There is a strong public interest in quieting any litigation, and this is 'particularly true in class actions.'" *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 310 (E.D.N.Y. 2006) (citations omitted).

The standards governing approval of class action settlements in this Circuit are well established. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d. Cir. 1974). In *Grinnell*, the Court of Appeals held that the following are factors to be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d. Cir. 1974), abrogated on other grounds by *Goldberger v. Integrated Res.*, Inc., 209 F.3d 43 (2d. Cir. 2000) (citations omitted).  Applying the factors stated by the Second Circuit to the facts in this case strongly suggests that the proposed settlement should be approved.

      A.    <u>Application of the Grinnell Factors</u>

          1.    The Complexity, Expense and Likely Duration of the Litigation Supports Approval of the Settlement

Typical in securities class actions, this litigation involves complex legal and factual issues.  This complexity is reflected in the many fully-briefed motions argued in the District Court and the Second Circuit in the nine years since the original complaint was filed.  Stamell Decl. ¶ 1.  Had this matter continued through trial, extensive evidence would have been presented by both parties through fact and expert witnesses and by entering into the record over 1,000 proposed trial exhibits.  Stamell Decl. ¶ 128.  The proof on many disputed issues – which involve complex financial concepts – would likely have included a battle of experts, leaving the trier of fact with difficult questions to resolve.  *Id.* ¶¶ 141, 157.

This action was aggressively litigated by both sides.  As set forth in the attached Declaration of Jared Stamell, by the time the parties reached a settlement, Lead Counsel had, among other things: (i) conducted an extensive factual investigation into the events and circumstances underlying the initial complaint filed in 2000 and the claims added in the second amended complaint filed in 2004 (Dkt #120), as further amended just before trial by the Court's Stipulation and Order Amending the Complaint (Dkt #491) (the "Complaint"); (ii) obtained and reviewed a decade of defendants' regulatory filings with the New York Insurance Department; (iii) thoroughly researched the law pertinent to the claims against defendants and potential defenses; (iv) prepared and submitted thousands of pages of legal briefings in, *inter alia*, motions

4

to dismiss, motions opposing discovery, motions for summary judgment, motions for interlocutory appeal, motions for class certification, mandamus petitions, an appeal and motions *in limine*, (v) conducted extensive document discovery that involved the review and analysis of hundreds of thousands of pages of documents produced by defendants and their actuarial and financial advisors; (vi) conducted or defended over thirty depositions of current and former MetLife officer, directors, and employees, experts and other representatives; and (vii) consulted with experts on actuarial issues regarding demutualization, actuarial valuation techniques and practices, and other actuarial and financial subjects pertinent to the litigation. *See generally* Stamell Decl. ¶¶ 1 – 172.

Pursuit of this action has been costly. As mentioned above, this litigation has now been ongoing for over nine years. Numerous legal motions have been fully and extensively briefed. The case has been litigated in both federal District Court and at the Second Circuit Court of Appeals (while the State Action has been litigated at both the trial level and the State intermediate appeal level). Total costs in both Federal and State Actions total approximately $4.7 million. Stamell Declaration in Support of Lead Counsel's Joint Application for an Award of Attorney's Fees and Reimbursement of Expenses ("Stamell Fee Decl.") ¶ 16. The cost of class notice alone in the Federal Action exceeded $1.8 million, and the cost of expert witnesses exceeded $1 million. *See* Exhibit E to Stamell Fee Decl.

Moreover, a trial would probably not have concluded this action. Time-consuming and expensive post-trial motions and appeals were inevitable. Defendants were and are represented by extremely capable counsel who specialize in defending complex insurance and securities class actions, such as this case, and left no stone unturned in defending their clients, adding to the complexity and expense of the continued prosecution of this case. Ultimately, the litigation

5

could have continued for many more years, with the risk of either no recovery for the classes or substantial loss to defendants. The settlement provides an immediate and certain recovery to members of the classes and unequivocally avoids substantial, continued and uncertain litigation.

      2.      The Classes' Reaction To The Settlement Supports Approval of the Settlement

The reaction of the class to a settlement is a significant factor to be weighed in considering its adequacy. *In re Am. Bank Note Holographics*, 127 F.Supp.2d 418, 425 (S.D.N.Y. 2001). Lack of objection is strong evidence of the settlement's fairness. *In re PaineWebber Ltd. P'Ships Litig.,* 171 F.R.D. 104, 126 (S.D.N.Y. 1997).

Although the date to submit has not past, so far the classes' reaction to the settlement is positive and supports approval. As ordered by the Court (Dkt #536), notice of the settlement was provided by publication. The notice, a copy of which is attached as Exhibit A to the Stipulation of Settlement, was published twice in the week of November 9 and twice in the week of November 16, in each of *USA Today*, *The Wall Street Journal*, *The New York Times*, and the *New York Law Journal*. The deadline for submitting objections is December 24, 2009. To date, only two objections have been received.[2] Two objections from a class of millions supports the fairness of the settlement. *See Strougo v. Bassini*, 258 F.Supp.2d 254, 258 (S.D.N.Y. 2003).

      3.      The Stage of the Proceedings and the Amount of Discovery Completed Supports Approval of the Settlement

A court considers the state the litigation has reached before settlement and the extent of discovery completed to ensure that plaintiffs have had access to sufficient material to evaluate their case and to assess the adequacy of the settlement proposal in light of the strengths and weaknesses of their position. *In re Luxottica Group S.P.A. Sec. Litig.*, 233 F.R.D. at 312. This

---

[2] Plaintiffs will separately prepare and submit to the Court a full response to all objections before the scheduled December 30, 2009 fairness hearing.

case went all the way to trial before settlement.  Stamell Decl. ¶ 169. There were complaints and

amended complaints, multiple motions to dismiss and for summary judgment, extensive

discovery, repeated petitions for interlocutory appeal and an appeal.  Stamell Decl. ¶ 1.  The

parties voir dired not one, but two separate jury venire.  *Id.* ¶¶ 150, 163.  Pre-trial rulings on key

issues were known; opening statements were at the ready.  *Id.* ¶¶ 153, 157, 159, 168.

Lead Counsel in this case had "a clear view of the strengths and weaknesses of the case"

and was "able to make an informed decision on the merits of the settlement." *Luxottica,* 233

F.R.D. at 312.  This factor supports approval of the settlement.

4.      The Risks of Establishing Liability Supports Approval of the Settlement

Plaintiffs faced substantial difficulty in proving their claims.  In order to prove liability in

the Federal Action, plaintiffs had to demonstrate for their 12(a)(2) claims that defendants omitted

or misstated material facts in the documents sent to class members regarding the

demutualization, that such omissions and misstatements rendered the documents misleading, that

the documents constituted a prospectus offering or selling a security, and that in the exercise of

reasonable care defendants should have known of and corrected the misleading information.  For

their 10(b) claims, plaintiffs had to demonstrate that these omissions or misstatements were made

with scienter and were the cause of plaintiffs' injuries.  As in any securities fraud action under

the PSLRA, plaintiffs faced a very high burden in demonstrating that defendants acted with the

requisite scienter.

Plaintiffs' case centered around four main allegations: (i) the demutualization documents

misled policyholders as to why MetLife chose one method of demutualization as opposed to

another available method by suggesting that the chosen method was the most appropriate option,

without revealing that the method not chosen would have resulted in greater consideration for

policyholders; (ii) the documents misled policyholders regarding the value of the variable

7

component of policyholder consideration relative to the estimated value of policyholders' contribution to surplus, specifically, by omitting the fact that MetLife had calculated policyholders' contribution to surplus at over $15 billion, while the value of the stock distributed to policyholders was less than $10 billion; (iii) the documents misled policyholders by claiming that future dividends would not be diminished in any way, without disclosing that the Closed Block constituted a limitation on the dividends that would be paid; and (iv) the documents misled policyholders regarding the calculation of the fixed component of policyholder consideration by suggesting that the determination of 10 shares as the fixed component was based on actuarial concepts and standards of practice rather than an arbitrary rule of thumb.

Defendants, for their part, denied all claims against them and asserted that the documents sent to policyholders before the demutualization were complete, accurate and not misleading, and, therefore, there were no misleading omissions or misrepresentations on which the Plaintiffs and class members could have relied when deciding how to vote. Defendants further asserted that the demutualization was beneficial for the company and its policyholders, and that MetLife and its directors had no intent to mislead anybody.

Defendants were prepared to present multiple experts opining that the demutualization was properly conducted according to precedent, and that each of the allegations of wrongdoing alleged by plaintiffs was in fact completely in line with how previous demutualizations have been done. Defendants would have argued to the jury that the demutualization plan, as presented to policyholders, was fair. In support of this, MetLife would have presented as evidence the decision of the New York State Superintendant of Insurance, which, following his own extensive review, consultation both with MetLife and his own experts, and following a public hearing on the issue, found that MetLife's plan of demutualization was fair and equitable to policyholders.

8

MetLife was also prepared to submit to the jury the materials sent to policyholders in previous New York state demutualizations as demonstration that the MetLife demutualization was proper and done according to precedent.  Stamell Decl. ¶¶ 141, 157, 159, 168.

The risk that plaintiffs would fail to prove liability was high.  This factor supports approval of the Settlement.

     5.     The Risks of Establishing Damages Supports Approval of the Settlement

As with liability, plaintiffs faced obstacles in proving damages.  Significantly, as indicated by the Court during pre-trial hearings, even if Plaintiffs were successful in proving liability, it still remained possible – perhaps even likely – that the Lead Plaintiffs in the Federal Action, all of whom opted for shares of stock in the new company rather than cash or policy credits, would have been unable to prove any damages at all.  Such a result may have required locating a class representative who received cash in the transaction and who was willing to intervene and could claim damages to represent the damaged members of the class.

The thrust of plaintiffs' damages theory was that for each share of MetLife stock distributed to policyholders in the demutualization, valued at the IPO price of $14.25 per share, policyholders had contributed approximately $26 to surplus.  Based on the actuarial standard of practice on the allocation of consideration in a demutualization,[3] damages to class members were at least the difference between the two figures.  The standard of practice, at ¶3.2.2, provides that what is called the "variable component of consideration" should be reasonable in relation to policyholders' contribution to surplus and that approximate equality was reasonable.  MetLife calculated that policyholders' contribution to surplus was $15.34 billion, but that policyholders

---

[3] Actuarial Standard of Practice 37, "Allocation of Consideration in Mutual Life Insurance Demutualizations." Plaintiffs' Trial Exh. 45 (attached as Exhibit D).

received a variable component of only 590,000,000 shares of stock at $14.25 per share, which amounted to $8.4 billion. Damages, therefore, would be the difference.

Plaintiffs' theory of damages would have had to overcome significant opposing arguments. First, defendants would have argued that $15.34 billion was not a calculation relevant to the value of policyholders' membership interests. This calculation was an actuarial computation of the estimated present value of policyholders' contribution to surplus of the company, which according to defendants, is not related to the value of what policyholders actually would have received if MetLife had remained a mutual company. Second, defendants would have argued that the calculation established an equitable basis to allocate consideration in the demutualization, not to establish the value of the membership rights policyholders were surrendering. Defendants also would have argued that under no law, either state or federal, and in no transaction, has a demutualizing company been required to distribute to policyholders the full value of contribution to surplus. Although a Method 2 demutualization under New York law may provide for that, Method 2 is an option only where that value was available, and here defendants would have argued it was not. The $15.34 billion simply did not exist, they would say.

Defendants also would have argued that plaintiffs' damages argument relies on the false theory that policyholders are "owners" of the mutual company, a theory this Court rejected as a matter of law, holding in defendants' favor in a motion *in limine*. Stamell Decl. ¶ 157. The Court specifically ordered that jury instructions be submitted to advise the jury on this point of law. *Id.* Further, defendants would have argued that, in any event, except for a five-month period immediately following the demutualization, MetLife's stock has traded *above* the $26 per share plaintiffs claimed that the class members were surrendering. Defendants would have

pointed to these stock market prices to argue that the transaction was a success, even by plaintiffs' standard, and that just about every policyholder, instead of being damaged, in fact profited as a result of the transaction or, for those who received cash, had the opportunity to do so.  And those policyholders who elected to receive cash instead of stock had exercised their free choice to do so.  Therefore, establishing damages would have been difficult.  The risk that plaintiffs would be unable to prove damages was high.

This factor supports approval of the settlement.

6.      The Risks of Maintaining the Class Action Through Trial

The ability to maintain the class action through trial was not a substantial risk.  While the Court ordered that the trial be bifurcated into two phases – a liability phase and a damages phase – the Court also ordered that it would not modify the class as defined.[4]  The Court recognized that possible conflicts may have arisen among differently situated class members during the damages phase of the trial and that subclasses might be required during that phase.  However, no arguments have been raised within the class regarding the adequacy of Lead Plaintiffs.

Importantly, the Second Circuit has noted that following certification of a class, if it later turns out that the named plaintiffs are not adequate class representatives, then the district court is not required to decertify the class.  *Sirota v. Solitron Devices, Inc.*, 673 F.2d 556, 572 (2d Cir. 1982) ("Although a district court may decertify a class if it appears that the requirements of Rule 23 are not met, it need not decertify whenever it later appears that the named plaintiffs were not class members or were otherwise inappropriate class representatives.").  In accord with Supreme Court precedent, the Second Circuit stated that "provided that the initial certification was proper … the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims."

---

[4] See 10/13/09 Hearing Tr. at 13 (Dkt. #534).

11

*Id.*; *see also Franks v. Bowman Transportation Co., Inc.* 424 U.S. 747 (1976) (once a class has been properly certified the action will not be dismissed by the subsequent mootness of the claim of the class representative). If a new class representative had been required, the proper approach would have been to provide an opportunity to substitute a new named plaintiff. *McAnaney v. Astoria Fin. Corp.,* 2007 WL 2702348, *13 (E.D.N.Y. Sept. 12, 2007).

This factor weighs neither for nor against approval of the Settlement.

7.      The Ability of the Defendants to Withstand Greater Judgment

MetLife is one of the largest publicly-traded companies in the United States. It is financially healthy and well capitalized. It could withstand a greater judgment. This factor weighs neither for nor against approval of the Settlement.

8.      The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery And All the Attendant Risks of Litigation Supports Approval of the Settlement.

The last two substantive factors courts consider are the range of reasonableness of the settlement amount in light of (i) the best possible recovery and (ii) litigation risks. In analyzing these last two factors, the issue for the court is not whether the settlement represents the "best possible recovery," but how the settlement relates to the strengths and weaknesses of the case. *Grinnell*, 495 F.2d 463. The court considers and weighs the nature of the claim, the possible defenses, the situation of the parties, and the exercise of the business judgment in determining whether the proposed settlement was reasonable. *Id.* at 462. Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *Paine Webber*, 171 F.R.D. at 130 (citations omitted). Instead, "in any case, there is a range of reasonableness with respect to a settlement." *Newman v. Stein*, 464 F.2d 689, 693 (2d. Cir. 1972).

Plaintiffs submit that the settlement is within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation, as described above and in the Stamell Declaration. In assessing whether a settlement is fair, reasonable, and adequate, courts often examine "the negotiating process by which the settlement was reached" to determine whether the settlement was the result of "arm's length negotiations" by counsel who has "the experience and ability . . . necessary to effective representation of the class's interests." *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

The settlement here is presumptively fair because it is the product of informed arm's-length negotiations between Lead Counsel and defendants' counsel with the assistance of the very capable Special Settlement Master Richard Davis. *See, e.g., Wellman v. Dickinson*, 497 F.Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 647 F.2d 163 (2d Cir. 1981); Stamell Decl. ¶¶ 158, 169.

This factor supports approval of the settlement.

## II.    The Plan of Allocation is Fair and Reasonable and Should be Approved

Plaintiffs request that the Court approve allocation of the settlement, which allocates $32.5 million to the Closed Block, $2.5 million to a health-based organization in the form of a *cy pres* award, and $15 million to attorneys' fees, reimbursement of expenses and compensation to lead plaintiffs for their service. Stipulation ¶¶ 15 – 20; *see also* Lead Counsel's Joint Application for an Award of Attorneys' Fees and Reimbursement of Expenses.

The allocation of the settlement must be fair and reasonable. *In re Sterling Foster & Co., Inc. Sec. Litig.*, 238 F.Supp.2d 480, 486 (E.D.N.Y. 2002) (citing *PaineWebber*, 171 F.R.D. at 133). The purpose of developing a plan of allocation is to devise a method that permits the equitable distribution of limited settlement proceeds to eligible class members. *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978). Courts recognize that "the adequacy of an allocation plan

13

turns on whether counsel has properly appraised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *PaineWebber*, 171 F.R.D. at 133.

Here, allocating most of the settlement ($32.5 million) by adding assets to the Closed Block is fair and reasonable because it will result in the distribution of those assets to class members in proportion to their contributions to surplus.  Furthermore, there is no administrative cost to paying out money from the Closed Block because the existing Closed Block administration takes care of that.  Class members benefit because the additional assets in the Closed Block flows through to class members in the form of increased policyholder dividends.

A small portion of class members, however, will not benefit from the allocation of Settlement Proceeds to the Closed Block, such as class members who have died or whose policies have lapsed.  With these class members in mind, the settlement includes a *cy pres* allocation ($2.5 million).  Approving a settlement which includes a *cy pres* allocation is appropriate under the circumstances here.  *See Fears v. Wilhelmina Model Agency*, 315 Fed.Appx. 333, 336-336 (2d Cir. 2009).

As the Second Circuit has observed, *cy pres* remedies are appropriate "in circumstances in which direct distribution to individual class members is not economically feasible…" and where "the proof of individual claims would be burdensome or the distribution of damages costly." *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d. Cir. 2007) (citations omitted).  Direct distribution in this action would be overwhelmingly burdensome because the costs associated with such an undertaking would be greater than the *cy pres* allocation. Therefore, the Court should approve the *cy* pres award.  *See Masters*, 472 F.3d at 436; *see also In re Pharmaceutical Industry Average Wholesale Price Litigation*, 2009 WL 3933088 at *7 (1st

Cir. Nov. 19, 2009); A. Conte & H.B. Newberg, 4 *Newberg on Class Action* § 11:20, at 28-31 (4th ed.2002).

The allocation proposed by plaintiffs is based upon and subject to the Court awarding $15 million to reimburse the litigation expenses incurred of approximately $4.7 million, with the balance, approximately $10.3 million, awarded for attorneys' fees and to the plaintiffs to compensate them for their service as class representatives. The application for reimbursement of expenses, fees and compensation is the subject of a separate brief and supporting papers.

For these reasons, the plan of allocation is fair and reasonable, and should be approved.

**III.    The Notice to the Class Satisfies Due Process**

Individualized mail notice of pendency was sent, and publication notice was provided to class members shortly before trial. Rule 23(e) requires that settlement notice fairly apprise class members of the terms of the proposed settlement, but does not require individualized notice. This Court concluded that publication notice was sufficient. As the Court noted, in view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements would be neither necessary nor appropriate. Dkt. #530 at 5.

Publication notice included all information required by Rule 23, including: (a) the amount of the settlement; (b) a statement about application for attorneys' fees and expense reimbursement; (c) the name, telephone number, and address of Lead Counsel in both the Federal and State Actions to answer questions from class members; (d) a statement explaining why the parties propose the settlement; (e) a description of the proposed plan of allocation; and (f) the right of each class member to opt-out or object to the settlement, attorneys' fees and expenses, or the plan of allocation. As a result, the published notice fairly apprised the class members about the settlement and their rights as required by Rule 23 and due process. *Consol. Edison, Inc. v. Northeast Utils.*, 332 F.Supp.2d 639, 652 (S.D.N.Y. 2004).

The schedule for notice ordered by the Court provided reasonable, appropriate and ample opportunity for class members to object if they wish to do so. *See County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp 1422, 1424 (E.D.N.Y. 1989).

## CONCLUSION

For the reasons stated above, Lead Plaintiffs request that the Court approve the settlement as fair, reasonable, and adequate, approve the plan of allocation as fair and reasonable, and enter final judgment.

December 22, 2009                    Respectfully submitted

STAMELL & SCHAGER, LLP

By: /s/ Jared B. Stamell
Jared B. Stamell, Esq. (JS 5225)
One Liberty Plaza, 35th Floor
New York, New York 10006-1404
(212) 566-4047

*Lead Counsel for Federal Plaintiffs and Federal Class*

16

**Exhibit A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                                          :
In re METLIFE DEMUTUALIZATION LITIGATION.                 :    E.D.N.Y. Docket No.
                                                          :    00 CV 2258 (JBW) (AKT)
This Document Applies to All Actions.                     :    (Judge Weinstein)
                                                          :
-------------------------------------------------------------------x


NEW YORK SUPREME COURT
COUNTY OF NEW YORK
-------------------------------------------------------------------x
                                                          :
EUGENIA J. FIALA et al.,                                  :
                                                          :    New York County Clerk's
          v.                                              :    Index No. 601181/2000
                                                          :    (Justice Kornreich)
METROPOLITAN LIFE INSURANCE COMPANY et al.                :
                                                          :
-------------------------------------------------------------------x


### STIPULATION OF SETTLEMENT

IT IS HEREBY STIPULATED AND AGREED, this 5th day of November 2009, by, between and among the Federal Plaintiffs, the State Plaintiffs, and the Defendants (each as defined below), that the two above-captioned actions (respectively the "Federal Class Action" and "State Class Action," as further defined below), and the matters raised by each of them, are settled and compromised on the terms and conditions set forth in this Stipulation of Settlement and its attached exhibits, subject to the approval of the Court in each action.

**I.      BACKGROUND OF SETTLEMENT.**

**A.   Federal Plaintiffs' Allegations**

1. The Federal Class Action asserts claims arising from and relating to the reorganization of Metropolitan Life Insurance Company ("MetLife") from a mutual life insurance company to a

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/00/09   Page 2 of 37

stock life insurance company (the "Demutualization," as further defined below), completed April 7, 2000.  Among other allegations, the Federal Class Action asserts or has asserted as follows:

      a.   that the information materials mailed to policyholders prior to the vote and public hearing on the demutualization (collectively, the "Booklets") were false and misleading in that they failed to disclose the following alleged facts:  (*i*) the dollar value of policyholders' contributions to MetLife's surplus (i.e., the actuarial equity shares of participating policyholders); (*ii*) the dollar value of the right to vote as a MetLife policyholder; (*iii*) the valuation methodology MetLife allegedly used to determine that each non-participating policyholder and each policyholder without a positive actuarial equity share should be allocated ten shares (or $142.50 at the IPO price); (*iv*) the value of the shares MetLife allegedly allocated to voting rights (ten shares per policyholder, or an aggregate of approximately 110,000,000 shares) was allegedly much greater than the actual value of those rights; (*v*) that MetLife allegedly calculated the actuarial contributions of participating policyholders to MetLife's surplus at approximately $15.34 billion; (*vi*) that MetLife allegedly determined that the aggregate value of the shares exchanged based upon the actuarial contributions would be less than the $15.34 billion calculated for the contributions to MetLife's surplus, and less than GAAP book value of approximately $15 billion; (*vii*) that MetLife allegedly allocated one $14.25 share of MetLife, Inc. to each participating policyholder for each $26 that such policyholder had contributed to the aggregate $15.34 billion of contributions to MetLife's surplus (or a total of 590,000,000 shares at an aggregate IPO price of $8.4 billion); (*viii*) that MetLife allegedly calculated, and had been advised by its outside experts, that the value of the shares issued to participating policyholders, pursuant to the Plan of Reorganization, would be materially less than both $26 per share and the participating policyholders' aggregate $15.34 billion contribution to

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/00/09   Page 3 of 37

MetLife's surplus; (*ix*) that participating policyholders allegedly would receive as little as 54¢ for each dollar of contribution to surplus at the estimated IPO price; (*x*) that the Plan of Reorganization allegedly restricted the assets allocated to the payment of dividends to the assets in the closed block, thereby modifying the alleged dividend rights of participating policyholders; (*xi*) that MetLife allegedly was entertaining a sale of a material number of shares to certain companies, that it allegedly held an equity interest in those companies and considered them to be business partners and joint venture parties, that MetLife board members allegedly sat on those companies' boards of directors, and that one of these companies allegedly was advising MetLife on the sale of equity in MetLife in the proposed demutualization; and (*xii*) that policyholders allegedly would not receive, in exchange for their membership interests, 100% of MetLife's value after taking into consideration the initial public offering and other capital raising transactions specified in the Plan of Reorganization;

      b.    that the Booklets were false and misleading in that they expressly and impliedly made the following alleged misrepresentations:  (*i*) that the shares offered in exchange for the actuarial contributions of participating policyholders (*i.e.* the variable component) would be equivalent in value to those contributions when MetLife allegedly knew that those shares would be less valuable; (*ii*) that participating policyholder benefits and dividend eligibility would not be diminished in any way when MetLife allegedly knew that the assets from which dividends were payable would be reduced and limited to the closed block assets; (*iii*) that the closed block would protect participating policyholder dividend expectations without disclosing the alleged fact that the closed block also imposed limitations on future dividends; (*iv*) that MetLife allocated ten shares per policyholder, multiplied by the IPO price of $14.25 per share, to compensate for loss of voting rights, even though MetLife had not determined whether voting rights had any material

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/06/09   Page 4 of 37

value or if so, the dollar value of voting rights; (*v*) that MetLife had no opinion on what the public market value of MetLife, Inc. shares would be after the IPO on a fully distributed basis, even though MetLife allegedly had been advised by its financial advisors to expect that the market price of its shares would be materially higher than the IPO price; (*vi*) that policyholders would receive 100% of MetLife's value in exchange for their membership interests when MetLife allegedly knew that the IPO and other capital raising transactions that were integral to the Plan of Reorganization would immediately dilute the value received by policyholders; and (*vii*) that MetLife chose not to demutualize under method 2, as described in New York Ins. Law § 7312(d)(2), because that method "does not provide for Eligible Policyholders to receive consideration in the form and manner provided in this Plan of Reorganization," although allegedly its real reason was that method 2 would provide for consideration to the participating policyholders of materially greater value than provided in the Plan of Reorganization, consisting of the actuarial equity shares (approximately $15.34 billion) plus 10 percent of the proceeds of an IPO;

c.   that the Booklets constituted a prospectus, and that policyholders who received cash, stock or Policy Credits as compensation in the Demutualization were purchasers of securities;

d.   that some of the alleged misrepresentations or nondisclosures were made with intentional or reckless disregard of the truth;

e.   that members of the Federal Class suffered injury as a result of the alleged wrongful acts;

f.   that the alleged misrepresentations or nondisclosures constituted a violation of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and

4

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/00.09   Page 5 of 37

  g. that members of the Federal Class were entitled to damages and other relief as a result.

  2. The Federal Plaintiffs continue to believe that there was and is a good faith basis for their allegations in the Federal Class Action.

  **B. State Plaintiffs' Allegations**

  3. The State Class Action also asserts claims arising from and relating to the Demutualization.  Among other allegations, the State Class Action asserts as follows:

   a. that, for the purpose of increasing director and officer compensation, Defendants caused MetLife, Inc. to issue excess shares of stock in the IPO conducted in connection with the Demutualization and subsequently to buy back those shares; and that the Defendants had formed a plan prior to November 1999 to issue excess shares in the IPO and then buy those shares back beginning shortly after the IPO;

   b. that the Booklets were false and misleading because they failed to disclose the alleged plan to issue excess shares and then buy them back;

   c. that the alleged nondisclosures were intentional, reckless or negligent;

   d. that the alleged misrepresentations or nondisclosures misled policyholders into voting for the demutualization or into electing cash compensation in lieu of stock;

   e. that policyholders suffered injury as a result of the alleged wrongful acts;

   f. that the alleged misrepresentations or nondisclosures constituted violations of New York Insurance Law § 7312 and common law fraud and negligent misrepresentation; and

   g. that members of the State Class were entitled to damages or other relief as a result.

  4. The State Class Action (including the actions consolidated therein) previously asserted additional claims arising from and relating to the Demutualization, which were dismissed by the State Court, including, among other assertions, the following:

5

a.    that the demutualization breached contractual obligations by reducing dividends or not providing insurance "at cost";

b.    that the Booklets and other communications by Defendants were false and misleading, in that they allegedly misrepresented or failed to disclose certain facts;

c.    that the adoption or implementation of the demutualization, or the alleged misrepresentations or nondisclosures, constituted or involved a breach of fiduciary or other duties, including duties of care, loyalty or disclosure, as well as common-law fraud and violation of Section 7312 of the New York Insurance Law; and

d.    that Defendants gave group policyholders who complained about the Demutualization preferential treatment in the allocation of consideration in the Demutualization.

5.    The State Plaintiffs continue to believe that there was and is a good faith basis for their allegations in the State Class Action.

**C.   Defendants' Responses to Allegations**

6.    The Defendants deny all allegations of wrongdoing against them.  The Defendants assert that the Demutualization was in all respects fair to policyholders and in the best interests of MetLife and its policyholders; that the Booklets were accurate, complete and not misleading; that the Plan and Booklets complied with all applicable legal requirements; and that the members of the Federal Class and State Class were not harmed but in fact benefited from the Demutualization.

7.    The Defendants do not admit or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against them in the State Class Action and the Federal Class Action, and do not waive any defenses or positions in any other dispute.  The Defendants deny that any of the claims in the State Class Action or Federal Class Action have any merit.

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/00/09   Page 7 of 37

**D.   Discovery**

8.   In the course of their examination and discovery in the litigation, counsel for the State Plaintiffs reviewed, among other things, hundreds of thousands of pages of documents produced by MetLife and its actuarial and financial advisors, conducted extensive depositions of current and former MetLife officers, directors and employees and experts and other witnesses, and conducted other discovery of Defendants and others relating to the issues raised in the State Class Action.

9.   In the course of their examination and discovery in the litigation, counsel for the Federal Plaintiffs reviewed, among other things, hundreds of thousands of pages of documents produced by MetLife and its legal, actuarial and financial advisors, conducted extensive depositions of current and former MetLife officers, directors and employees and experts and other witnesses, and conducted other discovery of Defendants and others relating to the issues raised in the Federal Class Action.

10. In the course of their examination and discovery in the litigation, counsel for the Defendants reviewed the documents that Defendants and others produced to Plaintiffs and the documents produced to Defendants by Plaintiffs.  Defendants' Counsel also conducted depositions of most of the State Plaintiffs and Federal Plaintiffs and of the expert witnesses retained by State Plaintiffs' Counsel and Federal Plaintiffs' Counsel.

**E.   Settlement Considerations**

11. Based upon their discovery, investigation and evaluation of the facts and law relating to the matters alleged in the pleadings, the Federal Plaintiffs and counsel for Federal Plaintiffs and Federal Class have agreed to settle the Federal Class Action pursuant to the provisions of this Stipulation of Settlement after considering, among other things, (*i*) the benefits available to the Federal Plaintiffs and the Federal Class under the terms of this Stipulation of Settlement, (*ii*) the

Case 9:00-cv-02258-JBW -AKT   Document 539-2   Filed 11/00/09   Page 8 of 37

attendant risks and uncertainty of litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation, and (*iii*) the desirability of consummating this settlement promptly to provide relief to the Federal Plaintiffs and the Federal Class.  The Federal Plaintiffs and their counsel believe the settlement to be fair, adequate, reasonable and in the best interests of the members of the Federal Class.

12. Based upon their discovery, investigation and evaluation of the facts and law relating to the matters alleged in the pleadings, the State Plaintiffs and counsel for the State Plaintiffs and the State Class have agreed to settle the State Class Action pursuant to the provisions of this Stipulation of Settlement after considering, among other things, (*i*) the benefits available to the State Plaintiffs and the State Class under the terms of this Stipulation of Settlement, (*ii*) the attendant risks and uncertainty of litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation, and (*iii*) the desirability of consummating this settlement promptly to provide relief to the State Plaintiffs and the State Class.  The State Plaintiffs and their counsel believe the settlement to be fair, adequate, reasonable and in the best interests of the members of the State Class.

13. The Defendants, while expressly denying any wrongdoing and the allegations made in the State Class Action and Federal Class Action, consider it desirable for the two actions to be settled and dismissed because this Stipulation of Settlement will (*i*) avoid the substantial expense, burdens and uncertainties associated with continued litigation of the claims asserted in the Federal Class Action and State Class Action, and (*ii*) provide for a certain and prompt resolution of the claims asserted in the Federal Class Action and State Class Action.

## II.   DEFINITIONS

14. The following definitions apply to capitalized terms used in this Stipulation of Settlement:

a.     "Booklets" means the materials concerning the Demutualization that MetLife mailed to policyholders prior to the public hearing and policyholder vote on the Demutualization, including but not limited to (*i*) all versions of the Chairman's Letter; (*ii*) all versions of the Read Me First booklet; (*iii*) Policyholder Information Booklet Part One and the portions of the Plan of Reorganization and other materials reprinted therein; and (*iv*) Policyholder Information Booklet Part Two and the opinion letters and other materials reprinted therein.

b.     "Claim" means any claim, cause of action, demand or right of any kind whatsoever, and includes without limitation any claim, cause of action or demand for or right to damages (whether compensatory damages, rescissory damages, punitive damages, exemplary damages, treble or other multiple damages, statutory damages, or any other damages), attorneys' fees, costs, interest, equitable relief, legal relief, administrative relief, judicial review, arbitration, penalties, reformation, rescission, restitution, declaratory relief, injunctive relief, imposition of a lien, imposition of a constructive trust, provisional or preliminary remedies, final remedies, or any other remedy or relief, regardless of whether such claim, cause of action, demand or right is asserted on one's own behalf or derivatively or in a representative capacity on behalf of another, and regardless of whether such claim, cause of action, demand or right is based on federal law, state law, local law, foreign law, statute, ordinance, regulation, constitutional provision, common law, contract, tort, unjust enrichment or any other source.

c.     "Class Member" means any Person who is a member of the Federal Class or of the State Class.

d.     "Closed Block" means the accounting mechanism established pursuant to Article VIII of the Plan of Reorganization, and the assets allocated thereto.

e.   "Closed Block Settlement Amount" means the amount computed as specified in paragraph 16.c of this Stipulation of Settlement.

f.   "Courts" means the Federal Court and the State Court.

g.   "Cy Pres Settlement Amount" has the meaning specified in paragraph 16.a of this Stipulation of Settlement.

h.   "Defendants" means Metropolitan Life Insurance Company, MetLife, Inc., Robert H. Benmosche, Curtis H. Barnette, Gerald Clark, Joan Ganz Cooney, Burton A. Dole, Jr., James R. Houghton, Harry P. Kamen, Helene L. Kaplan, Charles M. Leighton, Stewart G. Nagler, John J. Phelan, Jr., Hugh B. Price, Robert G. Schwartz, Ruth J. Simmons, and William C. Steere, Jr.

i.   "Defendants' Counsel" means Debevoise & Plimpton LLP.

j.   "Demutualization" means the reorganization of Metropolitan Life Insurance Company from a domestic mutual life insurance company to a domestic stock life insurance company pursuant to Section 7312 of the New York Insurance Law, conducted in the year 2000, and all other acts or transactions conducted at the time of the reorganization and provided for by the Plan, including but not limited to the following:

i.   The extinguishment of policyholders' Membership Interests;

ii.   The issuance or payment of MetLife stock, MetLife, Inc. stock, interests in the trust, cash or Policy Credits as compensation for Membership Interests or otherwise in connection with the Demutualization;

iii.   The establishment of the trust;

iv.   The exchange of MetLife stock for MetLife, Inc. stock by the trust;

v.   The establishment of the Closed Block; and

vi.   The IPO and Related Transactions.

For purposes of this definition, "trust" means the MetLife Policyholder Trust established pursuant to the Plan of Reorganization.

10

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/__/09   Page 11 of 37

k.   "Federal Attorneys' Fees and Litigation Expenses" shall mean such funds as the Federal Court may award to counsel for the Federal Plaintiffs as payment for their fees and reimbursement of expenses incurred in connection with the Federal Class Action, or to the Federal Plaintiffs for costs and expenses as provided in 15 U.S.C. § 77z-1(a)(4) or 15 U.S.C. § 78u-4(a)(4).

l.   "Federal Class" means all owners of Metropolitan Life Insurance Company participating policies in force on September 28, 1999, for whom MetLife calculated a positive actuarial equity share under its Plan of Reorganization, excluding Defendants and their officers, directors, subsidiaries and affiliates, and those who requested exclusion from the Federal Class within the time provided by previous order of the Federal Court.  For purposes of this definition, the terms "owners," "participating policies" and "in force" shall have the meanings specified in Article II of the Plan of Reorganization, and "actuarial equity share" shall mean "Variable Equity Share" as defined in Article II of the Plan of Reorganization.

m.   "Federal Class Action" means the lawsuit captioned *In re MetLife Demutualization Litigation*, also sometimes captioned *Darren F. Murray v. Metropolitan Life Insurance Company et al.*, Docket No. 00 CV 2258, in the United States District Court for the Eastern District of New York, and all cases consolidated with it, including *Kathy Vanderveur v. Metropolitan Life Insurance Company et al.*, Docket No. 00 CV 3118, and *Martin Gold et al. v. Metropolitan Life Insurance Company et al.*, Docket No. 00 CV 3723.

n.   "Federal Court" means the United States District Court for the Eastern District of New York sitting in the Federal Class Action or in an action designated as a related action to the Federal Class Action.

    o.    "Federal Final Judgment" shall mean a judgment entered by the Federal Court pursuant to the Federal Order Approving Settlement, containing all the provisions required by paragraph 28 of this Stipulation of Settlement.

    p.    "Federal Lead Counsel" means Stamell & Schager LLP.

    q.    "Federal Order Approving Settlement"  means an order entered by the Federal Court approving the settlement and this Stipulation of Settlement, containing all the provisions required by paragraph 28 of this Stipulation of Settlement.

    r.    "Federal Plaintiffs" means Mary A. DeVito, Kevin L. Hyms, Harry S. Purnell, III, and Michael A. Giannattasio, both in their individual capacities and in their capacity as representatives of the Federal Class, and plaintiffs Darren F. Murray and Kathy Vanderveur individually.

    s.    "Final Settlement Date" means the date on which the State Final Judgment, State Order Approving Settlement, Federal Final Judgment and Federal Order Approving Settlement have all become final.  For purposes of this definition, a judgment or order shall become final (a) if no appeal is taken therefrom, on the date on which the time to appeal has expired; (b) if any appeal is taken therefrom, on the date on which all appeals therefrom, including petitions for rehearing or reargument, petitions for rehearing *en banc*, petitions for leave to appeal, and petitions for *certiorari* or any other form of review, have been finally disposed of in a manner resulting in an affirmance of the judgment and order; or (c) on any other date after entry of the relevant judgment or order to which counsel for the Parties agree in writing.

    t.    "Former Defendants" means all Persons or decedents formerly defendants in the State Class Action, including Allen E. Murray, Neil D. Levin, Credit Suisse First Boston Corporation, and Goldman, Sachs & Company.

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/00/09   Page 13 of 37

u.  "IPO" means the initial public offering of MetLife, Inc. common stock conducted in connection with the Demutualization.

v.  "IPO and Related Transactions" means the IPO, the private placement of MetLife, Inc. common stock conducted at or about the time of the IPO, the initial offering of equity security units conducted by an affiliate of MetLife, Inc. at or about the time of the IPO, and any underwriting agreement, overallotment option or other agreement or transaction related to any of the foregoing.

w.  "Membership Interests" means any rights or interests of MetLife policyholders extinguished by operation of the Plan of Reorganization or by operation of Section 7312 of the New York Insurance Law.

x.  "MetLife" means Metropolitan Life Insurance Company, as specified in paragraph 1.

y.  "Party" or "Parties" means State Plaintiffs (in their individual and representative capacities), Federal Plaintiffs (in their individual and representative capacities), and Defendants.

z.  "Person" means an individual, corporation, company or other entity.

aa.  "Plaintiffs" means the Federal Plaintiffs and the State Plaintiffs.

bb.  "Plan" or "Plan of Reorganization" means the Plan of Reorganization of Metropolitan Life Insurance Company Under Section 7312 of the New York Insurance Law, adopted on September 28, 1999, as subsequently amended, with all of its exhibits and schedules.

cc.  "Policy Credit" has the meaning specified in Article II of the Plan of Reorganization.

dd.  "Publication Notice" means the published notice of the proposed settlement, as approved in form and content by counsel for Federal Plaintiffs, State Plaintiffs and Defendants and by the Federal Court and State Court.

ee.  "Release" means the release set forth in paragraph 21 of this Stipulation of Settlement.

ff.  "Releasees" means:

    i.  The Defendants, the Former Defendants, and the Superintendent;

    ii.  Any and all past, present and future parent companies (including intermediate and ultimate parents), subsidiaries, affiliates, predecessors and successors of any Person identified in clause i of this definition;

    iii.  Any and all past, present and future officers, directors, employees, agents, managers, representatives, advisors, consultants, attorneys, actuaries, accountants, bankers, insurers, heirs, devisees, legatees, executors, administrators, conservators, estates, successors and assigns of any of the individuals or entities identified in clause i or ii of this definition, and

    iv.  Any and all Persons acting directly or indirectly on behalf or at the direction of any of the individuals or entities identified in clause i, ii or iii of this definition.

gg.  "Settlement Amount" has the meaning specified in paragraph 15 of this Stipulation of Settlement.

hh.  "State Attorneys' Fees and Litigation Expenses" shall mean such funds as the State Court may award to counsel for the State Plaintiffs as payment for their fees and reimbursement of expenses incurred in connection with the State Class Action, or to the State Plaintiffs for costs or expenses (including lost wages) relating to the representation of the class.

ii.  "State Class" means all Eligible Policyholders of Metropolitan Life Insurance Company who owned and had in force, as of September 28, 1999, life insurance policies, annuity contracts, or accident and health insurance policies issued by MetLife, or other certificates or interests identified in the Plan, other than the Defendants, their officers, directors, subsidiaries, affiliates and legal representatives, and those who requested exclusion from the State Class within the time provided by previous order of the State Court.  For purposes of this definition, "Eligible Policyholders" and "in force" have the meanings specified in Article II of the Plan,

14

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/03/09   Page 15 of 37

"owned" means "was an Owner" as the term "Owner" is defined in Article II of the Plan, and "life insurance policies, annuity contracts, or accident and health insurance policies issued by MetLife, or other certificates or interests identified in the Plan" means "Policies" as defined in Article II of the Plan.

jj.    "State Class Action" means the lawsuit captioned *Eugenia J. Fiala et al v. Metropolitan Life Insurance Company et al.*, New York County Clerk's Index No. 601181/2000, and all cases consolidated with it, including *Mark Smilow et al. v. Metropolitan Life Insurance Company et al.*, Index No. 404124/2004 (transferred from Kings County Index No. 1787/2000); *Mollye E. Rothstein v. Metropolitan Life Insurance Company et al.*, Index No. 104827/2000; *Geneva Meloy et al. v. Metropolitan Life Insurance Company et al.*, Index No. 601218/2000, *Richard E. Schweinberg v. Metropolitan Life Insurance Company et al.*, Index No. 106789/2000; *Leo F. Schor v. Metropolitan Life Insurance Company et al.*, Index No. 106694/2000; and *Vijay J. Shah v. Metropolitan Life Insurance Company et al.*, Index No. 108887/2000.

kk.    "State Court" means the Supreme Court of the State of New York for New York County, sitting in the State Class Action or in an action designated as a related action to the State Class Action.

ll.    "State Final Judgment" shall mean a judgment entered by the State Court pursuant to the State Order Approving Settlement, containing all the provisions required by paragraph 28 of this Stipulation of Settlement.

mm. "State Lead Counsel" means Lovell Stewart Halebian LLP.

nn.    "State Order Approving Settlement" means an order entered by the State Court approving the settlement and this Stipulation of Settlement, and containing all the provisions required by paragraph 28 of this Stipulation of Settlement.

15

oo.  "State Plaintiffs" means Eugenia J. Fiala, Paulette Beliunas, Vijay J. Shah, John T. Brophy, Ira J. Gelb, June A. Gelb, both in their individual capacities and in their capacity as representatives of the State Class, and Mark D. Smilow, Theresa Hazen, Paul Hazen and Richard Schweinberg individually.

pp.  "Stipulation of Settlement" means this Stipulation of Settlement together with all of its exhibits.  Each such exhibit constitutes an integral part of this Stipulation of Settlement.

qq.  "Superintendent" means the Superintendent of Insurance of the State of New York in his official capacity, or any Deputy Superintendent of Insurance or other official of the New York Department of Insurance who is duly authorized to act on behalf of the Superintendent of Insurance.

## III.  SETTLEMENT AMOUNT AND PAYMENTS

15. MetLife, on behalf of all Defendants, shall pay or apply for the benefit of the Federal Class and State Class in the manner specified below the sum of $50,000,000 in the aggregate (the "Settlement Amount"), constituting in its entirety compensatory money damages in full and final settlement of both the Federal Class Action and State Class Action.

16. The manner of payment of the Settlement Amount shall be as follows:

a.  MetLife will pay $2,500,000 (the "Cy Pres Settlement Amount") in cash as a charitable contribution to one or more health-based or other nonprofit organizations to be proposed by the Parties and approved by the Courts.  This provision, together with other provisions herein, is designed to benefit State and Federal Class Members and is in settlement of both actions.

b.  MetLife will pay the Federal Attorneys' Fees and Litigation Expenses and State Attorneys' Fees and Litigation Expenses as directed by the Courts.  Federal Lead Counsel and State Lead Counsel will make a single joint application for attorneys' fees and litigation

16

expenses to the Courts.  Defendants reserve the right to oppose any such application.  The
Federal Attorneys' Fees and Litigation Expenses and the State Attorneys' Fees and Litigation
Expenses will be paid from, and will not increase, the Settlement Amount, and in the aggregate
will not exceed the excess of the Settlement Amount over the Cy Pres Amount.  An award of
attorneys' fees or litigation expenses is not a necessary term of or this Stipulation of Settlement
and is not a condition of settlement.  Federal Plaintiffs, State Plaintiffs, Federal Lead Counsel,
and State Lead Counsel may not cancel or terminate the Stipulation of Settlement or the
Settlement based on the Federal Court's, State Court's or any appellate court's ruling with
respect to the Federal Attorneys' Fees and Litigation Expenses or the State Attorneys' Fees and
Litigation Expenses.

       c.    The Closed Block Settlement Amount shall be the excess of the Settlement Amount
over the sum of (*i*) the Cy Pres Settlement Amount, (*ii*) the Federal Attorneys' Fees and
Litigation Expenses, (*iii*) the State Attorneys' Fees and Litigation Expenses, and (*iv*) any
additional notice costs, if any, as described in paragraph 19.  MetLife will allocate to the Closed
Block an amount of assets equivalent in value to the Closed Block Settlement Amount.  MetLife
will exercise its discretion in determining which assets to allocate to the Closed Block and any
such assets will be valued at their current market value as calculated by MetLife.  MetLife will
distribute the Closed Block Settlement Amount to policyholders in the Closed Block, over the
remaining life of the Closed Block, at its discretion, utilizing reasonable methods that consider
the administrative practicalities of operating the Closed Block.  This provision, together with
other provisions herein, is designed to benefit State and Federal Class Members and is in
settlement of both actions.

17. Except as otherwise ordered by the Courts, no Plaintiff and no Class Member shall have any right to receive any individual payment, it being understood that the payments and allocation of assets set forth in paragraph 16 constitute the sole relief to the Federal Class and the State Class in full and complete settlement of the Claims being settled by this Stipulation of Settlement.

18. MetLife shall pay or allocate the Settlement Amount as required by paragraph 16 within 30 days after the Final Settlement Date.  No interest shall accrue on the Settlement Amount or any portion of the Settlement Amount prior to the date on which payment or allocation is due, and MetLife and the other Defendants shall not be liable for any such interest.  If payment is late, interest shall accrue after the date on which payment was due at the rate specified by federal law for judgments of the Federal Court entered on the date of the Federal Final Judgment.

19. MetLife shall pay the costs of preparing and publishing the Publication Notice as described in paragraph 25.  The payment of such costs shall be in addition to and shall not reduce the Settlement Amount.  If the Federal Court or the State Court determines that additional notice must be given by mail or otherwise to members of the Federal Class or State Class, the cost of such additional notice will be paid from the Settlement Amount, and the Closed Block Settlement Amount will be reduced correspondingly.

20. Defendants' agreement to these terms is made in consideration of the Release and the other terms and conditions set forth in this Stipulation of Settlement.

## IV.   RELEASES

21. The following release shall take effect on the later of the date of entry of the Federal Final Judgment and the date of entry of the State Final Judgment:

a.    The Plaintiffs and Class Members hereby release, acquit and forever discharge the Releasees, and each of them, from any and all Claims, whether known or unknown, that any of

18

the Plaintiffs or any Class Member have asserted, could have asserted, or may or could assert

now or in the future against any of the Releasees, arising from or related to, in whole or in part,

any of the acts, omissions, facts, matters, transactions, occurrences, representations or

nondisclosures that were or are alleged or asserted in the Federal Class Action or State Class

Action (including but not limited to any allegations or assertions in any previous complaint that

were superseded or deleted by consolidation, amendment, dismissal or otherwise).  The Claims

released by this Release include, without limitation:

      i.     Any and all Claims arising from or related to the adoption, approval or implementation of the Demutualization or the Plan, including but not limited to (A) Claims that  the Demutualization was not fair and equitable to policyholders; (B) Claims that the amount of compensation paid to policyholders in the Demutualization, individually or in the aggregate, was inadequate; (C) Claims that the allocation of compensation among policyholders in the Demutualization was not fair and equitable; (D) Claims that the adoption, implementation or approval of the Plan, or the manner in which it was adopted or implemented, was a breach of any contractual, fiduciary or other legal duty; (E) Claims that the funding of the Closed Block was insufficient or that the Closed Block limited policyholder dividends; (F) Claims that the Demutualization or the Plan did not comply, in whole or in part, with any requirement of state or federal law; (G) Claims arising from or related to Membership Interests; (H) Claims arising from or related to the Booklets or other statements made in connection with the Plan, including but not limited to Claims that the Booklets or other statements contained false statements or omitted to state material or required information; and (I) Claims arising from or related to the pricing or conduct of the IPO and Related Transactions;

      ii.    Claims arising from or related to repurchases by MetLife, Inc. of shares of its common stock, insofar as such Claims are related in whole or in part to any misrepresentations or nondisclosures alleged to have occurred prior to June 28, 2000, or to the Booklets or other statements made in connection with the Plan, the Demutualization, or the IPO and Related Transactions; and

     iii.   Any and all Claims arising from or related to the defense, settlement or resolution of the Federal Class Action, the State Class Action or the Claims included in this Release.

    b.   The Plaintiffs, individually and on behalf of the Class Members, agree that they shall

not now or hereafter institute, maintain, receive any individual benefits from, maintain a right to,

or assert against the Releasees, either directly or indirectly, on their own behalf, on behalf of the Federal Class, the State Class, or any other class,  derivatively on behalf of MetLife or MetLife, Inc., or derivatively or otherwise on behalf of any other Person, any of the Claims released by paragraph a of this Release.  The Plaintiffs and Class Members agree that this Release will be, and may be raised as, a complete defense to and will preclude any action or proceeding encompassed by this Release.

      c.    Nothing in this Release shall be deemed to alter, limit or affect any Class Member's contractual rights to make a Claim for benefits or other contractual rights under the express terms of the policy that MetLife issued to that Class Member, or any Class Member's right to receive or retain any compensation or other right provided to that Class Member by the express terms of the Plan of Reorganization.

      d.    In connection with this Release, the Plaintiffs, individually and on behalf of the Class Members, acknowledge that they are aware that they may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those that they now know or believe to be true, with respect to the matters released by this Release or with respect to their Policies for acts, facts, circumstances or transactions occurring or arising prior to the date of execution of this Stipulation of Settlement.  Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters, and all Claims relating thereto, which existed in the past, now exist, or hereafter may exist. The Parties recognize that Section 1542 of the Civil Code of the State of California, and similar provisions or principles of law in some other jurisdictions, provide that a general release does not extend to Claims which a creditor does not know or suspect to exist in the creditor's favor at the time of executing the release, which if known by the creditor must have materially

affected the creditor's settlement with the debtor.  If and to the extent that any such provision or principle is or may be applicable to this Release, the Plaintiffs, individually and on behalf of the Class Members, hereby voluntarily waive and relinquish any rights that any Plaintiffs or Class Members might have under any such provision or principle in connection with this Release.

e.   Nothing in this Release shall preclude any motion or action to enforce the terms of the Stipulation of Settlement, provided that such action shall be brought only in the Federal Court or State Court.

f.   This Release is the result of a compromise of disputed claims and shall never at any time be used as evidence of any admission of liability by any Defendant or as evidence of the lack of merit of any of Plaintiffs' claims.

22. Effective upon the Final Settlement Date, the Defendants hereby release, acquit and forever discharge each of the Federal Plaintiffs, State Plaintiffs and their respective attorneys from all Claims, whether known or unknown, arising out of, relating to or in connection with the institution, prosecution, assertion, settlement or resolution of the Action or the claims included in this Release.

## V.   NOTICE AND APPROVAL

23. The Parties will submit this Stipulation of Settlement, including all attached exhibits, to the Federal Court and State Court, and will use best efforts to obtain final approval thereof from such Courts.

24. Defendants will submit this Stipulation of Settlement, including all attached exhibits, to the Superintendent for review and the Parties will use best efforts to obtain from the Superintendent any approval of this Stipulation of Settlement, or any provision thereof, that the Defendants in good faith determine is or may be required.

25. The Parties have negotiated, drafted and agreed to a proposed Form of Publication Notice, attached as Exhibit A to this Stipulation of Settlement. The parties shall use best efforts to cause the Federal Court and the State Court to approve (a) the Form of Publication Notice, substantially in the form attached as Exhibit A; (b) in each such court, an Order Regarding Notice and Hearing on Approval of Proposed Settlement, providing for notice substantially in the manner and on the terms contained in the proposed orders that were submitted to the Federal Court on November 3, 2009, and to the State Court on November 4, 2009. After such approvals have been obtained, MetLife shall cause notice to be given by publication twice in the week of November 9 and twice in the week of November 16, in each of *USA Today*, *The Wall Street Journal*, *The New York Times*, and *The New York Law Journal*.

26. Any objection to the proposed settlement by any Class Member may be made only at the time and in the manner specified in the respective Orders Regarding Notice and Hearing on Approval of Proposed Settlement to be entered by the State Court and Federal Court, subject to any reasonable modifications by the State Court or Federal Court of the dates set forth in those proposed orders.

27. Mary A. DeVito, Kevin L. Hyms, Harry S. Purnell, III, Michael A. Giannattasio, Darren F. Murray, Kathy Vanderveur, Eugenia J. Fiala, Paulette Beliunas, Vijay J. Shah, John T. Brophy, Ira J. Gelb, June A. Gelb, Mark D. Smilow, Theresa Hazen, Paul Hazen and Richard Schweinberg will not object to the proposed settlement of the Federal Class Action or the State Action and will not appeal from or otherwise seek review of any order approving the proposed settlement of the Federal Class Action or the State Class Action.

28. As a condition to the effectiveness of this Stipulation of Settlement, this Stipulation of Settlement must be approved by both the State Court and, after a hearing, by the Federal Court.

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/03/09   Page 23 of 37

The State Court and Federal Court may hold a joint hearing on such approval.  For this Stipulation of Settlement to be effective, the Federal Court and State Court each must enter an Order and Judgment incorporating the following requirements:

     a.    The Order must contain a finding that the Court has subject matter jurisdiction to approve this Stipulation of Settlement;

     b.    The Order must contain a finding that the Court has sufficient personal jurisdiction over all members of the Class to bind them to this Stipulation of Settlement;

     c.    The Order must contain findings that the Stipulation of Settlement, and the proposed settlement herein, are fair, reasonable and adequate, and that all legal requirements for approval of this Stipulation of Settlement have been satisfied, including all applicable requirements of the Rules, any constitutional due process requirements, and any other applicable requirements of law;

     d.    The Order must contain findings that the Publication Notice was reasonable; was the best practicable notice under the circumstances; constituted due, adequate and sufficient notice to all persons entitled to receive notice; was reasonably calculated to apprise all persons entitled to object to the proposed settlement or to appear at the hearing on approval of the settlement of their opportunity to do so; and met all applicable legal requirements, including all applicable requirements of the Rules, any constitutional due process requirements, and any other applicable requirements of law;

     e.    The Order must contain a finding that Lead Counsel and the Class representatives adequately represented the Class for purposes of entering into and implementing the settlement;

     f.    The Order and Judgment must approve this Stipulation of Settlement in its entirety and without modification;

g.    The Order and Judgment must dismiss the Action (including all individual claims and Class claims presented thereby) on the merits and with prejudice, without fees or costs to any Party except as provided in this Stipulation of Settlement;

h.    The Order and Judgment must incorporate the Release set forth above in paragraph 21, must make the Release effective as of the date of the Final Judgment, and must forever discharge the Releasees from any claims or liabilities arising from or related to the matters in the Release;

i.    The Order and Judgment must (*i*) permanently enjoin all Members of the Class from filing, commencing, prosecuting, maintaining, intervening in, participating as a party or class member in, or receiving any benefits or other relief from any other lawsuit, arbitration, administrative proceeding, regulatory proceeding, or other proceeding or order, in any jurisdiction, based on or relating to any Claims in the Action or the facts and circumstances relating thereto, or any claims released in the Release; and (*ii*) permanently enjoin all Persons subject to the Court's jurisdiction from attempting to organize any Members of the Class into a separate class for purposes of pursuing as a purported class action in any jurisdiction any lawsuit based on or relating to any Claims in the Action or the facts and circumstances relating thereto, or any claims released in the Release;

j.    The Order must authorize the Parties, without further approval from the Court, to agree to and adopt such amendments, modifications and expansions of this Stipulation of Settlement as (*i*) are not materially inconsistent with the Order and Judgment and (*ii*) do not limit the rights of Members of the Class;

k.    The Order and Judgment must, without affecting the finality of the Order and Judgment for purposes of appeal, retain jurisdiction as to all matters relating to the

24

administration, consummation, enforcement and interpretation of this Stipulation of Settlement and the Order and Final Judgment, and for any other necessary purpose; and

l.   The Order or Judgment may incorporate any other provisions that the Court deems necessary and just.

m.   It shall be sufficient if the Order, in lieu of containing any provision required to be included therein, directs that such provision be included in the Judgment, if the Judgment is simultaneously or subsequently entered.  As used in this paragraph 28, the capitalized terms "Action," "Class," "Court," "Judgment", "Lead Counsel," "Order," and "Rules" mean, respectively, (*i*) the Federal Class Action, the Federal Class, the Federal Court, the Federal Final Judgment, Federal Lead Counsel, the Federal Approval Order, and the Federal Rules of Civil Procedure together with the Federal Court's Local Rules, when such terms are used in reference to the Federal Approval Order; and (*ii*) the State Class Action, the State Class, the State Court, the State Approval Order, the State Final Judgment, State Lead Counsel, and the New York Civil Practice Law and Rules together with the Uniform Rules for the New York State Trial Courts, when such terms are used in reference to the State Approval Order.

## VI.   MODIFICATION OR TERMINATION

29. This stipulation may be modified by written agreement of the Parties with leave of the Federal Court and State Court.

30. This stipulation may be modified by written agreement of the Parties without leave of court if the modification (*i*) does not limit the rights of any Class Member, and (*ii*) is not materially inconsistent with the Federal Approval Order, Federal Final Judgment, State Approval Order, or State Final Judgment.  Without limiting the foregoing, the Parties may by written agreement extend or shorten any time period set forth in this Stipulation of Settlement, provided that leave of the Courts shall be required to alter the time for giving Publication Notice to the

Class Members, to shorten the time limit for objecting to the settlement, or to change the date of any court appearance.

31. The Federal Plaintiffs, State Plaintiffs, and Defendants shall each have the option to terminate this Stipulation of Settlement if any of the following events occurs:

a.    The Federal Court, the State Court or any appellate court rejects, materially modifies, denies, vacates or reverses approval of any portion of this Stipulation of Settlement that the terminating Party in its discretion determines is material, including, without limitation, the terms of relief, the provisions relating to notice, the definition of the Class and/or the terms of the Release; or

b.    The Federal Court, the State Court or any appellate court does not enter or completely affirm, or materially alters or materially expands, any portion of the Federal Final Judgment, State Final Judgment, Federal Order Approving Settlement, or State Order Approving Settlement that the terminating Party in its discretion determines is material, including, without limitation, the terms of relief, the provisions relating to notice, the definition of the Class and/or the terms of the Release.

32. In addition to the options available to all Parties, Defendants shall have the option to terminate this Stipulation of Settlement if any of the following events occurs:

a.    The Superintendent objects to this Stipulation of Settlement or to the settlement set forth in this Stipulation of Settlement; or

b.    MetLife determines in its sole discretion that approval by the Superintendent of such settlement or any portion of the settlement is or may be required, and the Superintendent fails or refuses to give such approval.

33. Any option to terminate shall be exercised within 21 days after the terminating Party has notice of the cause for termination.  Any option to terminate must be exercised in good faith.

34. If this Stipulation of Settlement is terminated pursuant to the provisions of paragraph 31 or 32, then:

    a.    This Stipulation of Settlement shall be null and void and shall have no force or effect, and no Class Member or Party to this Stipulation of Settlement shall be bound by any of its terms;

    b.    All of the provisions of this Stipulation of Settlement, and all negotiations, statements and proceedings relating to it shall be without prejudice to the rights of Defendants, Plaintiffs or any other Class Member, all of whom shall be restored to their respective positions existing immediately before the execution of this Stipulation of Settlement, as if this Stipulation of Settlement had never been entered into;

    c.    Neither this Stipulation of Settlement nor the fact of its having been made shall be admissible in evidence for any purpose; and

    d.    Any order or judgment entered in the Federal Class Action or State Class Action on or after November 2, 2009, but before the date of termination, will be deemed vacated and will be without any force or effect.

**VII.  OTHER MATTERS**

35. Each Party and its counsel shall be free to communicate with any Class Member, orally or in writing, with regard to this settlement or any other matter.  Any such communication shall be consistent with this Stipulation of Settlement.

36. No later than 90 days after the Final Settlement Date, the Federal Plaintiffs, State Plaintiffs and their counsel shall (a) return to Defendants' Counsel or destroy all documents produced by Defendants or their present or former legal, actuarial or financial advisors in the

Federal or State Action, and all video recordings, audio recordings or transcripts of and exhibits to any deposition testimony taken by Federal Plaintiffs or State Plaintiffs in the Federal or State Action, and all copies of such documents, recordings, transcripts and exhibits, to the extent that they are maintained on paper, audiotape, videotape, compact disc or digital video disc, and (b) make good faith efforts to delete all other electronic copies of such materials to the extent practicable; and (c) Federal Lead Counsel and State Lead Counsel shall certify to Defendants in writing that they and their clients have complied with the provisions of this paragraph. This obligation is in addition to the obligations imposed by the confidentiality orders and stipulations in the State Class Action and Federal Class Action, which shall remain in effect. The obligation to destroy or return materials in this paragraph does not apply to documents or copies of documents that have been filed (other than under seal) in any court or are otherwise publicly available.

37. The Parties intend the settlement set forth in this Stipulation of Settlement to be a final and complete resolution of all disputes asserted or that could be asserted by the Federal Plaintiffs or State Plaintiffs or any other Class Member or Class Members against all Releasees with respect to all Claims within the scope of the Release. Federal Plaintiffs, State Plaintiffs and Defendants shall assert no claims of any violation of Rule 11 of the Federal Rules of Civil Procedure or Part 130 of the Rules of the Chief Administrator of the Courts of New York relating to the prosecution, defense or settlement of the Federal Action or the State Action. The Parties agree that the amount paid and the other terms of the settlement were negotiated at arm's length and in good faith, including a mediation conducted by a professional mediator appointed as Special Master by the Federal Court, and reflect a settlement that was reached voluntarily after consultation with experienced legal counsel. The Parties further agree that except as provided

for in this Stipulation of Settlement, each Party shall bear the Party's own costs of the Federal Class Action and State Class Action and, except as expressly provided for herein, waive any and all claims for any costs or assessments against each other Party.

38. Each of the undersigned represents that he or she is authorized to enter into this Stipulation of Settlement on behalf of the Party or Parties for which he or she has signed.

39. This Stipulation of Settlement sets forth the entire agreement among the Parties with respect to its subject matter, and it may not be altered or modified except by a written instrument executed by Federal Lead Counsel, State Lead Counsel and Defendants' Counsel.  This Stipulation of Settlement supersedes any prior agreement, understanding, or undertaking (written or oral) by and between the Parties regarding the subject matter of this Stipulation of Settlement.

40. This Stipulation of Settlement and any ancillary agreements shall be governed by and interpreted according to the law of the State of New York, excluding any conflict-of-laws principles or provisions that would permit or require the application of the law of a different jurisdiction.

41. Any action or motion to enforce this Stipulation of Settlement, or otherwise arising out of or relating to this Stipulation of Settlement, shall be commenced and maintained only in the Federal Court or the State Court.  Without in any way compromising the finality of the Federal Final Judgment, Federal Order Approving Settlement, State Final Judgment and State Order Approving Settlement, the Federal Court and State Court shall each retain jurisdiction over the implementation, administration, and conduct of this settlement and the interpretation, construction, and enforcement of this Stipulation of Settlement.

42. Whenever this Stipulation of Settlement requires or contemplates that a Party or Parties shall or may give notice to another Party or other Parties, notice shall be in writing and shall be provided by hand delivery or next-day (excluding Sunday) express delivery service as follows:

    a.   If to Federal Plaintiffs, then to

> Jared B. Stamell, Esq.
> Stamell & Schager LLP
> One Liberty Plaza, 35th Floor
> New York, NY 10006

    b.   If to State Plaintiffs, then to

> Christopher Lovell, Esq.
> Lovell Stewart Halebian LLP
> 61 Broadway, Suite 501
> New York, NY 10006

    c.   If to Defendants, then to

> Duncan J. Logan, Esq.
> Metropolitan Life Insurance Company
> 1095 Avenue of the Americas
> New York, NY 10036

> *-and-*

> Bruce E. Yannett, Esq.
> Debevoise & Plimpton LLP
> 919 Third Avenue
> New York, NY 10022

Any Party may change the address or addresses for notice to such Party by giving written notice to the other Parties.

43. Any period of days set forth in this Stipulation of Settlement shall be computed in the manner provided in the Federal Rules of Civil Procedure (as in effect on the day from which such time period is measured) for the computation of time periods set forth in those rules.

44. The Parties reserve the right, subject to the approval of the State Court or Federal Court as appropriate, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Stipulation of Settlement.

45. All Parties agree that this Stipulation of Settlement is entered into freely and voluntarily, was drafted by counsel for the Parties as a result of extensive arm's-length negotiations, that no Party or counsel relied upon any representations by any other Party or counsel in entering into this Stipulation of Settlement, and that no parol or other evidence may be offered to explain, construe, contradict or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which the Stipulation of Settlement was made or executed.

46. This Stipulation of Settlement, its provisions, and the negotiations, statements and court proceedings relating to the Stipulation of Settlement and its provisions shall not under any circumstances be construed as, offered as, received as, used as or deemed to be evidence of any kind in the Federal Class Action, State Class Action or any other proceeding except a proceeding to enforce this Stipulation of Settlement.  Without limiting the foregoing, neither this Stipulation of Settlement nor any related negotiations, statements or court proceedings shall be construed as, offered as, received as, used as or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of the Defendants or any other person or entity, as a waiver of any defense that Defendants may assert in any other action or proceeding, or as a concession by the Plaintiffs or the Class Members that any claims, causes of action or remedies lack merit.

47. This Stipulation of Settlement shall not be construed as an amendment or novation of any insurance policy, annuity contract, or contract supplemental to an insurance policy or annuity contract.

48. This Stipulation of Settlement shall not be construed as an amendment to the Plan of Reorganization.

49. The Parties and their attorneys undertake to oversee and implement the terms of this Stipulation of Settlement in good faith, and to use good faith in resolving any disputes that may arise in the implementation of the terms of this Stipulation of Settlement.

50. The Parties and their attorneys agree to cooperate fully with one another in seeking approval of this Stipulation of Settlement by the Courts and to use their best efforts to effect the prompt consummation of this Stipulation of Settlement and the proposed settlement.

51. This Stipulation of Settlement shall be binding upon and inure to the benefit of the Parties and Class Members and their respective successors and assigns.

52. This Stipulation of Settlement may be signed in counterparts, each of which shall constitute a duplicate original.

Stipulated and agreed to as of the date first written above.

For the Federal Plaintiffs and Federal Class:

STAMELL & SCHAGER LLP

By: _____
      Jared B. Stamell

One Liberty Plaza, 35th Floor
New York, NY 10006
(212) 566-4047
stamell@ssnyc.com

*Attorneys for Mary A. DeVito, Kevin L. Hyms,
Harry S. Purnell, III, Michael A. Giannattasio,
Darren F. Murray, Kathy Vanderveur, and the
Federal Class*

32

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/05/09   Page 33 of 37

For the State Plaintiffs and State Class::

LOVELL STEWART HALEBIAN LLP

By: _____
      Christopher Lovell

61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900
clovell@lshllp.com

*Attorneys for Eugenia J. Fiala, Paulette Beliunas, Vijay J. Shah, John T. Brophy, Ira J. Gelb, June A. Gelb, Mark D. Smilow, Therese Hazen, Paul Hazen, Richard Schweinberg and the State Class*


For the Defendants:

DEBEVOISE & PLIMPTON LLP


By: _____
      Bruce E. Yannett

919 Third Avenue
New York, NY 10022
(212) 909-6000
beyannett@debevoise.com

*Attorneys for Metropolitan Life Insurance Company, MetLife, Inc., Robert H. Benmosche, Curtis H. Barnette, Gerald Clark, Joan Ganz Cooney, Burton A. Dole, Jr., James R. Houghton, Harry P. Kamen, Helene L. Kaplan, Charles M. Leighton, Stewart G. Nagler, John J. Phelan, Jr., Hugh B. Price, Robert G. Schwartz, Ruth J. Simmons, and William C. Steere, Jr.*

For the State Plaintiffs and State Class::

LOVELL STEWART HALEBIAN LLP

By: _____
     Christopher Lovell

61 Broadway, Suite 501
New York, NY 10006
(212) 608-1900
clovell@lshllp.com

*Attorneys for Eugenia J. Fiala, Paulette Beliunas,
Vijay J. Shah, John T. Brophy, Ira J. Gelb, June A.
Gelb, Mark D. Smilow, Theresa Hazen, Paul Hazen,
Richard Schweinberg and the State Class*

For the Defendants:

DEBEVOISE & PLIMPTON LLP

By: _____
     Bruce E. Yannett

919 Third Avenue
New York, NY 10022
(212) 909-6000
beyannett@debevoise.com

*Attorneys for Metropolitan Life Insurance
Company, MetLife, Inc., Robert H. Benmosche,
Curtis H. Barnette, Gerald Clark, Joan Ganz
Cooney, Burton A. Dole, Jr., James R. Houghton,
Harry P. Kamen, Helene L. Kaplan, Charles M.
Leighton, Stewart G. Nagler, John J. Phelan, Jr.,
Hugh B. Price, Robert G. Schwartz, Ruth J.
Simmons, and William C. Steere, Jr.*

33

## EXHIBIT A

### FORM OF PUBLICATION NOTICE

U.S. DISTRICT COURT, EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re METLIFE DEMUTUALIZATION LITIGATION. | Civil Case No. 00 CV 2258 (JBW) |

NEW YORK SUPREME COURT, NEW YORK COUNTY

| | |
|---|---|
| EUGENIA J. FIALA, et al., v. METROPOLITAN LIFE INSURANCE COMPANY, et al. | Civil Case No. 601181/2000 (Kornreich) |

### NOTICE OF CLASS ACTION SETTLEMENT

To:     Persons who on September 28, 1999, owned one or more policies issued by Metropolitan Life Insurance Company.

In April 2000, Metropolitan Life Insurance Company, commonly known as MetLife, converted from a mutual insurance company to a stock company, a process called "demutualization." Owners of MetLife policies that were in force on September 28, 1999, were eligible to vote on the demutualization and received compensation in exchange for their interests as members of the mutual company. This compensation was distributed in the form of stock of MetLife, Inc., MetLife's new holding company, cash or policy credits.

These two lawsuits were brought against MetLife and MetLife, Inc., asserting various claims related to the demutualization. The state-court lawsuit was also brought against the individuals who were members of MetLife's Board of Directors at the time the demutualization was approved. Both lawsuits allege that to win the policyholders' vote to demutualize, defendants sent an information package to policyholders that contained false statements and omitted material facts. The plaintiffs in the federal-court lawsuit allege that defendants violated federal securities laws. The plaintiffs in the state-court lawsuit allege that defendants violated the New York Insurance Law. Both lawsuits allege that eligible policyholders were damaged as a result of the alleged misstatements or omissions. MetLife and the other defendants deny the plaintiffs' claims. The defendants believe that their disclosures to policyholders were true, accurate and complete, and that no policyholders were damaged.

Both lawsuits were certified as class actions. A class action is a lawsuit in which representative plaintiffs litigate claims common to a group of persons, called a class, and the results are binding on all members of the class. The class in the state-court lawsuit consists of all policyholders who received compensation in any amount in the demutualization. The class in the federal-court lawsuit consists of all policyholders who received trust interests in 11 or more shares of stock or cash or policy credits of $156.75 or more as compensation in the demutualization. Defendants and certain persons associated with defendants are excluded from both classes. Policyholders previously were given an opportunity to request to exclude themselves from each of the two

Case 9:00-cv-02258-JBW-AKT   Document 539-2   Filed 11/09/09   Page 36 of 37

classes.  Policyholders who submitted a timely exclusion request for either class are not included in that class.  Policyholders do not have an additional opportunity to exclude themselves from either class at this time.

Defendants and plaintiffs have agreed to settle the claims in both lawsuits.  The settlement of the lawsuit is not an admission by the defendants of any wrongdoing or liability, and is not an admission by the plaintiffs that their claims lack merit.  If the settlement is approved, MetLife will contribute $50,000,000 in settlement of the claims in these two lawsuits.  Plaintiffs' litigation expenses and attorneys' fees, which must be approved as reasonable by the state or federal court, will be deducted from this amount.  $2,500,000 will be contributed to nonprofit organizations selected with court approval.  The balance will be contributed in assets to the closed block that was established in MetLife's demutualization.  The closed block is an accounting mechanism that is meant to protect the dividends of participating policyholders included in the closed block, and the assets contributed to the closed block can only be used to pay benefits and dividends to the holders of those policies.  No settlement benefits will be paid directly to the individual class members, except that plaintiffs may apply for reimbursement of their time and effort in pursuing the case.

If the settlement is approved, class members will be barred from bringing or maintaining lawsuits or claims against the defendants and others related to the demutualization.  However, class members will not be giving up any stock, cash or policy credits that they received in the demutualization.  **Class members' rights under their insurance policies and annuity contracts will not change in any way.  The settlement will not cause premiums to increase and will not cause benefits or dividends to decrease.**

The state and federal courts will hold a joint hearing on whether to approve the settlement on December 30, 2009, at 10:00 a.m., in Courtroom 10B South of the United States Courthouse at 225 Cadman Plaza East, Brooklyn, New York.  Class members or their representatives may appear and be heard at the hearing but are not required to do so.  Written objections must be sent to U.S. District Court Clerk, 225 Cadman Plaza East, Brooklyn, NY 11201, or to New York Supreme Court Clerk, 60 Centre Street, New York, NY 10007, so as to be received no later than December 24, 2009.  Objections sent to the U.S. District Court must be captioned "Objection: In re MetLife, 00 CV 2258 (JBW)," and objections sent to the New York Supreme Court must be captioned "Objection: Fiala v. MetLife, 601181/2000 (Justice Kornreich)."  Copies of all objections must be sent to Jared B. Stamell, Esq., One Liberty Plaza, 35th Floor, New York, NY 10006; Christopher Lovell, Esq., 61 Broadway, Suite 501, New York, NY 10006; and Bruce E. Yannett, Esq., Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022.

The parties to the federal-court case make the following statement, which is required by federal statute:  The amount of the settlement proposed to be distributed directly to the class is zero.  The amount being paid to the closed block for the benefit of the state and federal classes, in attorneys' fees and litigation expenses, or to a nonprofit organization is $50,000,000 in the aggregate, or approximately $0.07 per share on average.  The attorneys for the federal class intend to make a joint application with attorneys for the State class for reimbursement of expenses not to exceed $5 million and for attorneys' fees of up to 30% of the $50 million settlement for their work on this case (not to exceed $20 million, or approximately $0.03 per share, in fees and expenses in the aggregate).  The amount of fees and expenses paid, if any, will

be determined by the courts.  The parties disagree on the average amount of damages per share that would be recoverable if the federal plaintiffs prevailed on each claim alleged under federal law.  In the federal plaintiffs' view, the amount of damages would be up to $11.25 per share if they prevailed on all claims.  In defendants' view, the amount of damages would be $0 per share even if the plaintiffs prevailed on all claims.

If you have questions about the settlement, you may call or write to Jared B. Stamell, Esq., One Liberty Plaza, 35th Floor, New York, NY 10006, telephone (212) 566-4047, if it relates to the federal-court action, or to Christopher Lovell, Esq., 61 Broadway, Suite 501, New York, NY 10006, telephone (212) 608-1900, if it relates to the state-court action.  **Do not call the federal or state court.**

3

**Exhibit B**

Jared B. Stamell, Esq.
STAMELL & SCHAGER, LLP
One Liberty Plaza, 35th Floor
New York, NY  10006-1404
(212) 566-4047

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| In Re | : | 00 CV 2258 (JBW) (AKT) |
| METLIFE DEMUTUALIZATION LITIGATION | : | ECF CASE |
| | : | |
| This Document Relates To All Actions | : | |
| | : | |

**DECLARATION OF JARED B. STAMELL
IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS**

JARED B. STAMELL declares:

1.      I am a partner in the law firm of Stamell & Schager, LLP ("the Stamell Firm")

and I am lead counsel for  in the above-captioned Federal Action against  Metropolitan Life

Insurance Company ("MetLife Co.") and MetLife, Inc. (collectively, the "Defendants" or

"MetLife").  As this declaration and attached appendix details[1], this case was aggressively

litigated by the parties for over nine years.  The parties briefed and argued two motions to

dismiss, four motions for summary judgment, three motions relating to class certification, two

petitions for mandamus, a dozen motions *in limine*, plus many other discovery and pre-trial

motions.  Dozens of conferences were held to resolve discovery disputes.  In the course of

discovery hundreds of thousands of pages were produced and reviewed.  Several dozen witnesses

were deposed.  There were two separate and complete jury selections.  The settlement reached

---

[1] Attached at Exhibit 1 is an index of major events in the MetLife Demutualization Litigation.  It cross-references to
the paragraphs within this declaration where a listed event is discussed in more detail.

after the jury was empanelled should be approved because it is fair, reasonable and adequate in light of that litigation.

Factual Investigation by Class Counsel

2.      Before filing the initial complaint, my investigation into the facts and details of the demutualization plan (the "Plan") included the review and analysis of informational materials distributed by MetLife to policyholders describing the Plan and soliciting policyholders' votes, referred to as the Policyholder Information Booklet (the "PIB"), consultations with actuaries and financial experts, and study of mutual insurance law. After thoroughly reviewing the PIB, and following interviews and discussions with policyholders, I submitted a letter to the New York Superintendant of Insurance (the "Superintendant") on behalf of two clients opposing the Plan and outlining deficiencies in the information in the PIB relating to the ten-share fixed component. The Superintendent approved the Plan on April 4, 2000. After receiving the Superintendant's approval, MetLife proceeded immediately with the Plan and all transactions comprising the Plan were closed by April 7, 2000.

The Federal Action – History of the Proceedings

3.      The initial complaint was filed on April 18, 2000, shortly after the New York Superintendant of Insurance approved the Plan. Two additional complaints were simultaneously filed with the above-captioned case, Case Nos. 00-cv-003118 and 00-cv-3723, respectively. The three cases were ordered consolidated on June 28, 2000.

4.      The complaints alleged violations of §12(a)(2) of the 1933 Securities Act. Specifically, Plaintiffs claimed that MetLife made various material misstatements and omissions in the PIB sent to policyholders. The misrepresentations related to the ten-share fixed component.

2

5.     On August 3, 2000 the Court issued an order approving Darren Murray, Martin Gold, Mary DeVito, Kevin Hyms, Harry Purnell III and Kathy Vanderveur as Lead Plaintiffs in the action and appointing Stamell & Schager LLP as Lead Counsel.

6.     Two weeks earlier, on June 20, 2000, MetLife moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b) (6) for failure to state a claim, arguing that none of the allegations in the complaint were misrepresentations or misleading omissions of material fact. MetLife also argued that the McCarran-Ferguson act bars application of the Securities Act to the disclosures made by MetLife, since §7312 of the New York Insurance Law, which describes the procedure for demutualization, was enacted with the purpose of regulating the business of insurance and Congress specifically intended such regulation to remain the province of the states. MetLife further argued that the Court should abstain from hearing the action, under either the Burford Doctrine or the Colorado River exemption. MetLife's final argument was that even if were able to prove a §12(a)(2) violation, the recovery would be zero, since the policyholders received valuable stock in exchange for their membership interests, which had no monetary value.

7.     Plaintiffs served their opposition to the motion to dismiss on October 11, 2000. Among other things, Plaintiffs pointed out the inconsistency in MetLife's position, namely that while MetLife argued that policyholders' membership interests had no discernible economic value, MetLife nonetheless issued billions of dollars worth of stock in exchange for those interests. Plaintiffs also reiterated that a state court could not provide the relief sought under federal law, that the PIB in fact contained materially false statements and omissions, and that the approval of the New York Department of Insurance under state law did not oust Plaintiffs' rights under federal securities law.

8.     MetLife served a reply in further support of their motion to dismiss on November 20, 2000, largely reiterating the arguments in their original motion and emphasizing their contentions that §7312 is a state law which regulates the business of insurance and that Plaintiffs could demonstrate no recovery for the alleged §12(a)(2) violations.

9.     A hearing on MetLife's first motion to dismiss was held before the Court on January 19, 2001.  In the weeks following the hearing, both parties submitted multiple letters to the Court regarding new and relevant authority which might inform the Court's decision.

10.     On July 23, 2001, the Court denied the motion. *See* 156 F.Supp.2d 254 (E.D.N.Y. 2001).  In denying the motion, the Court rejected each of the arguments made by MetLife.  The Court held that the McCarren-Ferguson Act was inapplicable for two reasons: (i) §7312 was not enacted with the purpose of regulating the business of insurance, and (ii) the federal securities law does not invalidate, impair of supersede §7312.  156 F.Supp2d at 261.  The Court held that the Burford doctrine was inapplicable because enforcing the Securities Act's disclosure requirements would not frustrate New York's attempt to insure uniform treatment of a state issue.  *Id.* at 265.  The Colorado River exemption was also deemed inappropriate because actions pending in state court did not include the parties' claims in this federal action.  *Id.* at 265-266. Regarding the omissions and misstatements alleged by Plaintiffs, the Court found generally that they were not so unimportant that reasonable minds would not differ on the question of their importance, and therefore the Court could not rule on their materiality as a matter of law, rendering dismissal at this juncture inappropriate.  *Id.* at 266-269.  As to recovery, the Court acknowledged the inconsistency pointed out by Plaintiffs – namely that nonparticipating policyholders received an automatic 10-share allotment for their allegedly valueless membership interests.  *Id.* at 269.  However, the Court did not analyze this point more deeply, stating that on a

4

motion to dismiss, Plaintiffs need not allege damages.  MetLife's argument regarding damages and recovery would be more appropriately addressed in a summary judgment context.  *Id.* at 269-270.

11.     MetLife then moved to certify an interlocutory appeal from the order denying its motion to dismiss, arguing that the Court had decided two sharply disputed legal issues of first impression: (i) whether the McCarran-Ferguson Act bars application of the Securities Act of 1933 to challenge policyholder disclosure materials approved by a state insurance regulator under state law in connection with an insurance company demutualization, and (ii) whether, as a matter of law, policyholder membership interests in a mutual insurance company are without sufficient economic value to support a claim for damages.

12.     The parties fully briefed MetLife's motion for an interlocutory appeal.  The Court denied the motion on January 30, 2002.  The Court described an interlocutory appeal as an extraordinary remedy that was inappropriate here because the Court found, as no discovery had yet been taken, that multiple questions of fact remained unresolved and therefore there was not a complete record upon which an appellate court could rule.

13.     Following the Court's denial of MetLife's first motion to dismiss and while the interlocutory appeal was being briefed, the parties proceeded with what turned out to be contested and protracted discovery.  Plaintiffs had noticed a first round of discovery of Defendants and their financial advisors in the demutualization transaction in May and June 2000.  However, this discovery was adjourned because Defendants moved to dismiss. Under Section 101 of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §772-1(b)(1), the motion to dismiss automatically stayed discovery.

14.     After the motion to dismiss was denied, in a conference held before Magistrate Judge Michael Orenstein on October 9, 2001, discovery was ordered to move forward in accord with Judge Platt's July 23, 2001 decision.[2]  Judge M. Orenstein ordered discovery bifurcated, with the initial phase limited to the issues of damages and loss, which the Court identified as potentially suitable for summary judgment.  MetLife argued and Judge M. Orenstein seemed to agree that should Plaintiffs be unable to demonstrate loss, then that would be dispositive of the case and would obviate the need for potentially far-reaching and burdensome discovery on other issues.

15.     Accordingly, Plaintiffs issued deposition notices and document requests, serving subpoenas where necessary, to obtain testimony and documents from each of the individuals and firms identified by MetLife in its initial disclosures.[3]  Defendants and the witnesses they had identified uniformly objected to discovery, claiming, among other things, that the document requests were not sufficiently specific.

16.     To obviate objection to the specificity of document requests, Plaintiffs served an additional round of discovery in December 2001 to take depositions addressed to the location and nature of relevant documents.  Once again, MetLife and their financial advisors, specifically Credit Suisse and Goldman, objected and moved to quash the deposition subpoenas.

17.     The Court denied the motions to quash and ordered the depositions.  MetLife, meanwhile, agreed at a meet and confer with Plaintiffs in December 2001 to produce additional requested documents.  Plaintiffs in turn agreed to hold off on any motion to compel.  However,

---

[2] It should be noted that in the course of this litigation, hearings were held before both U.S. Magistrate Judge Michael Orenstein and U.S. Magistrate Judge James Orenstein.  To avoid confusion, each shall be identified with their first initial.

[3] Non-party financial advisors on whom discovery was served included Goldman Sachs & Co. ("Goldman"), Credit Suisse First Boston ("Credit Suisse"), Merrill Lynch, PriceWaterhouseCoopers, LLP ("PwC"), and Milliman, USA ("Milliman").  Plaintiffs also served but subsequently withdrew discovery requests on the New York Department of Insurance.

MetLife did not produce documents until shortly before a scheduled February 8, 2002 hearing in front of Judge M. Orenstein.  Moreover, the production was incomplete and consisted largely of public documents.  At the February 8 hearing, the Court ordered MetLife to produce the additional requested documents by February 22, 2002.

18.     On April 2, 2002, another hearing was held before Judge M. Orenstein.  Among the topics discussed were the suitability of the witnesses produced by non-party financial advisors, the extent of document production to date by MetLife, and negotiations between parties regarding a Confidentiality Agreement.  On May 6, 2002, the Court rejected all versions of confidentiality orders proposed by the parties and *sua sponte* imposed its own order.

19.     On May 20, 2002, the parties convened again before Judge M. Orenstein to resolve outstanding issues regarding depositions of the non-party financial advisors and the extent of document production needed before depositions on the merits could be taken.  The Court ordered supplemental document production as outlined in the hearing to be completed within 45 days.

20.     Non-party witnesses resisted discovery.  On June 5, 2002, Plaintiffs moved to compel the production of documents by PricewaterhouseCoopers LLP ("PwC").  Opposition to discovery from PwC was submitted by MetLife, as well as PwC, on June 19, 2002, and Plaintiffs responded on June 21, 2002.

21.     The parties reconvened before Judge M. Orenstein on July 11, 2002.  The Court ordered that further depositions of non-parties Credit Suisse and Goldman be denied without prejudice to renewal after deposition of MetLife's former Chief Actuary, Judy Weiss.  MetLife was ordered to complete its document production by July 19, 2002.  Also, due to the fact that

counsel for PwC was not present at this hearing, Plaintiffs' fully briefed motion to compel PwC was deferred until the next hearing.

22.     MetLife moved for a protective order on August 2, 2002 to limit discovery to the issue of loss, claiming that Plaintiffs' document requests went beyond limitations the Court placed on discovery.  Plaintiffs opposed the motion on August 8, 2002.

23.     A hearing was held before Judge M. Orenstein on August 13, 2002, to discuss Plaintiffs' motion to compel and MetLife's motion for a protective order.  At the hearing the Court reserved its ruling on both issues, determining that neither issue could be decided until Plaintiffs first depose PwC actuarial expert Kenneth Beck.

24.     Kenneth Beck was deposed on September 11, 2002.  On October 7, 2002, Plaintiffs submitted a letter to the Court saying that based on their deposition of Mr. Beck, they had been able to narrow their requests to PwC for additional documents.  At a hearing held on October 9, 2002, the Court granted the first request (that PwC produce an index of the boxes containing documents upon which Mr. Beck relied in issuing PwC's opinion letter on the demutualization), denied but reserved for later the second request (the right to inspect and copy the contents of the boxes), and denied the third request as irrelevant based on Mr. Beck's deposition testimony.  The Court predicted that this would conclude PwC's participation in the proceedings, obviating any need for a protective order or a motion to compel.

25.     At conference on November 21, 2002, the parties discussed Plaintiffs' intention to file an amended complaint.  MetLife indicated that it would accept the amended complaint and then file a second motion to dismiss as to any new claims asserted.  Plaintiffs' Consolidated, Amended and Supplemental Class Action Complaint was filed on February 4, 2003.  In the amended complaint, Plaintiffs added a securities fraud claim under Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  Plaintiffs also divided their existing 12(a)(2) claim into two separate claims for relief.  The principal omissions from the PIB now alleged as violating federal securities laws consisted of the following:  (i) omitting to state that the actuarial method used to calculate policyholders' contributions to MetLife's surplus arrived at a value of approximately $15 billion, whereas policyholders received consideration worth only $8.4 billion, (ii) omitting to state that MetLife's method of demutualization, an exchange of policies with a right to elect cash, as opposed to an exchange of policies for cash with the right to elect stock, was chosen for the benefit of MetLife and not of policyholders, because policyholders would have received greater consideration under the latter method, (iii) omitting to state that policyholders would surrender rights to annual dividends from their contributions to MetLife's surplus beyond the assets set aside in which is called the "Closed Block," (iv) misstating that reasonable dividends would continue to be paid as declared when the assets allocated to pay dividends had been limited by the Closed Block, and (v) misstating that the 10-share fixed component of the allocation was based on an actuarial evaluation when in fact the 10-share allotment was chosen based simply on a rule of thumb.

26.     On February 28, 2003, MetLife served simultaneously on Plaintiffs their motions to dismiss the §10(b) claim in the amended complaint and for summary judgment on the issue of loss.  Plaintiffs wrote to the Court on March 5, 2003, claiming that additional discovery was necessary in order to oppose MetLife's motion for summary judgment.  MetLife disputed Plaintiff's claim in a March 10, 2003 letter.  Due dates for replies and for filing with Judge Platt in accordance with his local rules were moved on multiple occasions by consent of both parties. At a hearing on June 19, 2003, Judge M. Orenstein ordered a final schedule for briefing on the two motions and ordered the parties to contact Judge Platt's chambers to schedule oral argument

9

promptly thereafter.  The parties agreed that the most appropriate course would be to argue both motions simultaneously before Judge Platt.  Oral Argument was subsequently scheduled for December 19, 2003, with papers to be submitted to the Court on December 9, 2003.

27.     On December 9, 2003, Plaintiffs filed by order to show cause a motion to strike portions of the reply declarations of Kenneth M. Beck and Carl Micarelli, Esq. and the reply declaration and supplemental expert report of Terry H. Korn that Defendants submitted in support of their summary judgment motion.  Plaintiffs argued that the Court should strike the portions of the sworn statements that contradict deposition testimony or prior sworn statements or set forth facts not admissible in evidence.  MetLife filed their opposition papers on December 19, 2003, arguing that Plaintiffs raised no legitimate dispute but rather were using the motion to strike as a vehicle for an unauthorized surreply on the underlying summary judgment motion. Furthermore, MetLife argued that even if Plaintiffs' objections had merit, they would not defeat summary judgment because the challenged testimony was not material to whether Plaintiffs suffered a loss in the demutualization, which was the sole issue relevant to the summary judgment motion.  Plaintiffs filed a reply on January 4, 2004.

28.     Due to the briefing on Plaintiffs' motion to strike, the hearing originally scheduled for December 19, 2003, to discuss both MetLife's second motion to dismiss and their motion for summary judgment was reset for March 26, 2004.

29.     At the March 26, 2004 hearing, Judge Platt announced that due to controlling Second Circuit law, he was unable to consider MetLife's motion for summary judgment and second motion to dismiss simultaneously.  To resolve the issue, MetLife agreed to withdraw its motion for summary judgment without prejudice to renewal after resolution of the motion to dismiss.   Plaintiffs in turn agreed to amend their complaint a second time to restore the §12(a)(2)

10

claim to its original state (which had already survived MetLife's first motion to dismiss in January 2002). A hearing on the motion to dismiss was then set for April 30, 2004.

30.     On April 26, 2004, Plaintiffs filed their Second Consolidated, Amended and Supplemental Class Action Complaint (the "Complaint"). On the same day, parties filed with the Court MetLife's fully briefed motion to dismiss the second claim for relief in the Complaint (Plaintiffs' 10(b) and Rule 10b-5 claim). In their motion, MetLife argued, generally, that Plaintiffs mischaracterized or misstated Defendant's representations in the PIB, and that the representations MetLife did make were true as a matter of law. Moreover, even if Plaintiffs did successfully plead a material misrepresentation, they failed to plead scienter with the specificity required under the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure and of the PSLRA for a 10b-5 claim. In response, Plaintiffs argued that MetLife had access to non-public information that contradicted the PIB and established strong circumstantial evidence of conscious misbehavior or recklessness. Plaintiffs cited to MetLife's internal calculation of a $15.3 billion contribution to surplus by policyholders, which calculation was not included in the PIB, in contrast to the $8.4 billion in stock these policyholders received in the demutualization. Plaintiffs also emphasized a presentation made on this subject by an actuary to MetLife's board of directors. As evidence of motive and opportunity, Plaintiffs argued that for years MetLife had secretly transferred $200 million of surplus on an annual basis to cover losses on certain products, that the demutualization diverted billions of dollars away from policyholders, and that MetLife hid this effect of the demutualization through false statements and omissions in the PIB. MetLife in turn argued that these allegations of motive were too broad and generalized, and that moreover a company's simple desire to raise capital is insufficient evidence of fraudulent intent under Rule 9 and the PSLRA.

11

31.     The parties argued the motion to dismiss Plaintiff's §10(b)(5) securities fraud claim before Judge Platt on April 30, 2004.  While Judge Platt's decision was pending, MetLife filed its answer to Plaintiffs' first claim for relief under §12(a)(2) on May 25, 2004.

32.     On June 22, 2004, Judge Platt denied MetLife's motion to dismiss Plaintiffs' second claim for relief.  *See* 322 F.Supp.2d 267 (E.D.N.Y. 2004).  Generally, Judge Platt found that Plaintiffs had made sufficient allegations to survive a motion to dismiss.  At core, the Court concluded that the issues being argued by the parties were factual issues.  The Court could not order dismissal because it could not conclude beyond a doubt that Plaintiffs could prove no set of facts in support of their claims which would entitle them for relief.  322 F.Supp.2d at 272-273.  The issues in dispute were best decided on a motion for summary judgment or, ultimately, at trial.  *Id.* at 273.  Accepting Plaintiffs' allegations as true and drawing reasonable inferences in their favor, Plaintiffs may be entitled to the relief they seek.  *Id.* Accordingly, the Court ordered that discovery continue regarding, *inter alia*, the circumstances under which the decision on how to value contributions to the surplus was arrived at and how this decision was explained to policyholders, and also as to the funding of the Closed Block and the issuance of dividends.  *Id.*

33.     MetLife filed its answer to Plaintiffs' second claim for relief on July 13, 2004.

34.     On July 7, 2004, the case was reassigned to U.S. Magistrate Judge James Orenstein.  Judge J. Orenstein ordered the parties to file a joint status letter by September 10, 2004.

35.     On August 6, 2004, MetLife resubmitted its motion for summary judgment which it had previously withdrawn at the March 2004 hearing before Judge Platt.

36.     On August 26, 2004, Plaintiffs moved by order to show cause for a Rule 16 conference, stating that despite Judge Platt's June 22, 2004 decision denying MetLife's second

motion to dismiss and ordering discovery to proceed, MetLife refused to proceed with discovery and had renewed their summary judgment motion.  Plaintiffs argued that the conference was necessary for the Court to decide whether MetLife's motion for summary judgment should be denied as premature or tabled until the completion of discovery.  MetLife opposed the motion, arguing that a hearing was already scheduled before Judge J. Orenstein on the same date as proposed by Plaintiffs for the conference and would provide ample opportunity for Plaintiffs to discuss their concerns.

37.     On September 9, 2004, Judge Platt denied Plaintiffs' request for a Rule 16 conference.  However, the Court also ruled that MetLife's motion for summary judgment was premature and denied the motion without prejudice.  The court ordered the parties to resolve outstanding discovery disputes before Judge J. Orenstein at the next scheduled status conference.

38.     As ordered, parties filed a joint status report for Judge J. Orenstein on September 13, 2004.

39.     The next status conference was held on October 5, 2004.   Judge J. Orenstein ordered both parties to prepare letters describing their stances on further discovery by October 12, 2004.  He also ordered the parties to submit to the Court a joint plan for discovery, should there be areas on which both parties could agree.

40.     Per Judge J. Orenstein's order, both parties submitted letters outlining their respective positions on discovery on October 12, 2004.  Plaintiffs argued that discovery should continue, citing Judge Platt's orders from June 22, 2004 (denying MetLife's second motion to dismiss) and from September 8, 2004 (denying as premature MetLife's renewed motion for summary judgment), each of which contemplated continued discovery by the parties. Plaintiffs also argued that their theory of damages, which followed established case law, entitled them to

13

additional discovery.   Plaintiffs further pointed to MetLife's repeated failure to produce documents in a timely manner, citing to seven separate instances where Judge M. Orenstein was forced to intervene and order MetLife to comply with discovery requests.

41.     MetLife in their letter argued that there was no need for further discovery until its motion for summary judgment was refiled and ruled upon by Judge Platt.  MetLife cited to the original October 9, 2001 discovery order from Judge M. Orenstein, which limited discovery to the issue of loss and to the specific issues identified by Judge Platt in his July 23, 2001 opinion denying MetLife's first motion to dismiss.  MetLife argued that the rationale for that limitation – that the issue of loss was potentially dispositive of the entire case and therefore could potentially obviate the need for the expensive and time-consuming discovery sought by Plaintiffs – was still valid, and that all such discovery was now complete.  MetLife argued that the renewed motion for summary judgment could be fully briefed on short order and, if granted, would end the case. Only if the motion were denied should the broader discovery sought by Plaintiffs proceed.

42.     Parties filed a joint discovery statement on October 29, 2004, identifying discovery requests that were undisputed, requests that could be deferred, requests that remain in dispute, and including a proposed scheduling order.

43.     A hearing was held on November 9, 2004 to discuss the parties' respective views on discovery and the proposed scheduling order.  Following the hearing, in a decision dated November 12, 2004, Judge J. Orenstein ordered MetLife to renew its motion for summary judgment and stayed further discovery, indicating that discovery of the remaining matters would only proceed on the earlier of (a) a decision by Judge Platt that the summary judgment motion remains premature, or (b) Plaintiffs' submission of an opposition to that motion on the merits. The order concluded that phase one discovery as outlined in the October 9, 2001 order was

14

complete, and that the issue of loss was ripe for determination by Judge Platt. Judge J. Orenstein also adopted a scheduling order for the case, including deadlines for discovery, expert discovery, class certification, and motions for summary judgment.

44. MetLife resubmitted its summary judgment papers on November 16, 2004.

45. On November 22, 2004, Plaintiffs filed an objection to the November 12, 2004 decision which stayed discovery. Plaintiffs argued that contrary to the order, discovery was not complete, as indicated by the parties themselves in the October 29, 2004 joint discovery statement. The ordered stay of discovery would place Plaintiffs in an unfair position where, in order to obtain what they deemed to be essential discovery, they would have to oppose a motion that the Court had previously denied as premature because discovery was not complete.

46. MetLife responded to Plaintiffs' objection on December 6, 2004. MetLife argued that allowing discovery to proceed at this point would render over a year spent on limited discovery directed to the specific issue of loss a wasted effort. The purpose of bifurcated discovery was precisely to avoid unnecessarily expensive and burdensome discovery in the event that the case could be disposed of by a summary judgment motion targeted to the loss issue.

47. Plaintiffs responded on December 6, 2004, again pointing out that discovery remained incomplete. Plaintiffs argued that their §12(a) and §10(b) claims challenged both the fixed and variable components of the demutualization. However, only partial discovery had been taken regarding the §12(a)(2) claim on loss as it pertained to the fixed component, and none at all regarding the §12(a)(2) claim on loss as it pertained to the variable component or on the §10(b) claim as it pertained to either the fixed or variable components.

48. By memorandum and order dated December 10, 2004, Judge Platt ruled that MetLife's motion for summary judgment remained premature and ordered that discovery

15