UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| : | No. 00 CV 2258 (JBW) (AKT) |
| *In re* METLIFE DEMUTUALIZATION LITIGATION. | : |
| : | Judge Weinstein |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| : |  |
| EUGENIA J. FIALA, *et al.*, | : |
| Plaintiffs, | : |
| vs. | : Index No. 601181/2000 |
| : |  |
| METROPOLITAN LIFE INSURANCE COMPANY, *et al.*, | : Justice Kornreich |
| : |  |
| Defendants. | : |
| : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF APPROVAL
OF THE SETTLEMENT AND IN RESPONSE TO OBJECTIONS**


Kevin S. Finnegan
Duncan J. Logan
METROPOLITAN LIFE
   INSURANCE COMPANY
1095 Avenue of the Americas
New York, NY 10036-6796

Bruce E. Yannett
Carl Micarelli
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022-3902
Telephone: (212) 909-6000
Email: beyannett@debevoise.com
      cmicarelli@debevoise.com

*Attorneys for Defendants*


Dated: New York, New York
     December 28, 2009

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND .......................................................................................................2

    A.  The Demutualization............................................................................2

    B.  The Lawsuits.......................................................................................6

    C.  Class Certification and Notice. ...........................................................8

    D.  Discovery, and Preparation for Trial .................................................10

    E.  Settlement Negotiations ....................................................................10

    F.  Terms of the Settlement.....................................................................11

    G.  Notice of Settlement. ........................................................................12

    H.  Objections. ........................................................................................12

ARGUMENT ..........................................................................................................13

  I.  THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, ADEQUATE
     AND IN THE BEST INTERESTS OF THE CLASS........................................13

    A.  Plaintiffs Have Virtually No Chance of Success in Proving Liability or
       Damages............................................................................................15

       1.  The Federal Plaintiffs Cannot Establish a Material Misrepresentation or
          Omission. ..................................................................................17

       2.  The Federal Plaintiffs Cannot Establish that Defendants Acted with an
          Intent to Deceive. .....................................................................22

       3.  The *Fiala* Plaintiffs Cannot Prove a Violation of New York Insurance
          Law Section 7312. ....................................................................23

       4.  Neither the Federal Nor State Plaintiffs Would Be Able to Prove
          Damages, Because No Class Members Were Injured by the
          Demutualization.......................................................................25

       5.  Other Defenses Also Would Bar Class Members' Recovery. ..............27

    B.  The Amount and Distribution of the Proposed Settlement is Fair, Reasonable
       and Adequate in Light of the Possible Recovery and the Risks of Litigation. ............27

# TABLE OF CONTENTS
(continued)

Page

1. The Amount of the Settlement Is Fair, Reasonable and Adequate. .......................27

2. The Manner of Payment Is Fair, Reasonable and Adequate..................................29

   a. Allocating Assets to the Closed Block Delivers More Value to Class Members Than a Direct Cash Payment. ..........................................................29

   b. The *Cy Pres* Settlement Payment Is an Appropriate Way to Deliver the Small Portion of the Settlement Proceeds Attributable to Non-Closed-Block Class Members.     31

   c. The Division of the Settlement Amount Between Closed-Block and Non-Closed-Block Portions Is Reasonable.......................................................32

C. The Remaining Relevant Factors Also Favor Approval of the Settlement. ...............33

II. NOTICE OF THE SETTLEMENT WAS PROPER .....................................................36

III. CLASS CERTIFICATION IS PROPER FOR SETTLEMENT PURPOSES..................38

IV. THE OBJECTIONS FILED AGAINST THE SETTLEMENT ARE WITHOUT MERIT. ...........................................................................................................................39

A. The Objection by Steven Waldman Is Without Merit. .................................................39

1. Waldman's Objection Misunderstands How the Closed Block Works. ...............40

2. Publication Notice of the Proposed Settlement was Constitutionally Adequate .............................................................................................................43

B. The Objection by John J. Pentz, Jr. and Thomas Sterrett Bell Misunderstands the Settlement and Misstates the Law Regarding Subclasses.....................................45

C. The Objection by Robert Gould Does Not Take Account of the Impracticality of Direct Payments to Class Members, Misunderstands the Operation of the Releases, and Misstates the Law.................................................................................47

D. The Objection of Christopher P. Mueller Has No Bearing on the Fairness, Reasonableness or Adequacy of the Settlement. ........................................................49

E. The Objection of Lawrence Kuczynski Has Nothing to Do with the Settlement. ....................................................................................................................51

CONCLUSION....................................................................................................................52

# TABLE OF AUTHORITIES

Pages

## CASES

*Amchem Prods. v. Windsor,* 521 U.S. 591 (1997) ............................................................39, 46, 47

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)...............................................................................18

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)........................................14, 15, 28

*Conolly v. Universal Am. Fin. Corp.*, 21 Misc. 3d 1109(A), 2008 N.Y. Slip Op.
   52018(U), 2008 WL 4514098 (Sup. Ct. Westchester County Oct. 8, 2008) ....................14, 28

*D'Amato v. Deutsche Bank,* 236 F.3d 78 (2d Cir. 2001) ................................................................13

*Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) ....................................................38, 47

*Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y. 1968) ...........................................................37, 44

*Farinella v. Paypal, Inc.,* 611 F. Supp. 2d 250 (E.D.N.Y. 2009) ..................................................13

*Fiala v. Metro. Life Ins. Co.*, 2005 N.Y. Slip Op. 30069(U), (Sup. Ct. N.Y. County Oct.
   11, 2005) ..............................................................................................................................8

*Fiala v. Metro. Life Ins. Co.*, 2006 N.Y. Misc. LEXIS 4092 (Sup. Ct. N.Y. County June
   2, 2006) ..............................................................................................................................38

*Fiala v. Metro. Life Ins. Co.*, 2006 N.Y. Slip Op. 30068(U), 2006 WL 6190175 (Sup. Ct.
   N.Y. County May 2, 2006), *aff'd as modified*, 52 A.D. 3d 251, 859 N.Y.S.2d 426 (1st
   Dep't 2008) .....................................................................................................................8, 35

*Fiala v. Metro. Life Ins. Co.*, 2007 N.Y. Slip Op. 51797(U), 2007 WL 2772230 (Sup. Ct.
   N.Y. County Aug. 28, 2007)..................................................................................................9

*Grobe v. Erie County Mut. Ins. Co.*, 39 A.D. 183, 57 N.Y.S. 290 (4th Dep't 1899), *aff'd
   on op. below*, 169 N.Y. 613, 62 N.E. 1096 (1902) ................................................................26

*Handschu v. Special Services Div.,* 787 F.2d 828 (2d Cir. 1986)...........................................37, 44

*In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396 (E.D.N.Y. 1985), *aff'd*, 818
   F.2d 179 (2d Cir. 1987).......................................................................................................31

*In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987).......................................28

# TABLE OF AUTHORITIES

(continued)

Pages

*In re Enron Corp. Sec. Litig.*, 2008 WL 4178151 (S.D. Tex. Sept. 8, 2008) ..........................32, 47

*In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004) .................................

..................................................................................................................15, 29, 30, 32, 35, 36

*In re Holocaust Victim Assets Litig.,* 311 F. Supp. 2d 407 (E.D.N.Y. 2004), *aff'd,* 424
F.3d 158 (2d Cir. 2005).........................................................................................................31

*In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710 (E. & S.D.N.Y. 1991)........................37, 44

*In re MetLife Demut. Litig.*, --- F.R.D. ---, 2009 WL 3633898
(E.D.N.Y. Nov. 4, 2009)..........................................................................12, 14, 15, 16, 37

*In re MetLife Demut. Litig.*, 156 F. Supp. 2d 254 (E.D.N.Y. 2001) ............................15, 26, 27, 34

*In re MetLife Demut. Litig.,* 2006 U.S. Dist. LEXIS 97633 .................................................9, 35, 38

*In re MetLife Demut. Litig.,* 2006 WL 2349998(E.D.N.Y. Aug. 7, 2006) ...................................35

*In re MetLife Demut. Litig.,* 2007 WL 1395560 (E.D.N.Y. May 9, 2007)....................................35

*In re MetLife Demut. Litig.,* 2007 WL 1395569 (E.D.N.Y. May 9, 2007)....................................38

*In re MetLife Demut. Litig.*, 2009 U.S. Dist. LEXIS 110519 (E.D.N.Y. Nov. 24, 2009) .......22, 23

*In re MetLife Demut. Litig.,* 229 F.R.D. 369 (E.D.N.Y. 2005)...........................................9, 34, 38

*In re MetLife Demut. Litig.*, 624 F. Supp. 2d 232 (E.D.N.Y. 2009) ...................................... *passim*

*In re Nasdaq Market-Makers Antitrust Litig.*, 2000 WL 37992 (S.D.N.Y. Jan. 18, 2000) ...........29

*In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129 (2d Cir. 2008) .........................................14

*In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997).....................................14

*In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570 (S.D.N.Y. 2008).................14, 28, 35, 36, 48, 50

*In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .............................47

*Kalnit v. Eichler,* 264 F.3d 131 (2d Cir. 2001) ............................................................................22

*Klein v. Robert's American Gourmet Food, Inc.*, 28 A.D.3d 63, 808 N.Y.S.2d 766 (2d
Dept. 2006) ...........................................................................................................................31

## TABLE OF AUTHORITIES
(continued)

Pages

*Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 668 N.E.2d 1370 (1996) ....................25

*Lewis v. McGraw*, 619 F.2d 192 (2d Cir. 1980) ...........................................................20

*Linder Fund, Inc. v. Waldbaum, Inc.*, 82 N.Y.2d 219, 624 N.E.2d 160 (1993) ...........................24

*Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002)....................................29

*Malhotra v. Equitable Life Assur. Soc'y*, 364 F. Supp. 2d 299 (E.D.N.Y. 2005)..........................19

*Matter of Colt Indus. Shareholder Litig.*, 77 N.Y.2d 185, 566 N.E.2d 1160 (1991)...13, 14, 15, 37

*Morris v. Lifescan, Inc.,* 54 Fed. Appx. 663 (9th Cir. 2003) ..........................................45

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306 (1950).........................................43

*Murray v. Metro. Life Ins. Co.*, 583 F.3d 173 (2d Cir. 2009) ..........................................18

*Ortiz v. Fibreboard*, 527 U.S. 815, 119 S. Ct. 2295 (1999) ...................................46, 47

*Panos v. Island Gem Enters. Ltd.*, 880 F. Supp. 169 (S.D.N.Y. 1995) .......................................25

*Schwab v. Philip Morris USA, Inc.*, 2005 WL 3032556 (E.D.N.Y. Nov. 14, 2005) ....................29

*Shah v. Metro. Life Ins. Co.*, 2003 N.Y. Slip Op. 50591(U), 2003 WL 728869 (Sup. Ct. N.Y. County Feb. 21, 2003), *modified sub nom. Fiala v. Metro. Life Ins. Co.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (1st Dep't 2004) .......................................... *passim*

*Soc'y for Savs v. Bowers*, 349 U.S. 143 (1955) ...........................................................26

*Spark v. MBNA Corp.*, 48 Fed. Appx. 385 (3d Cir. 2002)..........................................45

*Tancredi v. Metro. Life Ins. Co.,* 149 F. Supp. 2d 80 (S.D.N.Y. 2001)........................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)................................22

*TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .................................................18

*Uhlman v. N.Y. Life Ins. Co.,* 109 N.Y. 421, 17 N.E. 363 (1888) .................................18

*W. Va. v. Chas. Pfizer & Co.,* 314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971)..................................................................31, 37, 44

*Wal-mart Stores Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005)............................14, 35, 38

v

## TABLE OF AUTHORITIES
(continued)

<u>Pages</u>

*Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028 (2d Cir. 1979)..................................................27


**STATUTES**

15 U.S.C. § 77*l*(a)(2); ........................................................................................26

CPLR 903..........................................................................................................38

CPLR 907..........................................................................................................37

CPLR 908.....................................................................................................13, 37

CPLR Article 78 ............................................................................................7, 23, 24

Insurance Law § 7312 ............................................2, 3, 4, 6, 7, 8, 21, 23, 24, 25, 26


**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a)(4)........................................................................................47

Fed. R. Civ. P. 23(b)(3)(D)...................................................................................35

Fed. R. Civ. P. 23(c)(2)(B) ..................................................................................36

Fed. R. Civ. P. 23(e) ....................................................................................13, 36, 38

## PRELIMINARY STATEMENT

Nearly ten years ago, defendant Metropolitan Life Insurance Company ("MetLife," or "the Company"), one of the nation's largest life insurance companies with roughly 11 million policyholders, completed the enormous process of converting from a mutual insurance company into a stock insurance company—a process that included one of the largest initial public offerings of stock in history.  As often happens with transactions of this magnitude, over a dozen different lawsuits were filed against the Company while this process was underway or within a short time after the process was completed.  After numerous dismissals and consolidations, two of the sixteen original lawsuits that were filed remain pending today:  *Fiala v. Metropolitan Life Insurance Company* and *In re MetLife Demutualization Litigation.*

With plaintiffs' claims in both actions headed toward nearly certain failure on the merits, the parties have agreed on a settlement that puts to an end this nearly decade-long litigation, avoids the expense and burden of trial and appeal, and provides a monetary benefit to class members.  The parties reached settlement only after years of exhaustive discovery, months of intense trial preparation, repeated arm's-length settlement discussions, and the mediation efforts of a court-appointed special master.  While the $50 million settlement amount is small compared to the many billions of dollars to which plaintiffs claim they are entitled, it is eminently fair and reasonable in view of the bleak prospects for plaintiffs' claims at trial or in the *Fiala* case on summary judgment.

The fact that over ten million class members are involved in this suit has presented unusual challenges in managing the case.  The administrative costs of providing direct payments to a class of this size would severely deplete the settlement fund and ultimately deliver very little value to the class members.  To avoid this problem, the parties have agreed to a two-part distribution plan which will deliver monetary value to millions of class members through an

1

allocation of assets to the "closed block" established for policyholders' benefit in the demutualization.  It would deliver indirect value to the rest of the class through a *cy pres* contribution to one or more health-based or other nonprofit organizations to be proposed by the parties and approved by the Courts.  Each of these two steps would involve virtually no incremental administrative costs, thereby maximizing the funds delivered to the class members and the *cy pres* recipient.

The notice of settlement provided a period for class members to submit written objections to the settlement proposal, which fewer than a handful have done.  Defendants now respectfully submit this memorandum in support of approval of the settlement, and in opposition to the objections that have been filed.

## BACKGROUND

### A.  The Demutualization.

Metropolitan Life Insurance Company ("MetLife"), a New York corporation, was founded in 1868 and in 1915 became a mutual insurance company—that is, a nonstock corporation whose policyholders were its members.  Ex.[1] B ¶¶ 1-2 (Oct. 30, 2009 Stipulation of Agreed Facts, *In re MetLife* Doc. 530-9); Ex. D at 1 (Superintendent's April 4, 2000 Opinion and Decision).  In 1998, MetLife's Board of Directors authorized management to pursue demutualization—that is, conversion to a stock company.  Ex. B ¶ 10; Ex. D ¶ 15.  This process was governed by Section 7312 of the New York Insurance Law.  MetLife, working closely with its own consultants and with the New York Department of Insurance and its consultants, spent nearly a year and an enormous amount of resources developing a demutualization plan.  On

---

[1]   Unless otherwise specified, all citations to "Ex." are to the accompanying Affirmation and Declaration of Carl Micarelli on Support of Approval of the Stipulation of Settlement and in Response to Objections ("Micarelli Aff.").

September 28, 1999, MetLife's Board adopted a Plan of Reorganization (the "Plan"), Ex. C, which the Board found to be in the best interests of the company and its policyholders, and fair and equitable to the policyholders.  Ex. B ¶ 11; Ex. D ¶ 31.

MetLife then mailed its approximately 11 million eligible policyholders a ballot to vote on the demutualization Plan, together with a package of explanatory materials approved by the Superintendent of Insurance (including a two-part Policyholder Information Booklet and other materials).  Ex. B ¶¶ 17, 19-20; Ex. D ¶¶ 21, 24.  The Plan was approved by a 93% vote of the approximately 2.7 million policyholders who voted.  Ex. B ¶ 23; Ex. D ¶ 27.  The Superintendent of Insurance also approved the Plan after exhaustive review and a public hearing required by New York law, *see* Ex. D ¶¶ 16-17, 25-26, as being "in the best interest of MetLife and its policyholders," "fair and equitable to the policyholders," "not detrimental to the public," not hazardous to MetLife's solvency, and otherwise in compliance with applicable law.  Ex. D ¶¶ 200, 201, 238.

The demutualization became effective on April 7, 2000.  Ex. B ¶ 3.  As a result of the conversion from mutual to stock form, policyholders' "membership interests" were extinguished.  N.Y. Ins. Law § 7312(d)(4)(A), (m), (r); Ex. C §§ 3.1(c), 5.2(d)(iii) (Plan of Reorganization).  The term "membership interests" is defined by New York statute and the Plan to mean policyholders' rights as members of the mutual company by law or by the company's charter, and any right to vote conferred by their policies.  N.Y. Ins. Law § 7312(a)(3); Ex. C, Art. II, *Policyholders' Membership Interests*.  Membership interests do not include any rights expressly conferred by the insurance policies, other than the right to vote.  *Id.*  The demutualization did not

change policyholders' premiums, benefits or eligibility for policy dividends.  Ex. D ¶ 154.[2]

Principally, membership interests consist of the right to vote for company directors and a

contingent interest in a possible distribution of surplus in the unlikely event of a solvent

liquidation.  Ex. C, Art. II, *Policyholders' Membership Interests*.  Membership interests do not

include eligibility for policy dividends, which is a contractual right that persists after

demutualization.  *Id.*; *see also id.* § 3.1(b).

     Under New York law and the Plan, policyholders whose policies were in force on the

September 28, 1999 adoption date of the Plan (called "Eligible Policyholders" in the Plan) were

entitled to receive consideration in exchange for their membership interests.  N.Y. Ins. Law

§ 7312(e)(3); Ex. C, Art. II, *Eligible Policyholder*; Ex. C §§ 3.1(c), 5.2(d)(iii).  Following the

precedent established by prior demutualizations, MetLife's Plan allocated to the eligible

policyholders 100% of the stock of the company prior to the sale of additional shares in an initial

public offering ("IPO"), and let the market set the value of the stock at the time of the IPO.  *See*

Ex. D ¶¶ 15, 39; Ex. C § 3.1.  A minority of the policyholders elected to receive cash at the IPO

price in lieu of stock, and an even smaller minority were required for tax or regulatory reasons to

receive cash or credits to their policies, again determined at the IPO price.  Ex. B ¶¶ 39, 43-44;

Ex. C § 7.3(a)-(d).  The majority received shares of stock in MetLife's new holding company,

MetLife, Inc., held in a trust for their benefit.  Ex. B ¶ 43; *see* Ex. C § 7.3.  The trust was

designed to minimize the administrative costs associated with having millions of shareholders.

---

[2]   *See* N.Y. Ins. Law § 7312(r) ("the rights of all policyholders … shall be as specified in their
policies or contracts … except for the elimination of the right to vote"); *id.* § 7312(m) ("the
reorganized insurer shall be deemed a continuation of the corporate existence of the mutual
life insurer … and … shall be deemed to have assumed all of the obligations and liabilities
of the mutual life insurer … other than obligations and liabilities with respect to the
policyholders' membership interest eliminated by the plan of reorganization").

Ex. D ¶¶ 43-44.  Beginning shortly after the demutualization and continuing to the present day, these policyholders were able to sell their shares from the trust at the market price free of commissions.  Ex. B ¶ 70; Ex. D ¶ 51.  Beginning one year after the demutualization, policyholders could elect to withdraw their shares from the trust and hold the shares directly (for example, through their own broker) like any other shareholder, or could leave the shares in the trust so that they could take advantage of the commission-free sale program in the future.  Ex. B ¶ 72; Ex. D ¶ 51.

Those policyholders who retained their shares (either in the trust or separately) benefited greatly, as MetLife, Inc.'s stock price rose to $70 per share in 2007, and is trading even now at over $35 per share, and MetLife, Inc. has paid substantial cash dividends on the stock every year. *See In re MetLife Demut. Litig.*, 624 F. Supp. 2d 232, 264 (E.D.N.Y. 2009) ("From the available facts, it also appears that the demutualization process has been an overall boon to policyholders.").  These cash dividends on the stock are in addition to the policy dividends that MetLife continues to pay to class members who have retained their insurance policies.  But even those who sold their stock when it was trading at a lower price, or who took cash or policy credits in lieu of their allocated shares at the IPO price of $14.25 per share, benefited from the transaction, because they received tangible value in exchange for their illiquid membership interests—value that could not be realized in the absence of demutualization.  *See* Ex. C, Art. I.

The Plan's method of allocating shares among policyholders followed established precedent.  Every eligible policyholder received a "fixed component," consisting of an allocation of 10 shares, which accounted for about 16% of the total consideration.  Ex. D ¶ 122; Ex. C § 7.1(b)(i).  The Plan allocated the remaining 84% according to an actuarial formula, in

proportion to each participating policy's actuarial contribution to surplus.  Ex. D ¶ 124; Ex. C §§ 7.1(b)(ii), 7.2(a)(i).[3]

Further, like all other major life insurer demutualizations, MetLife's Plan established a dividend-protection mechanism known as a "closed block."  Ex. C §§ 3.1(a), 8.1.  A closed block is an accounting mechanism designed to protect reasonable policyholder dividend expectations by "provid[ing] for continuation of current payable dividend scales, if the experience underlying such scales continues and for appropriate adjustments in such scales if the experience changes." N.Y. Ins. Law § 7312(d)(5)(B); *see* Ex. D ¶¶ 142-144; Ex. C § 8.1(a).  The closed block includes, substantially, the individual policies that had dividends payable at the time of the demutualization.  Essentially, assets are allocated to the closed block that have been determined to be sufficient to pay benefits and to continue the current dividend scale, assuming that the experience underlying that dividend scale remains the same.  Ex. D ¶ 142.  Assets allocated to the closed block can only be used for the benefits, dividends and certain expenses of the policyholders included in the closed block, and they can never inure to the benefit of the company's stockholders.  Ex. C § 8.2(g).

**B.  The Lawsuits.**

Given the large amounts of money that are distributed in demutualizations, it should not be surprising that they tend to attract class-action lawsuits.  In keeping with the usual pattern, a

---

[3]   "Actuarial contribution to surplus" is an estimate of the policy's past contribution and projected present value of future contribution to the company's retained profits over the entire expected life of the policy, under certain assumptions.  Ex. B ¶¶ 54, 57.  As defined in the Plan, a "participating" policy is one that either (i) contains an express provision for policy dividends or (ii) does not expressly state that it is nonparticipating.  Ex. C Art. II, *Participating Policy*.  Policyholders who held only nonparticipating policies, or whose participating policies had zero or negative estimated actuarial contribution to surplus, received only a fixed component of ten shares and no variable component.  Ex. D ¶ 124.

number of policyholders filed suits against MetLife, MetLife, Inc., their officers and directors, their bankers and the Superintendent of Insurance in connection with MetLife's demutualization. Of the sixteen suits filed between 2000 and 2004, only the above-captioned *Fiala* and *In re MetLife* cases survive; the others were either consolidated into them, dismissed at the pleading stage, or voluntarily discontinued.  *See* Micarelli Aff. ¶ 3.  A seventeenth suit, a purported derivative case, was filed shortly before the parties settled the above-captioned cases.  *Waldman v. Benmosche*, Index No. 650643/2009 (N.Y. Sup. Ct. N.Y. County, filed Aug. 26, 2009); *see* Micarelli Aff. ¶ 4.

   Although *Fiala* is one of the two surviving actions, very little is left of it.  In a decision dated February 21, 2003, the state Court dismissed *Fiala* and *Shah* (another case that had yet to be consolidated into *Fiala*) in their entirety.  *Shah v. Metro. Life Ins. Co.*, 2003 N.Y. Slip Op. 50591(U), 2003 WL 728869 (Sup. Ct. N.Y. County Feb. 21, 2003), *modified sub nom. Fiala v. Metro. Life Ins. Co.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (1st Dep't 2004).  On appeal, the Appellate Division upheld the elimination of *all* claims against MetLife's financial advisors, *all* non-Article 78 claims against the Superintendent,[4] *all* breach of fiduciary duty claims, *all* breach of contract claims, *all* claims for violation of § 7312, and *nearly all* claims for fraud.  *Fiala*, 6 A.D.3d at 321-23, 776 N.Y.S.2d at 31-33.  The Appellate Division reinstated just two narrow

---

[4]   The *Shah* plaintiffs were granted leave to replead part of their case as a judicial review proceeding against the Superintendent of Insurance under CPLR Article 78.  *Shah*, 2003 WL 728869, at *18.  After remand from the Appellate Division, the repleaded Article 78 claims from *Shah* were consolidated into an already pending Article 78 proceeding, and *Shah* was otherwise consolidated into *Fiala*.  *See* Ex. CC (stipulation and order of consolidation).  The Article 78 proceeding was ultimately dismissed as mooted by the consummation of the Plan of Reorganization.  *Matter of Meloy v. Levin*, Index No. 108414/2000 (Sup. Ct. N.Y. County Nov. 10, 2005) (available on SCROLL) (order dismissing amended petition), *appeal dismissed*, 2007 N.Y. Slip Op. 65230(U), 2007 WL 1855762 (App. Div. 1st Dep't Mar. 15, 2007).

claims:  a claim under Insurance Law § 7312 based on the alleged allocation of excessive shares to a large group policyholder, and a fraud claim based on nondisclosure of an alleged plan by the defendants to buy back MetLife, Inc. stock after the IPO.  *Id.*  After remand, plaintiffs were allowed to recast their claim for failure to disclose the alleged share buyback plan as a § 7312 claim.  *See Fiala v. Metro. Life Ins. Co.*, 2005 N.Y. Slip Op. 30069(U), at *6-8 (Sup. Ct. N.Y. County Oct. 11, 2005).  *See generally* Ex. G (*Fiala* Revised Third Consolidated Amended Complaint).  Plaintiffs later voluntarily discontinued their "excessive allocation" claim for lack of evidence, Ex. H (stipulation and order), leaving only their "buyback" claim.  Defendants filed a motion for summary judgment as to that remaining claim, which was pending at the time the parties agreed to the proposed settlement.  Finnegan Aff. ¶ 11.

The *In re MetLife* action includes several more claims, including claims alleging incomplete disclosure of the basis for determining the 10-share minimum size of consideration paid to policyholders in the demutualization, misrepresentation or incomplete disclosure about the effect of the closed block on policyholder dividends, misrepresentation of the reasons for choosing "Method 4" under New York Insurance Law § 7312(d)(4), and incomplete disclosure of the role and amount of actuarial contribution to surplus.  *See generally* Ex. I (*In re MetLife* Second Consolidated Amended Complaint).  Additional claims about the policyholder trust were deleted by amendment.  Ex. J (stipulation and order).

**C.  Class Certification and Notice.**

In *Fiala*, a class was certified as to the Section 7312 cause of action only and denied as to the common-law fraud cause of action.  *Fiala v. Metro. Life Ins. Co.*, 2006 N.Y. Slip Op. 30068(U), 2006 WL 6190175 (Sup. Ct. N.Y. County May 2, 2006), *aff'd as modified*, 52 A.D. 3d 251, 859 N.Y.S.2d 426 (1st Dep't 2008) (deleting plaintiff Smilow as a class representative).  The class in *Fiala* consists of

8

> [a]ll Eligible Policyholders of MetLife, who owned and had in
> force, as of September 28, 1999, life insurance policies, annuity
> contracts, or accident and health insurance policies issued by
> MetLife, or other certificates of interest identified in the Plan.  The
> Class will exclude therefrom the defendants, their officers,
> directors, subsidiaries, affiliates and legal representatives, and
> those who request exclusion from the Class within a specified time
> after notice to be set forth in a further order of this Court.

Ex. K (order dated Mar. 12, 2008).  In other words, the class consists of all eligible policyholders

in the demutualization, except those who opted out and certain persons associated with

defendants.

In *In re MetLife*, a class was certified as to all claims.  The class in that case consists of

> all persons who were participating Metropolitan Life Insurance Co.
> ("MetLife Co.") policyholders on or about September 28, 1999, for
> whom MetLife Co. calculated a positive actuarial equity share and
> [] whose rights as participating policyholders were exchanged for
> shares of stock in MetLife Co., pursuant to defendants' plan of
> demutualization [], excluding defendants, their officers, directors,
> subsidiaries and affiliates[.]

*In re MetLife Demut. Litig.,* 229 F.R.D. 369, 372 (E.D.N.Y. 2005).  Subsequently, the Court

interpreted the class to include those who received cash or policy credits in addition to those who

received MetLife, Inc. stock.  *In re MetLife Demut. Litig.,* 2006 U.S. Dist. LEXIS 97633 *26

(E.D.N.Y. Aug. 29, 2006).  Thus, the *In re MetLife* class consists, in effect, of all policyholders

who received more than 10 shares of stock, or more than $142.50 in cash or policy credits, in the

demutualization (except those who opted out and certain persons associated with defendants).

In *Fiala,* the Court, after considering the substantial expense of individually notifying the

class members of the pending suit, ordered notice of pendency of the action by publication in

*The New York Times,* the *Wall Street Journal*, and the *New York Post*, once per week for three

weeks, and notice by mail to a random sample of 500,000 class members.  *Fiala v. Metro. Life

Ins. Co.*, 2007 N.Y. Slip Op. 51797(U), 2007 WL 2772230 (Sup. Ct. N.Y. County Aug. 28,

2007).  All class members had at least 45 days to request exclusion from the class.  Notice was given in accordance with the court's instructions.  Ex. M (declarations from Gilardi & Co., LLC confirming class notice).

In *In re MetLife*, pursuant to the Court's order, individual notice was mailed to approximately 6.7 million members of the class with known addresses that could practicably be obtained through reasonable efforts,  in addition to publication notice, and the establishment of a toll-free number and a dedicated website.  Ex. L ¶ 5 (Aug. 2, 2008 order directing class notice); Ex. N (declaration from Gilardi & Co., LLC).  We understand that nearly 13,000 class members submitted timely exclusions in *In re MetLife*¸ and 256 class members submitted timely exclusions in *Fiala*.

### D.   Discovery, and Preparation for Trial

Over the course of nearly 8 years, the parties engaged in extensive discovery.  Over 50 depositions were taken in the two actions, and hundreds of thousands of pages of documents were produced.  Finnegan Aff. ¶ 7.  Eventually, over sixty thousand pages were designated as trial exhibits in *In re MetLife*.  *Id.*  The parties in both cases retained experts, who were prepared to testify on issues involved in the case.  In *In re MetLife*, Judge Weinstein bifurcated the trial into liability and damages phases, *see* Ex. T (Oct. 15, 2009 order), and trial on the liability phase was due to begin on November 2, 2009.

### E.   Settlement Negotiations

In the over nine years since the initial complaints in the two above-captioned actions were filed in 2000, there have been, from time to time, discussions between MetLife and plaintiffs' counsel in both *In re MetLife* and *Fiala* regarding the possibility of settling one or both cases.  These discussions, by the parties alone and with the Court, did not lead to any agreement on settlement.  *See* Finnegan Aff. ¶¶ 8-9.

On October 16, 2009, Judge Weinstein appointed Richard J. Davis, Esq., a prominent member of the law firm of Weil, Gotshal & Manges LLP, as a Special Master to facilitate settlement.  Over the next several weeks, Mr. Davis acted as mediator between the parties, intensively discussing settlement with the representatives of each of them.  *See* Finnegan Aff. ¶ 9.  As the November 2, 2009 trial date in *In re MetLife* approached, it appeared that no settlement would be reached.  Jury selection was completed on Friday, October 30, and final preparations were underway to commence trial on Monday, November 2.  *See id.* ¶ 10.  On the evening of Saturday, October 31, 2009, after weeks of arm's length negotiations, the parties reached agreement, through Mr. Davis, on the basic terms of the settlement, including amount and structure.  Mr. Davis put the terms of the parties' agreement in principle on the record before Judge Weinstein on the morning of Monday, November 2, and recommended approval of the settlement.  *See id.*  At Judge Weinstein's request, the parties finalized a Stipulation of Settlement by Thursday, November 5, 2009, and then submitted it to both the state and federal courts for approval.  *See id.*; Micarelli Aff. Ex. A.

## F.   Terms of the Settlement.

The proposed settlement provides for a total payment of $50 million to the *In re MetLife* and *Fiala* classes combined.  The parties have agreed that this payment is entirely attributable to compensatory money damages.

The payment will be made as follows:  (i) $2,500,000 will be paid in cash as a *cy pres* payment to a health-based or other not-for-profit organization or organizations; (ii) the reasonable attorneys' fees and litigation expenses of the classes in the above-captioned actions, as determined by the state and federal courts, will be paid from the settlement amount; and (iii) the remainder will be allocated in assets to the closed block established by the Plan of Reorganization.  *See* Micarelli Aff. Ex. A ¶¶ 15-20.  In exchange for these payments, the

Stipulation of Settlement releases all claims of the plaintiffs and class members asserted in the two above-captioned cases, as well as any other claims related to the demutualization and related transactions, as further described in the Stipulation of Settlement. *Id.* ¶¶ 21-22.

### G.    Notice of Settlement.

By parallel orders issued by Judge Weinstein on November 4 and 6, 2009, and Justice Kornreich on November 5 and 6, 2009, the two Courts approved a form of publication notice, and directed notice by publication four times (twice per week for two weeks) in the *New York Times*, the *Wall Street Journal*, the *New York Law Journal* and *USA Today*. *In re MetLife Demut. Litig.*, --- F.R.D. ---, 2009 WL 3633898, at *3 (E.D.N.Y. Nov. 4, 2009); Ex. O at 2 (Nov. 5, 2009 *Fiala* Order); Ex. P (Nov. 6, 2009 *In re MetLife* Order, Doc. 540); Ex. Q (Nov. 6, 2009 *Fiala* Order). The orders specified that the Courts would hold a joint hearing at the U.S. Courthouse in Brooklyn on December 30, 2009, and they set a December 24, 2009 deadline for the receipt of written objections. *In re MetLife Demut. Litig.*, 2009 WL 3633898, at *2; Ex. O at 3. Notice was published as required, on November 12, 13, 17 and 19, 2009. *See* Finnegan Aff. ¶ 2. Notice also was given to the Superintendent of Insurance. *Id.* ¶ 3. A copy of the Notice and Stipulation of Settlement were made available on the "Notices" page of the District Court's website, which is reachable by a link from the Court's home page, and the address of which was included in the published notice. *Id.* ¶ 4.

### H.    Objections.

To defendants' knowledge, only five objections have been submitted on behalf of six class members, by (1) Steven Waldman, (2) John J. Pentz, Jr. and Thomas Sterrett Bell, (3) Robert Gould, (4) Christopher J. Mueller, and (5) Lawrence Kuczynski. It appears that some of these objections may have been received by the Court after December 24, 2009, and are therefore untimely. Some of them may have been submitted only to one Court and not the other.

As set forth below, defendants respectfully submit that none of the objections warrants denial of approval of the settlement.

## ARGUMENT

### I.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, ADEQUATE AND IN THE BEST INTERESTS OF THE CLASS.

Under federal law, the settlement of the claims of a certified class may be approved, and the class members bound by the settlement, upon the court's finding that the proposed settlement is "fair, reasonable and adequate."  Fed. R. Civ. P. 23(e)(2).  New York courts likewise have held that approval of a class action settlement requires the Court to determine whether the proposed settlement is "fair, reasonable, and adequate."  *Matter of Colt Indus. Shareholder Litig.*, 77 N.Y.2d 185, 197, 566 N.E.2d 1160, 1167 (1991); *see also* CPLR 908 (requiring court approval but not specifying a standard).  Both federal and New York courts have held that, in making this determination, the Court should consider both the process by which the settlement agreement was negotiated and the substantive fairness of the agreed-upon terms in light of the circumstances of the litigation.  *See, e.g., D'Amato v. Deutsche Bank,* 236 F.3d 78, 85-86 (2d Cir. 2001); *Farinella v. Paypal, Inc.,* 611 F. Supp. 2d 250, 264-68 (E.D.N.Y. 2009); *Matter of Colt Indus. Shareholder Litig.*, 155 A.D.2d 154, 160, 553 N.Y.S.2d 138, 141 (1st Dep't 1990), *aff'd as modified*, 77 N.Y.2d 185, 566 N.E.2d 1160 (1991).

In considering whether a settlement is fair, reasonable and adequate, the factors that a federal court should take into account include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement

> fund to a possible recovery in light of all the attendant risks of
> litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) (citations omitted); *see also, e.g., Wal-mart Stores Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005).  In addition, the amount of class counsel's fees may be a relevant factor.  *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 134 (2d Cir. 2008); *In re MetLife Demut. Litig.*, --- F.R.D. ---, 2009 WL 3633898, at *4 (E.D.N.Y. Nov. 4, 2009).

In applying these factors, "not every factor must weigh in favor of the settlement, but rather the court should consider the totality of these factors in light of the particular circumstances." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) (internal quotation marks omitted).  Moreover, "in applying these factors, the court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a 'mini-trial' of the merits of the action." *Id.* at 575-76.  Rather, courts accord "great weight … to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) (internal quotation marks omitted).

New York state courts apply a similar standard in determining whether a settlement is fair, reasonable, and adequate.  Factors to be considered include "the likelihood of success, the extent of support from the parties, the judgment of counsel, the presence of bargaining in good faith, and the nature of the issues of law and fact." *Colt*, 155 A.D.2d at 160, 553 N.Y.S.2d at 141.  In evaluating these factors, New York courts "take into account the risks and costs of continued litigation and balance those risks and costs against the benefits to be derived from the settlement." *Conolly v. Universal Am. Fin. Corp.*, 21 Misc. 3d 1109(A), 2008 N.Y. Slip Op.

52018(U), 2008 WL 4514098, at *8 (Sup. Ct. Westchester County Oct. 8, 2008).  The relevant factors all weigh in favor of approval.

**A.   Plaintiffs Have Virtually No Chance of Success in Proving Liability or Damages.**

The "risks of establishing liability" and "risks of establishing damages" are among the key factors that must be considered in evaluating a settlement.  *Grinnell*, 495 F. 2d at 463.  Indeed, "[t]he most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement."  *Id.* at 455; *see also In re MetLife Demut. Litig.*, 2009 WL 3633898, at *3 (Nov. 4, 2009 order).  In making this evaluation, "the Court's primary concern is with the substantive terms of the settlement and how they compare to the likely result of a trial."  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (internal quotation marks omitted).  New York courts, as well, have emphasized the "likelihood of success on the merits" as a key factor in evaluating the fairness of a settlement.  *Colt*, 155 A.D.2d at 160*; accord Connolly*, 2008 N.Y. Slip Op. 52018(U), at *8.

Both Courts have repeatedly warned plaintiffs of the weakness of their claims, almost from the beginning of the cases.  In its order denying defendants' motion to dismiss the original complaint, Judge Platt of the federal court made clear that the only remedy available under Securities Act Section 12(a)(2) for plaintiffs who retained their stock was rescission in exchange for the purchase price, *In re MetLife Demut. Litig.*, 156 F. Supp. 2d 254, 269 (E.D.N.Y. 2001)— a remedy that became worthless to most of the class once the stock price soared far above what even plaintiffs said their interests had been worth.  In denying summary judgment, Judge Platt made clear that MetLife has "strong factual support for its argument that it conducted its demutualization properly" adding that "plaintiffs' theories appear increasingly desperate in light of the factual record accumulated so far," *In re MetLife Demut. Litig.*, 624 F. Supp. 2d 232, 264 (E.D.N.Y. 2009), and observed that "[i]t appears that the demutualization process has been an

15

overall boon to policyholders, at least insofar as those who took stock have seen the price of the stock rise appreciably and have also kept the benefits of their life insurance policies," *id.* Judge Weinstein, to whom the case was reassigned in October 2009, also perceived that the policyholders "benefit from the total operation," Ex. R at 29:3-4 (Oct. 13, 2009 Hr'g Tr.), and also noted that "[t]he defendants' evidence with respect to no fraud is very strong" and "[t]he defendants' view of no damages is very strong," *id.* at 13:14-16. And finally, in his opinion memorializing his October 13 ruling—which held admissible for all purposes the Superintendent's decision that found the Plan of Reorganization fair and equitable and the disclosures to policyholders adequate—Judge Weinstein observed that "this evidentiary ruling favoring defendants makes it almost impossible for plaintiffs to prove their case." *In re MetLife Demut. Litig.*, --- F.R.D. ---, 2009 WL 4110298 (E.D.N.Y. Nov. 24, 2009). The *Fiala* case was entirely dismissed at the outset, and only narrow portions were reinstated. *See generally, Shah v. Metro. Life Ins. Co.*, 2003 N.Y. Slip Op. 50591(U), 2003 WL 728869 (Sup. Ct. N.Y. County Feb. 21, 2003); *Fiala*, 6 A.D.3d at 321-23, 776 N.Y.S.2d at 31-33. *See also Shah v. Metropolitan Life Ins. Co.*, 2003 WL 728869 at *16 (N.Y. Sup. Ct. N.Y. County Feb. 21, 2003) (finding that named plaintiffs have no injuries, and "presumably benefited" from the demutualization).

Had the *In re MetLife* case gone to trial, it would have resulted in a verdict for defendants—if not judgment as a matter of law at the close of plaintiffs' case. Even in the unlikely event of a verdict for plaintiffs, defendants were prepared to post a supersedeas bond and appeal, and expect that they would have prevailed on the issues raised in their motions to dismiss or for summary judgment. The remnant of the *Fiala* case, as well, was likely to end in summary judgment or a verdict for defendants, as explained below.

1. **The Federal Plaintiffs Cannot Establish a Material Misrepresentation or Omission.**

Plaintiffs alleged a total of 26 misrepresentations and misleading omissions in the Second Amended Complaint, seven of which were removed by stipulation of the parties. Ex. I ¶¶ 55-56. The evidence at trial would have established that none of the remaining 19 allegations amount to an actionable misrepresentation or omission.

*First*, several of the alleged misrepresentations and omissions are tied to the fact that the Policyholder Information Booklets did not state the dollar amount of the total actuarial contribution to surplus, a figure that plaintiffs tie to the value of MetLife as a company or, alternatively, to something that the policyholders "owned" before demutualization. Ex. I ¶ 55(a), (e), (f), (g), (h), (i), (r); *id.* ¶ 56(a), (e), (f) (Complaint). Actuarial contribution, however, is not a fund held by the company for anyone's benefit; it is by definition an estimate of the past and actuarially expected *future* profit that the company will earn from a policy under certain assumptions. Ex. C § 7.2 (Plan of Reorganization). The figure is determined solely for the purpose of allocating consideration among policyholders, not for the purpose of valuing the company, the company's stock, or the dollar value of any particular policyholder's consideration. *See id.*; *see also* Actuarial Standards Board, Actuarial Standard of Practice No. 37, *Allocation of Policyholder Consideration in Mutual Life Insurance Company Demutualizations* § 3.2.4 (June 2000), *available at* http://www.actuarialstandardsboard.org/pdf/asops/asop037_070.pdf (last accessed Dec. 28, 2009). In other words, it is an intermediate step in a calculation, not a number having any significance in itself. The Superintendent of Insurance, who carefully reviewed and heavily marked up the disclosure materials, did not see any reason to require MetLife to disclose this technical and irrelevant number, and neither of the two prior New York demutualizations had done so.

Plaintiffs' own valuation expert has made clear that market value, rather than a value derived from actuarial contribution, is the best measure of the value of a company as a whole. Ex. S at 38:23-39:6.  Moreover, as a matter of law, policyholders did not "own" MetLife as a mutual company prior to demutualization.  Ex. T at 2 (Oct. 15, 2009 Order) ("The court will instruct the jury that, as a matter of law, prior to the demutualization policyholders were not the 'owners' of the mutual insurance company…"); Ex. R at 10:14-17, 18:22-19:1, 36:14-37:14 (Oct. 13, 2009 Hr'g Tr.) ("it will not be referred to as an ownership relationship.  They're entitled to some rights as policyholders under the contract, under the plan.").  Rather, as the Second Circuit recently held in the *In re MetLife* case itself, " 'in a mutual company … the relation between the policy-holder and the company [is] one of contract, measured by the terms of the policy.' "  *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 177 (2d Cir. 2009) (quoting *Uhlman v. N.Y. Life Ins. Co.,* 109 N.Y. 421, 429, 17 N.E. 363, 365 (1888)).  And, going from the aggregate level to the individual level, none of plaintiffs' experts has offered any evidence tying actuarial contribution to the value of any individual policyholder's membership interests.

In short, it would have been misleading to suggest to policyholders that, as plaintiffs contend, there was something significant about the dollar amount of actuarial contribution. Certainly, plaintiffs have no basis to prove that the absence of that number from the Booklets made MetLife's disclosures misleading or was material to policyholders' vote on the demutualization.  *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) ("[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

*Second*, plaintiffs allege that MetLife misrepresented the reasons that "Method 4" was chosen as the form of MetLife's demutualization, rather than "Method 2," which bases policyholder consideration on a complex formula of which actuarial contribution is one element. Compl. ¶ 56(g).  In considering this issue at the summary judgment stage, Judge Platt acknowledged that "there is clearly no absolute requirement to disclose any business plan considered alongside the disclosed plan, particularly where the facts show that consideration of the alternative plan was quickly discarded." *In re MetLife Demut. Litig.,* 624 F. Supp. 2d at 270. The Court also found that plaintiffs "ha[d] not established that MetLife's real reason for not pursing Method 2 was a desire to reduce the amount of equity in the IPO." *Id.*  And, as the Court indicated, "MetLife provides convincing evidence that Method 2 would not have worked and would have been untenable for a variety of reasons." *Id*.

*Third*, plaintiffs allege omissions related to the "fixed component," which refers to the minimum portion of the total compensation that was distributed to every policyholder, regardless of the type, quantity or profitability of his or her policies.  Plaintiffs allege that MetLife failed to disclose "the dollar value of the right to vote," and that MetLife failed to disclose that the amount of the fixed component was not tied to the dollar value of the right to vote.  Ex. I ¶ 55(b), (c), (d); *id.* ¶ 56(d) (Complaint).  However, nothing in the Booklets mailed to policyholders suggested that there was a connection between a determination of the value of voting rights and the size of the fixed component, nor do they suggest that the fixed component was based on an actuarial formula, nor do plaintiffs identify any reason that plaintiffs would have expected it to be.  Absent a specific duty to disclose particular information, omissions are actionable only "when the omitted information is required to make other information presented not materially false or misleading."  *See, e.g., Malhotra v. Equitable Life Assur. Soc'y*, 364 F. Supp. 2d 299, 307

(E.D.N.Y. 2005).  The Booklets say only that the fixed component was equal to 10 shares per policyholder, and plaintiffs do not dispute that that statement was accurate and complete.  Thus, plaintiffs cannot prove a material misrepresentation or omission.  And as Judge Platt pointed out, plaintiffs' basic premise that "the fixed component created a windfall to non-participating policyholders" is "unsupported by any facts."  *In re MetLife Demut. Litig.,* 624 F. Supp. 2d at 264.

Furthermore, even if plaintiffs could show the omissions were material, they could not prove reliance and transaction causation.  A majority of the policyholders who were eligible to vote on the demutualization received *more* shares, not less, as a result of the fixed component, Ex. S at 150:14-24; 151:14-24, and thus would have been, if anything, *more* inclined to vote in favor of the demutualization had they been told that the fixed component was worth much more than their voting rights in accordance with plaintiffs' complaint.  *See Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir. 1980) (presumption of reliance on material omissions may only be applied "where it is logical to do so").

*Fourth,* plaintiffs have also alleged misrepresentations that pertain to the closed block, and, relatedly, the effect of the demutualization on policy dividends.  Ex. I ¶ 55(j); *id.* ¶ 56(b)-(c) (Complaint).  Specifically, plaintiffs allege that MetLife falsely stated that dividend eligibility would be unaffected by the demutualization, and omitted that the closed block limited dividends to the assets in the closed block.  However, the Policyholder Information Booklets explained in plain terms that (i) the assets allocated to the closed block were expected to maintain the 1999 dividend scales; and (ii) if the assets in the closed block perform better than expected, the dividends paid will be more, and conversely, if the assets return less than expected, the dividends paid will be lower.  Ex. E at 45 (Booklet).  Plaintiffs' actuarial expert does not dispute that the

closed block was adequately funded to achieve these goals, Ex. U at 283:5-11; 287:16-23; 349:14-21, which are prescribed by New York law and actuarial standards of practice and were disclosed in the Booklets.  N.Y. Ins. Law § 7312(d)(5); *see also* Actuarial Standards Board, Actuarial Standard of Practice No. 33*, Actuarial Responsibilities with Respect to Closed Blocks in Mutual Life Insurance Company Conversions* (Jan. 1999)*, available at* http://www.actuarialstandardsboard.org/pdf/asops/asop033_065.pdf (last accessed Dec. 28, 2009)*.*  And the Superintendent of Insurance and his independent actuarial consultants, after careful study, also found that the closed block was adequately funded for these purposes.  Ex. D ¶ 161 (Superintendent's Opinion).  In any event, nothing in the Plan prevents MetLife from exercising its discretion to pay dividends on closed block policies from outside the closed block, so plaintiffs' allegation that the closed block limits dividends to the assets in the closed block is simply not true.  *See* Ex. C Art. VIII (Plan).

*Finally*, the remaining allegation relates to the undisputed fact that Credit Suisse First Boston was an underwriter of the initial public offering that accompanied the demutualization (the "IPO"), and its affiliate Credit Suisse Group also purchased shares in a private placement. Ex. I ¶ 55(q).  But, aside from conclusory allegations, plaintiffs have never developed a factual basis to support their claim that MetLife was planning to conduct this private placement at the time it mailed the booklets to policyholders in November 1999.  The evidence shows that the private placement was contemplated as a way to increase the IPO price for the benefit of policyholders.  Ex. V at 160:21-161:9.  The evidence also shows  that as soon as it was known Credit Suisse would be a buyer, Credit Suisse First Boston was excluded from any IPO pricing decisions, Ex. W at 104:23-105:9, and at the request of the New York Insurance Department, MetLife brought in an independent banking firm, Merrill Lynch, to offer an opinion on the

fairness of the transaction, Ex. D ¶ 101.  The Superintendent found, in his opinion approving the

Plan of Reorganization, that the proposal to conduct a private placement was a "response to a

change in the financial services sector of the capital markets" in early 2000, Ex. D ¶ 29; *see also*

*id.* ¶ 95, and that the private placement was "not materially disadvantageous to any of the

policyholders," *id.* ¶ 100.  There is absolutely no evidence that MetLife knew, and concealed,

that it would issue shares to a Credit Suisse affiliate, or that the private placement would have

been material to policyholders even if it had been a known fact.

### 2.  The Federal Plaintiffs Cannot Establish that Defendants Acted with an Intent to Deceive.

The *In re MetLife* plaintiffs cannot prevail on their Rule 10b-5 claims because they are

unable to prove, as they must, that the Company acted with an intent to deceive—that is, with

knowledge that their statements were false or misleading or with reckless disregard for the truth.

*See In re MetLife Demut. Litig.*, 2009 U.S. Dist. LEXIS 110519 at *39 (Nov. 24, 2009 order on

Admissibility of New York Insurance Superintendent Opinion) (quoting *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007); *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.

2001)).  The evidence all shows that MetLife believed the disclosures were complete and

accurate.

MetLife developed the Plan of Reorganization and the Policyholder Information Booklets

under the intense scrutiny of the Department of Insurance, who provided the necessary approval

only after reviewing and commenting on virtually every aspect of the transaction, including

several revisions of the Policyholder Information Booklets and other materials sent to

policyholders. *See generally In re MetLife Demut. Litig.*, 2009 U.S. Dist. LEXIS 110519 at *10-

23 (detailing the Insurance Departments "pivotal role" in the demutualization).  In its review, the

Insurance Department was assisted by a number of experienced professionals—including

actuaries, financial advisors, accountants and attorneys—all from highly regarded firms.  Ex. D ¶¶ 16-17.  The Insurance Department's review provided MetLife's Board with sound reasons to believe that the materials distributed were accurate, and thus negates any allegation of scienter. *In re MetLife Demut. Litig.*, 2009 U.S. Dist. LEXIS 110519 at *14 ("MetLife's Board and management relied on the Superintendents's review and expertise in assuring themselves that the demutualization was being conducted properly[.]").  In approving the demutualization, the Superintendent not only found that the Plan of Reorganization was "fair and equitable to policyholders," Ex. D ¶ 238, but explicitly found that the Policyholder Information Booklets "contained sufficient information about the proposed reorganization to enable the Eligible Policyholders to make an informed decision regarding the Plan and, for that reason, were approved by the Superintendent."  Ex. D ¶ 216.  And, as this Court held, in light of this fact it would be "almost impossible" for plaintiffs to prevail at trial.  *In re MetLife Demut. Litig.*, 2009 U.S. Dist. LEXIS 110519 at *4.

### 3.   The *Fiala* Plaintiffs Cannot Prove a Violation of New York Insurance Law Section 7312.

Because the Superintendent found that the demutualization was fair—and beneficial—to the policyholders, the *Fiala* plaintiffs attacking the demutualization face even greater problems in proving their claims.  The only remaining class claim in the *Fiala* suit is that MetLife violated New York Insurance Law Section 7312 by forming an undisclosed plan to buy back stock. Defendants pending motion for summary judgment with respect to this claim is likely to succeed, because the undisputed facts preclude any finding of liability on the part of the defendants.

Under Section 7312, the Superintendent is responsible for determining that the Plan is fair and equitable to policyholders, *see* N.Y. Ins. Law § 7312(j), and his decision cannot be challenged except by a proceeding under CPLR Article 78.  *Fiala v. Metropolitan Life Ins. Co.*, 6

A.D. 3d 320, 321, 776 N.Y.S.2d 29, 31 (1st Dep't 2004).  Thus, as the Appellate Division held, defendants are entitled to summary judgment if the Superintendent was aware of the alleged facts on which plaintiffs' claim rests.  *Id.* at 321.  In that situation, plaintiffs' suit would be an indirect attack on the Superintendent's decision that the demutualization complied with Section 7312, which can only be challenged under Article 78.

The evidence clearly shows that the Superintendent was aware that MetLife was likely to repurchase stock after the IPO.  For example, the Complaint singles out MetLife's 2000 Business Plan as the central evidence of the Company's plans to repurchase stock, Ex. G ¶ 41—indeed, at one point, the *Fiala* plaintiffs were contending that this Business Plan *was* the supposed secret stock buyback plan.  In fact, that Business Plan is among the documents that the Superintendent specifically mentions *in the text of his opinion approving the demutualization*, as a document that his advisors reviewed and relied upon in recommending approval of the demutualization.  Ex. D ¶ 131.  The Purchase and Sale Program Brochure, which was reviewed and revised by the Superintendent and his advisors, and distributed to many of the policyholders, also indicated that it was likely that the company would repurchase shares.  Ex. X.  In other words, the likelihood of share repurchases was no secret, least of all to the Superintendent, and it caused no concerns for him and his advisors about the fairness of the demutualization.  In light of this evidence alone, Defendants are entitled to summary judgment.

Defendants also have a strong defense that the business judgment rule prevents, as a matter of law, any finding of liability.  Contrary to what plaintiffs seem to believe, there is nothing inherently unfair about share repurchases, and it was up to the company's Board of Directors and management, not the courts or the plaintiffs, to determine if those repurchases were in the best interests of the company and its shareholders.  *See Linder Fund, Inc. v.*

*Waldbaum, Inc.*, 82 N.Y.2d 219, 224, 624 N.E.2d 160, 161-62 (1993).  Plaintiffs have never

offered any concrete evidence of bad faith or lack of due care that would overcome the business

judgment rule—they have only voiced disagreement with the decisions that the company

ultimately made, and have ignored the substantial business justifications supporting the

company's decisions.

### 4.   Neither the Federal Nor State Plaintiffs Would Be Able to Prove Damages, Because No Class Members Were Injured by the Demutualization

Another serious problem with plaintiffs' claims is that no viable explanation of how the

class was injured by the demutualization has been offered, while there is affirmative evidence

that establishes that the demutualization directly benefited the entire class.  For the federal

plaintiffs' Rule 10b-5 claim—and probably for the *Fiala* plaintiffs' Section 7312 claim as well—

the measure of damages is out-of-pocket loss.  *See, e.g., Panos v. Island Gem Enters. Ltd.*, 880 F.

Supp. 169, 176 (S.D.N.Y. 1995) (Rule 10b-5 damages); *see also, e.g., Lama Holding Co. v.

Smith Barney Inc.*, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373 (1996) ("The true measure of

damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or

what is known as the out-of-pocket rule.") (internal quotation marks omitted).  To prove that

they suffered an economic loss in the demutualization, plaintiffs would have to show that what

they held after the demutualization (stock, cash or policy credits) was worth less than what they

held before demutualization (membership interests).  *None* of the federal or state plaintiffs'

expert witnesses has ever attempted to set a value on membership interests.  The federal

plaintiffs' experts have simply tried to wish the problem away by assuming that membership

interests in the aggregate are equal to the value of the company, but they have no evidence of

that—on the contrary, it has long been recognized that such interests are essentially worthless.[5]

Nor has any of the experts offered any evidence whatsoever that dividends were reduced, in

actual practice, as a result of the closed block, or that the decision to repurchase shares caused

the demutualization to harm the policyholders.

Indeed, the *Fiala* plaintiffs' expert admitted at his deposition that class members were

better off as a result of the demutualization.[6]  Ex. Y at 81:7-20.  Both of the federal district

judges who have presided over this case have also observed that the evidence strongly suggests

that the demutualization was a benefit, not a detriment, to policyholders.  *In re MetLife Demut.*

*Litig.*, 624 F. Supp. 2d at 264; *Shah v. Metro. Life Ins. Co.*, 2003 WL 728869, at *16 (N.Y. Sup.

Ct. N.Y. County Feb. 21, 2003) (Cahn, J.).  Plaintiffs simply cannot prove an economic loss.

The problem is even greater with respect to the *In re MetLife* plaintiffs' Section 12(a)(2)

claim.  The remedy under Section 12(a)(2) is limited to rescission, meaning that class members

would be entitled to surrender their stock (or the sale price, if they sold it) and recover what they

paid for it, adjusted for interest and dividends.  15 U.S.C. § 77*l*(a)(2); *In re MetLife Demut.*

*Litig.*, 156 F. Supp. 2d at 271.  Because plaintiffs exchanged their membership interests for the

stock, and these no longer exist, they would be entitled to surrender the stock in exchange for the

---

[5]    In fact, because numerous courts have found that, as a matter of law, mutual company
membership interests are essentially worthless, plaintiffs' claims should have been resolved
at summary judgment.  *See, e.g.*, *Soc'y for Savs v. Bowers*, 349 U.S. 143, 150 (1955);
*Tancredi v. Metro. Life Ins. Co.,* 149 F. Supp. 2d 80, 87 (S.D.N.Y. 2001); *Grobe v. Erie
County Mut. Ins. Co.*, 39 A.D. 183, 186, 57 N.Y.S. 290, 292 (4th Dep't 1899), *aff'd on op.
below*, 169 N.Y. 613, 62 N.E. 1096 (1902).

[6]    Instead, plaintiffs' expert offered a theory of damages that had no connection to the fairness
of the demutualization or compliance with § 7312, but merely second-guessed a number of
decisions surrounding the IPO—decisions which, the evidence shows, the Board
painstakingly reviewed with its financial advisors in an effort to achieve the optimal result
for the policyholders.  In other words, the supposed damages theory is indistinguishable
from plaintiffs' attack on the Board's business judgment.

cash value of the membership interests, plus interest, less the amount of any income received.  *In re MetLife Demut. Litig.*, 624 F. Supp. 2d at 271; *Wigand v. Flo-Tek, Inc.*, 609 F.2d 1028, 1036 (2d Cir. 1979).  But even on plaintiffs' experts own speculative views, the value of membership interests was no more than $25.54 per share—and the stock is now trading above $35, with substantial stockholder dividends paid in the meantime, and at one time was trading as high as $70.  Because the investment in MetLife stock paid off for class members who chose to retain that stock or who sold when the market was up, the rescission remedy has no value for them.

### 5.    Other Defenses Also Would Bar Class Members' Recovery.

Defendants also have other substantial defenses to liability and damages, many of which were set out at length in their motions to dismiss and for summary judgment.  To cite just one example, defendants' argument that the McCarran-Ferguson Act bars the application of federal securities laws to the distribution of compensation to policyholders in a demutualization, which Judge Platt rejected in 2001, *see In re MetLife Demut. Litig.,* 156 F. Supp. 2d 254, 261-64 (E.D.N.Y. 2001), remains open to defendants on appeal, and if successful would wipe out all the *In re MetLife* plaintiffs' claims.

Because a fairness hearing on a class settlement is not meant to be an adjudication of the merits, it is not necessary to rehearse all of the defenses here.  It suffices to say that these defenses, too, would pose substantial risks to any recovery by the class.

### B.   The Amount and Distribution of the Proposed Settlement is Fair, Reasonable and Adequate in Light of the Possible Recovery and the Risks of Litigation.

### 1.    The Amount of the Settlement Is Fair, Reasonable and Adequate.

It is clear from the above explanation that both the *In re MetLife* and *Fiala* plaintiffs would be unable to prove liability or damages.  To avoid the expense and distraction resulting from a trial, appeal, and possible retrial in two separate cases, and to eliminate the risk (however

minimal) of a substantial verdict for the class, defendants have agreed to pay $50 million to settle the case.  But under the circumstances, *any* settlement, no matter how small, would be fair.  As the Second Circuit has held, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Grinell*, 495 F.2d at 455 n.2; *see also Telik,* 576 F. Supp. 2d at 580 ("given the problems with the case, almost any amount could be deemed reasonable"); *Conolly*, 2008 N.Y. Slip. Op. 52018(U), at *7-9 (approving settlement that provided for modification of corporate governance provisions and no payment of money to plaintiffs, because "there is little, or no, likelihood that Plaintiffs would succeed").

When considered in light of the weaknesses in plaintiffs' case, a recovery of $50 million is more than reasonable.  The plaintiffs face insurmountable obstacles in proving nearly every element of their claims—including misrepresentation or misleading omission, materiality, scienter, and even reliance on the federal side, and unfairness outside the purview of the business judgment rule and the Superintendent's decision on the State side.  Even more important, they cannot prove any damages because the class members demonstrably benefited from the demutualization.  The state-law claims are barred because of required deference to both the Superintendent's actions and the judgment of the Board of Directors, and there too plaintiffs have failed to show that they were injured.  In this light, a total settlement of $50 million is very reasonable.  *See In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 150-51 (2d Cir. 1987) (approving "essentially a payment of nuisance value" where plaintiffs faced "many factual and legal difficulties"); *Telik*, 576 F. Supp. 2d at 580 (similar); *Conolly*, 2008 N.Y. Slip Op. 52018(U), at *10-11 (approving settlement involving no money payment).

### 2.   The Manner of Payment Is Fair, Reasonable and Adequate.

Courts have broad discretion in approving plans for the distribution of settlement funds: to be found "fair and reasonable," the plan for distribution  "need have only a reasonable, rational basis, when recommended "by experienced and competent class counsel."  *Global Crossing,* 225 F.R.D. at 462; *In re Nasdaq Market-Makers Antitrust Litig.*, 2000 WL 37992, at *2 (S.D.N.Y. Jan. 18, 2000) (same); *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) (same).  The distribution plan in the Stipulation of Settlement—consisting of a substantial allocation of assets to the closed block, plus a smaller *cy pres* payment—easily meets this requirement.

### a.   Allocating Assets to the Closed Block Delivers More Value to Class Members Than a Direct Cash Payment.

Here, the settlement delivers substantial cash value to class members through an allocation to the closed block worth at least $32.5 million, or even more if class counsel's $15 million fee request is reduced by the state or federal court.  That money ultimately will go directly to members of the state and federal classes.  That is true because the money in the closed block can *only* be used to pay dividends and benefits on policies in the closed block—and the only policies in the closed block are policies that were in force on the record date of the demutualization, whose holders therefore fall within the class definition.  Harwood Decl. ¶ 6.[7]

Courts have approved "fluid recoveries" of this type, which do not call for direct calculation and distribution of precise recoveries to the class members, as a fair means of delivering value to class members without undue administrative costs.  *See, e.g., Schwab v. Philip Morris USA, Inc.*, 2005 WL 3032556, at *4 (E.D.N.Y. Nov. 14, 2005).  The existence of

---

[7]    A negligible portion of this amount may incidentally benefit those who opted out or were otherwise excluded from the class.

the closed block within MetLife creates a unique opportunity for the Company to distribute settlement funds directly to the majority of class members while incurring almost no incremental administrative costs, as the process of investing closed block funds and determining closed block dividends is one that MetLife already carries out as part of its regular business operations, and adding approximately $32.5 to $47.5 million to the closed block will not alter the process.  The Plan requires that MetLife manage dividend payments from the closed block in an equitable manner, subject to monitoring by the New York Insurance Department.  This assures that the assets added to the closed block by the settlement, and the income earned from investment of those assets, will reach millions of the class members.  *See* Harwood Decl. ¶ 6.

Given the size of the class—about 11 million members in the aggregate—the cost of calculating, printing and mailing individual checks to class members would run to the millions of dollars, and would eat up a substantial amount of the settlement fund.  Even assuming optimistically that the administrative cost of preparing and mailing about 11 million checks, including postage, material and labor costs, would be only $1.00 per class member, the costs of administering the settlement payout would deplete as much as one-third of the settlement funds remaining after payment of fees and expenses of class counsel.  The availability of the closed block thus means that more of the settlement fund will reach class members through adding funds to the closed block than could be delivered by writing checks.

Moreover, if individual checks were mailed as described, each class member could be left with a payment of less than $2.00.  Courts have recognized that payments in such small amounts can create "excessive and unnecessary expenses" that are not "in the overall interests of the class as a whole." *See Global Crossing*, 225 F.R.D. at 463 ("settlements that distribute checks for less than $10 require disproportionately more follow-up, have a disproportionately high number of

uncashed checks, require more checks to be reissued, and often involve second or third

distributions of settlement funds").

>    **b.    The *Cy Pres* Settlement Payment Is an Appropriate Way to Deliver the Small Portion of the Settlement Proceeds Attributable to Non-Closed-Block Class Members.**

In addition to allocating funds to the closed block, the settlement also includes a *cy pres*

settlement payment to a health-based nonprofit organization in lieu of a direct payment to the

non-closed-block class members.  Because these class members are not part of the closed block,

a payment to them through increased closed-block dividends is not possible.  Courts have

recognized that a *cy pres* payment, as an adjunct to a payment by other means to some members

of the class, is appropriate where the amount to be distributed to the remaining class members is

small relative to the administrative costs of a direct distribution.  *See In re Holocaust Victim*

*Assets Litig.,* 311 F. Supp. 2d 407 (E.D.N.Y. 2004), *aff'd*, 424 F.3d 158 (2d Cir. 2005); *In re*

*"Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1403 (E.D.N.Y. 1985), *aff'd*, 818 F.2d

179, 181-82 (2d Cir. 1987); *W. Va. v. Chas. Pfizer & Co.,* 314 F. Supp. 710 (S.D.N.Y. 1970),

*aff'd*, 440 F.2d 1079 (2d Cir. 1971); *Klein v. Robert's American Gourmet Food, Inc.*, 28 A.D.3d

63, 73-74, 808 N.Y.S.2d 766, 775 (2d Dept. 2006).

The criteria for a *cy pres* payment are clearly satisfied here, as the non-closed-block

portion of the settlement fund is only $2.5 million, and would have to be distributed among

millions of policyholders.  The administrative cost of direct payments would unreasonably

deplete the funds to be paid.  The administrative burden is aggravated by the fact that the non-

closed-block portion of the class includes former policyholders whose policies went out of force

after the demutualization.  MetLife does not maintain current addresses for the former

policyholders, and having to mail individual small checks to them would be even more

burdensome than a mailing to the current policyholders.

31

      **c.**    **The Division of the Settlement Amount Between Closed-Block and Non-Closed-Block Portions Is Reasonable.**

It also is fair and reasonable that a smaller amount of recovery is allocated to the non-closed-block policyholders than the closed-block policyholders.  A distribution plan need not benefit all class members equally. *Global Crossing*, 225 F.R.D. at 462 & n.14; *In re Enron Corp. Sec. Litig.*, 2008 WL 4178151, at *2 (S.D. Tex. Sept. 8, 2008).

As discussed above, an actual distribution to the non-closed-block policyholders, who cannot be reached through adding assets to the closed block, would carry far greater administrative costs than the allocation of assets to the closed block.  This alone justifies allocating a smaller amount to them.

Moreover, a distribution plan may consider relative strength and values of different categories of claims.  *See, e.g., Global Crossing*, 225 F.R.D. at 462 & n.14.  Considered as a group, the claims of the non-closed-block policyholders are even weaker on the merits than those of the closed-block policyholders.  The non-closed-block policyholders include (1) institutional (*i.e.,* group) policyholders, (2) individual holders of nonparticipating and other non-dividend-paying policies, and (3) former policyholders.  *First,* the institutional policyholders include large and sophisticated business entities—many of which are highly knowledgeable about insurance matters and employ teams of analysts to help administer their pension and insurance plans.  Plaintiffs would have a particularly difficult time showing that these policyholders were deceived by the alleged misrepresentations or omissions.  In fact, not a single one commenced a lawsuit challenging the demutualization, notwithstanding their generally greater level of sophistication and resources to finance a lawsuit.  *Second*, the nonparticipating policyholders are not even part of the federal class—in fact, the federal plaintiffs contend that nonparticipating policyholders received an unfair windfall as a result of the alleged misrepresentations and omissions.  And in

any event, holders of non-dividend-paying policies are not affected by plaintiffs' claim that the demutualization or the closed block adversely affected dividends. *Third*, the former policyholders also do not fully share in all of the plaintiffs' claims. The gravamen of the federal and state plaintiffs' claims is that policyholders' membership interests were extinguished for inadequate consideration. But membership interests vanish when a policy terminates, so the former policyholders—whose policies lapsed or otherwise went out of force within a few years after the demutualization—would not have kept those membership interests for long even if MetLife remained a mutual company. Moreover, former participating policyholders gave up any claims to future dividends, which the federal plaintiffs alleged might be unfairly reduced, once their policies were no longer in force.

For these reasons, it is well within the range of reasonable settlements to allocate less to the *cy pres* payment for non-closed-block class members than to the benefits for closed-block class members. Defendants note that the certified class representatives include members of both groups, *see* Finnegan Aff. ¶ 13, and presumably, they were able to look out for the interests of both the closed-block class members and the non-closed-block class members in negotiating the settlement.

## C.   The Remaining Relevant Factors Also Favor Approval of the Settlement.

The remaining factors identified in the case law also favor approval of the settlement.

*First,* the complexity, expense and likely duration of the litigation favor the settlement. The liability phase of the *In re MetLife* trial was projected to last several weeks; the parties' witness lists contemplated potential testimony from nearly forty witnesses, including four experts, and over sixty thousand pages of documents had been designated as exhibits. Micarelli Aff. ¶ 5. In the unlikely event that the plaintiffs prevailed in the liability phase, a damages phase of the trial would then follow. Ex. T (Oct. 15, 2009 bifurcation order). Regardless of the

33

outcome, an appeal would then be certain, possibly followed by a new trial in the event of a reversal.  Meanwhile, in the *Fiala* case, a summary judgment motion remained to be decided, which would likely be followed by an appeal (interlocutory or otherwise) regardless of outcome. If summary judgment was denied, there would then be a trial, which could rival the federal trial in length and complexity.  Again, there would be a likely appeal, possibly followed by a new trial.  Settlement avoids the substantial burdens and costs that the litigation would impose on the parties, the non-party witnesses, and the federal and state courts.

*Second*, the reaction of the class members also favors settlement.  Only six of the approximately 11 million class members have objected to the proposed settlement.  The substance of these objections is addressed below.

*Third*, the stage of the proceedings and the amount of discovery completed favors settlement.  After over nine years of litigation, the parties agreed to the proposed settlement as trial in the federal case was beginning, and when summary judgment after close of discovery in the *Fiala* case was pending.  Finnegan Aff. ¶ 11.  Over the near decade that these cases were pending, the parties engaged in thorough and exhaustive discovery.  Plaintiffs took over 50 depositions and obtained hundreds of thousands of pages in documents.  *Id.* ¶ 7.  Both plaintiffs and defendants retained experts who reviewed and opined on the merits of the case.  *Id.*  The parties briefed and argued a motion to dismiss, motions for summary judgment, for class certification, and others.  *See id.* ¶ 11.[8]  The federal court made critical evidentiary rulings in

---

[8]     *See, e.g., In re MetLife Demut. Litig.,* 156 F. Supp. 2d 254 (E.D.N.Y. 2001) (denying defendants' motion to dismiss); *Shah v. Metro. Life Ins. Co.*, 2003 N.Y. Slip Op. 50591(U), 2003 WL 728869 (N.Y. Sup. Ct. N.Y. County Feb. 21, 2003) (granting defendants' motion to dismiss), *modified sub nom. Fiala v. Mtro. Life Ins. Co.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (1st Dep't 2004), *In re MetLife Demut. Litig.,* 322 F. Supp. 2d. 267 (E.D.N.Y. 2004) (denying Defendants' motion to dismiss second claim); *In re MetLife Demut. Litig.,* 229
(continued)

response to the parties' motions in limine filed in the weeks before trial, and these served to

clarify the parties' relative likelihood of success at trial. *See*, *e.g.,* Ex. T (Oct. 15, 2009 Order).

Because the parties were at an advanced stage in the case, and fully prepared for trial, this factor

clearly favors approval of the settlement.  *See*, *e.g., Walmart Stores, Inc. v. Visa U.S.A., Inc.*, 396

F.3d 96, 118 (2d Cir. 2005).

     *Fourth,* the risks of maintaining the class action through the trial favor settlement.  As

Judge Weinstein noted, there were possible concerns about the ability of the class representatives

to try the damages phase of the case, in the event that the damages phase terminated in favor of

the class.  Ex. R at 4:19-5:18.  Additionally, given the unique character of policyholders'

membership interests (which are illiquid and unmarketable), the complexity of the application of

the securities laws' damages measure at the individual class member level raised a substantial

risk that the federal court would find the *In re MetLife* case unmanageable as a class action at the

damages phase.  *See* Fed. R. Civ. P. 23(b)(3)(D).  As a result, this factor also favors approval of

the settlement.

     *Fifth*, the ability of the defendants to withstand a greater judgment is not relevant under

these circumstances.  Courts have recognized that the defendant's ability to pay is much less

important than the other *Grinell* factors.  *See, e.g., Global Crossing*, 225 F.R.D. at 460; *Telik*,

---

    F.R.D. 369 (E.D.N.Y. 2005) (granting plaintiffs' motion for class certification); *Fiala v. Metro. Life Ins. Co.*, 2006 N.Y. Slip Op. 30068(U), 2006 WL 6190175 (N.Y. Sup. Ct. N.Y. County May 2, 2006) (granting in part and denying in part plaintiffs' motion for class certification), *aff'd as modified*, 52 A.D. 3d 251, 859 N.Y.S.2d 426 (1st Dep't 2008) (deleting plaintiff Smilow as a class representative); *In re MetLife Demut. Litig.,* 2006 WL 2349998(E.D.N.Y. Aug. 7, 2006) (denying *In re MetLife* plaintiffs' motion to enjoin the *Fiala* action); *In re MetLife Demut. Litig.,* 2006 U.S. Dist. LEXIS 97633 (E.D.N.Y. Aug. 29, 2006) (denying defendants' motion for a determination regarding the definition of the class); *In re MetLife Demut. Litig.,* 2007 WL 1395560 (E.D.N.Y. May 9, 2007) (denying

(continued)

576 F. Supp. 2d at 580.  Simply put, "the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *Global Crossing*, 225 F.R.D. at 460.  MetLife is a large and strong company, and the settlement was not driven by any concern about MetLife's ability to pay.  Under these circumstances, ability to pay is not a factor in the settlement, and does not weigh either for or against approval.  *See Telik*, 576 F. Supp. 2d at 580.

*Finally*, the amount of attorneys' fees is not a relevant factor.  The Stipulation of Settlement contains no agreement on a minimum or maximum of fees that may be paid to class counsel.  That amount will be determined independently by the federal and state courts, which could even award no fees if they believe it appropriate.  Accordingly, the reasonableness of the fees requested by plaintiffs has no bearing, one way or the other, on the fairness of the settlement itself.  Defendants have addressed the plaintiffs' fee applications in a separate brief filed concurrently with this brief.

## II.  NOTICE OF THE SETTLEMENT WAS PROPER

In accordance with the two Courts' orders, notice of the settlement was given to the Superintendent of Insurance and was also given to the class members by publication, four times each, in four widely read newspapers.  *See* Finnegan Aff. ¶ 2.  It was neither necessary nor appropriate to give wider notice.

As for the *In re MetLife* action, nothing in the Federal Rules requires individual notice of a settlement reached after notice of pendency was previously mailed.  Rule 23(c)(2)(B) requires individual notice once a class is certified, but Rule 23(e)(1) requires only that the court direct

---

defendants' motion to reconsider class certification); *In re MetLife Demut. Litig.,* 624 F. Supp. 2d 232 (E.D.N.Y. 2009) (denying parties' motions for summary judgment).

notice of a subsequent settlement "in a reasonable manner."  As the Second Circuit has held in

*Handschu v. Special Services Div.*, 787 F.2d 828 (2d Cir. 1986), "the district court has virtually

complete discretion as to the manner of giving notice to class members."  *Id.* at 833.  Thus,

notice by publication alone has been repeatedly upheld where, as here, individual notice would

be burdensome or expensive.  *Handschu*, 787 F.2d at 832-33; *W. Va. v. Chas. Pfizer & Co.*, 440

F.2d 1079, 1090 (2d Cir. 1971); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 800 (E. &

S.D.N.Y. 1991); *Dolgow v. Anderson*, 43 F.R.D. 472, 497-498 (E.D.N.Y. 1968) (Weinstein, J.).

As Judge Weinstein properly concluded, in approving the form and manner of settlement notice

in the present case,

> [i]n view of the millions of members of the class, notice to class
> members by individual postal mail, email or radio or television
> advertisements, is neither necessary nor appropriate.  The
> publication notice ordered is appropriate and sufficient in the
> circumstances.  The timeline for notice provides reasonable,
> appropriate and ample opportunity for class members to oppose the
> settlement if they wish to do so.

*In re MetLife Demut. Litig.,* --- F.R.D.---, 2009 WL 3633898, at *3 (E.D.N.Y. Nov. 4, 2009); *see*

*also* Ex. M at 2 ("In accordance with Article 9 of the CPLR and specifically CPLR 907 and 908,

the court determines that notice by publication in the manner specified, is reasonable and

appropriate.").

     As for the *Fiala* action, New York law similarly gives trial courts broad latitude to order

notice of a settlement "in such manner as the court directs."  CPLR 908.  New York courts, as

well, have recognized that courts have broad discretion to order notice by publication.  *Matter of*

*Colt Indus. Shareholder Litig.*, 155 A.D.2d 154, 160, 553 N.Y.S.2d 138, 142 (1st Dep't 1990),

*aff'd as modified*, 77 N.Y.2d 185, 566 N.E.2d 1160 (1991).  As the *Fiala* class is even larger

than the *In re MetLife* class, individual notice would be at least as burdensome, and notice by

publication as directed by Justice Kornreich, *see* Ex. O, is equally appropriate.

Moreover, the Courts are not required to provide the class members another opportunity to opt out. *See* Fed. R. Civ. P. 23(e)(4) (court "may" allow a new opportunity to request exclusion); CPLR 903 (court "may" allow class members to request exclusion); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 271 (2d Cir. 2006) ("The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion."). Because the class members were given "notice of the action[s], the opportunity to opt out, notice of the proposed settlement, and the opportunity to object," the court is not required to afford "a second opportunity to opt out." *See Wal-Mart Stores*, 396 F.3d at 114. If any class members wished to control the prosecution or settlement of their own claims, they could have opted out or sought to intervene after notice of pendency was given. *See id.* at 115 (class members were "required to opt out at the class notice stage if [they] did not wish to be bound by the Settlement").

## III.  CLASS CERTIFICATION IS PROPER FOR SETTLEMENT PURPOSES.

Certification of the federal class received attention from Judge Platt on three separate occasions. *See In re MetLife Demut. Litig.*, 229 F.R.D. 369 (E.D.N.Y. 2005) (granting plaintiffs' motion for class certification); *In re MetLife Demut. Litig.*, 2006 U.S. Dist. LEXIS 97633 (E.D.N.Y. Aug. 29, 2006) (denying Defendants' Motion for a Determination Regarding the Membership of the Certified Class); *In re MetLife Demut. Litig.*, 2007 WL 1395569 (E.D.N.Y. May 9, 2007) (denying Defendants' motion to reconsider class certification). Certification of the *Fiala* class also received careful review from Justice Cahn and from the Appellate Division. *See Fiala v. Metro. Life Ins. Co.*, 2006 N.Y. Misc. LEXIS 4092 (Sup. Ct. N.Y. County June 2, 2006) (granting plaintiffs' motion for class certification); *Fiala v. Metro. Life Ins. Co.*, 6 A.D.3d 320, 776 N.Y.S.2d 29 (1st Dep't 2004) (modifying and affirming order certifying class). In the absence of changed circumstances or new facts, the Courts have no basis to revisit those

determinations now.  Moreover, regardless of defendants' objections to the maintenance of these cases as litigated classes, defendants do not dispute that class certification is appropriate for settlement purposes only.  To the extent that difficulties in managing the class are likely to arise during trial, that ground to deny certification is eliminated by settlement, because there will be no trial.  *See Amchem Prods. v. Windsor,* 521 U.S. 591, 620 (1997).

## IV.  THE OBJECTIONS FILED AGAINST THE SETTLEMENT ARE WITHOUT MERIT.

None of the five objections filed in these cases offer any valid reason to disapprove the settlement.

### A.   The Objection by Steven Waldman Is Without Merit.

Objector Steven Waldman has recently commenced a purported derivative suit against certain of MetLife's directors, claiming (among other things) that the alleged wrongdoing pleaded in the *In re MetLife* and *Fiala* complaints harmed MetLife by resulting in the expenses of this very litigation.  *Waldman v. Benmosche*, Index No. 650643/2009 (N.Y. Sup. Ct. N.Y. County, filed Aug. 26, 2009).  The suit was filed over nine years after the litigation supposedly causing the harm had commenced.  On December 8, 2009, Waldman's counsel provided the parties with an objection to the proposed settlement.

In opposition to the proposed settlement, Waldman makes four allegations:  (i) that MetLife has unfettered discretion to choose and value assets that are added to the closed block under the agreement; (ii) that MetLife has unfettered discretion to distribute, or not distribute, the assets added to the closed block and may begin to do so in 100 years or more, (iii) that the closed block is in "dire financial straits" and is unable to pay annual policy dividends; and (iv) that notice to the class was inadequate.   The Waldman objection also seeks discovery and further notice to the class.  None of these objections is well taken.

### 1.   Waldman's Objection Misunderstands How the Closed Block Works.

Fundamentally, Waldman's objection to the operation of the closed block misunderstands the rules governing the operation of the closed block.

*First,* Waldman's objection regarding the assets to be allocated to the closed block rests on a misunderstanding of the regulatory constraints that apply to MetLife.  The Stipulation of Settlement requires the assets to be valued at their "current market value as calculated by MetLife."  Stipulation of Settlement ¶ 16(c).  That calculation, in turn, is governed by rules established by the New York Insurance Department, which require that assets added to the closed block be valued either by established public markets or through an arms' length third-party valuation.  Harwood Decl. ¶ 4.  Because of these rigid valuation rules, MetLife does not have the discretion in valuing the assets of the closed block that (for example) an ordinary business corporation would have in valuing assets on its books.  MetLife also does not have unfettered discretion in choosing the assets to allocate to the closed block.  The Plan of Reorganization requires that the majority of the closed block assets be investment grade quality, Ex. C § 8.2(b)(1), and that the closed block be managed in good faith and "as if it were an independent entity apart from the Company." *Id*. § 8.2(b)(iv).

*Second,* Waldman asserts that "[i]t is unclear whether or not the Settlement at bar actually requires any assets contributed to the Closed Block ever be distributed to any living class member," and that "it appears that MetLife has discretion to distribute the assets to policyholders, or not to distribute them, providing them with nothing."  Waldman Obj. at 2.  Waldman further contends that the clause in the Stipulation of Settlement that provides that assets added to the closed block may be distributed at any time "over the remaining life of the Closed Block" means that MetLife could "begin[] a distribution 100 years hence…and continue[] it for 50 years after that." *Id*. at 3.

40

Again, this objection fundamentally misunderstands the operation of the closed block and is fully disposed of by Article VIII of the Plan of Reorganization, which was designed to ensure that MetLife does not operate the closed block in the manner that Waldman posits.  Under the Plan of Reorganization, no assets in the closed block may be used for the benefit of the shareholders, Ex. C § 8.2(g), and any asset transfers between the closed block and the remainder of the company must be to the benefit of the closed block. Ex. C § 8.2(b)(v).  Any assets added to the closed block as part of the proposed settlement are thus certain to be distributed to the millions of class members whose policies are in the closed block.  Harwood Decl. ¶ 5-6.

Moreover, the dividends paid to closed block policyholders are calculated annually with the goals of (*i*) exhausting the closed block assets with the last claim, and (*ii*) avoiding unreasonable buildups of assets benefiting only the later-to-die policyholders, known as "tontine effects." Ex. C § 8.2(d)(i).  To that end, MetLife, in consultation with the New York Insurance Department has established a "glidepath" to guide the amount of assets and liabilities retained in the closed block toward meeting these goals.  Harwood Decl. ¶¶ 9,12.  The Insurance Department, through annual reporting and quinquennial on-site reviews, has been closely monitoring the closed block to ensure that it is properly managed.  Ex. C § 8.2(d)(ii) and (iii).

The rules governing the closed block ensure that any assets added to the closed block, at any time, will be distributed to closed block policyholders.  Any assets added to the closed block as part of the proposed settlement are thus certain to be distributed to the millions of class members whose policies are in the closed block.  Harwood Decl. ¶ 6.  Assets placed in the closed block in connection with the proposed settlement will be commingled with the existing assets, Harwood Decl. ¶ 5, and the newly added assets will be paid out according to the governing principles of the closed block along with all the existing closed block assets.  Ex. C § 8.2(b)(ii)

and (iii); Harwood Decl. ¶ 5.  Because money is fungible, it would be a meaningless abstraction to earmark the settlement funds for payment separate from the other funds.

*Third*, the allegation that the closed block is in "dire financial straits" and has suffered a "multi-billion dollar shortfall," Waldman Obj. n.4, is without basis in fact.  The closed block is healthy and operating well within the very conservative range established by the Department of Insurance, which continues to closely monitor the closed block's operations.  Harwood Decl. ¶ 12.  There has been no "multi-billion dollar shortfall."  *Id.*

Waldman's misunderstanding of accounting terminology used in the Company's quarterly financial statements is responsible for his misplaced assertion that "billions of dollars in accrued dividend obligations have now been erased, and the dividend obligations for 2008 and the first nine months of 2009 have been set at *zero*."  Waldman Obj. n.3 (emphasis in original).  He apparently draws this statement from the note to MetLife, Inc.'s financial statements that refers to a Policyholder Dividend Obligation, or PDO, of zero.  *See Id.* at n.6 (citing MetLife, Inc.'s Form 10-Q filed 11/04/09 at F-66-67).  PDO, however, is a GAAP accounting concept that has no direct relationship to the amount of annual dividends paid to policyholders.  Harwood Decl. ¶ 7.  A PDO of zero indicates only that the closed block did not operate at a surplus over the "GAAP-determined glidepath"—which would be the case if the company was right on target in paying projected closed block dividends, converted to a GAAP basis.[9]  It does *not* mean that

---

[9]   The "GAAP-determined glidepath" is the projected change over time in the difference between closed block assets and closed block liabilities, as determined under Generally Accepted Accounting Principles ("GAAP").  Harwood Decl. ¶ 7.  The New York Insurance Department requires MetLife to compute annual dividends for closed block policies based on a glidepath determined under the Statutory Accounting Practices ("SAP"), but MetLife uses GAAP for reporting earnings.  *Id.* ¶ 7.  On a SAP basis, which is how the company actually determines dividends, the closed block is currently operating at a slight surplus over
(continued)

the company will be paying zero dollars in annual dividends to closed block policyholders.  *Id*.

¶ 11.  Contrary to Waldman's implication, MetLife paid approximately $1.5 billion in annual

dividends to closed block policyholders in 2008, will pay approximately the same amount in

2009, and has approved the payment of over $1.3 billion for 2010.  *Id*.  And, in any event, adding

funds to the closed block would be expected to increase dividends to closed-block policyholders

regardless of the closed block's current financial state.

 *Finally*, Waldman's objections ignore the costs that would be imposed by requiring

entirely new procedures for dealing with the small additional amount that the settlement will

contribute to the closed block.  Cost efficiency is the reason for distributing the settlement funds

through the closed block, and establishing burdensome new requirements would eliminate some

of the benefits of that efficiency.  Moreover, given that the settlement is distributing value in

exchange for essentially worthless nuisance claims, Waldman's objections—even if they had

merit, which they do not—would be trivial.  Any amount, or no amount at all, would be a fair

settlement of the claims in these actions.  *See supra* pp. 27-28.

###  2. Publication Notice of the Proposed Settlement was Constitutionally Adequate

 Waldman relies on the 1950 Supreme Court decision *Mullane v. Central Hanover Bank*

*& Trust Co.*, 339 U.S. 306 (1950), to support his position that publication notice was

constitutionally inadequate.  *See*  Waldman Obj. at 9.  Waldman's reading of *Mullane* amounts to

a claim that publication is *never* adequate.  *See id.* (referring to the "general inadequacy of

publication notice").  Waldman ignores, however, that the Second Circuit has repeatedly held

that notice of a settlement by publication is adequate, once class members have been given notice

---

the SAP-determined glidepath, and has remained within 3% of the glidepath since the
demutualization. *Id*. ¶ 12.

of pendency and an opportunity to opt out. *See Handschu*, 787 F.2d at 832-33; *W. Va. v. Chas.,* 440 F.2d at 1090; *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710 at 800; *Dolgow v. Anderson*, 43 F.R.D. at 497-498; *see also supra* p. 35. Indeed, Waldman acknowledges an exception in "cases … where the costs of such notice would eviscerate the settlement fund," Waldman Obj. at 10, ignoring the massive expense of administering individual notice and opt-outs for a class of over 11 million people.

Waldman also argues that because many Americans receive their news on the Internet, MetLife should have released a press release to ensure Internet coverage of the settlement. *Id*. at 10. However, he identifies no basis for requiring such notice in addition to publication notice; and in any event, news of the settlement is reported on a number of publicly accessible Internet sites. *See, e.g.,* http://www.law.com/jsp/article.jsp?id=1202435311218 (posted Nov. 10, 2009, last accessed Dec. 28, 2009).

The Waldman objection further alleges that MetLife misdirected class members who read the notice of settlement because "[t]he printed *New York Law Journal, New York Times,* [and] *Wall Street Journal* notices filed with the District Court on November 12-13, 2009 direct readers to 'http://nyed.uscourts.gov/Notices.cfm,' which returns no Internet page." Waldman Obj. n.10. This allegation is simply false. Each of the sixteen instances of the Notice of Settlement published by MetLife contained a correct, working URL (web page address): http://www.nyed.uscourts.gov/Notices. None of the notices contains the URL to which Waldman refers. *See* Finnegan Aff., exs. A-1 to A-16.[10] In any event, even if any class

---

[10]   The Courts' November 6, 2009 orders contained a typographical error, referring to "http://www.nyed.uscourts.gov/Notices.cfm" (Ex. P Ex. 1 at 3), but defendants caught and corrected this error before publishing notice. *See* Finnegan Aff. ¶ 2 & Exs. A-1 to A-16. And again, this differs from the URL to which Waldman refers. On November 10, 2009, the
(continued)

members had been confused by seeing a supposedly incorrect URL, they could still easily access the information by the "Notices" link from the Court's home page.  The published notice also contained a telephone number and address at which class members could contact class counsel for information.  In addition, we understand that the federal and state courts each had multiple hard copies of the Stipulation of Settlement on hand to give out to class members who requested them.  Finally, attorneys and others with accounts on PACER (the federal courts' electronic docketing system), could always obtain a copy of the Stipulation of Settlement through that avenue in the unlikely event that they could not figure out any other way to obtain a copy.

**B.   The Objection by John J. Pentz, Jr. and Thomas Sterrett Bell Misunderstands the Settlement and Misstates the Law Regarding Subclasses.**

John J. Pentz, Jr. and Thomas Sterrett Bell filed an objection with the Court on December 18, 2009.  Objector John J. Pentz, Jr. is represented by John J. Pentz, Esq., a professional class settlement objector, who used to call his firm "The Objectors Group,"[11] and now calls it "The Class Action Fairness Group."

Pentz and Bell have objected to the method, timing and form of class notice regarding the payment of attorneys fees from the settlement fund, and also assert that "the settlement must be rejected because of the failure to formally certify a former policyholder subclass, as well as the patently inequitable settlement allocation that completely excludes that subclass from any substantial benefits." Pentz-Bell Objection at 4.  The Pentz and Bell objection is based on a

---

*New York Law Journal* published a news article, which reprinted the incorrect copy of the notice from the Court's order, apparently on the *Journal's* own initiative, but this was in addition to the correct notices that MetLife later published.

[11]   *See, e.g., Morris v. Lifescan, Inc.,* 54 Fed. Appx. 663 (9th Cir. 2003); *Spark v. MBNA Corp.*, 48 Fed. Appx. 385 (3d Cir. 2002).

misunderstanding of the terms of the Settlement Agreement, the identity of the class representatives, and the law, and should be rejected.

*First*, Pentz and Bell ignore the $2.5 million *cy pres* payment, which represents the portion of the recovery for non-closed-block policyholders, who include the former policyholders.  *See* Pentz-Bell Objection at 3 ("The $50 million in settlement benefits will be contributed to the closed block … [and] [f]ormer policyholders …will receive nothing.").  As discussed above, courts have routinely approved *cy pres* payments where, as here, an individual distribution would be impracticable.  *See supra* p. 46.

*Second*, Pentz and Bell have incorrectly assumed that all of the named plaintiffs in this action are current policyholders.  *Id.* at 4 ("The named plaintiffs in this action are undoubtedly current policyholders.")  In fact, *In re MetLife* class representative Mary DeVito is a former policyholder, Finnegan Aff. ¶ 13 & Ex. B, as is *Fiala* class representative Vijay Shah, *see* Micarelli Aff. Ex. Z at 51:20-52:20.  Thus, both current and former policyholders, in both federal and state classes, were represented in the settlement negotiations.

*Third*, the objectors' conclusion that the Court must certify a subclass of former policyholders is unfounded.  Pentz and Bell rely on *Ortiz v. Fibreboard*, 527 U.S. 815, 119 S. Ct. 2295 (1999), which in turn relied on and extended *Amchem Products v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231 (1997).  Both *Ortiz* and *Amchem,* however, involved the problem of unknown *future* claimants, which is simply not present here.  In *Ortiz* and *Amchem*, the future-claim class members included individuals not yet born, individuals who did not know of their asbestos exposure, and others whose class membership could not be ascertained.  *Ortiz*, 527 U.S. at 819; *Amchem,* 521 U.S. at 628.  But here, former MetLife policyholders who are members of the class are identifiable, were given notice of the pending class action and notice of the settlement, and

have been afforded an opportunity to opt out or object.  As the Second Circuit has held, the

concerns of *Ortiz* and *Amchem* simply do not apply in these circumstances.  *Denney v. Deutsche*

*Bank AG*, 443 F.3d 253, 269 (2d Cir. 2006) (distinguishing *Amchem* where "all members of the

Denney class have been identified, have been given notice of the settlement, and have had the

opportunity to voice objections or to opt out entirely").  Requiring the certification of a subclass

whenever a group receives different treatment under a plan of distribution would place

undesirable obstacles in the way of class action settlements, and imposing such a requirement

would be contrary to settled law.  See *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d

124, 145 (2d Cir. 2001) ("[t]he conflict that will prevent a plaintiff from meeting the Rule

23(a)(4) prerequisite must be fundamental"); *In re Enron,* 2008 WL 4178151, at *2 (S.D. Tex.

Sept. 8, 2008) ("a class action settlement need not necessarily treat all class members equally.").

Particularly where, as here, the plaintiffs' claims are completely devoid of merit, creating a

separate subclass would be a waste of resources and would interfere with the desirable goal of

bringing about a settlement.

### C.  The Objection by Robert Gould Does Not Take Account of the Impracticality of Direct Payments to Class Members, Misunderstands the Operation of the Releases, and Misstates the Law.

Objector Robert Gould, like objectors Pentz and Bell, objects to the settlement because

"[c]lass members who no longer obtain a benefit from the closed block receive no benefit from

the settlement."  Yet, inconsistently, he objects to the portion of the settlement that was allocated

to the non-closed block policyholders, and argues in favor of "eliminating the *cy pres* component

of the settlement and paying all funds to the closed block."  *Id.* at 2.  To eliminate the *cy pres*

portion of the settlement, as Gould suggests, would be to disregard non-closed block class

members entirely.  In support of his attack on *cy pres* settlements, Gould relies on language from

the American Law Institute's draft *Principles of the Law of Aggregate Litigation*.  As Gould

acknowledges, however, those draft principles, make clear that *cy pres* awards are favored "when direct distribution to class members [is] not feasible… because distribution would involve such small amounts that, because of the administrative costs involve[d], such distributions would not be economically viable."  Gould Objection (citing *Principles of the Law of Aggregate Litigation* §3.07 (b), p. 221 (Proposed Final Draft 2009)).  As discussed above, this case clearly meets this proposed standard, as well as the standard adopted by existing caselaw.  *See supra* p. 31.

Gould further objects to certain aspects of the timing of events prescribed by the Stipulation of Settlement.  He argues that it is unfair for the class members' releases to become effective as of the date of the entry of the final judgment in either the state or federal action (whichever is later), while defendants are not required to pay or allocate the settlement amount until all appeals of the approval of the settlement date are final.  Gould's objection is misconceived.  It makes sense for MetLife to make payments only after the settlement approval is final, because if the settlement were rejected on appeal, the task of retroactively unwinding the allocation of assets to the closed block would be complex and administratively costly, and the recovery of fees and expenses paid to class counsel—and a donation to a non-profit organization—would be uncertain if not impossible.  On the other hand, the releases can easily be undone if the settlement approval is reversed on appeal.  Moreover, allowing class members to retain—and litigate—their causes of action while an appeal is pending would be wasteful and unnecessary, and it would undermine the strong public policy favoring settlement over litigation. *Telik,* 576 F. Supp. 2d at 575.  Gould also complains that the Settlement Agreement does not provide for interest payments while objectors' appeals are pending, but that provision was part of the bargain that the parties struck in a settlement agreement negotiated at arm's length and,

48

particularly given the weakness of plaintiffs' underlying claims, does not come close to taking the settlement out of the range of reasonableness.

The remaining objections raised by Gould, that class members should have been given individual notice of the settlement and a second opportunity to opt out, are without merit for the reasons previously discussed. *See supra* pp. 36-38.

**D.   The Objection of Christopher P. Mueller Has No Bearing on the Fairness, Reasonableness or Adequacy of the Settlement.**

Christopher P. Mueller served his objection on counsel for Defendants on December 25, 2009 by electronic mail (the "Mueller Objection"). It is not clear whether the Mueller Objection was timely filed with one or both courts by December 24, but in any event, the Mueller Objection does not present any legitimate reason that the settlement should not be approved.

*First,* Mueller objects to the settlement amount as "woefully inadequate," because plaintiffs have alleged billions of dollars in damages. See Mueller Obj. ¶ 3. But Mueller focuses only on the difference between the highest possible recovery and the dollar amount of the settlement, without any regard to the merits of plaintiffs' claims. The law, and basic common sense, dictate that the Courts cannot assess the fairness of the settlement without reference to the strength of plaintiffs' claims. *See supra* p. 15. As explained at length above, the plaintiffs' claims are virtually meritless, and their likelihood of success at trial extremely low—and in light of these factors, which must be considered by the Courts, the $50 million dollar settlement is more than reasonable.

*Second,* Mueller objects to the settlement amount as having "no rational basis." Mueller Obj. ¶ 1. According to Mueller, damages should be calculated by determining plaintiffs' financial picture after the demutualization and comparing it with the what would have happened if no demutualization had occurred, and states that "[t]his natural actuarial process was not

followed in developing the proposed settlement." *Id.*  Mueller's objection is misguided, because

both parties did do such a calculation—and in defendants' calculation, the result is zero. 624 F.

Supp. 2d at 264.  Such a comparison reveals that the class members benefited from the

demutualization, and have no damages whatsoever.  *Id.*  The proposed settlement was

legitimately based on the amount defendants were willing to pay to avoid the risk and delay of

continued litigation, and the amount plaintiffs concluded was in the interests of the class to

accept in light of the fundamental weaknesses in their case.

     *Third,* Mueller suggests that the Court should refuse to approve the settlement because he

believes this case could set precedent addressing or highlighting perceived shortcomings that

Mueller finds in the current laws pertaining to demutualization.  But Mueller's own views on the

appropriate development of the law have nothing to do with the fairness of the proposed

settlement.

     *Finally,* Mueller incorporates the position of Thomas P. Tierney, who submitted an

*amicus curiae* brief that was filed and docketed in the *In re MetLife* case on October 6, 2009.

Doc. 492 ("Tierney Brief") (available on PACER).  Tierney has a long history of objecting to

demutualizations, as documented in the *curriculum vitae* attached to his brief.  *See* Tierney Brief,

Attachment at 1.  The arguments presented by the Tierney Brief, and incorporated by Mueller in

his objection, reflect a disagreement with the substantive law of New York and most other states,

the practices of the New York Insurance Department and other state regulators, and the standards

of the actuarial profession governing demutualization and the calculation of policy dividends.

*See, e.g.,* Tierney Brief ¶¶ 25, 29, 31.  They are not an objection to the fairness of the settlement

of the claims asserted in these actions.  Indeed, Tierney's views are directly at odds with the

claims that are alleged in the complaint and are now being settled, because Tierney believes that

future actuarial contributions to surplus should have been disregarded, *see* Tierney Brief ¶¶ 23-26, while *In re MetLife* plaintiffs count those future contributions as part of their damages. Tierney attributes the fact that others have not adopted his dissident views on these matters to a "corrupt" conspiracy among "actuaries, lawyers, investment bankers, regulators, legislators and insurance company directors and officers." *Id.* ¶ 30.

The function of the Court in approving a settlement is to determine whether the settlement is fair, reasonable and adequate, not to pass judgment on the political agenda advocated by Mueller and Tierney. Mueller's objection is irrelevant to the issues that the Court has to decide and should be overruled.

**E.   The Objection of Lawrence Kuczynski Has Nothing to Do with the Settlement.**

Lawrence Kuczynski has sent a letter to the Court *pro se*, alleging that MetLife, Inc.'s annual statement filings with the Securities and Exchange Commission and the New York Insurance Department did not adequately disclose its former ownership of the Stuyvesant Town and Peter Cooper Village apartment complexes. Kuczynski's objection is simply irrelevant, because disclosures about MetLife's real estate holdings in its annual statements have nothing to do with the claims being settled in these cases, which relate to disclosures in the Booklets mailed to policyholders in the demutualization.[12]

---

[12]   It also appears that Kuczynski's objection may have been received by the Court after the December 24 deadline, and is therefore untimely. In any event, MetLife maintains that its annual statements were truthful, accurate, and contained all required material information.

**CONCLUSION**

For the foregoing reasons, the objections to the settlement and notice of settlement should

be overruled, and the settlement should be approved.

Dated: New York, New York
       December 28, 2009

Respectfully submitted,

Bruce E. Yannett
Carl Micarelli
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022-3902
Telephone: (212) 909-6000
Email: beyannett@debevoise.com
       cmicarelli@debevoise.com

Kevin S. Finnegan
Duncan J. Logan
METROPOLITAN LIFE
   INSURANCE COMPANY
1095 Avenue of the Americas
New York, NY 10036-6796

*Attorneys for Defendants Metropolitan Life*
*Insurance Company and MetLife, Inc.*

By:  *Carl Micarelli*
     Carl Micarelli