UNITED STATES DISTRICT COURT       MEMORANDUM, ORDER AND
EASTERN DISTRICT OF NEW YORK      JUDGMENT ON FINAL APPROVAL OF
                                      SETTLEMENT, FEES, EXPENSES AND
                                        COMPENSATION AWARDS

*In re* METLIFE DEMUTUALIZATION              00 CV 2258
LITIGATION

Appearances:

For Federal Plaintiffs:        STAMELL & SCHAGER, LLP
                        One Liberty Plaza
                        New York, N.Y. 10006
                        By:    JARED B. STAMELL, ESQ.

                        MANDEL & MANDEL, LLP
                        1200 Alfred I. duPont Building
                        169 East Flagler Street
                        Miami, Florida 33131
                        BY:    DAVID S. MANDEL, ESQ.

                        BERMAN DeVALERIO
                        425 California Street
                        San Francisco, CA 94104
                        BY:    JOSEPH J. TABACCO, JR., ESQ.

For State Plaintiffs:          WEISS & LURIE
                        551 Fifth Avenue
                        New York, N.Y. 10176
                        BY:    JOSEPH H. WEISS, ESQ.

                        LOVELL STEWART HALEBIAN, LLP
                        61 Broadway
                        New York, N.Y. 10006
                        BY:    CHRISTOPHER LOVELL, ESQ.
                                IAN T. STOLL, ESQ.
                                JODY KRISILOTT

MILBERG, LLP
One Pennsylvania Plaza
New York, N.Y. 10119
BY:    BARRY A. WEPRIN, ESQ.

State Plaintiff Appearing:    Mark Smilow, Esq.

For State Plaintiff
Mark Smilow:    STULL, STULL & BRODY
6 East 45th Street
New York, N.Y. 10017
BY: MARK LEVINE, ESQ.

For Defendants:    DEBEVOISE & PLIMPTON, LLP
919 Third Avenue
New York, N.Y. 10022
BY:    BRUCE E. YANNETT, ESQ.
CARL MICARELLI, ESQ.
JENNIFER SPAIN, ESQ.

METLIFE, INC.
1095 Avenue of the Americas
New York, N.Y. 10036
BY:    TERESA WYNN ROSEBOROUGH, ESQ.
DUNCAN J. LOGAN, ESQ.

For Objectors:    ROY JACOBS & ASSOCIATES
Attorneys for Steven Waldman
60 East 42nd Street
New York, N.Y. 10165
BY:    ROY L. JACOBS, ESQ.

JOHN J. PENTZ, ESQ.
Attorney for Thomas Bell & John Pentz, Jr.
2 Clock Tower Place
Maynard, Ma. 01754

Special Master:    Richard J. Davis, Esq.

**Table of Contents**

I. Introduction ........................................................................................................ 7

II. Facts ................................................................................................................... 8

  A. MetLife's Plan of Reorganization ................................................................. 9

    1. New York Insurance Law § 7312 ............................................................ 10

    2. Features of the Plan ................................................................................. 13

    3. Exercise of Board's Business Judgment in Selecting Method of Demutualization ....... 14

    4. Reliance on Superintendent ..................................................................... 15

  B. Solicitation of Policyholder Votes ................................................................. 17

    1. Mailings .................................................................................................... 17

    2. Telephone ................................................................................................. 21

  C. Superintendent's Investigation and Approval ................................................ 22

    1. Appointment and Reliance on Advisors .................................................. 22

    2. Public Hearing .......................................................................................... 23

    3. Written Submissions ................................................................................ 26

    4. Opinion and Decision .............................................................................. 27

  D. Demutualization Procedure ......................................................................... 29

  E. Related Lawsuits .......................................................................................... 33

  F. Class Certification and Notice ...................................................................... 35

  G. Discovery and Preparation for Trial ............................................................. 37

  H. Settlement Negotiations ............................................................................... 37

  I. Terms of Settlement ..................................................................................... 38

  J. Notice of Settlement ..................................................................................... 39

  K. Objections .................................................................................................... 40

III. Hearings on Proposed Settlement and Related Applications ......................... 40

  A. Trial and November 2, 2009 Preliminary Fairness Hearing ......................... 40

  B. December 30, 2009 Fairness Hearing ........................................................... 45

    1. History of Litigation, Discovery and Readiness for Trial ....................... 45

    2. Arguments of Parties ............................................................................... 46

    3.    Statements of Objectors ................................................................................ 46

        a)    Thomas Sterrett Bell and John J. Pentz, Jr. ..................................... 46

        b)    Steven Waldman ................................................................................ 47

        c)    Thomas Tierney ................................................................................ 47

    4.    Statement of State Plaintiff Mark Smilow ................................................. 48

    5.    Continuance of Hearing ............................................................................. 48

  C.    February 9, 2009 Hearing on Applications for Fees, Expenses, and Compensation ..... 48

IV.    Law and Application of Law to Facts ................................................................ 49

  A.    Standard of Review ............................................................................................. 51

  B.    Presumption of Fairness ..................................................................................... 53

  C.    Criteria for Approval of Settlement .................................................................. 54

    1.    Complexity, Expense, and Likely Duration of Litigation ......................... 55

    2.    Favorable Reaction of Class ...................................................................... 58

    3.    Stage of Proceedings and Amount of Discovery Completed ..................... 59

    4.    Risks of Establishing Liability and Risks of Establishing Damages ......... 61

        a)    Difficulty of Establishing Material Misrepresentation or Omission ..... 63

        b)    Difficulty of Establishing Intent to Deceive ................................... 66

        c)    Difficulty of Proving Injury to Class Members ............................... 67

        d)    Other Defenses ................................................................................ 69

        e)    Difficulty of Proving Claims in State Action ................................... 70

    5.    Risks of Maintaining Action Through Trial .............................................. 70

    6.    Ability of MetLife to Withstand a Greater Judgment ................................ 71

    7.    Range of Reasonableness of Settlement Fund in Light of Possible Recovery and Risks of Litigation ..................................................................................... 72

    8.    Attorneys' Fees and Expenses ................................................................... 74

  D.    Manner of Allocation of Settlement Funds ....................................................... 74

    1.    $32.5 Million Allocation to the Closed Block .......................................... 75

    2.    $2.5 Million *Cy Pres* Allocation ............................................................. 78

    3.    Division of Settlement Amount Between Closed-Block and Non-Closed-Block Allocations ................................................................................................. 80

E.     Notice of Settlement ................................................................................ 82

F.     Objections to Settlement ........................................................................ 84

   1.   Steven Waldman .............................................................................. 84

   2.   John J. Pentz, Jr. and Thomas Sterrett Bell ..................................... 91

   3.   Robert Gould .................................................................................... 93

   4.   Christopher P. Mueller ..................................................................... 96

   5.   Lawrence Kuczynski ........................................................................ 97

   6.   Thomas P. Tierney, in Support of Mueller's Objection .................... 98

V.     Fees and Expenses ................................................................................ 102

  A.   Class Counsel's Joint Application for Fees and Expenses ..................... 102

  B.   Standard of Review for Award of Fees and Expenses to Class Counsel .... 102

  C.   Criteria for Approval of Fees and Expenses .......................................... 106

   1.   Percentage-of-the-fund Method ...................................................... 107

   2.   Lodestar Method ............................................................................. 108

   3.   Other Factors .................................................................................. 110

     a)   Time and Labor Expended ......................................................... 110

     b)   Magnitude and Complexity of the Litigation ............................. 111

     c)   Risk of the Litigation ................................................................. 112

     d)   Quality of Representation ........................................................... 114

     e)   Requested Fee in Relation to the Settlement .............................. 115

     f)   Public Policy Considerations ..................................................... 116

   4.   Class Counsel's Expenses ................................................................ 117

   5.   Reaction of the Classes to Fee and Expense Application ................. 118

   6.   Award of Fees and Expenses to Class Counsel ................................ 118

  D.   Notice of Applications for Fees and Expenses ....................................... 119

  E.   MetLife's Objections to Class Counsel's Application for Fees and Expenses ............ 121

  F.   Objector Steven Waldman's Application for Attorney's Fees ................. 123

VI.    Compensation to Class Representatives ................................................. 126

  A.   Federal Plaintiffs' Applications for Compensation Pursuant to PSLRA ..... 126

B. State Plaintiffs' Applications for Compensation ............................................................ 130

1. New York Law Concerning "Incentive Awards" .......................................... 131

2. Plaintiffs Theresa Hazen, Mark Smilow, and Vijay Shah .......................... 132

3. Compensation for Efforts on Behalf of the Class ...................................... 133

VII. Conclusion .................................................................................................. 135

**JACK B. WEINSTEIN, Senior United States District Judge:**

**I.      Introduction**

This case and a related case in New York Supreme Court, *Fiala v. Metropolitan Life Ins. Co.*, Index No. 601181/2000, are class actions arising out of Metropolitan Life Insurance Company's ("MetLife") demutualization—its conversion from a mutual insurance company to a stock corporation.  The classes consist of individuals who held MetLife mutual insurance policies at the time of the demutualization in 2000 who were allegedly harmed by the demutualization.  The parties in this action and the *Fiala* action have arrived at a joint proposed settlement disposing of all claims in both cases.

The parties seek final approval of the proposed settlement.  Plaintiffs' counsel, and counsel for one objector to the settlement, have applied for attorneys' fees and expenses, to be paid out of the settlement fund.  Named plaintiffs in both actions have applied for compensation in recognition of time and effort expended in participating in these cases.

It is the policy of the federal courts to encourage coordination of pending state and federal cases concerning the same and closely related transactions.  *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 262 (E.D.N.Y. 2006) ("Cooperation with state courts will continue to be stressed."); *In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2006 WL 898105, at *1 (E.D.N.Y. Apr. 6, 2006) ("Coordination and cooperation between state and federal courts has been encouraged.").  In this instance close cooperation between the Supreme Court of the State of New York and the United States District Court for the Eastern District of New York, utilization of a single special settlement master, and joint hearings on the settlement permitted

termination of this litigation with minimal transaction costs, on the merits.

For the reasons indicated below, after full hearings, the proposed settlement of these actions is found to be fair, reasonable, and adequate to all parties and to all persons who might be directly or indirectly affected. *See* Fed. R. Civ. P. 23(e). The fees and expenses of class counsel are approved as fair, reasonable, and fully supported. Objector's counsel's fees are approved in part. Named plaintiffs' applications for compensation are approved in part and denied in part. Disposition of the amounts approved in the settlement is properly provided for.

For the convenience of the reader, parts of prior memoranda and orders of this court are incorporated in the present document. Relevant documents issued in the state case have been considered as if they were admitted in the federal action. Hearings conducted jointly with the New York Supreme Court and evidence reviewed in such joint hearings are relied upon in the findings of this court.

This Memorandum, Order and Judgment is not effective until the New York Supreme Court's judgment of approval of the settlement is issued in the *Fiala* case.

## II.    Facts

Detailed information concerning the factual and procedural history of these related litigations is provided in prior decisions of this court and the state court. *See, e.g., In re MetLife Demut. Litig.*, 156 F. Supp. 2d 254 (E.D.N.Y. 2001) (denying MetLife's motion to dismiss); *In re MetLife Demut. Litig.*, 322 F. Supp. 2d 267 (E.D.N.Y. 2004) (denying MetLife's second motion to dismiss); *In re MetLife Demut. Litig.*, 229 F.R.D. 369 (E.D.N.Y. 2005) (certifying plaintiff class), *pet. for interlocutory appeal denied* No. 05-8020 (2d Cir. Mar. 29, 2009); *In re*

*MetLife Demut. Litig.*, 624 F. Supp. 2d 232 (E.D.N.Y. 2009) (denying cross-motions for partial summary judgment); Order Appointing Special Settlement Master, *In re MetLife Demut. Litig.*, No. 00-cv-2258, Docket Entry No. 501 (E.D.N.Y. Oct. 16, 2009); Order Regarding Motions In Limine, *In re MetLife Demut. Litig.*, No. 00-cv-2258, Docket Entry No. 537 (E.D.N.Y. Oct. 30, 2009); *In re MetLife Demut. Litig.*, 262 F.R.D. 205 (E.D.N.Y. 2009) (Mem. & Order Regarding Notice & Hearing on Approval of Proposed Settlement); Order Approving Form of Class Notice, *In re MetLife Demut. Litig.*, No. 00-cv-2258, Docket Entry No. 540 (E.D.N.Y. Nov. 11, 2006); *Shah v. Metropolitan Life Ins. Co.*, Nos. 108887/2000 & 601181/200, 2003 WL 728869 (N.Y. Sup. Ct. Feb. 21, 2003) (granting MetLife's motion to dismiss); *Fiala v. Metropolitan Life Ins. Co.*, 6 A.D.3d 320 (N.Y. App. Div. 2004) (reversing in part decision on MetLife's motion to dismiss); *Fiala v. Metropolitan Life Ins. Co.*, 235 N.Y.L.J. 106, No. 601181/2000, 2006 N.Y. Misc. LEXIS 4092 (N.Y. Sup. Ct. June 2, 2006) (certifying plaintiff class); *Fiala v. Metropolitan Life Ins. Co.*, 17 Misc.3d 1102(A), No. 601181/2000, 2007 WL 2777230 (N.Y. Sup. Ct. Aug. 28, 2007) (unreported disposition) (approving procedure for class notification); *Fiala v. Metropolitan Life Ins. Co.*, 52 A.D.3d 251 (N.Y. App. Div. 2008) (affirming class certification as modified); Order Regarding Notice & Hearing on Approval of Proposed Settlement, *Fiala v. Metropolitan Life Ins. Co.*, No. 601181/2000 (N.Y. Sup. Ct. Nov. 5, 2009).

### A. MetLife's Plan of Reorganization

MetLife, a New York corporation, was founded in 1868, and in 1915 became a mutual insurance company—that is, a non-stock corporation whose policyholders were its members. *See* Oct. 30, 2009 Stipulation of Agreed Facts, Docket Entry No. 530-9, ¶¶ 1-2 ("Parties' Stip.");

April 4, 2000 Opinion and Decision of New York State Superintendent of Insurance Neil D. Levin, Docket Entry No. 578-9, at 1 ("Sup. Opinion").  In 1998, MetLife's Board of Directors (the "Board") authorized management to pursue demutualization—that is, conversion to a stock life insurance company.  *See* Parties' Stip. ¶ 10; Sup. Opinion ¶ 15.  This process was governed by section 7312 of the New York Insurance Law.  On September 28, 1999, MetLife's Board adopted a Plan of Reorganization (the "Plan").  *See* Metropolitan Life Ins. Co., Plan of Reorganization Under Section 7312 of the New York State Insurance Law, as Adopted on Sept. 28, 1999 (and as amended and restated by amendments dated Nov. 3, 1999 and Nov. 16, 1999) by the Board of Directors, Docket Entry No. 578-9.  After appropriate consideration, the Board determined that the Plan was in the best interests of the company and its policyholders, and that it was fair and equitable to the policyholders.  *See* Sup. Opinion ¶ 31.

1.  **New York Insurance Law § 7312**

Demutualization is authorized by section 7312 of the New York Insurance Law.  The state legislature found that:

> "[I]t is in the interest of the state to maintain a financially sound and competitive life insurance industry in this state and to provide statutory authority for domestic mutual life insurance companies to find it in the best interest of the company and its policyholders to convert to stock form to do so pursuant to this legislation. . . . [F]lexibility of corporate form can be an important factor in an environment of rapidly changing economic conditions.

Section 1 of L. 1988, ch. 683; amended L. 1988, ch. 684, § 1 (Sept. 1, 1988), *reprinted in* N.Y. Ins. Law § 7312 note (McKinney 2000) (legislative findings).

To demutualize, a mutual life insurance company must adopt, by action of three-fourths

of its entire board of directors, a detailed plan of reorganization that is consistent with the statue and "fair and equitable" to policyholders. N.Y. Ins. Law § 7312(e)(1). The plan must: "(1) demonstrate a purpose and specify reasons for the proposed reorganization; (2) be in the best interest of the mutual life insurer and its policyholders; (3) be fair and equitable to policyholders; (4) provide for the enhancement of the operations of the reorganized insurer; and (5) not substantially lessen competition in any line of insurance business." *Id.* § 7312(c). It must provide, among other things: (1) "the manner and basis by which the reorganization shall take place;" (2) "the consideration to be given to policyholders;" (3) "the method of allocating the consideration among policyholders;" and (4) "a plan of operation for the reorganized insurer including actuarial projections." *Id.* § 7312(e)(1).

Four different methods of demutualization are specified. The fourth encompasses "[a]ny method approved by the [New York State Superintendent of Insurance (the "Superintendent")] under which the policyholders' membership interest is converted into or exchanged for consideration determined by the superintendent to be fair and equitable to policyholders and meeting the requirements of this section." *Id.* § 7312(d)(4).

In order to become effective, the demutualization plan must be approved by two-thirds of votes cast by policyholders entitled to vote. *Id.* § 7312(k)(2). The Superintendent controls the voting procedure, including the notice that must be sent to policyholders before the vote. *Id.* § 7312(k)(3). Notice must be "preceded or accompanied by a true and complete copy of the plan, or by a summary thereof approved by the superintendent, and such other explanatory information as the superintendent shall approve or require." *Id.* § 7312(k)(1).

The Superintendent's approval of the demutualization plan must also be obtained:

> The superintendent shall . . . approve the plan of reorganization if he finds that the proposed reorganization, in whole and in part, does not violate this chapter, is fair and equitable to the policyholders and is not detrimental to the public and that, after giving effect to the reorganization, the reorganized insurer will have an amount of capital and surplus . . . reasonably necessary for its future solvency.

*Id.* 7312(j). Broad authority to review a proposed demutualization is provided to the Superintendent. Before issuing written approval, the Superintendent must hold a public hearing on the fairness of the plan, the reasons and purposes for the demutualization, and whether it is in the best interests of the insurer and its policyholders. *Id.* § 7312(i). The Superintendent may "appoint one or more qualified disinterested persons or institutions as consultants to advise him on any matter related to the reorganization." *Id.* § 7312(h)(1). These advisors may request access to the mutual company's books and records and any other information in its possession. *Id.* § 7312(h)(4). The Superintendent may "request any additional documents or information and may examine the mutual life insurer or any of its affiliates, to the extent he may determine necessary to enable him to make the findings required . . . for the approval by him of the plan of reorganization." *Id.* § 7312(g).

These provisions are consistent with the plenary authority the state legislature has delegated to the Superintendent to "make an examination into the affairs of any insurance corporation or other insurer doing or authorized to do any insurance business in this state . . . as often as he deems it expedient for the protection of the interests of the people of this state, in addition to examinations authorized by other provisions of [the Insurance Law]." *Id.* § 309(a);

*see also id.* § 401(b) (granting Superintendent "broad authority . . . to investigate activities which may be fraudulent and to develop evidence thereon"); *id.* § 201 ("The Superintendent shall possess rights, powers, and duties . . . expressed or reasonably implied by any applicable law of this state").

## 2. Features of the Plan

The Plan adopted by MetLife's Board provided for the fourth statutory method of demutualization. *See* Plan at 6 (§ 3.2, "Basis for Choice of Method"); N.Y. Ins. Law § 7312(d)(4). The major features of the Plan included:

1) a requirement that consideration be given to policyholders in the form of shares of common stock, cash, or policy credits, allocated among policyholders based on an actuarial calculation, as detailed in a separate Actuarial Contribution Memorandum, Plan at 18 (§ 7.1, "Allocation of Allocable Common Shares");

2) the creation of a MetLife Policyholder Trust (the "Trust") to hold the common stock that would be issued to eligible policyholders in consideration for their extinguished membership interests, *id.* at 6 (§ 3.3, "Establishment and Operation of the Trust.");

3) the establishment of an accounting mechanism known as the "Closed Block," the stated purpose of which was "to ensure [ ] the reasonable dividend expectations of policyholders," *id.* at 2 (defining "Closed Block"); *id.* at 22 (Article VIII, "Method of Operation for Participating Business");

4) a condition that the demutualization would not be effective unless it received the approval of the Superintendent, *id.* at 10 (§ 5.2, "Effectiveness of Plan");

5) an initial public offering ("IPO") to take place simultaneously with the effective date of the demutualization, *id.* at 10-12 (§ 5.2, "Effectiveness of Plan"); and

13

6) a caveat that the Board had authority to withdraw the Plan at any time prior to its effective date, *id.* at 27 (§ 10.4, "Amendment or Withdrawal of the Plan").

The sixth aspect was particularly significant for purposes of the instant case. The Superintendent's public hearing, the circularization of voters with a package of explanatory materials approved by the Superintendent, the availability of a telephone hotline to answer questions of voters, and the Opinion and Decision of the Superintendent approving the Plan and notice to policyholders all occurred before the Board's power to withdraw the Plan expired. *See* Parts II.B-C, *infra.*

### 3. Exercise of Board's Business Judgment in Selecting Method of Demutualization

After considering the limitations of alternate statutory methods of demutualization one and two, *see* N.Y. Ins. Law §§ 7312(d)(1) & (2), the Board determined that the flexibility of the fourth method, *id.* § 7312(d)(4), was "best suited to provide [MetLife's] policyholders with a fair and equitable result." Plan at 6 (§ 3.2, "Basis for Choice of Method"). The Board concluded that it was "the most appropriate method of reorganization under Section 7312 for [MetLife]." *Id.* (noting that the third statutory method, N.Y. Ins. Law § 7312(d)(3), is available only to insurers with less than $50 million of surplus).

Under the business judgment rule, the Board had broad discretion in adopting policy, strategy, and tactics. *See, e.g., Clifford v. Metropolitan Life Ins. Co.*, 264 N.Y.S.2d 168, 170 (N.Y. App. Div. 1942) ("Directors are presumed to act honestly and in accordance with their best judgment[.] . . . [In matters] of internal management . . . courts seldom interfere with the

14

discretion so exercised by directors."); *see also* James A. Smallenberger, *Restructuring Mutual Life Insurance Companies: A Practical Guide Through the Process,* 49 Drake L. Rev. 513, 541-42 (2001) (noting that demutualization approval process is structured to ensure that boards are protected by business judgment rule).

Based on the evidence presented, the court finds that the Board appropriately exercised its discretion in choosing method four and in selecting the detailed means of execution of the proposed demutualization.

### 4. Reliance on Superintendent

In late 1998, soon after the Board authorized management to develop a plan of reorganization, MetLife notified the Superintendent of its intention to demutualize. *See* Sup. Opinion ¶ 15; Parties' Stip. ¶ 10. Because the Board opted for the fourth method, which lacked statutory detail, it had to ensure that the details of the Plan satisfied the Superintendent.

MetLife personnel and advisors worked closely with the Superintendent and his staff and advisors for over a year in developing the Plan's details. There were, for example, meetings regarding what the Plan was going to provide to policyholders, how the Plan would be explained to policyholders, and the contents of the explanatory materials that would be sent to policyholders. *See, e.g.*, Apr. 10, 2002 Tr. of Joseph Reali Dep. 59:8-62:13, Docket Entry No. 363-35 (stating that MetLife representatives met and corresponded with Insurance Department representatives regarding terms of the Plan and contents of materials sent to policyholders); *id* at 37:23-25 (stating that MetLife "discussed issues time and again with the New York Insurance department"); *id.* at 83:8-20 (stating that MetLife personnel kept its own advisors apprised of

15

"where [it was] on discussions with the Insurance Department"); *see also* Nov. 5, 2002 Tr. of Michael Harwood Dep. 22:6-21, Docket Entry No. 431-2 (stating that MetLife representatives met weekly with Insurance Department regarding formation of closed block and calculation of actuarial equity share).

MetLife's Board and management relied on the Superintendent's review and expertise in assuring themselves that the demutualization was being conducted properly—particularly with respect to critical actuarial calculations and the formation of the closed block that would assure future dividends to policyholders. *See, e.g.*, May 25, 2006 Tr. of Robert G. Schwartz Dep. 78:22-79:11, Docket Entry No. 508-4 ("I relied . . . on the insurance department, who in turn hired, as I recall, outside professionals, actuaries. You know, we were extremely well-regulated and constantly under their supervision and review, so I felt very comfortable that it was being done well and properly"); May 11, 2006 Tr. of Stewart Nagler Dep. 202:20-203:14, Docket Entry No. 508-5 (stating that Board adopted Plan when Superintendent had indicated that Plan was "approvable . . . [and MetLife] could go ahead and just plan that it would be approved"); Mar. 9, 2006 Tr. of Robert H. Benmosche Dep. 61:9-14, Docket Entry No. 508-6 (stating that, in connection with technical and actuarial matters, "you have to rely on the advisers and the Insurance Department. The Insurance Department has a large number of people that go through the details of how you calculate it and review the calculations").

The Plan adopted by the Board—and then approved by voting policyholders—reflected MetLife's responses to the Insurance Department's "comments on elements of the plan,

suggestions, [and] questions." May 17, 2006 Tr. of Joseph Reali Dep. 9:17-23, Docket Entry No. 363-37.

The Board was aware that MetLife's demutualization could not be effective without the Superintendent's approval. By its own terms, the Plan could be amended, withdrawn, or altered in response to any concerns the Superintendent might raise before the IPO. *See* Plan at 27 (§ 10.4, "Amendment or Withdrawal of Plan"); *see also* Oct. 13, 2009 Hr'g Tr. at 56:16-57:8 (statement of MetLife's counsel). Any amendments would have required the Superintendent's approval to become effective. Plan at 27.

**B.      Solicitation of Policyholder Votes**

**1.      Mailings**

On November 24, 1999, MetLife began mailing a package of explanatory materials (the "Policyholder Packet") to policyholders describing the Plan in advance of the policyholder vote. *See* Parties' Stip. ¶ 20; Sup. Opinion ¶¶ 20-21. The mailing was completed on December 21, 1999, having by then reached substantially all of the 11 million policyholders entitled to vote on and receive compensation under the Plan. *See* Parties' Stip. ¶¶ 17, 20; Sup. Opinion ¶ 24.

Each Policyholder Packet contained:

- a cover letter from MetLife's Chairman of the Board;

- a brochure titled "Important!  Read Me First";

- a two-part Policyholder Information Booklet;

- a ballot for voting on MetLife's demutualization plan;

- a card listing the policies for which a policyholder was eligible to receive compensation and the form of compensation to be received;

- a card that allowed policyholders eligible to receive compensation in the form of stock to elect instead to receive compensation in the form of cash;

- an Internal Revenue Service Form W-9, along with a return envelope for returning the ballot, the Form W-9, and/or the card electing cash compensation.

*See* Policyholder Packet, Docket Entry Nos. 530-12 & 530-13; *see also* Parties' Stip. ¶ 19

(listing contents of Policyholder Packet).

Featured in the Policyholder Packet was a notice of the purpose, date, time, and location

of the policyholder vote:

> In order for the Plan to be approved, at least two-thirds of the votes validly cast by eligible policyholders must be in favor of the Plan. You may cast your vote in person at MetLife or return your ballot by mail using the postage-paid envelop enclosed. You may vote in person at the offices of MetLife:
>
> Place: MetLife
>        One Madison Avenue, 1st Floor
>        New York, New York
> Date:  February 7, 2000
> Time:  10:00 a.m. to 4.00 p.m. (EST)
>
> ****
>
> You must either vote in person or mail the ballot card (card #2) so that we receive it by 4:00 p.m. (EST) February 7, 2000 in order for your vote to count.

Policyholder Packet, Docket Entry No. 530-12, at 5; *see also id.* at 9-10 (letter of Insurance

Department stating, time, date, and place of vote).

Included was notice of the public hearing to be conducted by the Superintendent in advance of the policyholder vote. It stated that policyholders could make oral statements or written submissions in connection with the hearing:

> The Superintendent of Insurance of the state of New York has scheduled a public hearing to consider the Plan of Reorganization adopted by the Board of Directors of Metropolitan Life Insurance Company (MetLife) on September 28, 1999 and as amended by amendment adopted on November 16, 19999.
>
> THE PUBLIC HEARING WILL BE HELD AT THE GRAND HYATT NEW YORK, PARK AVENUE AT GRAND CENTRAL (AT EAST 42ND STREET), IN THE EMPIRE STATE BALLROOM, NEW YORK, NEW YORK, BEGINNING AT 10:00 A.M. (EST) ON JANUARY 24, 2000.
>
> ****
>
> If you would like to submit a written statement concerning the Plan to the New York State Superintendent, you may do so . . . . If you would like to make an oral statement at the public hearing, you should register [to do so] by January 20, 2000.

*Id.* at 8 (emphasis in original).

The bulk of the Policyholder Packet consisted of the two-part, 350-plus page Policyholder Information Booklet (PIB). Part One summarized the Plan, including a complete copy of the Plan of Reorganization (with some exhibits and schedules in summary form). Policyholder Packet, Docket Entry No. 530-12, at 20-50 & Docket Entry No. 530-13, at 1-114. Part Two contained information about MetLife's business and finances. Policyholder Packet, Docket Entry No. 530-13, at 115-338. The stated purpose of the PIB was to "give

[policyholders] information to help [them] decide how to vote." Policyholder Packet, Docket Entry No. 530-12, at 6.

The Policyholder Packet was designed to provide information necessary for an informed decision and to convince policyholders to vote for the Plan. It assured them that the Plan, though adopted by the Board, was subject to final approval by the Superintendent. The Chairman's Letter supported a favorable vote, explaining:

> In electing to demutualize, the Board was guided by one overriding concern: the best interests of our policyholders.
>
> ****
>
> The Board of Directors has determined that the reorganization is in the best interests of MetLife and its policyholders, and has found the demutualization to be fair and equitable to policyholders. Therefore, the Board urges you to vote YES in favor of approving the demutualization plan.

*Id.* at 1.

The pivotal role of the Superintendent was highlighted throughout the Policyholder Packet. A letter from the Insurance Department—embossed with the state agency's seal—was enclosed with the Read-Me-First brochure at the front of the Policyholder Packet. Signed by the Deputy Superintendent, the letter described the Insurance Department's involvement in the process and made clear that, even if policyholders were to vote in favor of the transaction, MetLife's demutualization would not become effective without final approval by the Superintendent. *Id.* at 10-11. Similar statements were contained throughout. *See, e.g.*, *id.* at 4, 5, 37-38.

The Superintendent reviewed, commented upon, and approved the Policyholder Packet.

Sup. Opinion ¶ 216 ("The policyholder notices and accompanying documents, including the

Policyholder Information Booklets, Parts One and Two . . . were approved by the

Superintendent[.]"); Apr. 10, 2002 Tr. of Joseph Reali Dep. 61:23-62:13, Docket Entry No. 363-

35 ("Everything that was sent out [to policyholders] was discussed with the Insurance

Department").

## 2. Telephone

Included in the Policyholder Packet were toll-free telephone numbers for policyholders to

call if they had questions, needed assistance, or wanted additional information. *See, e.g.*,

Policyholder Packet, Docket Entry No. 530-12, at 1, 2, 57, Docket Entry No. 530-13, at 31.

Prospective voters took advantage of this telephone hotline:

> MetLife received **over 2.5 million phone calls** from policyholders
> with questions about the demutualization, from the time of the
> mailing until after the initial public offering. To handle those calls,
> MetLife had a voice response unit that will [sic] allow
> policyholders to get answers to the frequently asked questions at
> any time. In addition, MetLife had 500 customer service
> representatives available to answer further questions.
>
> ****
>
> As of April 11, 2000, the call centers had received 2,513,183 calls
> (including 66,183 calls in Canada). 41.9% of these inquiries were
> satisfied through the voice response unit.

Apr. 4, 2008 Aff. of Jared Stamell, Ex. 2 at 29, Docket Entry No. 360-13 ("MetLife Overview:

Corporate Information," attached to Apr. 24, 2000 email from Cristina Amodeo to Christina Y.

Tso) (emphasis in original).

MetLife prepared scripts to be used at call centers, with answers to expected queries. *See* Oct. 14, 2009 Defs.' Letter to the court, Docket Entry No. 499 (attaching scripts). The prepared responses directed callers to the New York insurance law, and emphasized that the demutualization could not become effective without approval by the Superintendent. *See id.* The Superintendent and his advisors reviewed and commented on drafts of the telephone scripts before they were used. *See id.*

### C. Superintendent's Investigation and Approval

#### 1. Appointment and Reliance on Advisors

Four outside advisors were appointed by the Superintendent to assist in the review of MetLife's proposed demutualization: legal consultant Fried, Frank, Harris, Shriver & Jacobson LLP; financial consultant The Blackstone Group L.P.; actuarial consultant Milliman & Robertson, Inc., and accounting consultant Ernst & Young LLP. *See* Sup. Opinion ¶ 16; N.Y. Ins. L. § 7312(h) (authorizing appointment of outside consultants).

With the help of these advisors, the Superintendent posed searching questions to, and requested detailed information from, MetLife about the substantive details of the transaction. Actuarial and other documentation was requested to facilitate analysis. *See, e.g.*, July 6, 1999 Letter from N.Y. Ins. Dep't to MetLife, Docket Entry No. 431-5 (requesting actuarial information on behalf of consultant and stating that "[t]he department will not be in a position formally or informally to approve any aspect of the proposed transaction which is dependent upon matters which the department and its advisors have not had an adequate time to review, including any necessary revisions"); Jan. 12, 1999 Letter from MetLife to N.Y. Ins. Dep't and

22

its Consultants, Docket Entry No. 531-4 (containing responses to information request from the Department).  The Superintendent and appointed consultants reviewed and relied upon information MetLife provided voluntarily as well as in response to the Insurance Department's specific requests.  *See* Sup. Opinion ¶¶ 17, 127, 131.

## 2. Public Hearing

On January 24, 2000, the Superintendent held a public hearing, at which policyholders and members of the public were invited to speak on the proposed demutualization.  He put critical questions to MetLife management and directed them to answer inquiries from policyholders and the public.  *See* Jan. 24, 2000 Metropolitan Life Demutualization Transcript of Proceedings, Docket Entry No. 499-4 ("Public Hr'g Tr."), *available at* http://www.ins.state.ny.us/life/demut/met_trans.pdf (last accessed Jan. 25, 2010).

Approximately 150 people attended the hearing.  Sup. Opinion ¶ 25.  It lasted for some three hours.  *Id.* ¶ 26.  The Superintendent was present, accompanied by five officials from the Insurance Department.  *See* Public Hr'g Tr. at 2:4-13.

A video of the hearing was posted on the Insurance Department's website.  *See id.* at 114:16; Press Release, N.Y. Dep't Ins., "Department Makes Video of Public Hearing Available on Web Site for First Time: Consumers Can Access Video and Audio of MetLife's Demutualization Hearing" (Jan. 27, 2000), *available at* http://www.ins.state.ny.us/press/2000/p0001272.htm (last accessed Jan. 25, 2010).

Anyone who registered to pose a question was provided with ten minutes to make an oral statement.  Public Hr'g Tr. at 5:5-10.  Twenty members of the public registered with the

Insurance Department as speakers, and nine actually presented statements. *See* Sup. Opinion ¶ 26; *see also* Public Hr'g Tr. at 52:18-113:22 (statements of Richard Norton, Ralph Kabrinik, V.J. Shah, Lance Gad, Paul Benton Weeks III, Tom Tierney, Anita Kartalopoulos, Phillip Bieluch, and Thomas Welling).

Each of these speakers criticized the Plan and its various components, including the methods used to calculate policyholder compensation and the adequacy of the Policyholder Packet. *See e.g.*, *id.* at 52:18-58:11 (statement of Richard Norton) (policyholder criticizing, among other things, valuation of "right to vote"); *Id.* at 62:14-65:4 (statement of V.J. Shah) (policyholder criticizing lack of subscription rights); *id.* at 65:7-70:19 (statement of Lance Gad) (policyholder and self-described expert, criticizing methods of allocation as unfair and inequitable); *id.* at 70:20-80:12 (statement of Paul Benton Weeks III) (attorney representing policyholders criticizing adequacy of disclosures); *id.* at 80:13-92:25 (statement of Tom Tierney) (actuary criticizing, on behalf of policyholders, adequacy of closed block and compensation to each policyholder); *id.* at 99:19- 109:16 (statement of Phillip Bieluch) (actuary criticizing efficacy of closed block and adequacy of disclosures); *id.* at 109:21-113:22 (statement of Thomas Welling) (chartered underwriter and financial consultant criticizing 10-share fixed minimum allocation of compensation).

Robert Benmosche, MetLife's then Chief Executive Officer and Chairman of the Board, reiterated at the hearing the favorable conclusion in his letter included in the Policyholder Packet:

> Based on our extensive analysis and consultation with independent
> financial, actuarial, legal and other advisors . . . . [and] based on
> careful consideration of various elements of the plan over the
> preceding months, our board of directors unanimously adopted our
> demutualization plan. Our directors concluded, among other
> things, that the plan is in the best interests of MetLife and our
> policyholders, and that it is fair and equitable to our policyholders.

*Id.* at 10:21-11:1; *cf.* Policyholder Packet at 1, Docket Entry No. 530-12 (cover letter from

Chairman Robert Benmosche) ("The Board of Directors has determined that the reorganization is

in the best interests of MetLife and its policyholders, and has found the demutualization plan to

be fair and equitable to policyholders.").

MetLife Chief Financial Officer Stuart Nagler discussed the Trust, the closed block, and

the method of calculating and allocating policyholder compensation. *See* Public Hr'g Tr. at

14:2-23:4. MetLife General Counsel Gary Beller "reviewed how MetLife's demutualization

plan and related actions taken by MetLife will have satisfied each and every requirement of New

York Insurance Law." *Id.* at 23:14-23:18. Beller emphasized that the Superintendent had

reviewed and approved the Policyholder Packet, *id.* at 26:22-27:1, and that the Plan would not be

effective without ultimate approval from the Superintendent, *id.* at 30:2-30:14.

A representative of MetLife's financial advisors, Goldman Sachs & Company and Credit

Suisse First Bank Boston, reiterated the essence of their fairness opinions, that "the exchange of

the aggregate policyholders' membership interests in MetLife for shares of holding company

stock, cash or policy credits in accordance with the plan is fair from a financial point of view to

[eligible] policyholders." *Id.* at 39:16-40:4. The financial advisors stated that they expected to

coordinate the IPO with the Superintendent, who would be given an opportunity to monitor that

component of the transaction. *Id.* at 38:18-28.

MetLife's actuarial advisor, Kenneth Beck, a principal of PricewaterhouseCoopers ("PWC"), reiterated the content of PWC's fairness opinion, that "the plan for allocating compensation to eligible policyholders is fair and equitable," and that "the plan makes appropriate provisions with regard to the objective funding and operations for the closed block, as well as providing a vehicle to make appropriate adjustments to further policy dividends if the underlying experience changes." *Id.* at 45:19-46:1.

The Superintendent directed MetLife to answer five questions, regarding, among other things, the Plan's absence of subscription rights, the anticipated timing of the IPO, and the efforts MetLife was making to find policyholders for whom MetLife had no address. *Id.* at 46:10-5:24. Statements made at the public hearing were submitted to the Insurance Department and became part of the written record of the proceedings. Sup. Opinion ¶¶ 26, 28.

### 3. Written Submissions

The record of the public hearing remained open until February 14, 2000 so that the Superintendent could obtain additional written comments, questions, or statements about MetLife's demutualization plan from policyholders and others. *Id.*; Public Hr'g Tr. at 115:25-116:2. A total of 165 letters were received by the Department. Sup. Opinion ¶ 28. Many of the letters criticized policyholder compensation and the adequacy of materials mailed in solicitation of their votes. *See* Oct. 13, 2009 Defs.' Letter to the court, Docket Entry No. 512 (attaching written objections submitted by MetLife policyholders to the Superintendent).

The written submissions and responses became part of the public record of the Insurance

Department's hearing. *See* Sup. Opinion ¶ 28. They were reviewed by the Superintendent and

his advisors during their investigation of MetLife's proposed demutualization. *See id.*

### 4. Opinion and Decision

On April 4, 2000, the Superintendent issued his Opinion and Decision approving

MetLife's demutualization (the "Superintendent's Opinion"). The Superintendent's Opinion

contains conclusions with respect to the fairness and equity of the demutualization and the

adequacy of the disclosure materials sent to policyholders, *see generally* Sup. Opinion ¶¶ 198-

238 (section titled "Conclusions and Decision"), including the following:

1) "The reorganization of MetLife from a mutual insurer to stock company form, as set forth in the Plan, is in the best interests of MetLife and its policyholders, in compliance with Section 7312(c)(2)." *Id.* ¶ 200.

2) "The provisions of the Plan are fair and equitable to the policyholders of MetLife, in compliance with Section 7312(c)(3)." *Id.* ¶ 201.

3) "The Policyholders' Membership Interests will be exchanged for an aggregate amount of consideration that is fair and equitable to the policyholders of MetLife and meets the requirements of Section 7312, in compliance with Section 7312(d)(4)(A)." *Id.* ¶ 204.

4) "The consideration to be given to the policyholders of MetLife will be allocated among such policyholders in a manner which is fair and equitable in compliance with Section 7312(d)(4)(B)." *Id.* ¶ 205.

5) "The provisions of the Plan are fair and equitable to the policyholders of MetLife, taking into account the legitimate economic interests of participating policyholders as delineated in Section 7312, in compliance with Section 7312(d)(4)(D)." *Id.* ¶ 207.

6) "The policyholder notices and accompanying documents, including the Policyholder Information Booklets, Parts One and Two, contained sufficient information about the proposed reorganization to enable Eligible Policyholders to make an informed decision regarding the Plan, and, for that reason, were approved by the Superintendent pursuant to Section 7312(i), (k)(1)." *Id.* ¶ 216.

The sixth point, on the adequacy of the information supplied to prospective voters, is critical in rebutting any contention that notice was insufficient, unfair, or fraudulent. Other sections of the Superintendent's Opinion provide the facts and the law supporting the Superintendent's conclusions. The first three sections summarize applicable provisions of the New York Insurance Law and provide an overview of the process of MetLife's demutualization. *Id.* at ¶¶ 1-14 ("I. Legislative Background and Statutory Requirements"), ¶¶ 15-30 ("II. Procedural History"), ¶¶ 31-42 ("III. Plan of Reorganization"). The Superintendent's detailed findings and analysis with respect to specific components of MetLife's Plan are included in the following sections. *See id.* at ¶¶ 43-71 ("IV. The Trust"), ¶¶ 72-79 ("V. Purchase and Sale Program"), ¶¶ 80-112 ("VI. IPO, Private Placements, and Other Capital Raising Transaction"), ¶¶ 113-141("VII. Eligibility and Policyholder Consideration"), ¶¶ 142-161 ("VIII. The Closed Block"), ¶¶ 162-176 ("IX. Restrictions on Acquisition of Securities by MetLife Personnel."), ¶¶ 177-181 ("X. Future Operations and Solvency"), ¶¶ 182-188 ("XI. Corporate Governance"), ¶¶ 189-191 ("XII. Tax Matters"), ¶ 192 ("XIII. Department of Labor Exemption"), ¶¶ 193-194 ("XIV. Securities Law Matters"), ¶ 195 ("XV. Expenses"), ¶¶ 196-197 ("XVI. Notice of Pendency").

Throughout, the Superintendent's Opinion describes the careful steps the Superintendent took to investigate and determine whether to approve the Plan, including a description of the public hearing and the appointment of advisors to aid in the investigation. *See id.* ¶¶ 15-17, 21. Described were the facts and materials the Superintendent relied on in rendering his Opinion, including:

- The oral and written comments and objections on the demutualization submitted to the Insurance Department by policyholders and members of the public. *See, e.g., id.* ¶¶ 34, 37, 50, 54, 66, 84, 86, 106, 125, 128, 145, 153, 188, 237.

- The opinions of actuaries and other consultants. *See, e.g., id.* ¶¶ 15-17, 42, 83, 126, 127, 129, 131, 144, 160, 161, 194.

- The compensation given to policyholders and the allocation of that compensation among those policyholders, *see, e.g., id.* ¶¶ 119-131, 205, including the fixed share component and the actuarial formula used to calculate the variable component, *see id.* ¶¶ 122-124, 126-128.

- The structure and funding of the closed bock. *See id.* ¶¶ 142-161.

- The information on the demutualization that was disclosed to policyholders. *See e.g., id.* ¶¶ 66, 216, 238.

**D.    Demutualization Procedure**

The Plan was approved by 93% of the approximately 2.7 million policyholders who voted. Parties' Stip. ¶ 23; Sup. Opinion ¶ 27. The Superintendent also approved the Plan, after exhaustive review and a public hearing as required by New York law, *see* Sup. Opinion ¶¶ 16-17, 25-26, as being "in the best interest of MetLife and its policyholders," "fair and equitable to the policyholders," "not detrimental to the public," not hazardous to MetLife's solvency, and

otherwise in compliance with applicable law. *Id.* ¶¶ 200, 201, 238.

Demutualization became effective on April 7, 2000. Parties' Stip. ¶ 3. As a result of the conversion from mutual to stock form, policyholders' "membership interests" were extinguished. *See* N.Y. Ins. Law §§ 7312(d)(4)(A), (m), (r); Plan §§ 3.1(c), 5.2(d)(iii). The term "membership interests" is defined by New York statute and the Plan to mean policyholders' rights as members of the mutual company by law or by the company's charter, and any right to vote conferred by their policies. N.Y. Ins. Law § 7312(a)(3); Plan, Art. II (defining "Policyholders' Membership Interests"). Membership interests do not include any rights expressly conferred by the insurance policies, other than the right to vote. *Id.* The demutualization did not change policyholders' premiums, benefits or eligibility for policy dividends. Sup. Opinion ¶ 154; *see* N.Y. Ins. Law § 7312(r) ("[T]he rights of all policyholders . . . shall be as specified in their policies or contracts . . . except for the elimination of the right to vote[.]"); *id.* § 7312(m) ("[T]he reorganized insurer shall be deemed a continuation of the corporate existence of the mutual life insurer . . . . [The reorganized insurer] shall be deemed to have assumed all of the obligations and liabilities of the mutual life insurer . . . other than obligations and liabilities with respect to the policyholders' membership interest eliminated by the plan of reorganization."). Membership interests include the right to vote for company directors and a contingent interest in a possible distribution of surplus in the event of a solvent liquidation. Plan, Art. II (defining "Policyholders' Membership Interests"). Membership interests did not include eligibility for policy dividends, which is a contractual right that persists after demutualization. *Id.* ("The term 'Policyholders' Membership Interests' does not include rights expressly conferred upon the policyholders by their policies or

contracts . . . such as the right to any declared policy dividends."); *see also id.* § 3.1(b).

Under New York law and the Plan, policyholders whose policies were in force on the September 28, 1999 adoption date of the Plan (called "Eligible Policyholders" in the Plan) were entitled to receive consideration in exchange for their membership interests. *See* N.Y. Ins. Law § 7312(e)(3); Plan, Art. II (defining "Eligible Policyholder"), §§ 3.1(c), 5.2(d)(iii). Following the precedent established by prior demutualizations, MetLife's Plan allocated to the eligible policyholders 100% of the stock of the company prior to the sale of additional shares in the IPO. *See* Sup. Opinion ¶¶ 15, 39; Plan § 3.1. A minority of the policyholders elected to receive cash at the IPO price in lieu of stock, and an even smaller minority were required for tax or regulatory reasons to receive cash or credits to their policies, determined at the IPO price of $14.25 per share. *See* Parties' Stip. ¶¶ 27, 39, 43-44; Plan § 7.3(a)-(d).

The majority of Eligible Policyholders received shares of stock in MetLife's new holding company, MetLife, Inc., held in a trust for their benefit. Parties' Stip. ¶ 43; *see* Plan § 7.3. The trust was designed to minimize the administrative costs associated with having millions of shareholders. Sup. Opinion ¶¶ 43-44. Beginning shortly after the demutualization and continuing to the present day, these policyholders were able to sell their shares, subject to certain restrictions, from the trust at the market price free of commissions. Parties' Stip. ¶ 70; Sup. Opinion ¶ 51. One year after the demutualization, policyholders could elect to withdraw their shares from the trust and hold the shares directly (for example, through their own broker) like any other shareholder, or could leave the shares in the trust so that they could take advantage of the commission-free sale program in the future. Parties' Stip. ¶ 72; Sup. Opinion ¶ 51.

MetLife, Inc.'s stock price rose to $70 per share in 2007, and is now trading at approximately $34 per share. MetLife, Inc. has paid cash dividends on the stock every year. These cash dividends are in addition to the policy dividends that MetLife continues to pay to class members who have retained their insurance policies. MetLife contends that those who sold their stock when it was trading at a lower price, or who took cash or policy credits in lieu of their allocated shares at the IPO price of $14.25 per share, benefited from the transaction, because they received tangible value in exchange for their illiquid membership interests. *See* Plan, Art. I ("Purpose of Reorganization").

The Plan's method of allocating shares among policyholders followed established precedent. Every eligible policyholder received a "fixed component," consisting of an allocation of 10 shares, which accounted for about 16% of the total consideration. *See* Sup. Opinion ¶ 122; Plan § 7.1(b)(i). The remaining 84% was allocated under the Plan according to an actuarial formula, in proportion to each participating policy's actuarial contribution to surplus. *See* Sup. Opinion ¶ 124; Plan §§ 7.1(b)(ii), 7.2(a)(i). "Actuarial contribution to surplus" is an estimate of the policy's past contributions and the projected present value of future contributions to MetLife's surplus. Parties' Stip. ¶¶ 54, 57. As defined in the Plan, a "participating" policy is one that either (i) contains an express provision for policy dividends or (ii) does not expressly state that it is nonparticipating. Plan, Art. II, (defining "Participating Policy"). Policyholders who held only nonparticipating policies, or whose participating policies had zero or negative estimated actuarial contribution to surplus, received only the fixed component of ten shares and no variable component. Sup. Opinion ¶¶ 123-24.

In accordance with section 7312(d), MetLife's Plan established a dividend-protection mechanism known as a "closed block." Plan §§ 3.1(a), 8.1 ("Establishment of the Closed Block"). A closed block is an accounting mechanism designed to protect reasonable policyholder dividend expectations by "provid[ing] for continuation of current payable dividend scales, if the experience underlying such scales continues and for appropriate adjustments in such scales if the experience changes." N.Y. Ins. Law § 7312(d)(5)(B); *see* Sup. Opinion ¶¶ 142-144; Plan § 8.1(a). The closed block includes, substantially, the individual policies that had dividends payable at the time of the demutualization. *See* Plan, Art. II (defining "Closed Block Business"). Assets are allocated to the closed block that have been determined to be sufficient to pay benefits and to continue the current dividend scale, assuming that the experience underlying that dividend scale remains the same. *See* Sup. Opinion ¶ 142; Plan § 8.1(a). Assets allocated to the closed block can only be used for the benefits, dividends, and certain expenses of the policyholders covered by the closed block; these assets do not revert to the benefit of MetLife stockholders. *See* Plan § 8.2(g).

## E. Related Lawsuits

Out of a number of suits filed in the wake of MetLife's demutualization, it appears that only the instant action and the *Fiala* state action remain pending. A purported derivative action was filed shortly before the parties reached the proposed settlement in this case and the *Fiala* case. *See Waldman v. Benmosche*, Index No. 650643/2009 (N.Y. Sup. Ct., filed Aug. 26, 2009).

The instant action was filed on April 18, 2000. Compl., Docket Entry No. 1. Plaintiffs allege: incomplete disclosure of the basis for determining the fixed 10-share allocation to

policyholders; misrepresentation or incomplete disclosure about the effect of the closed block on

policyholder dividends; misrepresentation of the reasons for choosing statutory method four for

demutualization, *see* N. Y. Ins. Law § 7312(d)(4); and incomplete disclosure of the role and

amount of actuarial contribution to surplus. *See generally* Second Consolidated Am. Compl.,

Docket Entry No. 120 ("Am. Compl."). Additional claims about the policyholder trust were

deleted by amendment. *See* Oct. 7, 2009 Stip. and Order Amending the Compl., Docket Entry

No. 491.

In 2003 the New York Supreme Court dismissed in their entirety claims against MetLife

in *Fiala* and *Shah*, another case that was subsequently consolidated into *Fiala*. *See Shah v.*

*Metro. Life Ins. Co.*, 2003 N.Y. Slip Op. 50591(U), 2003 WL 728869 (N.Y. Sup. Ct. Feb. 21,

2003), *modified sub nom. Fiala v. Metro. Life Ins. Co.*, 6 A.D.3d 320 (N.Y. App. Div. 2004). On

appeal, the Appellate Division reinstated two claims: a claim under Insurance Law section 7312

based on the alleged allocation of excessive shares to a large policyholder, and a common-law

fraud claim based on nondisclosure of an alleged plan to buy back stock after the IPO. *Fiala*, 6

A.D.3d at 321-23. After remand, the *Fiala* plaintiffs recast their claim for failure to disclose the

alleged share buyback plan as a section 7312 claim. *See* Revised Third Consolidated Am.

Compl. ¶¶ 65-68, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y. Sup. Ct., Dec. 22,

2005) (Ex. G to Dec. 28, 2009 Aff. and Decl. of Carl Micarelli in Supp. of Approval of Stip. of

Settlement and in Response to Objections, Docket Entry No. 578-5 ("Micarelli Aff.")). The

"excessive allocation" claim was later discontinued for lack of evidence, *see* Stip. and

Withdrawal of Certain Claims, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y. Sup.

Ct., Feb. 22, 2008) (Ex. H to Micarelli Aff.), leaving only the "buyback" claims. MetLife filed a motion for summary judgment as to those remaining claims, which was pending at the time the parties settled. Dec. 28, 2009 Aff. and Decl. of Kevin S. Finnegan in Supp. of Approval of the Stip. of Settlement ¶ 11, Docket Entry No. 578-1 ("Finnegan Aff.").

### F.  Class Certification and Notice

In the instant action a class was certified as to all claims. The class consists of

> all persons who were participating Metropolitan Life Insurance Co. ("MetLife Co.") policyholders on or about September 28, 1999, for whom MetLife Co. calculated a positive actuarial equity share . . . and whose rights as participating policyholders were exchanged for shares of stock in MetLife Co., pursuant to defendants' plan of demutualization . . . , excluding defendants, their officers, directors, subsidiaries and affiliates[.]

July 19, 2005 Mem. and Order 4, Docket Entry No. 181 (*In re MetLife Demut. Litig.*, 229 F.R.D. 369, 372 (E.D.N.Y. 2005)). The trial court interpreted the class as including those who received cash or policy credits in addition to those who received stock. *See* August 29, 2006 Mem. and Order, Docket Entry No. 254 (*In re MetLife Demut. Litig.*, No. 00-CV-2258, 2006 U.S. Dist. LEXIS 97633 (E.D.N.Y. Aug. 29, 2006)). In effect, the class consists of all policyholders who received more than 10 shares of stock, or more than $142.50 in cash or policy credits, in the demutualization (except those who opted out and certain persons associated with defendants).

Pursuant to the court's August 2, 2008 Order, Docket Entry No. 358, individual notice was mailed to approximately 6.7 million members of the class with known addresses that could be obtained through reasonable efforts, in addition to publication notice and the establishment of a toll-free number and a dedicated website. *See* Oct. 20, 2009 Decl. of Eric H. Newman

Regarding Distribution of Notice of Pendency, Docket Entry No. 503; Oct. 16, 2009 Decl. of

Daniel R. Burke, Docket Entry No. 503-1 (describing work done by Gilardi & Co. LLC to

distribute notice of pendency to the class).  MetLife has represented that it understands that

nearly 13,000 class members submitted timely exclusions.  *See* MetLife's Dec. 28, 2009 Mem.

of Law in Supp. of Approval of the Settlement and in Response to Objections at 10, Docket

Entry No. 578 ("MetLife Mem.").

In the *Fiala* state action, a class was certified as to the section 7312 cause of action only

and denied as to the common-law fraud cause of action.  *See Fiala v. Metro. Life Ins. Co.*, Index

No. 601181/1812, 2006 WL 6190175 (N.Y. Sup. Ct. May 2, 2006), *aff'd as modified*, 52 A.D. 3d

251 (N.Y. App. Div. 2008) (removing plaintiff Smilow as a class representative). The class in

*Fiala* consists of

> [a]ll Eligible Policyholders of MetLife, who owned and had in
> force, as of September 28, 1999, life insurance policies, annuity
> contracts, or accident and health insurance policies issued by
> MetLife, or other certificates of interest identified in the Plan.  The
> Class will exclude therefrom the defendants, their officers,
> directors, subsidiaries, affiliates and legal representatives, and
> those who request exclusion from the Class within a specified time
> after notice to be set forth in a further order of this Court.

Order, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/00 (N.Y. Sup. Ct.  Mar. 12, 2008) (Ex. K

to Micarelli Aff.).

The New York Supreme Court, after considering the substantial expense of individually

notifying the class members of the *Fiala* suit, ordered notice by publication in the *Wall Street*

*Journal* and the *New York Post* once per week for three weeks, and notice by mail to a random

sample of 500,000 class members. *See Fiala v. Metro. Life Ins. Co.*, Index No. 601181/2000, 2007 N.Y. Slip Op. 51797(U), 2007 WL 2772230, at *2-3 (N.Y. Sup. Ct. Aug. 28, 2007). Notice was given in accordance with the court's instructions. *See* Decl. of Alan Vasquez Re: Notice Procedures, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/2000 (N.Y. Sup. Ct. July 25, 2008) (Ex. M to Micarelli Aff.). All class members had at least 45 days to request exclusion from the class. *See* Ex. M. to Micarelli Aff. (attaching copies of published notice). MetLife has represented that it understands that 256 class members submitted timely exclusions in *Fiala. See* MetLife Mem. at 10.

### G. Discovery and Preparation for Trial

Over the course of nearly eight years, the parties engaged in extensive discovery. More than 50 depositions were taken in the two actions, and hundreds of thousands of pages of documents were produced. Finnegan Aff. ¶ 7. Over sixty thousand pages were designated as trial exhibits in the instant case. *Id.* The parties in both cases retained experts, who were prepared to testify on issues involved in the cases. *Id.* Trial in the instant action was bifurcated into liability and damages phases, *see* Oct. 15, 2009 Order, Docket Entry No. 498 ("Oct. 15, 2009 Order"). Trial on the liability phase was due to begin on November 2, 2009.

### H. Settlement Negotiations

There had been, from time to time since this case and the *Fiala* case were filed, discussions between the parties regarding the possibility of settling one or both cases. These discussions, both between the parties alone and before U.S. Magistrate Judge A. Kathleen Tomlinson, United States District Judge Thomas C. Platt, and New York Supreme Court Justice

Herman Cahn (then in charge of the state case), did not lead to any agreement on settlement prior to October 2009. *See* Finnegan Aff. ¶¶ 8-9.

After the case was reassigned to the undersigned, on the disability of Judge Platt, by Order of October 16, 2009, Docket Entry No. 501, Richard J. Davis, Esq., a prominent member of the law firm of Weil, Gotshal & Manges LLP, was appointed as Special Master to facilitate settlement. Mr. Davis acted as mediator between the parties, discussing settlement with the representatives of each of them. *See* Finnegan Aff. ¶ 9.

Jury selection in this case was completed on Friday, October 30. *See* Oct. 30, 2009 Minute Entry, Docket Entry No. 547. Trial was scheduled to start on Monday, November 2.

On the evening of Saturday, October 31, 2009, after two weeks of arm's length negotiations, the parties reached agreement, with the help of Mr. Davis, on the basic terms of a settlement, including amount and structure. *See* Finnegan Aff. ¶ 10. Mr. Davis put the terms of the parties' agreement in principle on the record on November 2, and recommended approval of the settlement. *See* Nov. 4, 2009 Mem. and Order Regarding Notice and Hearing on Approval of Proposed Settlement 5, Docket Entry No. 536 (*In re MetLife Demut. Litig.*, 262 F.R.D. 205 (E.D.N.Y. 2009)) (the "Nov. 4, 2009 Order"). The parties submitted a Stipulation of Settlement to both the state and federal courts for approval on November 5, 2009. *See* Stip. of Settlement, Docket Entry No. 539-2 (the "Settlement").

## I. Terms of Settlement

The proposed Settlement provides for a total allocation of $50 million by defendants in the federal and state cases, combined. Settlement ¶ 15. This sum is deemed to be characterized

as compensatory money damages by the parties.

Distribution will be made as follows: (i) $2,500,000 will be paid in cash as a *cy pres* payment to a health-based or other not-for-profit organization or organizations; (ii) reasonable attorneys' fees and litigation expenses of the classes, as determined by this court and the *Fiala* court, will be paid in cash up to $15 million; and (iii) the remainder will be allocated in assets to the closed block established by the Plan of Reorganization. *See* Settlement ¶¶ 16-20. In exchange for these allocations, the proposed Settlement releases all claims of the plaintiffs and class members asserted in the state and federal cases, as well as any other claims concerning the demutualization and related transactions. *Id.* ¶¶ 21-22.

## J.    Notice of Settlement

Notice by publication was approved by the court. *See* Nov. 4, 2009 Order at 2-5 (*In re MetLife Demut. Litig.*, 262 F.R.D. 205, 207-08 (E.D.N.Y. 2009)); Nov. 6, 2009 Order Approving Form of Class Notice, Docket Entry No. 540. The same notice was approved in the *Fiala* case by orders of November 5 and 6, 2009. *See* Order Regarding Notice & Hearing on Approval of Proposed Settlement at 2, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/2000 (N.Y. Sup. Ct. Nov. 5, 2009) (Ex. O to Micarelli Aff.); Order Approving Form of Class Notice, *Fiala v. Metro. Life Ins. Co.*, Index No. 601181/2000 (N.Y. Sup. Ct. Nov. 6, 2009) (Ex. Q to Micarelli Aff.). The orders approving notice in this action and the *Fiala* state action directed notice to be made four times (twice per week for two weeks) in each of the *New York Times*, the *Wall Street Journal*, the *New York Law Journal*, and *USA Today*. *See, e.g.*, Nov. 4, 2009 Order at 3 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 207).

A joint hearing on the fairness of the proposed Settlement was scheduled for December 30, 2009 at the United States Courthouse in Brooklyn. A December 24, 2009 deadline was set for the receipt of written objections to the proposed Settlement by class members. *See, e.g.*, Nov. 4, 2009 Order at 4 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 207). Notice was published as required on November 12, 13, 17 and 19, 2009. *See* Finnegan Aff. ¶ 2 & Exs. A-1 to A-16 (copies of notice as published). Notice also was given to the Superintendent of Insurance. *Id.* ¶ 3. The form of notice and the Stipulation of Settlement were made available on the "Notices" page of the Eastern District of New York's website, which is reachable by a link from the court's home page, the address of which was included in the published notice. *Id.* ¶ 4.

### K. Objections

Five objections were submitted on behalf of six class members, by (1) Steven Waldman, (2) John J. Pentz, Jr. and Thomas Sterrett Bell, (3) Robert Gould, (4) Christopher J. Mueller, and (5) Lawrence Kuczynski. Actuary Thomas P. Tierney made an additional submission at the request of Mr. Mueller and in support of Mr. Mueller's objection. Several of these objections may have been submitted after December 24, 2009. Several of them may be directed only to the instant action or to the *Fiala* action, but not both. Setting aside issues of timeliness and treating all objections as directed to both actions, none of the objections warrants denial of approval of the proposed Settlement. *See* Part IV.F, *infra*.

### III. Hearings on Proposed Settlement and Related Applications

### A. Trial and November 2, 2009 Preliminary Fairness Hearing

Trial commenced in this action on Monday, November 2, 2009, with the swearing in of a

jury. *See* Nov. 4, 2009 Order at 1 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 206). Out of the presence of the jury, the court requested a report from Special Master Richard J. Davis, Esq. Mr. Davis reported that the parties had agreed to a joint settlement of this action and the *Fiala* action. *Id.* at 2. With the parties' consent the jury was then dismissed. *Id.* Counsel for the plaintiffs in this action, counsel for the plaintiffs in *Fiala*, and counsel for MetLife all confirmed on the record that all parties had agreed to the terms of the proposed Settlement. *Id.* at 3. Terms of the settlement were read into the record. *Id.* at 2-3.

State and federal civil rules authorize, but do not require, a court to conduct a preliminary review of the settlement agreement for probable reasonableness before notice is sent to the class. Based on the information available as of November 2, 2009, it was found probable that the settlement was fair, reasonable, and adequate. *Id.* at 5. In making this preliminary finding, the court relied upon key documents in the record, and upon an extended series of hearings held and rulings made in preparation for trial. *Id.*

In particular, this court made preliminary findings, which were stated on the record and summarized in the Nov. 4, 2009 Order as follows:

> The Special Master for settlement, Richard J. Davis, is a distinguished and experienced counsel appointed at the parties' unanimous suggestion. The Special Master has engaged in extensive discussions with the parties. He recommends approval of the settlement.
>
> This case and *Fiala* have been pending for some nine years. During that time, the facts and the law have been thoroughly explored under adversarial conditions. There has been extensive litigation in the trial court and Appellate Division in the state case and in the District Court and Court of Appeals for the Second Circuit in the federal case, including, among other matters,

summary judgment, class certification, and an attempted appeal of certification of a class.

Settlement negotiations have been conducted at arm's length, after full discovery. Counsel for the parties are experienced in similar litigation. They have been able to accurately assess the merits of their positions and to determine what is a reasonable settlement.

Several considerations are relevant to whether a settlement is fair, reasonable and adequate. First is the strength or weakness of the case on the merits, in comparison to the amount offered in settlement. The state substantive law on corporate functions and on demutualization has a strong bearing on the case, but the substance of this case is controlled by federal substantive statutes and the regulations of the Securities and Exchange Commission. The parties appear to have reached an appropriate balance of risks and benefits for all of those involved in this complex litigation. The total settlement amount and its division recognizes this practical balance in a pragmatic way. It provides advantages to all parties at relatively small additional cost to any of them. The cy pres portion of the settlement provides indirect benefit to those relatively few members of the class who will not benefit from the closed block portion of the settlement. That latter portion of the settlement will benefit a large number of class members who hold policies, without substantially adversely affecting shareholders of defendant.

The second consideration is whether there has been collusion. There has been no evidence of collusion. Each side has been strongly opposed by the other.

A third element is the reaction of the class members to the settlement. The courts will decide this matter based upon the hearing on approval of the settlement. It is expected that the number of objections will be minimal relative to the size of the class.

A fourth criterion is the stage of the litigation. Here the cases are fully matured. The parties conducted discovery in a highly skillful and thorough manner. This case was settled as the trial began. All parties were thoroughly prepared on the law and the facts.

An additional factor in determining the fairness of the settlement is the amount of the class counsel's fees. The state and federal courts will ensure that the fees of the state and federal

plaintiffs' counsel are reasonable. Plaintiffs' counsel shall inform the court of any agreement as to division of fees. The communication may be filed under seal, with the understanding that the documents may be unsealed by order at any time.

The courts will approve the settlement only after a hearing and a finding that the settlement is fair, reasonable and adequate. The only finding that the courts are making now is that approval is probable, based on the available information, subject to a further hearing.

Any agreement between or among the parties or counsel bearing on the settlement's reasonableness shall be filed with this court. Filing may be under seal, subject to the courts' power to order unsealing.

Where, as here, a class action has been certified and class members have had a previous opportunity to request exclusion by opting out of the class, the court may afford individual class members a new opportunity to request exclusion, but it is not required to do so. In the present cases there shall not be provided a second opportunity for exclusion. The administration of any new exclusions procedure would be expensive. The number of policyholders who would opt out now, after failing to exclude themselves previously, is likely to be minimal to the vanishing point.

*Id.* at 5-8 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 208-09).

The state and federal courts set a combined schedule and procedures for: submission of a proposed Stipulation of Settlement; notice to class members; objections by class members to the proposed Settlement; and a hearing on the fairness of the proposed Settlement. This schedule and procedure were summarized in the November 4, 2009 Order of this court as follows:

The courts direct the parties to submit a proposed Stipulation of Settlement and a proposed Order regarding notice to the class members not later than November 5, 2009. The notice will be published in a form to be set out in the proposed Order, twice in the week of November 9 and twice in the week of November 16, in each of *USA Today*, *The Wall Street Journal*, *The New York Times*, and *The New York Law Journal*. The notice shall

be combined for this action and the *Fiala* action. The defendants shall give notice of the settlement, no later than November 19, 2009, to the Superintendent of Insurance of the State of New York.

. . .

Arranging for notice by publication to class members and to the Superintendent of Insurance shall be defendants' responsibility. In accordance with the parties' agreement and the courts' discretion, the defendants shall bear the costs of notice. Plaintiffs' counsel shall cooperate with defendants to facilitate the giving of notice. Counsel for the defendants shall notify the court promptly after notice has been completed.

Class members' objections to the settlement shall be in writing received by the Clerk of this court or of the New York Supreme Court, New York County, not later than December 24, 2009, or orally at the fairness hearing.

. . .

The joint fairness hearing shall be held in the United States Courthouse in Brooklyn, New York, on December 30, 2009 at 10:00 A.M. The parties shall submit a proposed order of approval of the settlement prior to December 31, 2009. The two courts will make a joint final decision on whether or not to approve the settlement as soon as practicable thereafter.

In accordance with the broad discretion in directing class notice under the Federal Rules of Civil Procedure and the New York Civil Practice Law and Rules, notice shall be given in a reasonable manner. Reasonable notice shall include the time and place of the hearing, the time and method for making objections and enough information about the proposed settlement to permit class members to form objections in an informed manner.

The best practicable notice under the circumstances is notice by publication in newspapers. In view of the millions of members of the class, notice to class members by individual postal mail, email, or radio or television advertisements, is neither necessary nor appropriate. The publication notice ordered is appropriate and sufficient in the circumstances. The timeline for notice provides reasonable, appropriate and ample opportunity for class members to oppose the settlement if they wish to do so. *See County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1422, 1424 (E.D.N.Y. 1989).

*Id.* at 3-5 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 207-08).

With the consent of the parties, the undersigned and the Honorable Shirley Kornreich,

Justice of the New York Supreme Court, consulted in private. *Id.* at 4  The judges and the parties

agreed that all of those concerned waived any venue and jurisdiction objections to a joint hearing

on the settlement of this action and the *Fiala* action in the Eastern District of New York and of

the instant action in New York County. *Id.*

###### B.      December 30, 2009 Fairness Hearing

Argument on the fairness of the proposed Settlement was heard on December 30, 2009 in

a joint hearing before this court and Justice Shirley Kornreich of the New York Supreme Court

in the United States District Courthouse in Brooklyn.  The New York State Department of

Insurance was notified of the hearing, and acknowledged receipt of the notice.  Dec. 30, 2009

Hr'g Tr. at 9.  The case docket and the ordered hearing notice were electronically available to the

United States Attorney's Office and the Securities and Exchange Commission; those offices

were deemed to have been notified and to be aware of the hearing.  *Id.* at 9-10.  No

representative of the New York Insurance Department or of any agency of the United States

government appeared at the hearing.

###### 1.      History of Litigation, Discovery and Readiness for Trial

United States magistrate judge A. Kathleen Tomlinson addressed the history of the

litigation, the state of discovery, and the readiness of the case for trial.  *Id.* at 7-8.  Magistrate

judge Tomlinson had supervised discovery and preliminary motions in the case starting in 2006.

In connection with her involvement in the case, she reviewed and became familiar with the full

history of the litigation.  *Id.* at 7.  The magistrate judge reported that discovery in this case had

45

been comprehensive and complete. *Id.* at 8. She noted that a pretrial order had been submitted, that the case had been ready for trial, and that a jury had been summoned and empanelled prior to the parties' reaching a settlement. *Id.*

### 2. Arguments of Parties

Arguments were heard in support of the settlement by counsel for the plaintiffs in this case, by counsel for the plaintiffs in *Fiala*, and by counsel for MetLife. *Id.* at 13-20. All of the parties acknowledged the critical role played in settlement negotiations by Special Master Richard Davis. It was emphasized by both parties in the instant case that the proposed Settlement's use of the closed block to allocate settlement funds "ensures that the maximum amount of settlement funds will go to the benefit of the class and not be consumed through things such as administration of the settlement." *Id.* at 19 (statement of MetLife's counsel); *see id.* at 19-20 (statement of federal class counsel) (placing funds in the closed block is the most efficient way to distribute funds to the class).

### 3. Statements of Objectors

Objectors Robert A. Gould and Lawrence Kuczynski, were not present at the hearing. *Id.* at 32, 34.

#### a) Thomas Sterrett Bell and John J. Pentz, Jr.

Objectors Thomas Sterrett Bell and John J. Pentz, Jr. were heard through counsel. *See id.* at 21-32. Mr. Bell and Mr. Pentz's objection was made only in the instant action, not in the *Fiala* action. *Id.* at 23.

A possible conflict between Mr. Bell and Mr. Pentz was noted. *Id.* at 22. Counsel was

permitted to proceed for purposes of this argument only, based upon counsel's conclusion that no conflict existed that would prevent him from representing both Mr. Bell and Mr. Pentz. *Id.* at 22-23.

It was argued that the proposed Settlement was insufficient for all class members, in light of the class's potential recovery at trial. In particular, with respect to class members who are not current policyholders, recovery in the form of the $2.5 million *cy pres* payment was said to be inadequate. *See id.* at 23-24.

### b) Steven Waldman

Objector Steven Waldman was heard through counsel. *See id.* at 32-34. Mr. Waldman's objection was made in both the instant action and the *Fiala* action. *Id.* at 32.

Counsel for Mr. Waldman stated that MetLife's written submission in response to his objection had "in effect" made changes to the settlement. *Id.* at 33. It was argued that "[a]s a result of the objection, MetLife has come forward and said things they probably otherwise would not have said which they probably didn't want to say and this settlement has been improved based on this objection." *Id.*

The objection was said no longer to be necessary. Counsel for Mr. Waldman withdrew his objection in both the *Fiala* action and, with permission of this court, the instant action. *Id.* at 33-34.

### c) Thomas Tierney

Non-attorney Thomas Tierney appeared and stated that he had been asked to speak by objector Christopher Mueller, who had been unable to obtain counsel. *Id.* at 34. Mr. Tierney

was requested to make a written submission on behalf of Mr. Mueller within ten business days. *Id.*

### 4. Statement of State Plaintiff Mark Smilow

Class member Mark Smilow appeared through counsel. *See id.* at 36-37. Mr. Smilow was not an objector, but he wished to be heard with respect to applications for incentive awards by named plaintiffs in the *Fiala* action. Mr. Smilow's counsel reserved argument until the February 9, 2009 hearing on applications for fees, expenses, and compensation. *Id.*

### 5. Continuance of Hearing

The December 30, 2009 fairness hearing was continued until February 9, 2009, in the Supreme Court, New York County, for argument on applications for attorneys' fees and expenses and other compensation. A deadline of February 5, 2009 was set for submission of any objections to applications for fees, expenses, or other compensation. *Id.* at 38. MetLife was ordered to issue a press release announcing continuance of the hearing and the schedule for objections and arguments. *Id.* at 39; *see also* Dec. 30, 2009 Mem. and Order of Hearing on Fees, Expenses, and Incentive Awards, Docket Entry No. 585.

### C. February 9, 2009 Hearing on Applications for Fees, Expenses, and Compensation

Argument on individual plaintiffs' compensation applications and counsel's applications for fees and expenses were heard on February 9, 2010 in a joint hearing before this court and the New York Supreme Court, in the New York State Courthouse at 60 Centre Street in Manhattan. Prior to the hearing written submissions were received.

The parties were represented at the hearing. Mark Smilow, a plaintiff in the state case,

was present with separate counsel. Also present was a representative of objector Steven Waldman.

Waldman's counsel and the parties were heard on Waldman's application for attorneys' fees. *See* Feb. 9, 2010 Hr'g Tr. at 4-7. Class counsel's applications for fees and expenses were addressed by the parties. *Id.* at 7-9. Mr. Smilow and the parties were heard on individual plaintiffs' applications for compensation. *Id.* at 9-24. No other person requested to be heard on these or any other subject. The parties were directed to submit to the state and federal courts an agreed upon short form judgment incorporating the payment decisions described in the present document. *See id.* at 24-32; *see also* Part VII, *infra*.

## IV. Law and Application of Law to Facts

The Federal Rules of Civil Procedure require a court that has certified a class to approve any proposed settlement as "fair, reasonable, and adequate." Rule 23(e) provides:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> > (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
> >
> > (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
> >
> > (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
> >
> > (2) The parties seeking approval of a settlement, voluntary

49

dismissal, or compromise under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

(3) In an action previously certified as a class action under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(4)(A) Any class member may object to a proposed settlement, voluntary dismissal, or compromise that requires court approval under Rule 23(e)(1)(A).

(B) An objection made under Rule 23(e)(4)(A) may be withdrawn only with the court's approval.

Pursuant to Rule 23(e), reasonable notice was given to class members, informing them of the proposed Settlement and their right to object. Evidentiary hearings were held to consider the fairness of the proposed Settlement and related applications. Class members who objected to the proposed Settlement made written submissions. Objectors were provided the opportunity to be heard at the December 30, 2009 fairness hearing, and several objectors were heard through counsel. This court and the *Fiala* court jointly received and fully considered extensive evidence on the merits of the proposed Settlement and related applications.

Based upon consideration of that evidence and of the extensive records in this case and the *Fiala* case, the proposed Settlement is found to be fair, adequate, and reasonable. The settlement is approved in this case, subject to the New York Supreme Court's concurrent approval of the settlement in the *Fiala* state action.

**A.     Standard of Review**

The federal court must determine that the settlement is "fair, reasonable, and adequate" before it may approve it.  Fed. R. Civ. P. 23(e)(2); *see McReynolds v. Richards-Cantave*, 588 F.3d 790, 803 (2d Cir. 2009).  "Whether to approve a settlement normally rests in the discretion of a district judge."  *Denney v. Deutsche Bank AG*, 443 F.3d 253, 273 (2d Cir. 2006); *see also McReynolds*, 588 F.3d at 800 ("A district court's determination that a settlement in a class action lawsuit is 'fair, reasonable, and adequate,' . . . is reviewed for abuse of discretion.").

In its exercise of that discretion, the court must engage in careful balancing.  "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."  *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds*, *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).

> It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement . . . . Such procedure would emasculate the very purpose for which settlements are made.  The court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable.

*Id.* (original ellipsis; quoting *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971)); *see also In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) (quoting *Grinnell*); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 361 (S.D.N.Y. 2002) (quoting *Grinnell*).

In making its fairness determination, the Court should consider both the process by which

the settlement agreement was negotiated and the substantive fairness of the agreed-upon terms in light of the circumstances of the litigation. *See, e.g., McReynolds*, 588 F.3d at 803-04; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85-86 (2d Cir. 2001); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 264-68 (E.D.N.Y. 2009). "[G]reat weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 576 (S.D.N.Y. 2008) (internal quotation marks omitted).

There is a "strong judicial policy in favor of settlements, particularly in the class action context." *McReynolds*, 588 F.3d at 803; *see also In re PaineWebber Ltd. P'ships Litig*, 147 F.3d 132, 138 (2d Cir. 1998) (same); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 337 (S.D.N.Y. 2005) ("[P]ublic policy favors settlement, especially in the case of class actions." (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)). "[C]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2008 WL 2944620, at *3 (S.D.N.Y. July 31, 2008) (quoting *In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. at 310).

Approval of a class action settlement under New York law similarly requires a determination of whether the proposed Settlement is "fair, reasonable, and adequate." *Klein v. Robert's Am. Gourmet Food, Inc.*, 28 A.D.3d 63, 70 (N.Y. App. Div. 2006) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)); *see also Colt Indus. Shareholder Litig. v. Colt Industries, Inc.*, 566 N.E.2d 1160, 1167 (N.Y. 1991); N.Y. C.P.L.R. 908 (requiring court approval but not specifying a standard).

### B. Presumption of Fairness

There is "a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement is reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *McReynolds*, 588 F.3d at 803 (internal quotation marks and alteration omitted); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (same); *see also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d at 576 ("[A] strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among able counsel.").

The lengthy history of this hard-fought litigation justifies a presumption of fairness. "[T]here could not be any better evidence of procedural integrity than the aggressive litigation spanning nearly a decade and the impassioned settlement negotiations that produced an agreement on the brink of trial, . . . collusion or coercion could not conceivably have tainted the process." *Wal-Mart Stores*, 396 F.3d at 117 (internal quotation marks and alteration omitted).

As detailed above, over the course of this decade-old case, the parties have engaged in comprehensive discovery and motion practice, before both trial and appellate courts. *See* Parts II.E-G, *supra*. Experienced, highly-qualified counsel have represented both parties. The quality of counsel's work has been outstanding. After repeated efforts to negotiate a settlement at various stages in the litigation, Special Master Richard Davis, a prominent law firm partner and mediator, guided the parties through extensive arm's-length discussions on the eve of trial that culminated in the proposed Settlement. *See* Part II.H, *supra*.

There is no indication of any collusion. The proposed Settlement leaves the amount of

attorneys' fees to the discretion of the federal and state courts. It provides that "[a]n award of attorneys' fees or litigation expenses is not a necessary term of this Stipulation of Settlement and is not a condition of settlement." Settlement ¶ 16(b). "[B]ecause class counsel left the issue of attorney's fees to the discretion of the District Court, there was no indication that the Settlement was the product of bad faith or collusion." *McReynolds*, 588 F.3d at 804 (internal quotation marks omitted).

The presumption of fairness is particularly strong in the present case because the Superintendent of Insurance supervised and approved the procedures for demutualization used by MetLife. In an analogous case, the Securities and Exchange Commission supported a corporation's omission of information in registration and prospectus statements. The Commission "opined" that the law did not require "defendants to disclose the information that plaintiffs allege was omitted." The Court of Appeals for the Second Circuit held that "the Commission's position . . . is entitled to judicial deference [and is] persuasive." *See In re Morgan Stanley Information Fund Sec. Litig.*, --- F.3d ----, No. 09-0837-cv, 2010 WL 252294, at *1 (2d. Cir. Jan. 25, 2010).

Based on extensive discussions with the parties, Special Settlement Master Davis, a skilled neutral, recommended approval of the settlement as fair and reasonable. *See* Nov. 4, 2009 Order at 5 (*In re MetLife Demut. Litig.*, 262 F.R.D. at 208).

### C.    Criteria for Approval of Settlement

The factors to be considered by a district court in making a Rule 23(e) fairness determination are:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks
> of establishing liability; (5) the risks of establishing damages; (6)
> the risks of maintaining the class action through trial; (7) the
> ability of the defendant to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery;   and (9) the range of reasonableness of the
> settlement fund to a possible recovery in light of all the attendant
> risks of litigation.

*Grinnell*, 495 F.2d at 463 (citations omitted); *see also McReynolds*, 588 F.3d at 804; *In re*

*Currency Conversion Fee Antitrust Litig.* --- F.R.D. ----, MDL No. 1409, No. M 21-95, 2009 WL

3415155, at *11 (S.D.N.Y. Oct. 22, 2009).  In applying these factors, "not every factor must

weigh in favor of the settlement, but rather the court should consider the totality of these factors

in light of the particular circumstances." *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d at 575

(internal quotation marks omitted).

Even setting aside the presumption of fairness that applies in this case, *see* Part IV.B,

*supra*, the facts and law strongly support a finding that the proposed Settlement is fair,

reasonable, and adequate in all respects.

### 1.      Complexity, Expense, and Likely Duration of Litigation

The complexity, expense, and likely duration of the litigation favor the proposed

Settlement.

This case involves complex legal and factual issues.  This complexity is reflected in the

many fully-briefed motions argued in the District Court and the Court of Appeals for the Second

Circuit in the nine years since the original complaint was filed.  *See e.g.*, *In re MetLife*

*Demutualization Litig.*, 156 F. Supp. 2d. 254 (E.D.N.Y. 2001) (denying MetLife's motion to dismiss); *In re MetLife Demutualization Litig.*, 322 F. Supp. 2d. 267 (E.D.N.Y. 2004) (denying MetLife's second motion to dismiss); *In re MetLife Demutualization Litig.*, 229 F.R.D. 369 (E.D.N.Y. 2005) (certifying plaintiff class), *pet. for interlocutory appeal denied* No. 05-8020 (2d Cir. Mar. 29, 2009); *In re MetLife Demutualization Litig.*, 624 F. Supp. 2d 232 (E.D.N.Y. 2009) (denying cross-motions for partial summary judgment); Order Regarding Motions In Limine, *In Re MetLife Demutualization Litig.*, No. 00-cv-2258 (E.D.N.Y. Oct. 30, 2009) (Docket Entry No. 537).

Were it not for the settlement, the case would have continued to be fiercely contested. MetLife has demonstrated a commitment to defend the case through and beyond trial, if necessary. The liability phase of trial was projected to last several weeks and would have occupied many attorneys for each party. The parties' witness lists contemplated potential testimony from nearly forty witnesses, including four experts, and over sixty thousand pages of documents had been designated as trial exhibits. *See* Micarelli Aff. ¶ 5. The proof on many disputed issues—which involve complex financial concepts—would likely have included a battle of experts, leaving the trier of fact with difficult questions to resolve. *See* Oct. 15, 2009 Order at 3 (stating court was disinclined to grant parties' *Daubert* motions to exclude expert testimony).

In the event that the plaintiffs prevailed in the liability phase, a damages phase of the trial would then follow. *See* Oct. 15, 2009 Order (bifurcating trial into liability and damages phases). Regardless of the outcome at trial, post-trial motions and an appeal by the losing party were likely, possibly followed by a new trial in the event of a reversal. *See In re Crazy Eddie Sec.*

*Litig.*, 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (detailing risks of further litigation and delay in absence of settlement). "[V]ictory—even at the trial stage—is not a guarantee of ultimate success." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993) (noting that likelihood of appeals and resultant delay favored settlement). The litigation would have been likely to continue for many more years. There was a serious risk of no recovery for the classes and an insubstantial risk of billions in damages for defendants.

The *Fiala* state case presents similar complexities. *See* Part II, *supra* (citing decisions on significant motions over the course of the case). As in the federal case, expensive litigation would have been likely to drag on for an extended period. MetLife's summary judgment motion was pending. Regardless of the outcome of that motion, an appeal, either interlocutory or otherwise, was likely. If summary judgment were denied, there would then be a trial, perhaps comparable to the federal trial in length and complexity. There would then be a likely appeal, possibly followed by a new trial or trials.

The proposed Settlement provides an immediate and certain benefit to members of the classes. Avoided are the substantial burdens and costs that continued and uncertain litigation would impose on the parties, non-party witnesses, and the courts. Delay at the trial stage and through post-trial motions and the appellate process might have forced class members to wait years longer for any recovery. This would have increased the fees and expenses of plaintiffs' counsel and reduced the value of any award to the class. Settlement of this action before significant additional resources have been expended benefits the class. Class members will receive compensation now rather than rely on an uncertain recovery of an unknown sum at some

point in the future.

The possibility of an adverse result to defendant was minimal.  But the overhanging possibility of a huge award could not be ignored by responsible persons.  And the cost of the litigation and lost time of executives of MetLife would likely be no less than the cost of the settlement.

## 2.    Favorable Reaction of Class

The reaction of the class members favors the proposed Settlement.

"It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.  In fact, the lack of objections may well evidence the fairness of the Settlement." *Maley v. Del Global Techs. Corp.*, 186 F. Supp. at 362 (citations and internal quotation marks omitted); *see also In re Am. Bank Note Holographics*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001) (same).

This proposed Settlement has been well received by the class:  Five objections to the proposed Settlement were submitted by six of the approximately 11 million members of the federal and state classes—a rate of objection of well below .000001%.  This ratio of objectors compares favorably with settlements approved in other class actions.  *See, e.g., Wal-Mart Stores*, 396 F.3d at 118 (settlement is fair where "[o]nly eighteen class members out of five million objected to the Settlement"); *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 WL 1956267, at *6 (S.D.N.Y. May 1, 2008) ("Of approximately 175,000 class members, only 22 (0.0126%) have chosen to opt out of the class, and only 45 have voiced objections.  The small number of opt-outs and objections relative to the size of the class

in this case supports approval of the Settlement."); *In re AOL Time Warner ERISA Litig.*, No. 02

Civ. 8853, 2006 WL 2789862, at *6 (S.D.N.Y. Sept. 27, 2006) (settlement warrants approval

where, of a putative class of approximately 65,000 members, "the Court received only two

objections, and only one directed at the nature of the Settlement or the Class"); *In re Am. Bank*

*Note Holographics*, 127 F. Supp. 2d at 425 (settlement warrants approval where there were no

objections and five shareholders sought exclusion out of a class of more than 5,000 members).

Objections to the proposed Settlement were addressed in briefs submitted by the parties.

In light of the parties' responses, one of the five objections was withdrawn at the December 30,

2009 fairness hearing. *See* Part III.B.3.b, *supra*. The substance of class members' objections is

addressed below. *See* Part IV.F, *infra*.

### 3.      Stage of Proceedings and Amount of Discovery Completed

The stage of the proceedings and the amount of discovery favor the proposed Settlement.

"This factor relates to whether the plaintiffs had sufficient information on the merits of

the case to enter into a settlement, and whether the Court has sufficient information to evaluate

such a settlement." *Parker v. Time Warner Entertainment Co., L.P.*, 631 F.Supp.2d 242, 259

(E.D.N.Y. 2009) (citation omitted). "If all discovery has been completed and the case is ready to

go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement."

*Wal-Mart Stores*, 396 F.3d at 118 (internal quotation marks omitted; quoting 4 Alba Conte &

Herbert B. Newberg, *Newberg on Class Actions* § 11:45, at 129 (4th ed. 2002)). Extensive

discovery ensures that the parties have had access to sufficient material to evaluate their case and

to assess the adequacy of the settlement proposal in light of the strengths and weaknesses of their

positions. *See Parker*, 631 F. Supp. 2d at 259.

The parties were at an advanced stage in the case, and fully prepared for trial. They were able to make an informed decision on the merits of the Settlement. Defense and class counsel have "had sufficient information to act intelligently." *In re PaineWebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997). The court has sufficient evidence to determine the adequacy of the Settlement.

After over nine years of litigation, the parties agreed to the proposed Settlement just as trial in the federal case was beginning, and when summary judgment after close of discovery in the *Fiala* state case was pending. The parties engaged in thorough and exhaustive discovery. Plaintiffs took over 50 depositions and obtained hundreds of thousands of pages of documents in discovery. *See* Part II.G, *supra*. Both plaintiffs and defendants retained experts who reviewed and opined on the merits of the case. *Id.* The parties briefed and argued a motion to dismiss, motions for summary judgment, a motion for class certification, and others. *See* Part II, *supra* (citing trial and appellate court decisions on parties' motions).

Critical evidentiary rulings on the parties' motions in limine in the weeks before trial in this action served to clarify the parties' relative likelihood of success. *See, e.g.,* Oct. 15, 2009 Order. After extensive briefing and argument, the Superintendent's Order approving the Plan of demutualization was ruled admissible as non-hearsay evidence of MetLife's scienter—a critical factual issue. *See* Nov. 24, 2009 Mem. and Order on Admissibility of New York Insurance Superintendent's Opinion, Docket Entry No. 555 ("Nov. 24, 2009 Order"). It was determined that the information MetLife was supplied by the Superintendent and his advisors, and

transmitted to potential voters, was central to the defendants' state of mind. *Id.* at 4. "This evidentiary ruling favoring defendants [made] it almost impossible for plaintiffs to prove their case." *Id.*

> ### 4. Risks of Establishing Liability and Risks of Establishing Damages

The risks of establishing liability and risks of establishing damages favor the proposed Settlement. The risk that plaintiffs would fail to establish liability or damages was high.

"The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *American Medical Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800, 2009 WL 4403185, at *4 (S.D.N.Y. Dec. 1, 2009) (quoting *Grinnell*, 495 F.2d at 455). In making this evaluation, "the Court's primary concern is with the substantive terms of the settlement and how they compare to the likely result of a trial." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455 (S.D.N.Y. 2004) (internal quotation marks omitted).

> The essence of a settlement agreement is compromise, "a yielding of absolutes and an abandoning of highest hopes." *United States v. N. Y. City Bd. of Educ.*, 85 F. Supp. 2d 130, 157 (E.D.N.Y. 2000) (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972)). Each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory. *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (citing *United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S. Ct. 1752, 1757 (1971); *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d 416, 429 (7th Cir. 1977); and *United States v. Jackson*, 519 F.2d 1147, 1152 (5th Cir. 1975)).

*In re Luxottica Group S.p.A. Sec. Litig.*, 233 F.R.D. at 316. "The fact that the class potentially

could have achieved a greater recovery at trial is not dispositive and does not preclude the court from finding that the settlement is within a 'range of reasonableness' that is appropriate for approval." *Id.*

The apparent weakness of plaintiffs' claims in this action has been repeatedly noted. In denying MetLife's motion to dismiss the original complaint, Judge Platt observed that the only remedy available under section 12(a)(2) of the Securities Act for plaintiffs who retained their stock was rescission in exchange for the purchase price. July 23, 2001 Mem. and Order, Docket Entry No. 34 (*In re MetLife Demut. Litig.*, 156 F. Supp. 2d 254, 269 (E.D.N.Y. 2001)). This could result in no damages to most of the class because the stock price rose above what plaintiffs said their interests had been worth. In denying summary judgment, Judge Platt stated that MetLife had "strong factual support for its argument that it conducted its demutualization properly," and that plaintiffs' "theories appear increasingly desperate in light of the factual record accumulated so far." May 27, 2009 Mem. and Order 52, Docket Entry No. 386 (*In re MetLife Demut. Litig.*, 624 F. Supp. 2d 232, 264 (E.D.N.Y. 2009)). It was noted that "[i]t appears that the demutualization process has been an overall boon to policyholders, at least insofar as those who took stock have seen the price of the stock rise appreciably and have also kept the benefits of their life insurance policies." *Id.* at 53 (624 F. Supp. 2d at 264).

Shortly before trial, the court reiterated that that "[t]he defendants' evidence with respect to no fraud is very strong" and "[t]he defendants' view of no damages is very strong." Oct. 13, 2009 Hr'g Tr. at 13:14-16. The ruling that the Superintendent's Opinion's was admissible at trial made "it almost impossible for plaintiffs to prove their case." Nov. 24, 2009 Order at 4.

Had the parties not reached a settlement, the court would be obliged to revisit the prior ruling denying MetLife's motion for summary judgment in light of the decision on admissibility of the Superintendent's Opinion.

a)       **Difficulty of Establishing Material Misrepresentation or Omission**

Available to MetLife at trial were several strong defenses to plaintiffs' allegations of material misrepresentations or omissions.

*First*, plaintiffs alleged that the demutualization documents "misled policyholders regarding the value of the variable component of policyholder consideration in relation to the estimated value of policyholders' contribution to surplus, specifically, by omitting the fact that MetLife had calculated policyholders' contribution to surplus at over $15 billion, while the value of the stock distributed to policyholders was less than $10 billion." Dec. 22, 2009 Mem. in Supp. of Final Approval of Settlement and Plan of Allocation of Settlement Proceeds at 7-8, Docket Entry No. 560 ("Fed. Pl. Mem."); *see also* Am. Compl. ¶¶ 55-56.

Defendants proposed to argue that the "contribution to surplus" number was not a fund held by the company, but an actuarial estimate of the past and expected future profit that the company would earn from policies under certain assumptions. *See* MetLife Mem. at 17; *see also* Plan § 7.2. The figure is said not to have been used for the purpose of valuing the company, the company's stock, or the dollar value of any particular policyholder's consideration. MetLife Mem. at 17 (citing Actuarial Standards Board, Actuarial Standard of Practice No. 37, *Allocation of Policyholder Consideration in Mutual Life Insurance Company Demutualizations* § 3.2.4

(June 2000), *available at* http://www.actuarialstandardsboard.org/pdf/asops/asop037_070.pdf (last accessed Dec. 28, 2009)). MetLife could also have argued that under no law, either state or federal, and in no transaction, has a demutualizing company been required to distribute to policyholders the full value of the contribution to surplus. *See* Fed. Pl. Mem. at 10.

Plaintiffs' theory was undermined by the court's finding that, as a matter of law, policyholders "were not 'owners' of the mutual insurance company." Oct. 15, 2009 Order at 2; *see also Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 177 (2d Cir. 2009) ("'[I]n a mutual company . . . the relation between the policy-holder and the company [is] one of contract, measured by the terms of the policy.'" (quoting *Uhlman v. N.Y. Life Ins. Co.,* 17 N.E. 363, 365 (1888)).

Plaintiffs would have faced substantial difficulty in showing that the alleged misrepresentations or omissions relating to the "contribution to surplus" calculation were misleading or material to policyholders' vote on the demutualization. *See, e.g., Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." (internal quotation marks omitted)).

*Second*, plaintiffs alleged that the demutualization documents "misled policyholders as to why MetLife chose one method of demutualization as opposed to another available method by suggesting that the chosen method was the most appropriate option, without revealing that the method not chosen would have resulted in greater consideration for policyholders." Fed. Pl. Mem. at 7; *see also* Am. Compl. ¶¶ 56(g).

The court's decision denying summary judgment pointed out that "[t]here is clearly no absolute requirement to disclose any business plan considered alongside the disclosed plan, particularly where the facts show that consideration of the alternative plan was quickly discarded." May 27, 2009 Mem. and Order at 63, Docket Entry No. 386 (*In re MetLife Demut. Litig.*, 624 F. Supp. 2d at 270). Plaintiffs "ha[d] not established that MetLife's real reason for not pursing Method 2 was a desire to reduce the amount of equity in the IPO." *Id.* "MetLife [had] provide[d] convincing evidence that Method 2 would not have worked and would have been untenable for a variety of reasons." *Id.*

*Third*, plaintiffs alleged that the demutualization documents "misled policyholders regarding the calculation of the fixed component of policyholder consideration by suggesting that the determination of 10 shares as the fixed component was based on actuarial concepts and standards of practice rather than an arbitrary rule of thumb." Fed. Pl. Mem. at 8; *see also* Am. Compl. ¶¶ 55-56.

MetLife was prepared to persuasively argue that nothing in the Policyholder Packets mailed to policyholders suggested that the fixed component was based on an actuarial formula. *See* MetLife Mem. at 19. The Policyholder Packet stated only that the fixed component was equal to 10 shares per policyholder, *see* Plan § 7.1(b)(i), and that statement is said to have been accurate and complete. Thus, it was contended that plaintiffs could not prove a material misrepresentation or omission. In its decision on summary judgment the court declared that plaintiffs' position that "the fixed component created a windfall to non-participating policyholders" is "unsupported by any facts." May 27, 2009 Order at 53 (*In re MetLife Demut.*

*Litig.,* 624 F. Supp. 2d at 264).

*Fourth,* plaintiffs alleged that the demutualization documents "misled policyholders by claiming that future dividends would not be diminished in any way, without disclosing that the Closed Block constituted a limitation on the dividends that would be paid." Fed. Pl. Mem. at 8; *see also* Am. Compl. ¶¶ 55(j), 56(b)-(c).

The Policyholder Information Booklet informed policyholders that (i) the assets allocated to the closed block were expected to maintain the 1999 dividend scales; and (ii) if the assets in the closed block perform better than expected, the dividends paid would be more, and conversely, if the assets return less than expected, the dividends paid would be lower. Policyholder Packet, Docket Entry No. 530-13 at 19. The closed block is properly argued by MetLife to be consistent with the requirements of New York law. MetLife Mem. at 20 (citing N.Y. Ins. Law § 7312(d)(5)). The Superintendent's actuarial consultant found that the closed block was adequately funded for these purposes. Sup. Opinion ¶ 161. Nothing in the Plan prevented MetLife from exercising its discretion to pay dividends on closed block policies from outside the closed block, and dividends are not limited to the assets in the closed block. *See* MetLife Mem. at 21 (citing Plan Art. VIII).

### b) Difficulty of Establishing Intent to Deceive

To succeed on their Rule 10b-5 claims plaintiffs must prove that MetLife acted with intent to deceive. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). MetLife has marshaled strong evidence that it believed the challenged disclosures were complete and accurate, and that deceptive intent was

lacking.

MetLife developed the Plan of Reorganization and the Policyholder Information Booklet under the intense scrutiny of the Department of Insurance, which provided the necessary approval only after reviewing and commenting on virtually every aspect of the transaction, including several revisions of the Policyholder Information Booklet and other materials sent to policyholders. *See generally* Nov. 24, 2009 Order (detailing the Insurance Department's pivotal role in the demutualization). In its review, the Insurance Department was assisted by a number of experienced professionals—including actuaries, financial advisors, accountants, and attorneys. *See* Sup. Opinion ¶¶ 16-17. In approving the demutualization, the Superintendent not only found that the Plan of Reorganization was "fair and equitable to policyholders," *id.* ¶ 238, but explicitly found that the Policyholder Information Booklet "contained sufficient information about the proposed reorganization to enable the Eligible Policyholders to make an informed decision regarding the Plan and, for that reason, [was] approved by the Superintendent," *id.* ¶ 216. MetLife could have argued at trial that its Board and management relied on the Superintendent's review and expertise in assuring themselves that the demutualization was being conducted properly.

### c) Difficulty of Proving Injury to Class Members

For the plaintiffs' Rule 10b-5 claim—and arguably for the *Fiala* state plaintiffs' Section 7312 claim—the measure of damages is out-of-pocket loss. *See, e.g., GVA Market Neutral Master Ltd. v. Veras Capital Partners Offshore Fund, Ltd.*, 580 F.Supp.2d 321, 333 (S.D.N.Y. 2008) (Rule 10b-5 damages) (citing *Panos v. Island Gem Enters. Ltd.*, 880 F. Supp. 169, 176

(S.D.N.Y. 1995)); *see also, e.g., Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996) ("In an action to recover damages for fraud . . . [t]he true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule.") (internal quotation marks omitted).

For plaintiffs' claim under section 12(a)(2), *see* 15 U.S.C. § 77*l*(a)(2), the remedy is limited to rescission, meaning that class members would be entitled to surrender their stock (or the sale price, if they sold it) and recover what they paid for it, adjusted for interest and dividends. 15 U.S.C. § 77*l*(a); July 23, 2001 Mem. and Order, Docket Entry No. 34 (*In re MetLife Demut. Litig.*, 156 F. Supp. 2d at 269). On plaintiffs' own view, the value of their membership interests was no more than $25.54 per share—and the stock is now trading above $34. Stockholder dividends have been paid in the meantime, and at one time the stock was trading as high as $70. *See* Part II.D, *supra*. The evidence suggests that the demutualization was a benefit, not a detriment, to policyholders. *See* May 27, 2009 Mem. and Order 53, Docket Entry No. 386 (*In re MetLife Demut. Litig.*, 624 F. Supp. 2d at 264) ("[I]t also appears that the demutualization process has been an overall boon to policyholders[.]").

Because the MetLife stock appreciated in value, the rescission remedy would appear to have no value for class members who chose to retain the stock or who sold when the market was up. Plaintiffs also faced significant difficulties in proving their valuation of membership interests in the mutual insurance company since MetLife argued that such interests are essentially worthless. *See* MetLife Mem. at 25-26 & n.5 (citing *Soc'y for Savs v. Bowers*, 349 U.S. 143, 150 (1955); *Tancredi v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 80, 87 (S.D.N.Y. 2001);

*Grobe v. Erie County Mut. Ins. Co.*, 39 A.D. 183, 186, (N.Y. App. Div. 1899), *aff'd on op. below*, 62 N.E. 1096 (1902)).

Proof is lacking to support a theory that dividends were reduced as a result of the closed block, or that any plan to repurchase shares harmed class members. *See, e.g., Shah v. Metro. Life Ins. Co.*, Index Nos. 108887/00, 601181/00, 2003 WL 728869, at *16 (N.Y. Sup. Ct. Feb. 21, 2003) (Cahn, J.) ("Plaintiffs assert that, following the announcement of the share repurchase in June 2000, the price of MetLife shares increased. Policyholders who held onto their shares presumably benefitted thereby.")

### d)    Other Defenses

MetLife has asserted other defenses to liability and damages, set out at length in its motions to dismiss and for summary judgment. *See* MetLife Mem. at 27. Some of those arguments were rejected by the court, but remain open to MetLife at trial, post-trial, and on appeal. Because a fairness determination on a class settlement is not meant to be an adjudication of the merits, it is not necessary to rehearse all of the defenses here. They might have posed additional risks to any recovery by the class. MetLife could have pursued these and other legal issues at trial, in post-trial motions, and on appeal. The risks and costs of establishing liability were enormous.

Even if plaintiffs had succeeded in establishing defendants' liability, a substantial dispute on the measure of damages would have remained. The damage assessments of plaintiffs' and defendant's trial experts varied substantially. In such a "battle of the experts," the jury could well have been swayed by defendants' experts, finding that the plaintiffs were entitled to little or

no recovery even if liability were established.  *See, e.g., PaineWebber*, 171 F.R.D. at 129 (noting unpredictability of outcome of battle of damage experts).

### e)  Difficulty of Proving Claims in State Action

For the reasons discussed above, the *Fiala* plaintiffs faced substantial difficulties in proving their remaining section 7312 claim based on an undisclosed stock buyback scheme. Difficulties of proving injury to class members similar to those in the instant case faced the state plaintiffs.  Strong defenses were available to MetLife that might have prevented the state plaintiffs from establishing necessary elements of their section 7312 claim.  *See, e.g.,* MetLife Mem. at 23-25.

### 5.  Risks of Maintaining Action Through Trial

The risks of maintaining the class action through trial favor the proposed Settlement.

In light of the difficulty plaintiffs faced in proving injury to class members, there appeared to be some doubt whether the class representatives sustained injury.  In the event named plaintiffs could show no injury, a conflict of interest could potentially arise between the class representatives and other class members who may have been injured, raising concerns about the ability of the class representatives to try the damages phase of the case, in the event that the liability phase terminated in favor of the class.  *See* Oct. 13, 2009 Hr'g Tr. at 4:19-5:18 (statement of the court).

Where initial certification is proper, "the claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims."  *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir.

70